FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

2011 MAR 17 P 4: 56

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **SODEXO, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Civil Action No.** 1:11CV276 |
| **SERVICE EMPLOYEES** | ) CMH/IDD |
| **INTERNATIONAL UNION; CHANGE TO** | ) |
| **WIN; SEIU LOCAL 32BJ; SEIU LOCAL** | ) |
| **615; SEIU LOCAL 1; WORKERS** | ) |
| **UNITED; SEIU-UNITED SERVICE** | ) |
| **WORKERS WEST; MICHAEL** | ) |
| **FISHMAN; MARY KAY HENRY; BRUCE** | ) |
| **RAYNOR; AUTUMN WEINTRAUB;** | ) |
| **THOMAS WOODRUFF,** | ) |
| **Defendants.** | ) |

## COMPLAINT FOR DAMAGES AND EQUITABLE RELIEF

## TABLE OF CONTENTS

Page

NATURE OF THE CLAIMS FOR RELIEF ........................................................................1

JURISDICTION AND VENUE ................................................................................13

PARTIES AND NON-PARTY PARTICIPANTS ...........................................................13

    I.    THE PLAINTIFF ...........................................................................................13

    II.    THE DEFENDANTS ......................................................................................14

    III.    NON-PARTY PARTICIPANTS .......................................................................19

RELEVANT TIME PERIOD ...................................................................................24

FACTS REGARDING DEFENDANTS' UNLAWFUL EXTORTION SCHEMES.............25

    I.    OVERVIEW OF THE UNION CORPORATE CAMPAIGN: DEFENDANTS'
        ILLICIT TACTICS FOR AVOIDING LAWFUL UNION ORGANIZING.........................25

        A.    Defendants' Common Goals and Objectives...........................................25

        B.    Defendants Use Extortionate Corporate Campaigns to
            Achieve Their Forced Unionization Objectives ....................................26

        C.    Defendant SEIU Has Devised Its Own Playbook for
            Smearing, Pressuring and Extorting Employers .....................................31

        D.    Engaging in Extortionate Corporate Campaigns is
            Defendants' Regular Way of Doing Business.........................................38

    II.    DEFENDANTS DEVISE THEIR UNLAWFUL SCHEME TO EXTORT SODEXO ...........40

        A.    Defendant SEIU's Plot to Monopolize Sodexo's Industry.....................40

        B.    Formation of the Sodexo Conspiracy.....................................................44

        C.    Defendants Have Substantial Motive to Extort Sodexo ........................49

    III.    DEFENDANTS' UNLAWFUL THREATS AND ATTACKS AGAINST SODEXO
        TO OBTAIN SODEXO'S PROPERTY................................................................51

        A.    Nature of Defendants' Actions ..............................................................51

**B.**    **Defendants Have Directly and Explicitly Attempted to Extort Sodexo on Multiple Occasions** .................................................56

    **1.**    **Defendants' Initial Threat to Launch their Extortionate Campaign** ...................................................56

    **2.**    **Defendants Make Additional Explicit Extortionate Demands During the Campaign** .......................................58

        **a.**    **The August 17, 2010 Face-to-Face Meeting in Virginia** .............................................................58

        **b.**    **The September 22, 2010 Face-to-Face Meeting** ................61

        **c.**    **The October 13, 2010 Phone Call** .......................................63

**C.**    **Defendants Publicly Announce the Commencement of the Clean Up Sodexo Campaign** .................................................64

**D.**    **Preparation and Use of Inflammatory and Misleading "Studies" and "Reports" With Which to Smear the Company** ..............................................................................................65

**E.**    **Direct Attacks on Sodexo's Business Relationships** .............................70

    **1.**    **Colleges and Universities** .........................................................71

        **a.**    **George Mason University** ....................................................71

        **b.**    **"Kick Out Sodexo"** ..............................................................74

        **c.**    **Other College & University Activities** ..............................77

    **2.**    **K-12 School Districts** .................................................................85

    **3.**    **Hospitals** ....................................................................................87

        **a.**    **City of Los Angeles Contract** .............................................87

        **b.**    **Harris County Hospital District** .........................................89

        **c.**    **Other Hospital Activities** ....................................................91

    **4.**    **Government Contracts** ...............................................................94

5.    Direct Attack on Sodexo's Corporate Headquarters ............ 101

6.    International Attacks ................................................................. 103

7.    Other Attacks ........................................................................... 106

F.    Defendants Have Caused Sodexo Significant Business Injuries ..................................................................................................... 111

EFFECT OF DEFENDANTS' CONDUCT ........................................................... 113

FIRST CLAIM FOR RELIEF (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)) Against Each of the Defendants ................................... 113

SECOND CLAIM FOR RELIEF (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)) Against Each of the Defendants .............................. 116

THIRD CLAIM FOR RELIEF (Violation of 18 U.S.C. § 1962(c)) Against Defendants Change to Win, the Local Union Defendants and Each of the Individual Defendants .................................................................................. 117

FOURTH CLAIM FOR RELIEF (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)) Against Defendants Change to Win, the Local Union Defendants and Each of the Individual Defendants ...................................... 119

FIFTH CLAIM FOR RELIEF (Violation of Va. Code Ann. § 18.2-499) Against Each of the Defendants ........................................................................................ 120

SIXTH CLAIM FOR RELIEF (Tortious Interference with Contractual and Economic Relations) Against Each of the Defendants .................................. 122

PRAYER FOR RELIEF ........................................................................................ 123

APPENDIX A: Other Victims of Defendants' Extortionate Corporate Campaigns .......... A-1

A.    Prime Healthcare Services ................................................... A-1

B.    Justice for Janitors .............................................................. A-6

1.    Somers Building Maintenance ................................. A-7

2.    Professional Janitorial Services ............................. A-10

3.    Executive Management Services ........................... A-14

C.    Beverly Enterprises ............................................................ A-19

D.   CVS/Caremark ...................................................................................... A-23

E.   Allied International Union ................................................................... A-27

F.   Sutter Health ........................................................................................ A-31

G.   Catholic Healthcare West .................................................................... A-33

## NATURE OF THE CLAIMS FOR RELIEF

1.     Plaintiff, Sodexo, Inc. ("Sodexo" or the "Company"), brings this action to vindicate its right to control and operate its business affairs free from Defendants' campaign of intimidation, threats, and other extortionate conduct.

2.     This case is not about traditional union organizing.   It is about a group of powerful labor organizations that have abandoned the traditional legal framework for organizing employees into unions, in favor of old-fashioned, strongarm tactics to get what they want.  Their methods, although wide-ranging and elaborate, are simple at their core.  Defendants have met face-to-face with Sodexo on multiple occasions.  They have told Sodexo that if it does not allow Defendants to unionize the Company's non-union workforce on terms dictated by Defendants, then they will destroy the Company.  To make good on these threats, Defendants have unleashed an avalanche of malicious attacks on every aspect of Sodexo's business affairs.  Through these attacks, Defendants seek to decimate the client and consumer relationships on which Sodexo depends for survival.  In essence, Defendants have pushed Sodexo to the edge of an economic cliff, and then offered to back off, but only if Sodexo "agrees" to Defendants' forced unionization demands.  Their efforts are alien to the notion of traditional union organizing.  They are classic extortion.

3.     Defendant Service Employees International Union ("SEIU" or the "Union") is a labor union representing employees in the service industries.  The remaining Defendants are SEIU local chapters, union officers, and the labor federation Change to Win, with whom SEIU is affiliated. Defendant SEIU is one of the most powerful unions in the United States. It is seeking constantly to expand its jurisdiction and power within organized labor and often pursues its growth objectives through aggressive and unconventional means.  Defendant SEIU's unlawful

attacks on Sodexo described herein are the latest chapter in the Union's effort to eliminate fair competition with other labor unions and to establish a stranglehold over the industry in which Sodexo does business.

4.     Sodexo is one of the largest providers of food, laundry, maintenance, janitorial, and facilities services in the United States.  The Company employs over 120,000 employees servicing almost 6,000 client sites across North America.  The majority of Sodexo's employees are hourly employees who work in entry-level foodservice positions.  Approximately 18,000 of Sodexo's hourly employees are currently represented by labor unions, and the Company maintains over 300 collective bargaining agreements.  Sodexo's rate of unionization is more than twice that of the private sector average, and the Company maintains positive labor relations with the majority of the unions that represent its employees.  However, more than 80,000 of Sodexo's hourly employees are not union members.  Unionizing some or all of these employees would generate millions of dollars in dues and other contributions for Defendant SEIU and the other institutional Defendants, and increased stature, influence, and power for the individual Defendants.  It also would provide Defendant SEIU with substantial leverage in its quest for dominance over other unions in the industry in which Sodexo does business.

5.     For many years, Defendant SEIU took little interest in Sodexo's hourly workforce.  In the early part of the last decade, Defendant SEIU began to recognize that Sodexo and its competitors, despite traditionally being within the organizing jurisdiction of other labor unions, presented a tremendous opportunity for new membership and increased revenue.  In late 2005, around the time that Defendant SEIU and several other large unions disaffiliated from the AFL-CIO to form Defendant Change to Win, Defendant SEIU created a partnership with the UNITE HERE union to address its interest in Sodexo and its competitors.  UNITE HERE is an

entity that was created by a merger of the former HERE union, which draws a substantial portion of its membership from foodservice, and the former UNITE union. Defendant Bruce Raynor headed the merged UNITE HERE union. The partnership objective of Defendant SEIU and the newly merged UNITE HERE was to eliminate competition between themselves and their affiliated locals and to seek together to unionize the major employers doing business in Sodexo's industry.

6. The SEIU-UNITE HERE partnership did not result in the gains that Defendant SEIU had envisioned and did not last. By the end of 2008, their alliance was falling apart. The UNITE and HERE factions of UNITE HERE were at odds, which led Defendant Raynor to plot an exit from his union that would allow him to retain control over the assets he brought into the merger between UNITE and HERE. Andy Stern, then the International President of Defendant SEIU, invited Raynor to abandon UNITE HERE and affiliate with Defendant SEIU. Raynor accepted, bringing with him hundreds of millions of dollars in UNITE HERE assets and approximately 100,000 of UNITE HERE's dues-paying members. Together, Stern and Raynor devised a scheme to use the resources of Defendant Change to Win, as well as Defendant SEIU and its affiliated locals, to gain thousands of new dues paying members from the industry while shutting what was left of UNITE HERE out of the ability to organize employees in Sodexo's industry. Their plan centered on Defendants' execution of a series of forced unionization campaigns designed to bludgeon the three major employers in the industry, ARAMARK, Compass, and Sodexo, one-by-one, into allowing Defendant SEIU and its affiliated locals to unionize their employees to the exclusion of all competing labor unions. Sodexo was chosen as Defendants' first victim.

7.    In or around March of 2009, Defendants set their extortionate plan in motion. In carrying out their scheme, Defendants abandoned all legitimate efforts to compete fairly with other unions, to convince Sodexo employees of the benefits of union membership, or to allow Sodexo's employees to exercise their federal statutory rights to a secret-ballot election to determine whether they want to be represented by Defendant SEIU, by some other labor union, or by no union at all. Defendants instead embarked on a strategy aimed not at Sodexo's employees, but at Sodexo itself.    Specifically, Defendants conspired to extort Sodexo's "voluntary" recognition of Defendant SEIU and its affiliated locals--to the exclusion of all other competing labor organizations--as exclusive bargaining agents of as many of Sodexo's non-union employees as Defendant SEIU desires to unionize, by damaging the Company financially until it either acceded to Defendants' demands or was driven into economic ruin.

8.    Defendants have not pursued this strategy through traditional labor negotiations with Sodexo, or through employee organizing drives. Instead, they have sought to batter Sodexo into surrender through a relentless and vicious assault designed to smear Sodexo with countless public attacks, embarrass and intimidate the Company's managers and executives, and compel its current and prospective business partners to terminate their business affairs with the Company. Defendants have executed this assault through the use of a so-called "corporate campaign" they call "Clean Up Sodexo" ("Clean Up Sodexo Campaign" or the "Corporate Campaign"). The Clean Up Sodexo Campaign is not a traditional union organizing effort. Instead, it is a deliberate attempt to avoid altogether the federal legislative scheme for organizing employees into labor unions that has been in place for over seventy years. The Campaign is carefully crafted to appear as if it is the effort of Sodexo's employees and/or like minded workers' rights advocates. In reality, the Clean Up Sodexo concept is a façade created by Defendants in order to conceal their

true motives from public view.  The real objective of Defendants is to extort Sodexo into handing over its non-union workforce to Defendants without resorting to statutory procedures and to cause Sodexo to surrender to Defendants its property in the form of protected legal rights to which Defendants have no legal entitlement, or lawful claim. The upshot to Defendants is a guaranteed increase of new dues paying SEIU members, an influx of millions of dollars of Sodexo's money, and resulting increased leverage for Defendants SEIU and Raynor in their continuing battle with UNITE HERE.

9.    Defendants have developed and honed their corporate campaign tactics over many years.  In fact, Defendant SEIU has even written and published its own corporate campaign playbook, which describes in detail its preferred tactics for harassing, intimidating, smearing, and psychologically and financially punishing employers that are unwilling to yield to its extortionate demands.  Incredibly, this playbook openly acknowledges that their <u>corporate campaign tactics can constitute extortion or blackmail</u> and suggests creative strategies for diverting the blame for a union's malicious campaign attacks to third parties, including the target's employees themselves. It notes, "It may be **<u>a violation of blackmail and extortion laws</u>** to threaten management officials with release of 'dirt' about them if they don't settle a contract.  But there is no law against union members who are angry at their employer deciding to uncover and publicize factual information about individual managers." In attacking Sodexo as described herein, Defendants have followed Defendant SEIU's extortion playbook to the letter.

10.    Unlike the general public, Sodexo is well aware of the real objective of the Clean Up Sodexo Campaign.  That is because Defendants privately have threatened Sodexo explicitly with economic ruin in face-to-face meetings that took place in Arlington, Virginia in August 2010 and Washington, DC in September 2010.  In those meetings, Defendants Mike Fishman

and Autumn Weintraub, SEIU executives acting on behalf of all Defendants, told Sodexo executives, point-blank, that if Sodexo refused to allow Defendant SEIU and its affiliated locals to unionize as many of the Company's non-union employees as Defendant SEIU determined to be satisfactory, without resort to NLRB election procedures, then Defendants' Campaign of threats, intimidation, smears and other attacks would never stop.    Specifically, Defendant Fishman (1) threatened to use Defendants' Corporate Campaign "weapon[s]" to destroy Sodexo and promised that the only way that the Company could achieve "peace" in the future would be to give in to Defendants' demands; (2) stated openly that the reason for Defendants' Corporate Campaign was not "rocket science," and that "we will apply pressure wherever we can" to force Sodexo to capitulate; (3) claimed that Defendant SEIU would either "help" or "hurt" Sodexo with current and future business opportunities, depending on whether Sodexo acceded to Defendants' demands; (4) admitted that Defendants' Corporate Campaign was not about achieving a fair process for employees to choose unionization, but instead was about "how many employees you [Sodexo] are willing to unionize and how many we [SEIU] are willing to accept"; (5) promised to make the "echo chamber" around Sodexo's business practices created by Defendants' Corporate Campaign "go away" if, and only if, Sodexo agreed to Defendants' demands; and (6) told Sodexo's executives that if the Company continued to resist the Corporate Campaign, Defendants would "continue to fight" and would "go after [Sodexo's] clients." Defendant Fishman also admitted that Sodexo was not Defendants' only target and that they had commenced, or were planning to commence, extortion campaigns against Sodexo's industry competitors.

11.    In waging their extortionate Corporate Campaign and making good on Defendant Fishman's detailed threats to harm the Company, Defendants have swarmed Sodexo's existing

and potential business partners with physical and virtual disruptions, protests, and other actions, in order to compel them to terminate, or decline to enter, business relationships with Sodexo. In virtually all cases, Defendants have been total strangers to the colleges, hospitals, school districts, and political subdivisions to which they have addressed these illicit attacks. In other words, Defendants have no legitimate business reason to deal with these entities; instead, their reason for doing so is to carry out their extortionate efforts to cause Sodexo financial and business harm. One of the most egregious examples of this conduct is Defendants' conduct in George Mason University in Fairfax, Virginia, described in detail below.

12.    Defendants and their agents have engaged in a variety of other sinister tactics during the Corporate Campaign--some of which are themselves independently illegal--including, but by no means limited to, the following acts:

- Violating applicable lobbying laws to attempt to interfere with the outcome of bidding procedures for public contracts for which Sodexo was competing;

- Misrepresenting themselves as Sodexo employees and then trespassing on elementary school grounds, in order to bypass security and gain access to educational facilities attended by children, in knowing violation of local and state laws outlawing trespass under false pretenses;

- Intentionally engaging in raucous public disturbances directed against Sodexo and its business partners, that included disorderly conduct, obstruction of justice, and trespass, resulting in the arrest of Defendants and/or their agents in a number of places, including in Ohio and at Sodexo's corporate headquarters in Maryland;

- Hacking into and gaining unauthorized access to a Sodexo education website, in knowing violation of federal computer crime laws, and then embedding within the site a link to Defendants' own website, on which malicious and disparaging claims are made about Sodexo.

- Using false pretenses to infiltrate a prestigious medical conference catered by Sodexo and, once inside, throwing plastic roaches onto the food being served at the conference and engaging in a physical altercation with security guards;

- Threatening to injure Sodexo's reputation and property during interstate phone calls with a Sodexo representative, in reckless disregard of federal law and in violation of 18 U.S.C. § 875(d);

- Attempting to instill fear and disgust in hospital patients and their loved ones by passing out "patient surveys" asking--without a shred of factual justification--whether patients had encountered "bugs, rat droppings, mold or flies" in the food they were served by Sodexo employees, and tampering with food intended to be served to hospital patients, in an attempt to obtain "evidence" that Sodexo was serving unsanitary meals at hospitals;

- Attempting to cause alarm among Sodexo's clients and investors, as well as the public, regarding the cleanliness of its facilities by falsely claiming that the Company's food production plants have "rodent problems;" that Sodexo's unsanitary food preparation practices led to an infestation of "maggots" in a California hospital; and that Sodexo provided to hospital

clients laundered linens contaminated with the "remnants of someone else's hospital waste"; and

- Causing agents to make violent threats against Sodexo and its employees.

13.    To ensure that Sodexo is aware, and fears repetition of, their many harmful attacks, Defendants have gone to great lengths to publicize each Clean Up Sodexo Campaign event through traditional and social media.    Without exception, Defendants' press copy misleadingly portrays such events as the collective action of employees, students and others, as opposed to Defendants themselves.    In using the press and electronic media to draw attention to their attacks, Defendants' intention is to remind Sodexo that they are making good on Defendant Fishman's explicit threats to harm the Company and to convince Sodexo that each event will be followed by a similarly destructive attack unless the Company gives in.

14.    Defendants have sought to buttress their ground assault by smearing Sodexo with an unending stream of sensational and disparaging public allegations about Sodexo's business and human relations practices.    Defendants have publicly attacked Sodexo as a "racist" company with a "troubling" record regarding race relations; claimed that the Company's wages and benefit levels "feed poverty in the United States," force employees to seek public assistance, and deny employees access to affordable healthcare; alleged that Sodexo's food preparation facilities are unsanitary and dangerous; and accused the Company of being a "labor law violator" that intimidates and retaliates against employees for engaging in union activity

15.    In making these many sensational and negative public allegations, Defendants have intentionally ignored Sodexo's substantial record of accomplishments.    For example:

- Sodexo has been named the "Top Company in America for Diversity" by DiversityInc. Magazine in 2010 and has made the top 50 list every year

since 2004. Sodexo has also been named "One of 40 Best Companies for Diversity" by Black Enterprise Magazine in 2009 and 2010 and named to the "Top 60 Companies for Hispanics" by Hispanic Business Magazine every year since 2005.

- Sodexo offers highly competitive hourly wages and leads the food service industry in offering a full range of benefits to hourly employees, including having the most liberal benefits eligibility criteria in the industry. Sodexo's most popular healthcare plan costs approximately $25 a week.

- Sodexo was named one of the "Best Companies for Hourly Workers in 2010" by Working Mother, an award that takes into account factors such as overall workforce composition, benefits, training, development and advancement programs, child care, flexibility programs, and paid time off.

- Sodexo's food preparation facilities are some of the safest in the nation. In fact, each year over the past 10 years, roughly 99.5% of Sodexo's more than 5,000 U.S.-based facilities have gone without a Federal or State OSHA citation.

- As stated above, approximately 18,000 of Sodexo's hourly employees are union members. Sodexo is currently a party to almost 300 collective bargaining agreements with roughly 30 different labor unions, including Defendant SEIU. The Company maintains positive working relationships with the vast majority of the unions that represent its employees.

16.    Sodexo is not the only victim of Defendants' destructive tactics, as it is the first of many companies in its industry that Defendants intend to extort into forced unionization

arrangements to the exclusion of all other unions. Defendants hope that Sodexo's competitors will surrender without a fight once they have seen the beating that Sodexo has endured at the hands of Defendants. In addition, Defendants have waged extortionate corporate campaigns against a long list of other employers--and even unions--that stood in the way of their insatiable appetite for growth, power, and financial gain.

17.     Defendants' lengthy track record of bludgeoning other victims for new members and money, coupled with their malicious campaign against Sodexo and admitted plans to take over the remainder of Sodexo's industry, belies their contention that they are merely attempting to raise working standards, or to "shine a light" on Sodexo's allegedly unfavorable business practices. Defendants' own internal manual, conduct in this and past corporate campaigns, and direct and repeated explicit threats made to Sodexo's executives, amply demonstrate their true intent: to force Sodexo, at the point of an economic bayonet, to allow Defendant SEIU and its affiliates (to the exclusion of all other competing unions) to unionize as many of the Company's currently non-union employees as Defendant SEIU is willing to accept (regardless of the level of employee support for such representation), to pay to Defendants millions of dollars in dues and other payments, and to cede to Defendants substantial control over the Company's business affairs.

18.     Most disturbingly, there is no foreseeable end to Defendants' onslaught. Sodexo's non-union employees work in hundreds of different facilities throughout the United States. Thus, even if Sodexo were to give in to the Campaign tomorrow, the nature of Defendants' demands is such that the Company would be required to hand over to Defendants the money and property rights described above over and over again, and in countless Company locations, as Defendant SEIU and its affiliated locals proceed to unionize Sodexo's employees

facility by facility. All the while, Defendants' extortionate threats will hang like a dark cloud over the Company as it faces a Morton's Fork: to capitulate again and again to Defendants' standing demands, or face the wrath of Defendants' continued attacks.

19.    As explained in depth herein, forcing Sodexo to purchase Defendants' forbearance from engaging in such harmful conduct constitutes extortion under a variety of applicable state criminal laws. Defendants' actions have cost Sodexo millions of dollars in lost contracts and other business injuries, and the damage only stands to increase.

20.    This Complaint presents Sodexo's allegations in several parts. In Section I below, Sodexo summarizes Defendants' common growth objectives and describes how Defendants have developed and perfected corporate campaign techniques to extort employers into acceding to their unionization demands. In Section II, Sodexo summarizes the history of the failed partnership between Defendant SEIU and UNITE HERE that led to Defendants' scheme to monopolize Sodexo's industry, describes the formation of Defendants' conspiracy to extort Sodexo, and establishes their substantial financial motive to extort the Company. In Section III, Sodexo describes in detail Defendants' direct and repeated extortionate threats made during meetings and conversations with Sodexo executives, highlights the many unlawful actions Defendants have taken against Sodexo in furtherance of the Clean Up Sodexo Campaign, and describes the economic harm the Company has suffered as a result of Defendants' acts and threats. In Appendix A, Sodexo describes several of Defendants' malicious corporate campaigns waged against other employers, which demonstrates that Defendants' pursuit of their growth agenda through extortionate tactics is their regular way of conducting business.

21.    Accordingly, Sodexo brings this action for actual, threefold, and exemplary/punitive damages and injunctive relief pursuant to Pub.L.No. 91-452, codified in part at 18 U.S.C. § 1961 *et seq.*, as alleged below and as allowed by applicable law.

## JURISDICTION AND VENUE

22.    Plaintiff's claims for relief include alleged violations of Pub.L.No. 91-452, codified in part at 18 U.S.C. § 1961 *et seq.* (to wit: multiple, repeated, and continuous acts and/or threats involving extortion and attempted extortion that are chargeable under the laws of a variety of states, as alleged below). This Court has jurisdiction over the subject matter of this action pursuant to 18 U.S.C. § 1961 *et seq.*, 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1337 (commerce jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

23.    Personal jurisdiction and venue in this district are proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b) because, as alleged below: (i) certain of the Defendants are found in, have agents in, and/or transact their business and affairs in this district; (ii) a substantial part of the events or omissions giving rise to the claims for relief occurred in this district; and (iii) the ends of justice require that those of the Defendants residing outside this district be brought before the Court to answer for their conduct.

## PARTIES AND NON-PARTY PARTICIPANTS

### I.    THE PLAINTIFF

24.    Plaintiff, Sodexo, Inc., is a corporation organized under the laws of Delaware, with its principal place of business located at 9801 Washingtonian Blvd, Gaithersburg, MD, 20878. It is a subsidiary of Sodexo SA, a French-based multi-national organization that employs over 380,000 employees in 80 countries. Sodexo is the leading provider of integrated food and facilities management services in the United States, Canada and Mexico, serving over 10 million

customers in 6,000 locations every day and employing more than 120,000 employees in North America. Because of its sheer size, high corporate profile, enviable social and human relations record of accomplishment, and number of non-union employees, Sodexo is a prime target for Defendants' extortionate tactics.

## II.    THE DEFENDANTS

25.    Defendant SEIU is an unincorporated labor association with its principal place of business located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036. SEIU represents units of workers and attempts to negotiate terms and conditions of employment for the workers it represents. Currently, Defendant SEIU claims to represent over 2 million hourly workers across the United States. In exchange for fees in the form of union dues, which its local affiliates collect from member-workers and then pay to Defendant SEIU on a per capita basis, Defendant SEIU provides services related to the terms and conditions of employment as well as other products and services. Defendant SEIU exists to organize new members and to maintain existing members. It does not generate revenue, besides investment income, without its dues-paying members. Defendant SEIU is a chartered member of Defendant Change to Win, described below, and transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

26.    Defendant Change to Win ("CtW") is an unincorporated labor association with its principal place of business located at 1900 L Street N.W., Suite 900, Washington, DC 20036. CtW was created in or around September 2005. It consists of the following separate labor organizations: Defendant SEIU, International Brotherhood of Teamsters, United Food and Commercial Workers, and United Farm Workers of America, all of which disaffiliated from the American Federation of Labor and Congress of Industrial Organizations ("AFL-CIO") and joined CtW in 2005. The unions that compose CtW claim to represent approximately 5.5 million

-14-

members. In exchange for fees in the form of a per capita tax on the members of its affiliated labor organizations, Defendant CtW provides services, including strategic and tactical organizing advice and other business and financial advice and assistance, to each of its affiliates in an effort to increase union membership in the United States. Its primary governing body is a "Leadership Council" consisting of the principal officer of each affiliated labor organization. Other Executive Officers are a Chair and Secretary-Treasurer, which are both selected by the Leadership Council. In addition to these executive officers, Defendant CtW's organizational structure includes a Strategic Organizing Center and an Investment Group, which describes itself as an advisor to member unions' pension funds. Defendant CtW transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

27.     Defendant SEIU Local 32BJ ("Local 32BJ") is an unincorporated labor organization with its principal place of business located at 101 Avenue of the Americas, New York, NY, 10013. It also maintains an office located at 1916 Wilson Blvd., Suite 204, Arlington, VA, 22201. Defendant Local 32BJ represents units of workers and attempts to negotiate terms and conditions of employment for the workers it represents. With more than 120,000 members in eight states, including Virginia, the District of Columbia, and Maryland, Local 32BJ is one of the largest local unions representing property and food services workers in the United States. In exchange for fees in the form of union dues, which it collects from member-workers, Defendant Local 32BJ provides services related to the terms and conditions of employment as well as other products and services. Defendant Local 32BJ is affiliated with, but distinct from, Defendant SEIU. Defendant Local 32BJ transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

28.    Defendant SEIU Local 615 ("Local 615") is an unincorporated labor organization with its principal place of business located at 26 West Street, Boston, MA, 02111-1207. Defendant Local 615 represents units of workers and attempts to negotiate terms and conditions of employment for the workers it represents. Defendant Local 615 represents over 17,500 workers located in Massachusetts, New Hampshire and Rhode Island. In exchange for fees in the form of union dues, which it collects from member-workers, Defendant Local 615 provides services related to the terms and conditions of employment as well as other products and services. Defendant Local 615 is affiliated with, but distinct from, Defendant SEIU. Defendant Local 615 transacts business activities in interstate commerce and on a national scale, including in this judicial district.

29.    Defendant SEIU Local 1 ("Local 1") is an unincorporated labor organization with its principal place of business located at 111 E. Wacker Drive, Suite 2500, Chicago, IL, 60601. Defendant Local 1 represents units of workers and attempts to negotiate terms and conditions of employment for the workers it represents. Defendant Local 1 represents over 50,000 workers located in Illinois, Indiana, Michigan, Missouri, Ohio, Texas and Wisconsin. In exchange for fees in the form of union dues, which it collects from member-workers, Defendant Local 1 provides services related to the terms and conditions of employment as well as other products and services. Defendant Local 1 is affiliated with, but distinct from, Defendant SEIU. Defendant Local 1 transacts business activities in interstate commerce and on a national scale, including in this judicial district.

30.    Defendant Workers United is an unincorporated labor organization with its principal place of business located at 49 West 27th Street, 3rd Floor, New York, NY 10001. Workers United consists primarily of former members of the labor organization UNITE HERE.

Workers United was created in or around March 2009 when Defendant SEIU reached an agreement with Defendant Bruce Raynor (then General President of UNITE HERE) to facilitate the breakaway of over 100,000 UNITE HERE members to join Defendant SEIU's ranks. Defendant Raynor's breakaway group affiliated with Defendant SEIU under the name "Workers United." (*See* Ex. 1.) As described in more detail below, the split began a bitter feud between Defendant SEIU, on Defendant Raynor's behalf, and the remaining leadership within UNITE HERE. This feud drove Defendant SEIU's attempts to shut UNITE HERE out of representing workers of Sodexo and its competitors and was at least one contributing factor in Defendants' decision to commence the Clean Up Sodexo Campaign. Defendant Workers United represents units of workers and attempts to negotiate terms and conditions of employment for the workers it represents. Currently, it represents over 100,000 members in the textile, commercial laundry and gaming industries. In exchange for fees in the form of union dues, which its Joint Boards and affiliated locals collect from member-workers, Defendant Workers United provides services related to the terms and conditions of employment as well as other products and services. Defendant Workers United transacts business in interstate commerce and on a national and international scale, including in this judicial district.

31.    Defendant SEIU-United Service Workers West ("USWW") is an affiliation consisting of SEIU Local 1877, Security Officers United in Los Angeles ("SOULA") Local 2006, SEIU Local 24/7, SEIU Airport Workers United and SEIU Higher Education Workers United Local 2007. USWW was created in 2006 when the above described locals voted to merge into one "mega-local." It has a principal place of business located at 3411 East 12th Street, Suite 200, Oakland, CA, 94601 and another located at 828 W. Washington Blvd., Los Angeles, CA, 90015. Defendant USWW represents units of workers and attempts to negotiate

terms and conditions of employment for the workers it represents. Currently, it is one of the largest local unions representing property and food services workers in California. In exchange for fees in the form of union dues, which it collects from member-workers, Defendant USWW provides services related to the terms and conditions of employment as well as other products and services. Defendant USWW is affiliated with, but distinct from, Defendant SEIU. Defendant USWW transacts business activities in interstate commerce and on a national and international scale, including in this judicial district.

32.     From time to time herein, Defendants Local 32BJ, Local 615, Local 1, Workers United and USWW may be referred to collectively as the "Local Union Defendants."

33.     Defendant Michael Fishman is an individual capable of holding a beneficial interest in property. He is the President of Defendant SEIU Local 32BJ and a Vice President of Defendant SEIU. He maintains an office located at 101 Avenue of the Americas, New York, New York, 10013. Fishman transacts business on behalf of Defendants SEIU and SEIU Local 32BJ on a national and international scale, including in this judicial district.

34.     Defendant Mary Kay Henry is an individual capable of holding a beneficial interest in property. She is the International President of Defendant SEIU. She also is a member of Defendant CtW's Leadership Council. She maintains an office located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036 and another office located at 1900 L Street N.W., Suite 900, Washington, DC 20036. Henry transacts business on behalf of Defendant SEIU on a national and international scale, including in this judicial district.

35.     Defendant Bruce Raynor is an individual capable of holding a beneficial interest in property. He is an Executive Vice-President of Defendant SEIU. He also is the President of Defendant Workers United. Prior to joining SEIU, Raynor was General President of the UNITE

HERE labor organization. He also was a founding member of Defendant CtW's Leadership Council. He maintains an office located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036. Raynor transacts business on behalf of Defendant SEIU on a national and international scale, including in this judicial district.

36.     Defendant Autumn Weintraub is an individual capable of holding a beneficial interest in property. She is Defendant SEIU's Campaign Director. Upon information and belief, Weintraub reports directly to Defendant Thomas Woodruff, Executive Vice-President of Defendant SEIU and director of Defendant CtW's Organizing Center. She has an office located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036. Weintraub transacts business on behalf of Defendant SEIU on a national and international scale, including in this judicial district.

37.     Defendant Thomas Woodruff is an individual capable of holding a beneficial interest in property. He is an Executive Vice-President of Defendant SEIU. He also is the director of Defendant CtW's Strategic Organizing Center. He has an office located at 1900 L Street N.W., Suite 900, Washington, DC 20036 and another office located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036. Woodruff transacts business on behalf of Defendants SEIU and CtW on a national and international scale, including in this judicial district.

38.     From time to time herein, Defendants Fishman, Henry, Raynor, Weintraub and Woodruff may be referred to collectively as the "Individual Defendants."

## III.    NON-PARTY PARTICIPANTS

39.     Mitch Ackerman is an individual and is an Executive Vice-President of Defendant SEIU.

40.     Margarita Alonzo (Ortiz) is an individual and is a Campaign Coordinator for Defendant SEIU, as well as an Organizing Coordinator for Defendant Local 32BJ.

41.     Renee Asher is an individual and is Defendant SEIU's Assistant Director of Strategic Communications.

42.     Jan Bindas-Tenney is an individual and is employed by Defendant Local 32BJ.

43.     Kevin Brown is an individual and is Defendant Local 32BJ's New Jersey District Leader.

44.     Tom Balanoff is an individual and is the President of Defendant Local 1.

45.     Laurie Couch is an individual and is a Communication Specialist for Defendant Local 1.

46.     Adriana Fieldman is an individual and is the Central and Western Massachusetts Field Director for Defendant Local 615.

47.     Laura Flanders is an individual.    She is a media personality and frequent contributor to the television network, GRITtv.

48.     Laura Garza is an individual and is the Vice-President of Defendant Local 1.

49.     Josh Glasstetter is an individual and is a Media Campaign Manager employed by Defendant SEIU.

50.     Andrew Gross-Gaitan is an individual and is the Multi-Service Director for Defendant USWW.

51.     Austin Guest is an individual and is an organizer-in-training with Defendant SEIU. His linkedin.com profile notes that from September 2009 - March 2010 he "participated in [a] national campaign to organize global property services firm, Sodexo."    (*See* www.linkedin.com/in/austinguest).

52.     Amaya Henry is an individual and, upon information and belief, is employed by Defendant SEIU and/or Defendant Local 32BJ.

53.    David Huerta is an individual and is Vice President of Defendant USWW.

54.    Debbie Kline is an individual and is the Coordinator of Jobs With Justice's Cleveland, OH-based local coalition, called "Cleveland Jobs With Justice."

55.    Brad Levinson is an individual and is a Media Campaign Specialist employed by Defendant SEIU.

56.    Tom MacDermott is an individual and is employed by the Clarion Group, described more fully below.  MacDermott prepared for Defendants a highly misleading report about Sodexo's business practices called "Hard to Swallow: Do Private Food Service Contractors Shortchange New Jersey Schools?"

57.    Wayne MacManiman is an individual and is Mid-Atlantic District Director for Defendant Local 32BJ.

58.    Tony Maldonado is an individual and is a Lead Organizer for SEIU Local 1877, an affiliate of Defendant USWW.

59.    Marakah Mancini is an individual and is the Director of the SEIU front group Campaign for Quality Services, described in detail below.

60.    Gabe Morgan is an individual and is Western Pennsylvania Area Leader for Defendant Local 32BJ.

61.    Kevin O'Donnell is an individual and is employed by Defendant SEIU.

62.    Beverly Ortiz is an individual and is a coordinator for Defendant Local 1.

63.    Matt Painter is an individual and is the Assistant Communications Director of Defendant Local 32BJ.  He also serves as an agent of Defendant SEIU with respect to certain matters, including but not limited to Defendants' Corporate Campaign against Sodexo.

64.    Sasha Rogers is an individual and is employed by Defendant SEIU.

65.     Rocco Saienz is an individual and is the President of Defendant Local 615.

66.     Chris Schwartz is an individual and is employed by Defendant SEIU.

67.     Andrew L. Stern is an individual. Until in or around May 2010, he was International President of Defendant SEIU and was a member of Defendant CtW's Leadership Council, and had an office located at 1900 L Street N.W., Suite 900, Washington, DC 20036 and another office located at 1800 Massachusetts Avenue, N.W., Washington, DC 20036.

68.     Kate Thomas is an individual and is employed by Defendant SEIU.

69.     Ashley Wood is an individual and is employed by Defendant SEIU.

70.     Campaign For Quality Services is a "project" of Defendant SEIU, supposedly created to help "facilities management and food service workers form unions in order to ensure good jobs with healthcare and quality services for their communities." (*See* http://campaignforqualityservices.org/a/campaign-for-quality-services---faq.php.) It claims to advocate for issues such as good nutrition, healthy buildings and responsible use of taxpayer money. In reality, Campaign For Quality Services uses these issues as a pretext for leveling malicious allegations against Sodexo, in order to facilitate Defendants' extortionate campaign described herein.

71.     Clarion Group is a management services consulting group that specializes in hospitality and food service. It has an office located in Kingston, NH and a mailing address at P.O. Box 158, Kingston, NH 03848-0158. Clarion Group was commissioned by Defendants to prepare a highly misleading report regarding Sodexo entitled "Hard to Swallow: Do Private Food Service Contractors Shortchange New Jersey Schools?" and to prepare a disparaging analysis of Sodexo's contract performance at George Mason University.

-22-

72.    Jobs With Justice is a non-profit entity based in Washington, DC. It maintains a network of regional offices--called "local coalitions"--located throughout the United States. Jobs With Justice focuses its efforts on supporting the growth of organized labor through collective actions such as protests, boycotts, and the like. Jobs With Justice's national headquarters are located at 1325 Massachusetts Avenue N.W., Suite 200, Washington, DC 20005.

73.    No Border, also known as the "No Border Network," is a loose association of groups and individuals in Europe that exists principally to resist immigration control efforts by European immigration authorities. It has engaged in disruptive and aggressive activity in the past, including efforts in or around December 2007 to prevent UK Border Agency officials from conducting immigration raids by deploying coordinated human blockades in several UK cities and towns. No Border has been linked in the past with the use of "black bloc" tactics: wearing black clothing, scarves, ski masks, helmets and/or other face-concealing items, to avoid being identified and to appear as one large mass. These tactics gained notoriety outside of Europe during the 1999 anti-WTO demonstrations in Seattle, WA, when a "black bloc" caused substantial property damage at GAP, Starbucks, Old Navy and other retail locations in downtown Seattle.

74.    SEIU Capital Stewardship is a pension advisory affiliate of Defendant SEIU. It was created by the 2000 SEIU Convention to provide investment analysis and advice to SEIU-controlled retirement and investment plans. It also frequently engages in "shareholder activism," taking advantage of Defendant SEIU's holdings in publicly traded companies in order to advance SEIU's ulterior organizing goals involving those companies. SEIU Capital Stewardship has an office located at 1313 L Street, N.W., Washington, DC, 20005.

75.     TransAfrica Forum is a foreign policy advocacy organization. It works with civil society groups in Latin America to help protect constitutional rights, opposes further militarization of the African continent, and attempts to shape U.S. policy towards Africa. TransAfrica Forum has an office located at 1629 K Street, NW, Suite 1100, Washington, DC 20006. Defendant Raynor is a member of TransAfrica Forum's Board of Directors.

76.     United Students Against Sweatshops ("USAS") is a grassroots organization of youth and students that often assists in the organizing and other initiatives of major labor unions in the United States. It has an office located at 1150 17th Street N.W., Washington, DC 20036. USAS receives funding from both Defendants CTW and SEIU. USAS was recruited by Defendants to assist in carrying out their extortionate campaign against Sodexo on college and university campuses, so that the extent of Defendants' role in such campaign activities would appear minimized and/or to be the idea of students, as opposed to Defendants. USAS, in conjunction with Defendants, has spearheaded an initiative called "Kick Out Sodexo" that is designed to pressure colleges and universities to cease doing business with Sodexo.

## RELEVANT TIME PERIOD

77.     Upon information and belief, Defendants' conspiracy to extort Sodexo began at least as early as March 2009 and continues today. In addition, Defendants have engaged in extortion schemes as a regular way of conducting business for several decades.

# FACTS REGARDING DEFENDANTS' UNLAWFUL EXTORTION SCHEMES

## I.    OVERVIEW OF THE UNION CORPORATE CAMPAIGN: DEFENDANTS' MODUS OPERANDI FOR AVOIDING LAWFUL UNION ORGANIZING

### A.    Defendants' Common Goals and Objectives

78.    Defendants' common institutional and individual goal is to build dues paying union membership throughout the United States and abroad. Sodexo has no quarrel with this objective, as it is unremarkable that any labor union would seek to grow its ranks through legitimate means. The entity Defendants' self-governing documents, resolutions, and mission statements, as well as their shared personnel at high levels, however, establish that Defendants have committed to pursue union growth by working in concert and dedicating substantial financial resources towards an agenda dictated by Defendants SEIU and Change to Win. This mandated cooperation makes it easier for Defendants SEIU and Change to Win to conceive and carry out unlawful forced unionization campaigns, such as the Clean Up Sodexo Campaign, with the assistance of their affiliates and locals.

79.    Defendant SEIU's 2008 constitution greatly consolidates with its senior leaders power over unionization campaigns. It provides that "[t]he International President shall have general supervision and direction of the organizing efforts" of Defendant SEIU. (*See* Ex. 2 at Art. VIII, § 1(e).) More importantly, Defendant SEIU's constitution shows that SEIU's affiliated locals are <u>constitutionally bound</u> to commit resources and finances to the execution of any aggressive unionization efforts Defendant SEIU decrees, including unlawful unionization campaigns. (*Id.* at Art. VIII, § 1(e), Art. XV § 16(a); *see also* Ex. 3 at p. 10-11, Appx. C.) These constitutional edicts were advocated for, drafted, and eventually implemented by a group of

SEIU International and local leaders and affiliates--including Andy Stern and Defendants Fishman, Henry, and Woodruff. (*See* Ex. 3 at Appx. C.)

80.     Defendant CtW not only has knowledge of Defendant SEIU's tactics, but also approves and directly supports them. Defendant CtW requires all of its affiliated Unions, including Defendant SEIU, to "develop strategic organizing plans" that "focus on key target areas important to increase market density...." (*See* Ex. 4 at Article XII § 3.) All such strategic organizing plans must be approved by CtW's Leadership Council. (*Id.*) Defendant CtW's structure includes a "Strategic Organizing Center," established "to develop and implement comprehensive organizing campaigns...." (*Id.* at Art. XIII § 1.) CtW's constitution mandates that "at least 75 percent of all per capita [contributions] paid to the alliance shall be dedicated to the operation of the Strategic Organizing Center and to Organizing." (*Id.* at Art. XI § 5.) Defendant CtW also supports the campaigns of its affiliates by hiring and providing campaign staff. According to its 2009 federal LM-2 filing with the U.S. Department of Labor, Defendant CtW provided to Defendant SEIU "Organizing Campaign In Kind Staff" with a total amount of $721,847 in compensation. Defendant CtW's commitment to growth and campaign coordination among affiliates has continued since its inception. At its September 2007 convention, CtW delegates resolved to "increase coordination between our affiliates to unite millions of workers into our unions." (*Id.*)

## B.     Defendants Use Extortionate Corporate Campaigns to Achieve Their Forced Unionization Objectives

81.     To more effectively carry out their growth objectives, Defendants have seized on and perfected a devastating pressure technique called the "corporate campaign." Defendant CtW calls such efforts "comprehensive" or "strategic" campaigns.

82.    The term "corporate campaign" is generally used to describe a multi-faceted and long-running attack against the business relationships on which a company--or an industry--relies for profitability, wellbeing, and, ultimately, success.    A corporate campaign is a sophisticated system of warfare in which a target company is subjected to numerous and diverse legislative, regulatory, legal, economic, psychological and physical attacks. These coordinated attacks are designed to undermine confidence in the target company, disrupt its normal operations and interfere with, impair, or destroy its business relationships with its various constituents, including investors. Ray Rogers, the self-styled "father" of the modern corporate campaign, has described the concept as follows:    "The goal of a corporate campaign is to polarize the entire corporate and financial community away from a primary target, thus pulling its most crucial underpinnings out from underneath it."    (Quoted in Stephen Szkotak, *The Nation's Longest Running Major Strike Highlights New Labor Strategy, Industry Woes*," United Press International, August 25, 1982.)

83.    A number of labor organizations in the United States, particularly those under Defendant CtW's umbrella, have seized on Rogers' tactics and have used corporate campaign tactics to force targeted companies to accede to their unionization goals.    As several federal courts have noted, a union corporate campaign: "encompasses a wide and indefinite range of legal and potentially illegal tactics used by unions to exert pressure on an employer . . . [including] litigation, political appeals, requests that regulatory agencies investigate and pursue employer violations of state or federal law, and negative publicity campaigns aimed at reducing the employer's goodwill with employees, investors, or the general public." *Food Lion, Inc. v. UFCW*, 103 F.3d 1007, 1014 n.9 (D.C. Cir. 1997) (quoted by *Smithfield Foods, Inc. v. UFCW*, 633 F. Supp. 2d 214, 219 (E.D. Va. 2008)).

84.    In this way, corporate campaigns are quite distinct from traditional union organizing campaigns, where the union's activities center on convincing employees of the benefits of union membership. Instead, unions employ corporate campaign tactics as a "top-down" organizing technique. They have concluded that it is easier for a union to convince or, if need be, bludgeon an employer into paving the way for its workforce to be unionized *en masse* than it is for the union to play by the rules established by Congress under the National Labor Relations Act ("NLRA"). The NLRA rules require that a union first convince at least 30% of a group of employees at a given location to express an interest in that particular union, and then prevail in secret-ballot election of the entire employee-group once the employees have had an opportunity to hear the pros and cons of unionization. This process is administered by the National Labor Relations Board ("NLRB"). If the union wins such an election at a given facility, and becomes certified by the NLRB as collective bargaining agent for the employees in the voting unit, the system of collective bargaining contemplated by the federal labor framework allows the employer to take into account local economics when negotiating with the union for wages and benefits.

85.    Through a corporate campaign, a union seeks to circumvent this process by using pressure and smear tactics to force an employer to play by an entirely different set of rules -- a set of rules made up by the union, and which an employer is not legally obligated to follow. Union demands in a corporate campaign can include, among other things, the employer's conceding to: (1) forfeit its and its employees' right to a secret-ballot election under NLRB rules and, instead, to recognize the union through "card-check," a method of unionization requiring recognition once the union collects authorization cards from 50% plus one of the employees in a proposed bargaining unit, and thus denying those who did not sign union cards a chance to voice

their preference for or against the union; (2) forego its guaranteed free speech rights protected under federal statute and concede to the union entirely the podium of debate on the question of unionization by remaining neutral during subsequent card signing drives; (3) allow a union access to its facilities during working hours so that the union can more easily convince employees to sign union cards; (4) establish, to the exclusion of all other unions, a "system-wide" bargaining unit of many employees in different locations within a certain geography that the union could never achieve for itself under NLRB rules; and (5) recognize outright the union as bargaining agent for certain groups of employees. Once the union obtains the employer's right to speak, access to its property and the ability to be recognized solely on the basis of a signed union card, the rate of unionization of the targeted employer's employees increases dramatically.

86.    Corporate campaign tactics are employed by some unions because of the substantial benefits that flow from union recognition. When an employer recognizes a union, a host of federal statutory obligations are triggered immediately, even before a labor contract is negotiated or signed. Upon recognition, the union obtains the instant right to have a significant say in the operation of the employer's business affairs and, as a practical matter, entitlement to dues money from its new members. Upon recognition, the employer and the union must engage in exclusive and good-faith bargaining in relation to all terms and conditions of employment, no matter how small. Thus, the employer can no longer subcontract a product line, relocate a portion of its operations from one facility to another, or even decide to change from Coke to Pepsi in its employee vending machines, without bargaining with the union over those matters. In essence, through recognition, the union obtains an immediate "seat at the table," even before contract negotiations begin. In most every respect, the employer can no longer make business

decisions that could impact its employees without first obtaining the advice and consent of the union.

87.    The approach of extorting an employer into forced union recognition, without regard for the level of employee interest in forming or joining a union, has been articulated succinctly in the article, "The Pressure is On: Organizing Without the NLRB," written by former UFCW organizer Joe Crump.  In that article, Crump states, "Who do we really need to convince of the advantages of being union?  Employees or employers . . . Organizing without the NLRB means putting enough pressure on employers, costing them enough time, energy and money to either eliminate them or get them to surrender to the union . . .  One of the concerns organizers might have about waging economic war on an unorganized company is that it might turn employees against the union.  I look at it this way:  If you had massive employee support, you probably would be conducting a traditional organizing campaign." (*See* Ex. 5.)  Crump defined a union corporate campaign's success in one of two ways:  "either a ratified, signed collective bargaining agreement with a previously non-union employer or a significant curtailment of a nonunion operator's business, including shutting the business down.  Neither of these outcomes will occur by relying on the NLRB."  (*Id.*)

88.    Some of the Defendants themselves have stated in the past that extortionate corporate campaigns are their preferred method of forcing unionization on employers. Defendant Raynor has publicly asserted that: "[T]o be successful [in unionizing target companies], I believe you have to be relentless . . . . We're not businessmen, and at the end of the day they are.  If we're willing to cost them enough, they'll give in." (Presentation at the annual meeting of the American Political Science Association, Atlanta, Georgia, September 3, 1999.) Defendant Fishman has also been so bold as to state plainly:  "We don't do [NLRB] elections."

(*See* Ex. 6.) Focusing on the election process alone, it is easy to see why unions prefer card check--where one or more union organizers or supporters can persuade an employee directly to sign a union card--to a secret-ballot election, where the employee's choice is truly his or her own.

89. In or around August 2007, at a dinner of labor activists that took place in Chicago, Illinois and was hosted by Defendant CtW, a representative of CtW's Strategic Organizing Center described the purpose of a corporate campaign in the following manner: "It's no longer sufficient to use a strike or other work disturbance to pressure a company to do the right thing. Increasingly, it's necessary to pressure a company by causing a crisis of confidence among its customers, shareholders, directors or other constituents." (*See* Ex. 7.)

90. Distilled to their essence, corporate campaigns are a means of transforming the union recognition process from a give-and-take affair in which the outcome is uncertain, into a foregone conclusion in which the capitulating employer essentially guarantees recognition to the particular union. A union employing a corporate campaign does not have to rely on employee support to gain members. Instead, it counts on employer surrender in order to fill its ranks with new members and to fill its coffers with the employer's money.

## C. Defendant SEIU Has Devised Its Own Playbook for Smearing, Pressuring and Extorting Employers

91. Defendant SEIU has published its own manual instructing union members how to intimidate, smear, and pressure employers that the Union has targeted for corporate campaigns. Defendant SEIU's "Contract Campaign Manual" (the "Manual") is widely known in the labor arena and has been a blueprint on making good on Defendants' extortionate threats to Sodexo. The Manual is a stunningly candid assessment of Defendant SEIU's partiality towards the use of sophisticated extortion campaigns--including its observation in the Manual that <u>union pressure</u>

campaigns often involve a conscious choice to break the law in order to be more effective--to bend employers to their will. Defendant SEIU reserves an entire section of its Manual, called "Pressuring the Employer," for describing in detail its most powerful pressure and smear tactics. That section's introduction notes that "outside pressure can involve jeopardizing relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds." It also states that "community action and the use of the news media can damage an employer's public image and ties with community leaders and organizations." Defendant SEIU believes these tactics to be effective because "the **threat** of action often has more psychological effect on management officials than the action itself because they don't know exactly what the impact will be." The introduction concludes by noting that pressure campaigns often require many different tactics and belies the real motivation underlying union corporate campaigns: "You have to put pressure in many ways so that the total cost of your campaign to the employer begins to outweigh the benefits of rejecting your proposals." (*See* Ex. 8 at p. 3-2, 3-3, emphasis added.)

92.     The Manual suggests that one of the first steps in designing an effective extortion campaign is determining how such pressure will hurt the employer financially. In asking the reader to consider the purpose of each potential pressure tactic, the Manual states:

Costing the employer money. Can you **threaten** to or actually:

- Reduce productivity?

- Increase costs?

- Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

- Create bad publicity which would, in turn, affect the relationships described above?

- Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

- Directly affect the careers or other interests of individual management officials?  (*Id*. at p. 3-6, emphasis added.)

93.     In this regard, the Manual encourages union campaigners to focus on an employer's lenders and investors: "If those lenders/investors decide that because of your dispute it is not worth their while to help finance the employer, the employer may have increased financial incentive to settle." (*Id*. at p. 3-18.) The Manual also suggests that a good campaign "may be able to **threaten** the relationship between a company or agency and the customers, clients, tenants, or patients it depends on for income." (*Id*. at p. 3-19, emphasis added.) It further advises campaigners to assess how best to "embarrass [company managers] in front of their superiors, associates, families, neighbors or friends in the community." An effective campaign should "figure out who really holds the power and tailor your tactics to affect them."

94.     The Manual also suggests that a campaign should avail itself of the legal process, not to seek legitimate redress for employer violations of law, but to distract the employer's executives, drain its resources, and increase the extortionate pressure:

Even if the violations [of applicable laws] are completely unrelated to bargaining issues, your investigations may give management added incentive to improve its relationship with you . . . [T]he employer is now facing:

- Extra expense to meet regulatory requirements or qualify for necessary permits or licenses.

- Costly delays in operations while those requirements are met.

- Fines or other penalties for violating legal obligations.

- Damage to the employer's public image, which could jeopardize political or community support, which in turn could mean less business or public funding. (*Id.* at p. 3-21.)

95.    Utilizing the assistance of friendly politicians can also be used to generate outside pressure on an employer, according to the Manual. "Political pressure," claims Defendant SEIU, can be used in two ways: (1) to "draw politicians into" the union's fight, and (2) to send a message to management officials that if they do not heed union demands, "union members will be more inclined to push for legislative action on other issues that would affect management." (*Id.* at p. 3-25.) In keeping with Defendant SEIU's overall theme of pressuring and extorting an employer by causing it substantial financial and business injury, campaigners are encouraged to press politicians for "changes in the way employers are taxed, awarded public funds, or required to provide service." (*Id.*) The Manual actually suggests that a campaign should pressure *the politicians themselves* into taking harmful action against the target employer if those politicians are not inclined to cooperate with the union. (*Id.* at p. 3-26.) In contrast, friendly politicians should be invited to speak at protests and demonstrations. (*Id.*)

96.    The Manual also notes that applying pressure directly on individual executives and managers can be a most effective tactic. Defendant SEIU suggests that this tactic works best in the case of company managers who have good reputations: "If they have built a good reputation through involvement in community service or religious organizations, for example, both they and those groups may find it potentially embarrassing to be linked to racism, sexism, exploitation of immigrants, or proposals that would take money out of the community for the

benefit of distant stockholders." (*Id.* at p. 3-27.)  In other words, managers who have not engaged in corporate misdeeds, and who are recognized in their communities and churches as good citizens, are the ones <u>most</u> likely to be negatively affected by a union smear campaign and, therefore, are the most likely to yield to extortionate threats.

97.    The Manual further instructs campaigners on how to take advantage of the media in order to harass and pressure a target employer: "Use of the media can put pressure on the employer and support all of the other tactics discussed in this part of the manual.  For example, media coverage and advertising can help to:

- Give customers, clients, investors and others in the community reasons to cut off economic ties with the employer.  Media attention can convince the community of the justice of your cause, or can make businesses or individuals feel that they don't want to be involved with the employer while it is getting such bad publicity.

- Make individual managers nervous about the effect bad publicity may have on their careers and reputations.  If they see that you have the ability to use the media successfully, they may worry that you will be able to publicize unfavorable information about their activities." (*Id.* at p. 3-56.)

98.    To help maximize media coverage, the Manual suggests that campaigners "create" news designed to spotlight allegations of employer wrongdoing: "For the most part, getting free news coverage depends on creating 'newsworthy' events - events that can be shown visually, that are unusual in some way, that involve action by large numbers of people, or that involve well known public figures." (*Id.* at p. 3-65.)  To help facilitate this process, campaigners are encouraged to increase the size and intensity of union-led protests and attacks on target

employers and/or their business relations by recruiting, or even paying for, outside assistance: "Other unions or community groups may be able to beef up demonstrations or rallies by supplying demonstrators who are not afraid of losing their jobs, are used to confronting authorities, or have more convenient schedules." (*Id.* at p. 3-51; 3-53.) The Manual also suggests that unions take advantage of other groups, such as students, to help enhance a pressure campaign "Other organizations in the community . . . may already have done research and organizing you can take advantage of. For example . . . Groups of students, people who receive government benefits, or other 'consumers' of public services who may be organizing to demand improved services or benefits." (*Id.* at p. 3-50.)

99.    Defendant SEIU's extortion playbook does not end there. The Manual also advises would-be campaigners to <u>break the law</u> in order to increase the pressure on a targeted employer. (*Id.* at p. 47.) The Manual urges campaigners to remember that "the job of [the union's] lawyers is not to make the decisions about when and how to obey the laws," and actually suggests that sometimes <u>disregarding a lawyer's advice</u> against violating the law may be the best course of action. It states: "Their job is to tell you what the laws are and how they are likely to be interpreted by the courts. Using that advice, union members and their elected leaders must then weigh the risks and benefits of potential actions." (*Id.*) The reason for doing this, claims Defendant SEIU, is that if a union turns up the pressure high enough, an employer might not have the will to challenge a union's illegal conduct:

In many situations, employers may have a strong incentive not to take legal action against workers or their union. For example:

- Legal action, no matter who initiates it, may expose an employer to the process of 'discovery,' which means that the union has the right to

subpoena employer documents and witnesses in order to prepare its case. The employer may feel that revealing inside information through that process is too risky.

- Lawsuits also may mean more publicity, which the employer may not want.

- Certain acts which might technically be illegal might be seen by the public, news media, customers, or other potential worker allies as justifiable and not something the employer should be challenging.

- Even if workers or the union might be found guilty, you have to consider what the penalty is likely to be. If a civil lawsuit might be involved, what damages could the employer actually prove and collect? (*Id.* at p. 3-47, 3-48.)

100.    Perhaps the Manual's most stunning revelation is Defendant SEIU's admission that it is necessary to blackmail or extort a target employer in order to maximize a campaign's effectiveness, and it should be done in a way that diverts the blame to the target employer's employees. The Manual notes, "It may be a violation of blackmail and extortion laws to threaten management officials with release of 'dirt' about them if they don't settle a contract. But there is no law against union members who are angry at their employer deciding to uncover and publicize factual information about individual managers." (*Id.* at p. 3-27, emphasis added.) In other words, Defendant SEIU acknowledges that its campaign tactics violate extortion laws but suggests that a campaigning union can get away with these tactics, nevertheless, by making its threats appear to have originated with anyone but itself.

101. By designing their corporate campaigns to appear to be employee-led uprisings, Defendant SEIU hopes to conceal its true involvement from everyone but the targeted employer. This sophisticated sleight of hand can prove intellectually vexing, emotionally frustrating, and psychologically and financially devastating for the targeted--and enlightened--employer.

102. Since the original publication of its Contract Campaign Manual, Defendant SEIU has refined the tactics discussed above and adapted them for use in situations where its goal is to force a non-union employer to allow the unionization of its employees without a secret ballot vote under NLRB procedures.

### D. Engaging in Extortionate Corporate Campaigns is Defendants' Regular Way of Doing Business

103. Defendants employ the extortionate corporate campaign tactics described throughout as a regular way of doing business. Defendants' Corporate Campaign against Sodexo is the first of several extortion campaigns Defendants have planned in their quest to dominate, to the exclusion of all other unions, Sodexo's industry. Defendants have already admitted to Sodexo their plans to launch extortionate forced unionization campaigns against Sodexo's competitors ARAMARK and Compass.

104. Moreover, Defendants' scheme to monopolize the representation of employees of Sodexo and its competitors is just one example of Defendants' many attempts to extort employers, and even other unions, for new members and dues monies. Over the past two decades, Defendants have attempted--with some success--to bludgeon the following employers and unions into forced unionization arrangements: Prime Healthcare Services, Somers Building Maintenance, Professional Janitorial Services, Executive Management Services, Beverly Enterprises, CVS/Caremark, Allied International Union, Sutter Health, and Catholic Healthcare

West.  Defendants' malicious and extortionate attacks against these entities are described in detail in Appendix A.

105.    As with the Clean Up Sodexo Campaign, each of these campaigns centered on Defendants' explicit and/or implicit threats to destroy or damage the business interests of the target unless it agreed to accede to Defendants' forced unionization demands and deliver the same or similar money and property rights demanded of Sodexo.  To make good on their threats in each case, Defendants deployed some variation of the tactics described in Defendant SEIU's Contract Campaign Manual, including:

- Threatening to put Prime Healthcare Services' senior executives in jail if they did not agree to let Defendant SEIU and one of its locals unionize Prime's California hospitals, and, after Prime refused to yield, making false public claims that Prime's substandard hospital care resulted in high rates of "life-threatening" blood infections and that Prime had engaged in Meidcare fraud;

- Telling Somers Building Maintenance executives that "We will never let your employees vote," and, after Somers refused to allow Defendant SEIU to unionize its janitors without NLRB elections, filing dozens of baseless charges against Somers with regulatory agencies, then promising to "make them disappear" if Somers would just capitulate to Defendant SEIU's demands;

- Threatening the CEO of Professional Janitorial Services that if he did not allow Defendant Local 1 to unionize the company, Defendants SEIU and

Local 1 would destroy its business and community standing, and further threatening to "**come down there [to Houston] and kill PJS**;"

- After threatening Executive Management Services' CEO with economic ruin if he did not allow Defendant SEIU to unionize his company, barraging the company with malicious attacks, including a fraudulent OSHA charge that falsely alleged that EMS' employees were forced to carry human body parts out of biology laboratories, and recruiting individuals from a local homeless shelter to impersonate EMS employees and participate in a protest at the offices of one of EMS' biggest clients;

- Attempting to destroy Beverly Enterprises in retaliation for its refusal to agree to Defendant SEIU's unionization demands by publishing sensational and disgusting claims about Beverly, including that Beverly employees routinely tied nursing home residents to their beds for hours at a time, causing them to become soaked in urine and excrement.

106.    These and the other examples described in Appendix A demonstrate that Defendants' Clean Up Sodexo Campaign is not an isolated method. As described throughout, Defendants would rather abandon the traditional NLRB organizing model. Instead, they prefer to pressure a targeted employer through a "top down," forced unionization effort to which a targeted employer accedes not because its employees are genuinely interested in union representation, but because the alternative for the employer is public scorn and substantial financial harm.

## II.    DEFENDANTS DEVISE THEIR UNLAWFUL SCHEME TO EXTORT SODEXO

### A.    Defendant SEIU's Plot to Monopolize Sodexo's Industry

107.    Defendants' conspiracy to extort Sodexo represents, in large part, a power play in a bitter feud between rival unions competing for turf in the industry in which Sodexo competes.

108.    For decades, major labor unions in the United States have acknowledged and observed informal jurisdictional limits on their prerogative to unionize certain groups of workers. For example, Teamsters undertake to represent truck drivers, and United Mine Workers undertake to represent coal miners.  For the most part, these limits have served to prevent unions from raiding the memberships of their rivals, or from competing too closely for new members in a given industry or geography.  The vast majority of employees in Sodexo's industry are foodservice employees, who traditionally have fallen within the jurisdiction of the former Hotel Employees and Restaurant Employees ("HERE") union.  In the spring of 2004, HERE merged with the UNITE union, an organization that traditionally has represented employees in the laundry and textile industries.  The merger of UNITE and HERE was one of necessity.  By the spring of 2004, UNITE was dying.   Though flush with assets and cash--including the Amalgamated Bank, which is the only FDIC-insured commercial bank in the United States that is 100% union-owned--UNITE was losing its membership as the domestic textile industry evaporated.  HERE had a stable jurisdiction and the opportunity for growth, but needed assets. The marriage of these unions allowed UNITE to redirect its assets into the food service industry. Upon their merger, Defendant Raynor, who had been the head of UNITE, became the General President of the newly created UNITE HERE.  John Wilhelm, who had been the head of HERE, became the President of UNITE HERE's Hospitality Division.

109.    Around that time, Defendant SEIU was also looking for ways to expand its ranks and viewed the employees of Sodexo and its competitors as a prime opportunity to do so.  To facilitate its foray into the industry, Defendant SEIU entered into an agreement with UNITE

HERE establishing ground rules for unionizing employees of companies in Sodexo's industry. The agreement included the formation of a joint national local union called Service Workers United ("SWU"). Defendant SEIU and UNITE HERE created SWU to be the union that collectively would represent workers signed up by either of the two unions. For several years thereafter, the two unions unionized a number of bargaining units under SWU, including several units of Sodexo employees.

110.    In late 2008, Defendant Raynor believed he would not prevail in the 2009 election of UNITE HERE officers. He therefore plotted an exit from UNITE HERE that would enable him to take with him the hundreds of millions of dollars in assets that he brought into the merger between UNITE and HERE. At the same time, Defendant SEIU's partnership with UNITE HERE was beginning to falter, as the two unions had not made the gains that Defendant SEIU had envisioned. Andy Stern, on behalf of Defendant SEIU, invited Defendant Raynor to bring to SEIU his assets and the parts of UNITE HERE that remained loyal to Raynor. This move promised to give Defendant Raynor a soft landing and to give Defendant SEIU additional assets, additional membership, and additional foodservice members, all at the expense of UNITE HERE.

111.    Defendant Raynor did in fact leave UNITE HERE in early 2009, delivering to Defendant SEIU approximately 100,000 UNITE HERE members who affiliated with Defendant SEIU as Defendant Workers United. Raynor's defection from UNITE HERE touched off a heated battle for control over UNITE HERE's remaining members and assets. Wilhelm and the remaining members of UNITE HERE disaffiliated from Defendant CtW and re-joined the AFL-CIO. In an open letter to Stern, Wilhelm accused Defendant SEIU, along with Stern and Defendant Raynor, of "plott[ing] to break up UNITE HERE, remove assets from the Union's

control and organize in UNITE HERE's traditional industry jurisdictions." (*See* Ex. 9). Wilhelm's letter also accused Defendants Fishman and Woodruff of encouraging UNITE HERE members to defect from their union and noted with incredulity Stern's call to have a third-party mediator arbitrate the division of the "membership, jurisdiction and treasury" Defendants allegedly stole from UNITE HERE. He said: "Suppose a burglar broke into your house, stole your property, and demanded ransom. Then the burglar contacts you to demand that a third party be given the right to divide up the stolen property. Would anyone accept such an offer?" (*Id.*) Wilhelm also wrote to his own membership to address the plot against UNITE HERE. In this letter, he described a strategy document recovered from Defendant Raynor's former office at UNITE HERE that included a detailed plan conceived by Defendant Raynor and Stern to split up UNITE HERE, take away its assets and assume total control of the laundry and food service industries. According to this internal document, the plan included strategies to tie up UNITE HERE's assets in frivolous legal proceedings, to secretly transfer funds from UNITE HERE to Joint Boards controlled by Defendant Raynor, to target and take over UNITE HERE local unions, to "turn the labor movement against [UNITE HERE]" by "lin[ing] up key [Change to Win] Presidents" against Wilhelm; and to execute a public smear campaign against UNITE HERE also designed to damage Wilhelm's credibility. (*See* Ex. 9A.) The battle lines in Defendants' war against UNITE HERE were clearly drawn.

112.    Among other things, Wilhelm disagreed with Stern and Defendant Raynor over the allocation of existing SWU bargaining units or of the rights to unionize workers employed by Sodexo or its competitors going forward. Thus, in addition to Defendants' attempts to raid UNITE HERE's existing membership and assets, Stern and Defendant Raynor, acting on behalf of Defendants SEIU and Workers United, and with the knowledge and approval of Defendant

CtW, opted to initiate a massive effort to establish Defendant SEIU's dominance in the industry. The focus of this effort was Defendants' plot to execute a series of forced unionization campaigns against the major employers in Sodexo's industry. Through this path, Defendants hoped either to obtain leverage in their battle with UNITE HERE, or to succeed in squeezing UNITE HERE out as an effective competitor, or both. Sodexo was chosen as Defendants' first victim.

### B.    Formation of the Sodexo Conspiracy

113.    To commence implementation of their strategy, Defendants devised a scheme to extort Sodexo's "voluntary" recognition of Defendant SEIU and its affiliated locals as bargaining agent for as many of the Company's non-union employees as Defendant SEIU could accept, to the exclusion of competing unions such as UNITE HERE. To realize this goal, Defendants conspired to utilize the resources of Defendants CtW, SEIU, and the Local Union Defendants to engage in a wide-ranging corporate campaign of extortion of Sodexo. Consistent with the teachings of Defendant SEIU's Contract Campaign Manual, Defendants agreed to use their collective political, social, and financial strength to attempt to bring suffocating extortionate pressure on Sodexo by repeatedly attacking Sodexo in the print, television, radio, and internet media; unlawfully interfering with Sodexo's existing and prospective business relations; orchestrating frivolous regulatory and other "investigations" of Sodexo; recruiting a small number of disgruntled current or former Sodexo employees and falsely portraying their allegations regarding their treatment as representative of the Company's behavior as a whole; recruiting third-party participants, such as college students, to take part in protests, boycotts and other demonstrations; participating in and/or encouraging supporters to engage in the conscious violation of state and local laws; threatening to accuse Sodexo of criminal activity; threatening to

engage in violence against Sodexo and/or its property; and communicating with investors in an attempt to discourage financial investments in the Company, its parent entity, and its other affiliates around the world. Defendants have threatened Sodexo directly, openly, and repeatedly that they intend to continue attacking Sodexo's business relationships and smearing its name until it surrenders to Defendants' demands.

114.    Although Defendants did not announce their Corporate Campaign against Sodexo until in or around August 2009, upon information and belief, Defendants devised their conspiracy in or around March 2009, after the dissolution of UNITE HERE and affiliation of Defendant Raynor and his Workers United group with Defendant SEIU. Defendant CtW's Leadership Council, which at that time included Stern as a member and today includes Defendant Henry as a member, authorized the creation and/or execution by Defendant SEIU of the Clean Up Sodexo Campaign. They also approved the Defendants' utilization of the Clean Up Sodexo Campaign as the primary means through which to initiate and carry out their extortionate scheme.

115.    The Corporate Campaign is coordinated on a strategic level by Defendant SEIU and its leadership, which at the time of the Campaign's inception included Stern and presently includes Defendants Henry and Woodruff. The Campaign also is coordinated within Defendant CtW's Strategic Organizing Center, which is led by Defendant Woodruff. Defendant Weintraub--who reports directly to Defendant Woodruff--and Defendant Fishman are responsible for the day-to-day planning and execution of the Campaign's tactics. They also have communicated several of Defendants' direct extortionate threats to Sodexo representatives. Defendant Raynor controls and directs Workers United's participation in the conspiracy and coordinates its actions

with Defendant SEIU. Finally, the other Local Union Defendants carry out the majority of the various Campaign attacks described below.

116.    Defendant SEIU created the Clean Up Sodexo concept to fit the modus operandi of its past extortion schemes directed against other employers, including but not limited to those described in Appendix A below. The Clean Up Sodexo Campaign is nothing more than the Defendants themselves. Defendants fabricated the Clean Up Sodexo concept out of whole cloth in order to portray publicly their extortionate scheme as a social movement, initiated and carried out by Sodexo's hourly employees as well as other concerned third parties. Defendants then sought to misrepresent themselves publicly as the employees' noble savior, having involved themselves in the Clean Up Sodexo Campaign only at the urging of Sodexo's employees who, according to Defendants, pine for union representation as a means of improving their working conditions and their overall quality of life.

117.    Despite these claims, at no time since the inception of the Campaign have Defendants actually pursued union representation through traditional NLRB means. These means are available to Defendants almost instantaneously, assuming Sodexo employees want a union, a question Defendant SEIU seems unwilling to put to the test. Defendants' failure actually to seek representation of Sodexo's employees lays bare Defendants' real intention, which is to bludgeon Sodexo into acceding to Defendants' unionization demands, conceding to Defendants a substantial interest in the conduct of the Company's business affairs, and paying to Defendants the dues and other payments that would attend unionization of the Company's hourly employees.

118.    To create the appearance that the Clean Up Sodexo Campaign is a collective effort of Sodexo's hourly workforce and of like-minded social justice groups and individuals,

Defendants recruited and secured the assistance of a small handful of current and former Company employees so that Defendants could portray their stories of alleged mistreatment as representative of Sodexo's human relations, safety, sanitary, and business practices as a whole. In many cases, Defendants have misrepresented the facts regarding their featured employee testimonials. In all cases, they have consciously sought to twist the facts regarding Sodexo's public record to create the impression that their handpicked employee coterie represents how Sodexo typically does business, rather than isolated or exceptional circumstances. Because the portrayal of Clean Up Sodexo as a worker-led movement is critical to Defendants' success, they have gone to great lengths to generate this façade, in some cases intimidating and threatening Sodexo's employees and/or misrepresenting themselves to solicit the participation of such employees.

119.    Defendants then sought to use the perception they created regarding the alleged plight of Sodexo's employees as a recruiting tool, garnering the assistance of a number of third parties. Defendants misled such third parties into believing that Clean Up Sodexo events were designed to address genuine issues of social concern. As described above, Defendants' purpose in securing the participation and assistance of such third parties was to create a public perception that the majority of Defendants' unlawful and extortionate conduct originated with the employees and third-party participants, and not the Defendants.

120.    To maximize the pressure their Campaign would create, and to be sure Sodexo would fear repetition of their Corporate Campaign activities, Defendants have repeatedly staged "newsworthy" events, as described below, and then promoted those events through press releases to the media and/or blog posts on various internet sites. Defendant SEIU created and registered several internet sites dedicated exclusively to achieving this end, including the following:

www.campaignforqualityservices.org, registered on or about February 21, 2008, www.cleanupsodexo.org ("Clean Up Sodexo website"), registered on or about October 7, 2009, and www.sdxwatch.org, registered on or about August 19, 2010. The Clean Up Sodexo website serves as the primary launch platform for the majority of Defendants' smears and attacks. Since creating the site, Defendants have posted at least 230 separate print articles, video, audio and/or or other media to the Clean Up Sodexo website, many of which are cited herein. The "SDXwatch" site was created by SEIU Capital Stewardship, Defendant SEIU's pension advisory affiliate. It is aimed at the Company's global investors and business partners. Its purpose is to appear to provide "investment analysis" regarding major Clean Up Sodexo Campaign events, which are "reported" in a "neutral" and "unbiased" fashion. The majority of SDXwatch's writings suggest to investors that Sodexo's "labor problems," which in fact have been orchestrated by Defendants, are a troubling indicator of the Company's potential financial health and that investors should think twice about making financial commitments to Sodexo.

121.  Defendants also have taken advantage of the various forms of electronic social media to spread their hateful message regarding Sodexo, re-publishing Campaign information on the Facebook pages of groups that have participated in anti-Sodexo events, including, but not limited to: GMU Students for Sodexo Workers, Defendant Local 615's Massachusetts Clean-Up Sodexo, USAS' Ohio State page, The Luther [College] Community Against Sodexo, Students and Workers in Solidarity, Tulane University's Students Who Support Sodexo Workers' RIGHT to Organize, and Sodexo Campaign at Westfield. Upon information and belief, some or all of these sites were established at Defendants' urging to facilitate the spread of their Campaign attacks.

122.    Defendants also established a Clean Up Sodexo Twitter page, on which they frequently have re-posted Campaign attacks, videos, reports, press releases, and blog articles. Since the inception of the Clean Up Sodexo Campaign, Defendants have uploaded hundreds of "tweets" to the Clean Up Sodexo Twitter page. (*See* www.twitter.com/CleanUpSodexo.)   In addition, numerous employees and agents of Defendants, including Joaquin Guerra, Brad Levinson, Kate Thomas, and Andy Stern himself, have posted accounts of the Campaign on their personal Twitter pages.

123.    Defendants' virtually endless stream of press releases, blog articles, and social media posts is intentionally calculated to have a cumulative effect on Sodexo; its clients, employees, and management; its investors, lenders, and business partners; and the public. Specifically, Defendants hope that their numerous accusations and allegations regarding Sodexo, if repeated often enough and in enough places, will cause Sodexo's various constituents to terminate, or decline to enter, business relationships with the Company, not because they believe Defendants' malicious rhetoric, but because they do not want to become embroiled in the middle of Sodexo's "labor problems" or to become a target of Defendants' Campaign attacks.    In this regard, each and every press release, blog article and social media posting is specifically calculated by Defendants and their agents to: 1) create additional extortionate pressure on Sodexo, and 2) remind Sodexo that Defendants--through their varied and diverse attacks described in those articles and postings--were making good on their extortionate threats.

### C.    Defendants Have Substantial Financial Motive to Extort Sodexo

124.    All of the Defendants have substantial financial motive to extort Sodexo.  Forcing Sodexo to allow the unionization of tens of thousands of its non-union employees would result in millions of dollars in dues and other payments from Sodexo to Defendant SEIU and its affiliated locals, including but not limited to the Local Union Defendants.  As of the date on which

Defendant SEIU's 2008 Constitution became effective, Defendant SEIU has received a per capita tax on all dues received by its local unions in the amount of $7.65 per member, per month. (*See* Ex. 2 at Art. XIII § 1(a).) Thus, unionizing the remainder of Sodexo's non-union workforce would equate to roughly $7,344,000 per year in additional revenue to Defendant SEIU. In addition to this per capita tax, each local must pay an additional per capita tax in the amount of $5.00 per member to finance the "Unity Fund," the dedicated revenue source for organizing campaigns. (*Id.* at Art. XIII § 1(d).) The SEIU Constitution also imposes on affiliated locals "minimum dues," which are the lowest permissible amounts to be assessed against members. Minimum dues range from $24.00 to $29.00 per member/per month and are by Constitutional provision set to increase by one dollar on January 1st of each year. (*Id.* at Art. XIII § 6(a).) Thus, unionizing Sodexo would result in substantial financial gain both to the Local Union Defendants and to Defendant SEIU.

125.    The Individual Defendants also derive substantial income from the ongoing operation of Defendant SEIU and/or its affiliates. According to Defendant SEIU's 2009 LM-2 filing with the Department of Labor, Defendant SEIU in 2008 paid $102,840 in compensation to Defendant Weintraub; $199,640 in compensation to Defendant Woodruff; and $199,640 in compensation to Defendant Henry. In addition, according to Defendant Local 32BJ's 2009 LM-2 filing, Defendant Local 32BJ paid $211,938 in compensation to Defendant Fishman. Finally, according to Defendant Workers United's 2009 LM-2 filing, Defendant Workers United paid $154,707 in compensation to Defendant Raynor. More importantly, forcing Sodexo, and/or its competitors, to unionize exclusively with Defendant SEIU and its affiliates would bring the Individual Defendants increased power and status within their respective organizations and in the labor movement in general.

126.    Defendant CtW also stands to reap significant financial and strategic rewards from the Clean Up Sodexo Campaign.  As discussed above, Defendant CtW's Constitution obligates each union affiliate to pay to Defendant CtW a per capita tax of $.25 per member/per month.  (*See* Ex. 4 at Art. XI § 2.)  Also, by constitutional mandate, at least 75% of CtW's per capita tax "shall be dedicated to the Strategic Organizing Center and to organizing."  (*Id.* at Art. XI, § 5.)  For Defendant CtW, a successful Clean Up Sodexo Campaign would result in a substantial increase in per capita contributions from Defendant SEIU, which in turn would allow Defendant CtW to facilitate future corporate campaigns.  Moreover, by facilitating Defendant SEIU's takeover of Sodexo, Defendant CtW would increase its own footprint in Sodexo's industry.

127.    Finally, the Clean Up Sodexo Campaign represents the first step in Defendants' collective attempt to sideline their major industry competition:  UNITE HERE, which no longer is affiliated with Defendant CtW and therefore no longer makes per capita contributions to Defendant CtW.  Thus, the Clean Up Sodexo campaign is a means of eliminating UNITE HERE as a financial competitor of Defendants in Sodexo's industry.

## III.    DEFENDANTS' UNLAWFUL THREATS AND ATTACKS AGAINST SODEXO TO OBTAIN SODEXO'S PROPERTY[1]

### A.    Nature of Defendants' Actions

128.    Some or all of the actions and events described below constitute acts and threats undertaken by Defendants with the specific intent to extort money, property, and pecuniary benefit from Sodexo.  Therefore, such acts or threats are separately chargeable as attempted extortion or extortion, or both, under the laws of a variety of States, at least including, but not

---

[1] Because of the complicated and prolonged nature of Defendants' extortionate scheme, this Complaint presents the factual allegations by subject matter, rather than by date.

limited to, the laws described in the First, Second, Third and Fourth Claims for Relief, and punishable by imprisonment for more than one year under such laws.

129.    The specific property Defendants are attempting to extort from Sodexo includes, but is not limited to the following:

- Sodexo's recognition of Defendant SEIU and/or its affiliated locals, including but not limited to the Local Union Defendants, as bargaining agent of the Company's non-union employees, at current and future Sodexo facilities in the United States that have not, to date, been organized by SEIU or any other labor union;

- Sodexo's agreement to allow Defendant SEIU to exercise for Sodexo its right to insist on secret-ballot elections conducted by the NLRB at each Company facility Defendant SEIU selects for unionization, by forcing Sodexo to waive such right;

- Sodexo's agreement to allow Defendant SEIU to exercise for Sodexo its right guaranteed under Section 8(c) of the National Labor Relations Act to voice its opinion about, and/or opposition to, attempts to unionize its employees, by forcing Sodexo to waive such right and remain neutral and therefore silent on the matter, thereby allowing Defendant SEIU to fill the void created by the Company's forced silence with additional communications to employees regarding unionization;

- Sodexo's agreement to allow Defendant SEIU to exercise for Sodexo its right to refuse to recognize Defendant SEIU as bargaining agent of the Company's employees on the basis of signed union authorization cards, by forcing Sodexo to waive such right and to recognize Defendant SEIU as such bargaining agent on the basis of such cards;

- Sodexo's agreement to give up its right to exclude representatives of Defendant SEIU from premises under its control and instead to allow Defendants to have physical access to its facilities and employees to which Defendants are not otherwise entitled;

- Sodexo's agreement to enter into collective bargaining agreements with Defendant SEIU or its affiliated locals;

- Sodexo's relinquishment of substantial autonomy and control over its business operations and, at the same time, turning over to Defendants for their own use and exercise, a significant portion of that autonomy and control;

- Sodexo's money in the form of union dues paid to Defendants by Sodexo on behalf of the Company's employees that are the target of Defendants' extortionate scheme;

- Gain of considerable strategic and financial leverage when negotiating on behalf of other units of Sodexo employees currently represented by Defendant SEIU and/or its affiliated locals; and

- Contributions by Sodexo to other funds benefiting Defendants, including but not limited to certain of Defendants' pension funds.

130. Defendants have no lawful claim or any other claim of right to any of the money and other property demanded from Sodexo.

131. Each of the actions and events described below was undertaken either by Defendants themselves, or by and through their agents and with their actual knowledge, approval and/or ratification, in furtherance of the unlawful conspiracy alleged herein to extort money and property from Sodexo and to acquire unlawfully an interest in, or control of, Sodexo's business

affairs, by interfering unlawfully with Sodexo's relations with its shareholders, customers, business partners, investors, lenders, and the general public and by inflicting repeated and substantial financial injury upon Sodexo. The actions and events taken against Sodexo were not isolated, but were related in that each has the same or similar purpose, participants, victim, and methods of commission, and are designed to obtain the same result.

132. Accordingly, such actions are part of a pattern of repeated conduct, directed by Defendants against Sodexo, in a closed, but substantial, period of time, commencing in or around August 2009 and continuing through and including the present.

133. Defendants' racketeering activity described herein also poses a distinct threat of long-term continued criminal activity because Defendants' past extortionate conduct, by its nature, projects into the future with a clear threat of repetition. As Defendant Fishman has told Sodexo's executives on multiple occasions, Defendants plan to continue to harass, intimidate, smear, and financially injure Sodexo until Defendants have achieved all of their unionization objectives. To allow Defendants to achieve these objectives, Sodexo would have to surrender to Defendants the various property rights described above time and time again, each time Defendants select another Sodexo facility for unionization. Moreover, Defendants can unionize Sodexo's employees only one new bargaining unit at a time. Therefore, Sodexo's delivery of the property rights described above will occur one new bargaining unit at a time. In this regard, Defendant Fishman has already admitted that Defendants intend to obtain Sodexo's money and property rights--and therefore to extort Sodexo--a countless number of times under applicable State law. Thus, Defendants' unlawful conspiracy is designed to continue well beyond Sodexo's initial capitulation to the extortionate pressure created by the Clean Up Sodexo Campaign.

134.    Defendants' extortion scheme is also of an indefinite nature. The number of locations at which Sodexo has employees continuously expands. In fact, Sodexo has added hundreds of new accounts in each of the past several years, the majority of which have required that the Company hire new employees to provide the contracted services. Accordingly, every time Sodexo adds a new client and hires employees to service the new account, Defendants will be presented with yet another opportunity to unionize Sodexo employees, both on the terms they previously have demanded and under the cloud of their prior extortionate threats. As such, there is no fixed end to Defendants' scheme to extort the Company.

135.    Moreover, and as described in more detail in Appendix A, the actions taken by Defendants in furtherance of this pattern also reflect their regular way of doing business. Sodexo is one of many entities that have suffered at the hands of Defendants' extortionate schemes and also represents the first of several employers of foodservice employees Defendant SEIU has targeted in its bid to squeeze UNITE HERE and other competing unions out of Sodexo's industry.

136.    Although Defendant SEIU and many of its affiliated locals, including the Local Union Defendants, currently represent units of Sodexo employees, none of Defendants are currently the collective bargaining agent for the Company's non-union employees that are the object of Defendants' extortionate conspiracy. Defendants have no legal right to engage in collective bargaining with, or to make demands of, Sodexo on behalf of the Company's non-union employees.

137.    Defendants' rhetoric to the contrary, their Corporate Campaign is only about pressuring Sodexo into accepting their demands and according recognition to Defendant SEIU and its affiliated locals. Were Sodexo to raise hourly wages and improve its benefits tomorrow,

Defendants' Corporate Campaign would not stop. Defendants' Corporate Campaign is not about achieving a process by which Defendant SEIU could test its status with Sodexo's employees, as Defendant SEIU can do that at any time by requesting NLRB secret-ballot elections. Defendant SEIU needs no agreement from Sodexo to do so. Defendants' real object is representation and money, not improvements in employee treatment.

### B.    Defendants Have Directly and Explicitly Attempted to Extort Sodexo on Multiple Occasions

138.    Defendants have directed a series of unambiguous extortionate threats to Sodexo on at least four separate occasions, during direct conversations with Sodexo executives. Throughout each of these conversations, Defendants have left no room for doubt that their intent is to decimate Sodexo's business relations absent the Company's total surrender to their demands.

### 1.    Defendants' Initial Threat to Launch their Extortionate Campaign

139.    Before publicly launching the Clean Up Sodexo Campaign, Defendants dispatched Defendant Fishman to carry their demands directly to Sodexo and to ensure that the Company understood that it would be attacked if it did not agree to Defendants' terms. In or around August 2009, Defendant Fishman telephoned Dick Macedonia, who formerly served as Sodexo's Chief Executive Officer and now serves as a Company advisor. Macedonia was in Maryland when he received the call. Upon information and belief, Defendant Fishman placed the call from New York.

140.    During their phone conversation, Defendant Fishman told Macedonia that Defendant SEIU was making a number of demands of the Company. Specifically, he demanded that Sodexo allow Defendant SEIU and/or its affiliated local unions, including but not limited to the Local Union Defendants to (1) unionize Sodexo's U.S.-based non-union employees without

allowing the employees to vote in secret-ballot elections conducted by the NLRB; (2) have access Sodexo's employees on Sodexo's property during working time; (3) exercise for Sodexo its right to speak out concerning unionization by forcing the Company to remain neutral and silent; (4) be recognized, to the exclusion of all other unions, by Sodexo in each proposed bargaining unit on the basis of signed authorization cards; and (5) organize the Company's employees via "geo-sector" groupings (sectors of Sodexo's business in a particular defined geography, such as K-12 school districts in New Jersey) wherein every new employee group organized by Defendants within a certain "geo-sector" would automatically fall under one master collective bargaining agreement, the terms of which would be decided in advance. Fishman stated to Macedonia regarding Defendant SEIU's demands, "You're not going to agree to that, are you?" When Macedonia said Sodexo would not agree, Defendant Fishman cut off the conversation and said the Defendant SEIU would be "coming after" Sodexo and launching a "campaign" against it. Defendant Fishman's comments during his phone call with Macedonia constitute the transmission in interstate commerce of threats to injure the property or reputation of Sodexo, communicated with the intent to extort from Sodexo money and other things of value as described herein. Such threats violate 18 U.S.C. § 875(d) and are further evidence of Defendants' reckless disregard of the law generally with regard to the manner in which they have conducted, and continue to conduct, their extortionate Corporate Campaign.

141.    Macedonia knew of Defendant SEIU's past extortion tactics and understood Defendant Fishman's threatening comments to mean that he and his union colleagues were preparing to smear the Company publicly, damage its business relationships, and cause it financial and other harm, until it agreed to Fishman's demands. Macedonia reported Defendant Fishman's threats to Sodexo's senior leaders, who interpreted them the same way. Shortly

thereafter, Defendants launched the Clean Up Sodexo Campaign and began to make good on Defendant Fishman's threats.

### 2.   Defendants Make Additional Explicit Extortionate Demands during the Campaign

#### a.   The August 17, 2010 Face-to-Face Meeting in Virginia

142.   After Sodexo's initial refusal to capitulate to Defendant Fishman's threats, Defendants unleashed their multi-pronged, all-out attack on Sodexo in the United States and abroad. These attacks are described in detail below. On or about August 17, 2010, well into Defendants' Campaign, Defendants Fishman and Weintraub met with Macedonia and Tom Mackall, Sodexo's Vice President of Employee and Corporate Relations, at the Marriott Crystal City in Arlington, Virginia. Defendants Fishman and Weintraub traveled from New York to Virginia specifically for the purpose of meeting with Macedonia and Mackall.

143.   The ostensible purpose of the parties' meeting was to discuss a proposed allocation of the Service Workers United bargaining units that were at issue in Defendant SEIU's battle with UNITE HERE. Defendant Fishman commenced the discussion by informing Mackall and Macedonia that Defendant SEIU and UNITE HERE had agreed upon an allocation of these units and intended that SWU would eventually be dissolved. Defendant SEIU had decided to transfer representation at the Sodexo locations it obtained from SWU to other SEIU locals or Workers United joint boards. Both Sodexo and SEIU knew that to effect a lawful transfer of representative status from SWU to another local, a majority of the employees at each unit would need to support the transfer.

144.   To facilitate these transfers, Fishman stated that Defendant SEIU was demanding that Sodexo give up the right to secret-ballot elections at these locations and simply recognize Defendant SEIU's chosen local affiliate as bargaining agent at each such location based on a

card check procedure. When Mackall asked Fishman why Sodexo would do that when it was unwilling to recognize new bargaining units on the basis of signed cards, and had no legal obligation to do so, Fishman replied, "Well, if you don't want to, then we will have a fight. We will go after the clients. That is what we do." Fishman's comments made it crystal clear that Defendant SEIU's intention was to force Sodexo, against its will, to recognize SEIU's chosen locals at the disputed sites, and that it would expand its extortion campaign to include these sites unless Sodexo agreed.

145.    Fishman then proceeded to expound upon his blatant threat, stating that their discussion "really implicated the whole picture," a reference to the hundreds of other Sodexo facilities where SEIU did not already represent the Company's employees and that were targeted in the Clean Up Sodexo Campaign. He reiterated the demand he previously made to Macedonia in August of 2009: that Sodexo allow Defendant SEIU to divide the Company arbitrarily into "geo-sectors", and to proceed to unionize the Company geo-sector by geo-sector. Fishman also stated in no uncertain terms that Sodexo would need to comply with the following demands: 1) stand neutral at each and every facility Defendant SEIU unionized under its "geo-sector" approach; 2) give up its right to NLRB-sponsored secret-ballot elections at each facility; and 3) grant Defendant SEIU physical access to Sodexo premises to accost its employees to sign union cards. Defendant SEIU is legally entitled to none of these concessions.

146.    When Mackall insisted that Sodexo believed in secret-ballot elections and did not want to be forced into allowing Defendant SEIU to take over the entire Company, Fishman responded: "Elections don't work for us." Mackall then asked Fishman where it left the parties if Sodexo did not concede to their demands. Fishman's clear and unambiguous response: "We will continue to fight." He stated that Defendant SEIU would continue to go after Sodexo

clients, would continue to have students protesting at colleges, and would cause additional disruption of the Company's business operations. He then stated that if Sodexo would just agree to Defendants' demands, things would be "peaceful" instead. Mackall responded that Defendants had attacked many of Sodexo's business interests that were completely unrelated to the Company's employees, such as its approximately $1 billion contract with the United States Marine Corps, described in detail below. Mackall asked Defendant Fishman why Defendant SEIU would try to cause Sodexo to lose accounts (like Sodexo's Marine Corps account) even where most employees were already represented by unions and were therefore not targeted for representation by Defendant SEIU. Fishman smirked before responding with stunning honesty: "**This is not rocket science. We will apply pressure anywhere we can**."

147.    Upon hearing Fishman's brazen demands, Mackall asked why Defendants had chosen to wage a corporate campaign first against Sodexo and not against the Company's competitors, ARAMARK and Compass. Fishman stated that they believed Sodexo was the most likely of the companies to surrender to such a campaign and that he was confident that the other two companies would capitulate once Sodexo acquiesced to Defendants' Campaign.

148.    Defendant Weintraub also suggested that the campaign activity of Defendant SEIU's locals was approved in advance by SEIU. It was also revealed that she reported directly to Defendant Tom Woodruff and was responsible for "all of [SEIU's] campaigns," including the Sodexo campaign.

149.    As the meeting came to a close, Fishman made yet another comment underscoring that the purpose of their campaign was to obtain Sodexo's capitulation to their demands for money and property. He said, "We campaign as a means to an end. We fight in order to reach 'agreement.' We are not like others who fight for the sake of fighting." Mackall and Macedonia

left the meeting more convinced than ever that Defendants had no intention of discontinuing their extortionate campaign until Sodexo surrendered to Defendant SEIU's demands.

**b.      The September 22, 2010 Face-to-Face Meeting**

150.     Although Defendant Fishman's direct and repeated extortionate threats left Sodexo's senior leaders alarmed and discouraged, and Defendants continued to wage their Corporate Campaign assault against Sodexo, the Company agreed to another meeting with Defendants Fishman and Weintraub in the hopes that Mackall and Macedonia somehow could secure a halt to the Campaign.  The meeting took place on or about September 22, 2010, at the Capital Hilton in Washington, DC between Fishman and Weintraub, who were present and spoke on behalf of Defendants, and Mackall and Macedonia, who represented the Company.

151.     As the meeting commenced, it quickly became apparent to Mackall and Macedonia that Defendants had no intention of backing off from the extortionate demands that Fishman had made in their last meeting.  In fact, Fishman actually repeated, and even clarified, his prior demands.  Fishman began the meeting by repeating that Defendant SEIU's expectation was that Sodexo would allow SEIU to divide the Company into a series of "geo-sectors" and then allow SEIU to unionize all Company locations in a particular sector.  Fishman and Weintraub both stated that they expected Sodexo to allow this process to be repeated across the United States, but that Defendant SEIU's initial priority was to unionize Pennsylvania higher education units, New Jersey K-12 school districts accounts, Ohio higher education units, and Illinois higher education units.

152.     Mackall asked Fishman what Defendants would do if some other union attempted to organize Sodexo locations that the Company was expected to deliver to Defendant SEIU.

Fishman responded that Defendant SEIU "would keep them out," suggesting that once Sodexo surrendered to SEIU's demands, the Union would protect its "turf" from other competing unions.

153.    Fishman then revealed that Defendant SEIU was already planning similar takeovers of Sodexo's two largest competitors, ARAMARK and Compass. He indicated that ARAMARK was sufficiently battered by Defendant SEIU's previous campaign against it that it would go along with Defendants' demands, and that he expected Defendant SEIU to commence a global campaign against Compass. He stated that although Defendants would "have to have a fight" with Compass in order to force it to recognize Defendant SEIU as bargaining agent for the company's employees, he thought that they "were smart guys" and would "see what is best for them" after they were attacked by Defendants.

154.    Mackall then asked Fishman whether Defendants' Clean Up Sodexo Campaign "was just about a process," or whether it was "really about new members and growth." Fishman answered unambiguously that the Campaign against Sodexo was indeed about increasing both union membership and Defendants' bottom line, and not just about a card-check process. Mackall responded that the only logical conclusion he could draw from Fishman's answer was that Defendants would not stop attacking Sodexo until Defendant SEIU had gotten all of the new union members it wanted from among Sodexo's non-union workforce. Fishman confirmed Mackall's fear, stating that "it's about how many employees you are willing to unionize and how many we are willing to accept." In other words, losing was not part of the equation for Defendants. Fishman went on: "We would prefer to reach agreement, but we will fight if we have to."

155.    Mackall responded that Defendant SEIU was not proposing anything other than that Sodexo either give in to Defendants' threats and demands, or continue to be smeared and

attacked. He demanded to know how Fishman's "proposal" offered anything for Sodexo at all, besides a way to end the Clean Up Sodexo Campaign. Fishman responded that Defendant SEIU could be a "good partner" to Sodexo. When Mackall asked how that could ever be possible, Fishman responded with yet another threat: Defendant SEIU could "help or hurt [Sodexo] with business" depending on whether the Company agreed to Defendants' demands. Mackall then said that even if Sodexo acquiesced, Defendants already had created an "echo chamber" filled with lies, distortions and smears about Sodexo's business practices. He asked how Defendants could ever "un-ring the bell." Fishman confidently answered that "we have been through this many times," and that they would be able to meet with other unions, "put sunshine" on SEIU's new relationship with Sodexo, and "it will go away." Fishman's comments in this regard further illustrate Defendant SEIU's blatant hypocrisy and financial motivation in extorting Sodexo.

156.    Mackall responded in frustration that he felt as if Defendants were "holding a gun to [Sodexo's] head." Fishman's response left no doubt as to Defendants' true motive and genuine desire to harm the Company: "I'm not sure how you want me to respond to that, Tom. We are aggressive. We are aggressive about growth. That's what makes us a good union. **And we have that gun, or that sword, or whatever you want to call it. It's the weapon we have and we will use it if we have to.**" Fishman concluded his brazen remarks by informing Mackall that Sodexo would just have to decide what it wants to do.

### c.    The October 13, 2010 Phone Call

157.    In the midst of Defendants' ever-mounting attacks, and well over a year into Defendants' extortion campaign against Sodexo, Macedonia made one last attempt to communicate with Defendant Fishman during a phone call that took place on or about October 13, 2010. Defendant Fishman had called Macedonia earlier to provide more details regarding

Defendants' demands. Macedonia was in Maryland when he placed the call. Upon information and belief, Defendant Fishman received the call in New York.

158.    Macedonia sought clarification on a number of Fishman's "proposals," but primarily his intent was to inform Fishman that Sodexo remained unwilling to agree to Defendants' demands. Fishman's response was simple, and blunt: "Then we continue to fight." He further stated that Sodexo should realize that an "agreement" with Defendants would "give Sodexo peace." The parties concluded the phone call without any resolution, with Defendants' extortionate demands still on the table, and with the Clean Up Sodexo Campaign still in action. Defendant Fishman's comments during his phone call with Macedonia constitute the transmission in interstate commerce of threats to injure the property or reputation of Sodexo, communicated with the intent to extort from Sodexo money and other things of value as described herein. Such threats violate 18 U.S.C. § 875(d) and are further evidence of Defendants' reckless disregard of the law with regard to the manner in which they have conducted, and continue to conduct, their extortionate Corporate Campaign.

### C.    Defendants Publicly Announce the Commencement of the Clean Up Sodexo Campaign

159.    Defendants fired one of the first public shots in the Clean Up Sodexo Campaign when, on or about November 22, 2009, Brad Levinson published a blog article on the Clean Up Sodexo website titled "What is 'Clean Up Sodexo?'" The blog contained disparaging and highly negative allegations that Sodexo contributes to the "cycle of poverty" in the United States, denies its workforce access to affordable healthcare coverage, routinely engages in racial and sexual discrimination and harassment, and provides meals that fail to meet basic nutrition standards. The blog also claimed that Clean Up Sodexo serves as "the online voice of the workers at Sodexo," when in fact Clean Up Sodexo was designed by Defendants to serve as a vehicle

through which they could smear, harass, and threaten the Company. (*See* Ex. 10.) On that same date, Levinson also published three "testimonials" from food and hospital service workers represented by Defendant SEIU and/or its affiliated locals. The purpose of these blog postings was to create a misleading comparison between the supposed advantages to union membership enjoyed by the employees featured in the postings and Sodexo's non-union employees, whom Defendants have described repeatedly in Campaign publications as mistreated by Sodexo.

160.    Following this initial publication, Defendants unleashed their multi-faceted Corporate Campaign assault on Sodexo's business. In planning, developing and executing the Clean Up Sodexo Campaign, Defendants have followed Defendant SEIU's extortion playbook to the letter.

### D.    Preparation and Use of Inflammatory and Misleading "Studies" and "Reports" with which to Smear the Company

161.    As part of their conspiracy, Defendants published, or caused to be published, a litany of "reports" attacking Sodexo's safety, financial, and human relations practices. Defendants' employees prepared most of these reports; in one instance, Defendant Local 32BJ commissioned the Clarion Group to prepare a report titled "Hard to Swallow: Do Private Food Service Contractors Shortchange New Jersey Schools?" which accuses Sodexo of overcharging its New Jersey K-12 clients for certain contract services. (*See* Ex. 11.) Without exception, Defendants' reports intentionally portray Sodexo in a demeaning and negative light with respect to its various services and business practices.

162.    Each report is designed to appear as a scientific or scholarly study and purports to make "findings" about the overall working conditions at Sodexo. However, these "findings" are nothing more than isolated events taken out of context with the intent to mislead the readers into believing that Sodexo is an unsafe and unscrupulous company. The reports have provocative