titles, such as "How Sodexo Contributes to Poverty in the United States," (*see* Ex. 12), "Profits First, School Kids Last," (*see* Ex. 13), and "Hardship in the Big Easy: How Sodexo's practices leave New Orleans Workers in Poverty," (*see* Ex. 14), and frequently resort to sensational language and descriptions, to create in the reader a sense of alarm, disgust, or disdain towards Sodexo.

163.    Consistent with Defendant SEIU's extortion playbook, Defendants, their agents and surrogates routinely cite to these reports as "independent" evidence of Sodexo's alleged misbehavior. In a textbook example of bootstrapping, Defendants create the "evidence" against Sodexo and then cite to it in order to demonstrate the credibility of their accusations. Defendants hope that the individuals or organizations to whom they direct their "research reports" do not realize that they are not the product of unbiased analysis or generally accepted research methodologies.

164.    Defendants published and publicly distributed these reports in furtherance of Defendants' threat to "come after Sodexo," as Defendant Fishman warned Macedonia in August 2009. Tellingly, Defendants' pre-Campaign publications regarding employers in Sodexo's industry did not target or malign Sodexo in any way; it was only after Macedonia refused to accede to Defendants' demands, as conveyed by Defendant Fishman, that Defendants inundated Sodexo's customers, prospective customers, government officials, and the public at large with these highly disparaging reports aimed solely at Sodexo.

165.    For example, on or about October 20, 2009, Defendant SEIU's front group, Campaign for Quality Services, released a report called "Can you Count on your Contractor? How Sodexo's Troubled Record Leaves School Districts Footing the Bill." (*See* Ex. 15.) The report describes a handful of isolated incidents occurring in Sodexo facilities scattered

throughout the United States over a three-to-four year period.  Without statistics or other evidentiary basis for doing so, the report then claims that these isolated incidents are indicative of Company-wide, endemic problems.  The alleged deficiencies described in the report have nothing to do with unionizing employees or with employee-related issues such as wages, hours, and benefits, but instead relate to alleged budget deficits, food safety, and school maintenance. The report draws a global conclusion of "poor performance" in the area of school safety, but cites to only two specific allegations of food quality issues, two specific allegations of maintenance problems, and two specific allegations of mishandled security checks over a four year period from among the hundreds of schools actually serviced by Sodexo.

166.    Another prime example of Defendants' malicious report-writing style is "Profits First, School Kids Last." (*See* Ex. 13.) Despite its misleading title, the report has nothing to do with "school kids" and is at best tangentially related to school district costs associated with Sodexo contracts. The report is sprinkled with random vitriol, such as the misleading allegation that: "In 2008, at one elementary school, black plastic was found in a *Sodexo-provided* drink carton." (*Id.*)(emphasis added.)  The report conveniently omits the fact that Sodexo does not manufacture such items and therefore that any contamination of a sealed product such as a drink carton necessarily originated with its manufacturer, not Sodexo. The report also offers questionable statistics regarding Sodexo's pay and benefits, misrepresenting the average income earned by Sodexo's workforce as "far below the poverty line."

167.    Despite its many platitudes regarding the need to keep school children safe and to help lift school workers up out of poverty through responsible contracting, "Profits First, School Kids Last" concludes with an aggressive and accusatory recommendation to school board officials that betrays Defendants' true motive in releasing the report: "It is not easy being an

educational leader when economic times are tough. The decisions school leaders must make are extraordinarily difficult. But if you closely examine all the costs associated with your school's relationship with Sodexo and you identify areas where there can be cuts, the decision will be easy. Either you choose Sodexo profits or children's welfare." (*Id.* at p. 18)(emphasis added.)

168. Defendants have also directed one of their favorite Corporate Campaign allegations--that the targeted employer is "racist"--at Sodexo. On or about April 27, 2010, Defendant SEIU published "Missing the Mark: Revisiting Sodexo's Record on Diversity." (*See* Ex. 16.) The report cites selectively to statistics in Sodexo's annual SEC filings to support a conclusion that the proportion of minorities and females holding Company management positions has not improved between 2004 and 2009, while intentionally omitting any reference to the fact that the proportion of African-Americans in senior management positions at Sodexo increased by 27% between 2006 and 2009, or that the overall ratio of minority employees increased by 27% during the same period. The omission is noteworthy because senior-level management positions were the focus of the referenced lawsuit.

169. As these examples demonstrate, Defendants' reports were written not to raise issues of genuine concern to those employees on whose behalf Defendants purport to advocate, but to facilitate Defendants' collective desire to portray Sodexo as a disreputable human rights violator that is riddled with financial, safety, and other problems. In fact, a majority of the issues raised in these reports have nothing to do with Defendants' purported goal of obtaining better working conditions for Sodexo employees, but instead relate to alleged budget deficits, food safety, health and welfare of school children, and school maintenance shortfalls.

170. Defendants used their reports to increase the pressure applied to Sodexo by republishing them nationwide by various means and through various media outlets. Not only did

Defendants distribute these reports to specific Sodexo's customers, such as school superintendents and administrators in districts with whom Sodexo has food service contracts, but they also circulated them to a wider and more global audience.    For instance, Defendants circulated one report at the National School Board Association Conference.  They also widely publicized another report via "robocalls" to all households in a particular school district and falsely represented the caller as a "concerned parent and taxpayer."  Defendants also publicized and posted the reports on various Defendant-controlled and third-party websites, in the press, and on social networking sites such as Facebook and Twitter. (*See* Exs. 17-23.)

171.    In another instance, on or about June 3, 2010, Defendant Weintraub sent an email to Dorothy Marstaller, an Administrator at Connally Independent School District in Waco, Texas, with whom Sodexo has a food services contract. (*See* Ex. 24.)  Defendant SEIU has no business whatsoever with the Connally Independent School District.  The re: line of Weintraub's email was entitled "Is your food service provider eating into your budget?"  The email included a web link to "Profits First, School Kids Last,"  as well as the malicious claim that Sodexo's "business model" consisted of "low-wage jobs that depress the tax base . . . force workers to rely on different forms of public assistance and charity to meet basic housing, nutritional, and healthcare needs . . . and actually end up costing communities money."  Upon information and belief, Defendants have sent similar emails and links to their disparaging anti-Sodexo reports to dozens of other school districts around the country.

172.    As the Campaign has continued, some of Defendants' reports have been re-published by unwitting third parties.  For example, in or around October 2010, Defendant SEIU published a report called "Out Loud: Sodexo Workers From Seven Countries Speak Out on Human Rights." (*See* Ex. 25.)  The report makes a number of sensational accusations, including

that Sodexo's parent company forced female job applicants in Colombia to take pregnancy tests and fed employees rancid food, required hourly employees in Guinea to eat in separate, sub-standard facilities, and failed to provide workers in the Dominican Republic with basic safety equipment and training, which resulted in preventable injuries. The report also directly accuses Sodexo of paying "poverty wages" in the United States.

173.    Not long after the release of this report, on or about January 19, 2011, TransAfrica Forum ("TransAfrica") released its own report regarding Sodexo called "Voices for Change: Sodexo Workers From Five Countries Speak Out." (*See* Ex. 26.) The report is strikingly similar to Defendant SEIU's "Out Loud" report and indeed lists Kate Thomas, an SEIU employee and frequent contributor to the Clean Up Sodexo blog, as an "investigative journalist" whose "independent research" helped contribute to the report. Upon information and belief, TransAfrica was urged to adopt the conclusions in Defendant SEIU's "Out Loud" report in its "Voices for Change" report by Defendant Raynor, who is a member of TransAfrica's Board of Directors, and/or actor and social activist Danny Glover, a participant in Defendants' direct attack on Sodexo's corporate headquarters described below, who is the Chair of TransAfrica's Board of Directors.

174.    "Voices for Change" and the events surrounding its release received substantial media attention, including a feature in the Sunday, January 24, 2011 edition of the Washington Post. (*See* Ex. 27.) Defendant SEIU also issued a misleading press release disguising Defendants' role in the report's preparation and distribution. (*See* Ex. 28.)

### E.    Direct Attacks on Sodexo's Business Relationships

175.    Consistent with the teachings of Defendant SEIU's Contract Campaign Manual, Defendants have also sought to further their extortionate scheme by repeatedly interfering with Sodexo's business relationships. The goal of this activity is clear: undermine Sodexo's business

relationships with its customers and cause them to terminate existing, or decline to enter into new, business relationships with Sodexo, thus eventually causing the Company to give in to Defendants' demands in order to avoid further financial damage.

### 1.    Colleges and Universities

176.    Sodexo's Campus Services business unit currently provides dining services to over 600 colleges and universities across the United States. Because university campuses are fertile ground for a variety of student-driven social movements, Sodexo's business relationships with its university clients are a perfect target for Defendants. In order to create pressure on Sodexo, Defendants have collaborated with student groups such as United Students Against Sweatshops ("USAS") to generate a number of major attacks not only against Sodexo itself, but also against the college and university administrators with whom Sodexo does business.

### a.    George Mason University

177.    George Mason University ("GMU"), in Fairfax, Virginia, is one of the hubs of Defendants' Corporate Campaign against Sodexo. Defendants have launched a substantial effort aimed at forcing GMU to fire Sodexo as its food services contractor. Defendants' hope that their activities at GMU will create a groundswell that will overflow onto other university campuses and communities. For instance, union supporters have been wearing insignia bearing the phrase "GMU First, We're Next" at other colleges and universities where Sodexo has accounts. Defendants' actions at GMU have followed precisely the guidelines set out in Defendant SEIU's Contract Campaign Manual. They have created "newsworthy events," used the news media to publicize their activities and disparaging allegations, pressured individual managers and executives, threatened Sodexo's relationships with its customers, and utilized third parties such as students, politicians and employees, to disguise Defendants' role in their Campaign attacks.

178.    Defendants instigated numerous and widely publicized events at GMU in furtherance of their Corporate Campaign.  For instance, on separate occasions in April and September 2010, Defendants orchestrated mass disruptions, protests, and marches on GMU's campus.  These activities were designed to appear as if they were conceived and carried out by disgruntled Sodexo employees when, in fact, Defendant Local 32BJ planned and executed the events.  Defendants attempted to enhance the damage that their attacks would cause Sodexo by falsely telling Sodexo employees that Sodexo was closed during the protests and informing students that the cafeteria was closed.  These events caused closures all over GMU's campus, and many of the dining facilities that remained open were understaffed.

179.    Defendants publicized each of these "newsworthy events" widely in various media outlets such as the Washington Business Journal and the Fairfax Times, and The Washington Post, Connect2Mason, and Social Worker websites, and further bragged about their accomplishments by distributing flyers throughout GMU's campus, and posting articles and statements on Defendants SEIU, Local 32BJ, and Clean Up Sodexo websites and on Local 32BJ's Twitter page. (See, e.g., Exs. 29-36.)  In these articles and public statements, Defendants intentionally concealed not only their involvement in the events but also their identity as the source of the disparaging allegations.  Defendants also filmed, or caused to be filmed, these events and posted, or caused to be posted, such films on publicly accessible websites such as YouTube and Connect2Mason.

180.    Defendants also engaged in deceptive practices to garner the assistance of the GMU community at large.  For instance, on or about April 26, 2010, SEIU employee Amaya Henry sent a mass email to GMU students and SEIU supporters urging them to write letters to the student print and on-line newspapers, the student government, the GMU president, and

Sodexo to communicate their support for workers' rights to organize. (*See* Ex. 37.) Ms. Henry misrepresented herself to the Student Senate as a GMU student in an attempt to get members of the Student Senate to attend a SEIU-sponsored meeting and in an attempt for Ms. Henry to gain access to a Student Senate meeting.

181.    Defendants also targeted influential members and organizations within the GMU community in an attempt to disrupt and damage Sodexo's contractual relationship with GMU. For example, Defendants caused to be written a letter purportedly from GMU students to University President Alan G. Merten, demanding that GMU terminate its contact with Sodexo immediately. (*See* Ex. 38.) Shortly after receiving this letter, GMU announced that it would engage an outside consultant to conduct an independent investigation into the students' allegations against Sodexo's. Defendants then caused to be published statements announcing GMU's investigation into the "students'" allegations.

182.    Defendants and their agents also personally targeted President Merten by harassing his neighbors for several hours with disparaging statements about Sodexo and President Merten, and distributing hundreds of flyers repeating these same disparaging remarks. This event, labeled by Defendants as "Reverse Trick-or-Treating," culminated in Defendants and their entourage taking their demonstration to President Merten's home where they harassed President Merten and his family until the GMU police arrived. Defendants then caused an article to be published about the above events on their GMU Students For Workers Rights website. (*See* Ex. 39.)

183.    More recently, Defendants intensified their attack on Sodexo's relationship with GMU by commissioning a Clarion Group study that accused Sodexo of overcharging George Mason University by $620,000. (*See* Ex. 40.) Defendants sent the report under cover of a letter

dated December 14, 2010, to members of Virginia's Governor's Commission on Higher Education Reform, Innovation and Investment, and to members of GMU's Board of Visitors. (*Id.*) Defendants then publicized their "findings" by causing articles to be published by media outlets such as the Richmond Times-Dispatch. (*See* Ex. 41.) Predictably, Defendants' disparaging claims about Sodexo proved to be meritless. Sodexo performed a thorough review of insurance and benefits charges relating to the Company's contract with GMU, and concluded that all charges to GMU were fully compliant with Sodexo's contract with GMU.

### b.    "Kick Out Sodexo"

184.    USAS has served as one of Defendants' primary allies in the higher education phase of the Corporate Campaign. With Defendants' assistance and/or guidance, USAS began an initiative called "Kick Out Sodexo" in 2009 after students "discovered" "employer abuse by the multinational corporate giant, Sodexo." (*See* www.kickoutsodexo.usas.org/about.) However, this initiative was instigated and continues to be influenced by Defendants, as the students' perception of Sodexo is shaped by the one-sided and misleading information they receive from Defendants. Defendants have not made these students aware of Defendant SEIU's power play with regard to UNITE HERE or of their true financial and strategic motives in attacking Sodexo.

185.    While the students who carry out USAS' ground attacks likely do so based on the perception that they are working to achieve social justice, the USAS entity has additional incentive for supporting Defendants' campaign and following their instructions. Since 2007, Defendants SEIU and CtW collectively have contributed at least $55,000 to USAS, presumably to obtain its assistance in carrying out campaigns such as the Clean Up Sodexo Campaign.

186.    To help further Defendants' extortionate scheme, USAS created a website called "Kick Out Sodexo," which is dedicated to disseminating highly disparaging allegations about Sodexo in furtherance of USAS' goal to undermine Sodexo's contractual relations on university campuses across the nation. (*See* www.kickoutsodexo.usas.org.) The Kick Out Sodexo website provides an additional mouthpiece for Defendants to level extortionate threats disguised as statements of concerned students. For example, the website states, "We know our universities can put incredible pressure on Sodexo as major clients of the company, so we're organizing with our fellow students to call on university presidents and chancellors to stop doing business with Sodexo immediately . . . It's time for our universities to take responsibility and kick out Sodexo!" (*Id.*)

187.    USAS has also accused Sodexo on its website of being a "serial worker rights abuser" and paying its employees "poverty wages" and denying them "access to healthcare." (*See* www.kickoutsodexo.usas.org/about.) USAS has established a Facebook page on which it frequently posts updates regarding its anti-Sodexo attacks and other Clean Up Sodexo events. (*See* www.facebook.com/KickOutSodexo.)

188.    The website also provides students with a "step-by-step guide to kicking Sodexo out at your school." (*See* Ex. 42.) The guide encourages students to "step up the heat" by backing up their written demands with action including "engaging in civil disobedience to kick out Sodexo." The guide also encourages students to deliver a form letter to their university president or chancellor demanding that they immediately terminate the university's business relationship with Sodexo. (*See* Ex. 43.)

189.    USAS has been active throughout the Campaign and has organized coordinated harassment of Sodexo's higher education clients. For example, on or about October 21, 2010,

USAS announced that "14 student organizations" were urging their university presidents to "stop poverty and intimidation for campus workers." Doing Defendants' dirty work for them, the student delegations attempted to pressure their campus administrators to terminate their contracts with Sodexo. A press release published on USAS' website noted that the student delegations were delivering an identical letter to each of their university presidents, who USAS claimed "are choosing to allow campus workers to live in the shadows of poverty and intimidation, instead of heeding students' calls to kick out Sodexo." (*See* Ex. 44.) The letter was signed by student groups at the following colleges and universities: George Mason University, College of Williams & Mary, Ohio State University, Emory University, Tulane University, Georgia Institute of Technology, Western Washington University, University of Washington, Ithaca College, Northeastern University, University of Maryland, University of Chicago, Cornell University, and Rutgers University. Defendants publicized USAS' efforts on the Clean Up Sodexo website in a blog article written by Ashley Wood and posted on or about October 29, 2010. (*See* Ex. 45.)

190. In addition, on or about January 21, 2011, at the urging of Defendants, USAS disrupted a National Food Service Conference meeting that was taking place at the University of Washington ("UW"), a Sodexo client. The conference was attended by UW and Sodexo officials, as well as other Sodexo clients. The protesters repeatedly demanded that UW terminate its contract with Sodexo. Ultimately, campus police had to be called to remove the protesters from the site of the conference. USAS uploaded local media coverage of its protest on its Kick Out Sodexo Facebook page. (*See* www.facebook.com/KickOutSodexo)

191. USAS' Kick Out Sodexo initiative is fabricated to appear as if it is an independent movement of socially conscious students, when in fact it has been orchestrated and set in motion by Defendants. Through Kick Out Sodexo, Defendants have used USAS' student supporters as

-76-

unwitting pawns in precisely the manner Defendant SEIU's Contract Campaign Manual suggests students can be manipulated to help "pressure the employer." Kick Out Sodexo also allows Defendants to conceal the full extent of their involvement in their campus actions and outright threats to Sodexo's business relationships that have occurred in furtherance of Defendants' Corporate Campaign.

<strong>c.    Other College and University Activities</strong>

192.   ***Spring 2010 Disruptions and Protests.***  As part of their targeting Sodexo's university accounts, Defendants orchestrated, sponsored, and caused to take place many more disruptions and protests on dozens of college campuses throughout the country during the spring of 2010. The majority of these demonstrations were carried out by the Local Union Defendants and occurred simultaneously in an effort for Defendants to deliver as effective and deafening a threat as possible while maximizing the damage caused to Sodexo. These protests were likewise designed to appear as if they were conceived and carried out by disgruntled Sodexo workers and college students, when in fact they were planned and executed by Defendants. These activities took place at locations such as Ohio State University (a demonstration in which Defendant Mary Kay Henry participated), Loyola University, Northwestern University, Whittier College, Rensselaer Polytechnic Institute, Clark University, Emory University, Tulane University, Dillard University, Muhlenberg College, Lehigh University, Lafayette College, University of Denver, University of Lethbridge, Merrimack College, Anna Maria College, Georgia State, Clark-Atlanta University, Morehouse College, Georgia Tech, and Denison University. Besides staging substantial protests on these campuses, Defendants further interfered with Sodexo's business by falsely telling workers that Sodexo was closed for business during the protests, causing Sodexo workers on several campuses not to show up to work. Defendants then publicized these attacks

-77-

on the Clean Up Sodexo website and through other media outlets, in order to ensure that Sodexo knew it was Defendants that had attacked the Company. (*See, e.g.*, Exs. 46-48)

193.    In addition, during the rally at Ohio State University, which took place on or about April 15, 2010, a number of demonstrators, including agents and or employees of Defendant Local 1, intentionally broke the law by sitting in the middle of North High Street in Columbus, Ohio, and impeding traffic. When these demonstrators intentionally ignored the orders of the Columbus police, they were arrested for disorderly conduct. (*See* Ex. 49; YouTube video available at http://www.youtube.com/watch?v=AMTscIXpEzM.).    That same day, protesters also were arrested during a demonstration staged by Defendant Local 615 at Clark University in Massachusetts. (*See* Ex. 50.)

194.    During this time, Defendants and their agents also sent or caused to be sent letters to University Presidents purportedly authored by students demanding that their respective schools terminate their contract with Sodexo. Upon information and belief, some or all of the language of these letters was prepared in advance by Defendants. Defendants then published, or caused to be published, these "student" letters on a number of internet sites. Such letters were delivered to Presidents at George Mason University, College of William and Mary, Tulane University, Clark University, Ohio State University, Emory University, Tulane University, Georgia Institute of Technology, Western Washington University, University of Washington, Ithaca College, Northeastern University, University of Maryland, University of Chicago, Cornell University, and Rutgers University. Defendants then publicized the sending of these letters on various media outlets such as Defendants' GMU Students for Workers Rights, Clark-Unite, and Clean Up Sodexo websites, and third-party sites such as Connect2Mason and the Louisiana Weekly.

195.    ***SEIU Summer Brigade***.  During the summer of 2010, Defendants orchestrated a series of events directed at Sodexo's college and university clients.  Defendant SEIU called this the "SEIU Summer Brigade."  A Workers World article written by Roger Sikes, a graduate student and a collaborator with Defendants, and published on or about September 6, 2010, described the purpose of Defendant SEIU's "Summer Brigade" activities as "a summer-long program aimed at pressuring food service giant Sodexo to agree to a global card check agreement."  (*See* Ex. 51.)  Sikes also noted that Defendant Workers United, along with its surrogates, "descended" upon Atlanta in or around the week of August 9, 2010, to stage a series of protests at local colleges and universities designed to achieve that end.  Betraying the true goal of Defendants' Corporate Campaign, Sikes further noted that the campaign was designed to "facilitate[] cross-campus and cross-state coordination, <u>because pressure applied to any of Sodexo's sites will impact a national or international bargaining agreement</u> . . . Students have leverage in this situation because it is the universities that hold the contracts with Sodexo . . . [I]t does not bode well for . . . Sodexo if students reject the current exploitative working conditions of subcontractors like Sodexo  .  .  .  If Sodexo is not willing to comply, then a different subcontractor will be brought in with restructured labor standards."  (*Id.*)

196.    The kick-off event of the ten-week summer program was a training session in Washington, DC for students, employees and union organizers, during which Defendant SEIU provided training on how to harass Sodexo and interfere with its relations with higher education clients.  (*See* Ex. 52.)  Upon information and belief, the students that participated in Defendant SEIU's Summer Brigade were compensated by Defendants for their aiding the Campaign.

197.    ***Extortionate Threats Transmitted through Sodexo's Own Employee***.  Having created a cacophony of disruption at Sodexo's college accounts across the United States over the

spring and summer months of 2010, Defendants then sought to level additional extortionate threats through the Company's employees themselves, another tactic directly out of Defendant SEIU's Contract Campaign Manual. On or about September 19, 2010, Tom Suber, who works for Sodexo on its Ohio State University account, approached the Company's area managers, Molly Kurth and Marvin Phillips, during an Ohio State football game. According to Ms. Kurth, Mr. Suber stated that "Sodexo['s] dragging their feet is costing them millions and that he knows that the attorney generals in Ohio, Michigan, and Illinois will be investigating Sodexo." He also told them "there will be 21 demonstrations across the country in the month of October [2010], all of which are unnecessary if Sodexo would just settle with the union." Defendants had communicated to Mr. Suber their threats to harass, smear, and harm Sodexo until Sodexo capitulated to their demands, with the intent that he would relay their extortionate message back to Company officials.

198.   *Fall 2010 Coordinated "Strikes."*  Mr. Suber's prediction quickly came true. In or around October 2010, Defendants staged a series of disruptive protests at Sodexo locations around the United States. Defendants portrayed these actions as a cumulative effort on the part of Sodexo employees to demand better treatment, when in fact some or all of these events were orchestrated and carried out by Defendants and their agents to cause Sodexo further harm. Defendants bragged on the Clean Up Sodexo website that their efforts had resulted in near-simultaneous disruptions at the following locations in or around the first week of October 2010: Clark University, Crew and Ohio Stadiums in Columbus, OH, Lehigh Valley Hospitals, including Cedar Crest, Good Shepherd and Sacred Heart, Highland Park Public Schools, Morehouse College, Tulane University, and Whittier College. In a blog article publicizing these

events, Defendants made the baseless claim that Sodexo has a "practice of paying workers as little as they can get away with in order to increase profits." (*See* Ex. 53.)

199.    ***Additional Arrests.***    Defendants also coordinated and carried out further illegal activities around college campuses. On or about November 22, 2010, Defendant Local 1 staged a protest at Ohio State University that resulted in the arrest of 25 demonstrators on charges of criminal trespass. The demonstrators were arrested for blocking access inside a campus student union. In keeping with Defendant SEIU's Contract Campaign Manual's suggestion to make pressure tactics appear to originate with the employees themselves, Defendant Local 1 convinced a small number of Sodexo employees to participate in the protest and to be arrested. Prior to the demonstration, Defendant Local 1 instructed those employees to call Sodexo's local managers from jail after they were arrested in order to generate additional pressure on the Company. At least one employee followed Defendant Local 1's instructions. At approximately 9:40 p.m. that evening, Chris North, Sodexo's Ohio State Concessions Manager, received a call from Gary Snell, a Company employee who had been arrested during the protest earlier that evening. Snell told North that he was in jail and wanted to know when Sodexo would "recognize the union." North asked Snell why he would call from jail to ask this question. Snell responded only that he had been told to call North's phone number and ask that question.

200.    Other agents of Defendants also made harassing phone calls to Sodexo managers following these arrests. General Manager Dan Phillips received a phone call at approximately 12:49 a.m. on November 23, 2010, from a person named Hayden Shortman, who stated that he was calling from Franklin County Jail "on behalf of Sodexo workers" and that they would not "stop fighting" until Sodexo employees had a union. Mid-Atlantic District Manager Paul Laky received a call at approximately 12:53 a.m. from a person who called himself "Zack" and who

-81-

claimed to be in jail "as part of a solidarity movement with Sodexo employees at Ohio State." "Zack" stated that the protest was carried out to "prove" that working conditions at Ohio State are "atrocious," that other protestors were "reserving one phone call in jail" for Laky, and that they will "do everything it takes to win this campaign."

201.    ***Direct Harassment of Clients***.   Defendants have also directly contacted Sodexo's higher education clients and attempted to cause them to sever their business relationships with the Company.   For example, on or about November 3, 2010, Gabe Morgan, Defendant Local 32BJ's Western Pennsylvania Area Leader, sent a form letter to the members of Lehigh University's Board of Trustees addressing Lehigh's food services contract with Sodexo. Morgan's letter claimed that Sodexo "has a questionable track record with clients, employees, and students on college campuses across the country" and attached almost 100 pages of "information" regarding Sodexo's "irresponsible practices" that "may be of interest" to the University.   (*See* Ex. 54.)   Predictably, the vast majority of materials enclosed with Morgan's letter were press clippings and other coverage of Defendants' own attacks and smears against Sodexo.   Defendants mailed identical letters and materials to other Sodexo university clients, including, but not limited to, Neumann College in Aston, Pennsylvania.   (*See* Ex. 55.)

202.    ***Other College Activities***.   Defendants' other unlawful activities at various colleges and universities targeted by Defendants during the Clean Up Sodexo Campaign have caused Sodexo, its employees, and their families considerable alarm.

(a)      Defendants singled out five Sodexo managers working at Loyola and Tulane Universities by shamelessly posting their personal photographs on "WANTED" posters, which claimed that these individuals were being sought for "violating workers' human rights." (*See* Ex. 56.)   Defendants superimposed cowboy hats, bandanas and mustaches over the

managers' photographs to make them resemble "outlaws" and included an allegation in the posters that Sodexo "has allowed its managers to run food services at Loyola and Tulane Universities like the wild west."   As directed by Defendant SEIU's Contract Campaign Manual, Defendants specifically targeted these Sodexo managers with the intent to personally "embarrass them in front of their superiors, associates, families, neighbors or friends in the community." (*See* Ex. 8 at p 3-27.)  These posters also published the personal phone number of Sodexo's New Orleans District Manager and encouraged readers to call and harass him personally.  Defendants circulated their demeaning "WANTED" posters around the Loyola and Tulane campuses.  In at least one case, agents of Defendants tried to convince students to accept the posters by telling them that they were course registration materials.

        (b)      On or about November 10, 2010, Stu Gerhardt, a Sodexo employee who manages Sodexo's contract with Clark University, received an anonymous email from an individual who identified himself as "the concerned husband of one of your valued employees." (*See* Ex. 57.)  The sender attached an anti-Sodexo flier being passed out on campus by Defendant Local 615.  He also informed Gerhardt that Defendants had sent Clark University students to his home "and the homes of other Sodexo employees," posing as Sodexo Human Resources representatives, in an effort to gain entry to their homes and "pull in support."  He also stated that "vandals" he suspected to be connected with Defendants "struck off campus," and worried that Defendants were preparing an attack on his home: "What kind of attacks are possibly to come upon our homes?"   Clearly frightened that he and/or his wife might suffer repercussions at Defendants' hands, the sender pleaded with Gerhardt to keep his complaint confidential and suggested that his wife already had been threatened by Defendants: "My wife has taken it on the chin once and it concerns me that this may not be the end of it.  Also, that these types of strong

arm tactics my [sic] spill over to our home at some point." The sender concluded with the ominous prediction that Defendants would "make good" on their threats.

(c)     On or about April 16, 2010, unidentified individuals believed to be agents of Defendants vandalized the personal vehicle of Sodexo manager Joe Mitchell. The vandalism occurred during a peak of activity at Emory University, where Mr. Mitchell is a Resident District Manager. The vandals wrote the word "Stop" across the back window of Mitchell's car and pelted it with eggs and Jell-O. Mitchell lives in a community of nineteen homes, and the vandals had to pass by sixteen of them to reach Mitchell's home. No other car in his community was touched that evening.

(d)     On or about November 9, 2010, Jeff Scott, Sodexo's Area General Manager of Campus Services for Sodexo's food service contract at Ithaca College in Ithaca, NY, received a threatening e-mail from an anonymous sender identified only as "whizzleblowwer23." The e-mail leveled a number of personal threats at Mr. Scott, including the following: "You don't know me, but I know you . . . I will be in touch from time to time, to keep you on your toes, and to report yours and their crime . . . There is more to come, more wrongs to correct . . . These words may not make too much sense today, but in due time they will, with the things I will say." The author then implicitly threatened to [falsely] accuse him of engaging in criminal activity: "Do you want to test the info that I know? If so, please keep doing the things that are wrong, like personal use of the company credit card . . . There is more to come, and I can email the president [of Ithaca], I wonder whose reputation I will dent? Shall we see, and continue to dance? And watch you fly by the seat of your pants?" The sender also implicitly threatened to level more allegations against Mr. Scott when he least expected it in the future: "I will be back, but when? Or where? What more info will I be willing to share?" (*See* Ex. 58.) Upon

-84-

information and belief, these direct extortionate threats against a Sodexo manager were sent by Defendants and/or Defendants' agents in order to further their scheme.

### 2.   K-12 School Districts

203.   Sodexo's School Services business unit manages foodservice and student well-being activities for more than 470 school districts throughout the United States. Defendants have engaged in a myriad of conduct designed to interfere with these local school services contracts. Defendants have created and repeatedly published disparaging, misleading studies and alarming reports about Sodexo's school district services. Defendants have also orchestrated protests directed at Sodexo's K-12 business partners, including three New Jersey school districts: Highland Park, Long Branch, and Pittsgrove. Defendants then publicized these events widely. (*See* Exs. 59-62.)

204.   Defendants also have engaged in deceptive, and sometimes illegal acts, in their effort to disrupt Sodexo's K-12 business relationships. For example, in or around April 2010, at several Chicago-area elementary schools, organizers working for Defendants SEIU and/or Local 1 trespassed on school grounds by misrepresenting themselves to school officials as being "from Sodexo" in order to bypass security and gain access to Sodexo employees. These individuals attempted to obtain personal information from employees and succeeded in getting such information from at least one employee before their identities were discovered and they were removed from school premises. These actions were illegal under Illinois law regarding trespass on common school lands. (*See* 105 ILCS 5/15-5.) Furthermore, in or around July 2010, agents of Defendants SEIU and Local 32BJ visited Sodexo employees at their homes in Asbury Park and Manchester Township, New Jersey. Claiming to be representatives of "Sodexo," these

agents provided Sodexo employees with information about Defendant SEIU and made it appear that they, as "Sodexo representatives," were endorsing the union.

205.    Defendants made many other direct attempts to cause Sodexo's K-12 clients to sever their relationships with Sodexo. For example, on or about November 23, 2010, Defendant Local 615 attempted to interfere with Sodexo's contract with Fitchburg Public Schools, in Fitchburg, MA. On that date, Adriana Fieldman mailed a letter to the Superintendent of Fitchburg Public Schools requesting a meeting to share Defendant Local 615's "concerns about the potential misuse of millions of dollars in federal school meal program funding." Fieldman's letter leveled a variety of disparaging allegations regarding Sodexo's alleged violations of contracts in other states. Claiming to have a "longstanding interest and focus on the financial accountability and transparency of employers," Fieldman expressed hope that Fitchburg Public Schools would "consider launching a thorough investigation of Sodexo's school food service contracts in this state." (*See* Ex. 63.) Defendants' purpose in requesting this investigation was not to address a genuine concern for the misuse of public funds in Massachusetts, but instead was yet another effort to cause Sodexo to lose business and to suffer additional financial injury.

206.    Defendant SEIU's front group Campaign for Quality Services has also attempted to disrupt Sodexo's K-12 business relationships. Throughout the fall of 2010, agents of Campaign for Quality Services attended a series of educational conferences, such as the National Association of Black School Educators Conference and the New Jersey Parent Teachers Association Conference. Although Campaign for Quality Services' purported presence at these events was to share information regarding food quality and "ethically-contracted" meals at U.S. elementary and middle schools, in reality its mission was to further smear Sodexo to conference participants. Agents of Campaign for Quality Services set up informational booths at each such

conference and distributed disparaging and negative information about Sodexo, including but not limited to the many sensational and misleading reports described throughout this Complaint.

207.    Defendants have also circulated some of their smear reports to Sodexo's K-12 clients in a way that attempts to minimize Defendant SEIU's direct involvement and/or self-interests.  For example, Campaign for Quality Services prepared and released a report called "High Cost of Backroom Deals: How Secret Agreements with Sodexo's Suppliers May be Bad for Clients," which accuses Sodexo of "cheat[ing]" clients out of lower prices on products and services and of using "hidden incentives" to create conflicts of interest in its contract managers. On or about January 12, 2011, Marakah Mancini, Campaign for Quality Services' Director, sent copies of the report to a number of Sodexo's K-12 clients, at least including, but not limited to, the Guam Public School System.  (*See* Ex. 64.)

### 3.    Hospitals

208.    Sodexo also provides food and property services at hundreds of hospitals and hospital systems throughout the United States.  As with Sodexo's higher education and K-12 clients, the Company's hospital clients have been targeted in Defendants' extortionate Campaign.

### a.    City of Los Angeles Contract

209.    Sodexo is currently in the bidding process for renewing a dietary services contract and entering a new environmental services contract with the Los Angeles County Department of Health Services.  The Company's dietary services contract with LA County is worth $2.1 million in revenue annually, and the potential environmental services contract is estimated to be worth $5 to $10 million in annual revenue.

210.    During the evaluation of the bids for the contracts, members of Defendant USWW deliberately and unlawfully interfered with the process by attempting to influence

members of the Los Angeles County Board of Supervisors ("Board") to reject Sodexo's bid. Specifically, on or about August 10, 2010, David Huerta, Vice-President of Defendant USWW, sent a letter to Kathy Hanks, the County's Director of Contracting, and to members of the Board. (*See* Ex. 65.) Huerta's letter referenced the County's bid proposals for housekeeping services and promoted two potential bidders as more suitable candidates than Sodexo. Both were companies whose employees are represented by SEIU locals, including Local 1877.

211. On that same date, Andrew Gross Gaitan, Multi-Services Director for Defendant USWW, distributed another letter and materials to Hanks and to members of the Board. (*See* Ex. 66.) Gaitan's letter directly attacked Sodexo's qualifications to serve as a county contractor and included several sensational and highly misleading allegations. For instance, the letter alleged that a 2007 county health inspection revealed "brown fluids and smears on patient room walls, door handles and the floors of areas operated by Sodexo" at the Citrus Valley Medical Center, a facility serviced by Sodexo. Not only has the Citrus Valley Medical Center been one of the cleanest hospitals in Los Angeles County under its contract with Sodexo, but this alleged 2007 incident preceded the Company's involvement with the facility. Despite knowing this, Defendant USWW intentionally blamed Sodexo for this incident, in order to generate a sense of disgust and lack of confidence towards Sodexo among the Board of Supervisors.

212. Gaitan's salvo of smears did not end there. His letter also claimed that health inspectors "found an infestation of gnats and flies in the food preparation and food serving area managed by Sodexo" at the Hollywood Presbyterian Medical Center, another facility for whom Sodexo provides food services. Gaitan attempted to link this alleged "infestation" with a prior finding that "poor pest control presented a danger of maggot formation" and that the hospital was ultimately cited after patients were found with "maggots in their wounds." In the course of

painting this grotesque picture, Gaitan deliberately ignored these facts: the hospital, not Sodexo, was cited for the alleged pest control problem; "pest control," especially in and around the patient areas, is not Sodexo's responsibility; and there has never been any incident of food-borne illness under Sodexo's food services contract with Hollywood Presbyterian. Gaitan's sensational accusations were intended to alarm the Board and to influence negatively its decision relating to Sodexo's contract bid. The materials enclosed with Gaitan's letter also included misleading allegations that Sodexo's supposed lack of health care benefits would cost the County of Los Angeles taxpayers $1.1 million annually.

213.    Gaitan's and Huerta's correspondence with the Board of Supervisors was expressly illegal and violated Los Angeles County Code Chapter 2.160. On or about August 16, 2010, William T. Fujioka, Chief Executive Officer of the Board of Supervisors, wrote to Huerta. Fujioka admonished Huerta that the County has a "clear policy and rules against any entity from interfering with a bid process as well as laws concerning the lobbying of County officials." (*See* Ex. 67.) He also advised Huerta that Defendants' "activities to influence the Board Offices and officials at the Department of Health Services during the solicitation process is not allowed and is inappropriate." Defendants knew that their attempt to influence a public bidding competition was illegal under local law, but did it anyway. Consistent with Defendant SEIU's Contract Campaign Manual, which teaches that breaking the law is sometimes necessary to achieve campaign objectives, Defendants hoped that their unlawful influence would force the Board of Supervisors to refuse to select Sodexo as its contractor.

**b.    Harris County Hospital District**.

214.    Harris County Hospital District ("HCHD"), servicing the greater Houston, Texas area, has contracted with Sodexo to provide a variety of services over the past 14 years. During

the spring of 2010, Sodexo was in the final months of its contract to provide environmental services to HCHD worth several million dollars per year in revenue, and was preparing to bid on the successor environmental services contract.  In or around March 2010, HCHD's purchasing agent, Harris County Purchasing, invited Sodexo and one other contractor to make a live presentation.  Although HCHD's executive leadership informed Sodexo that it was planning to recommend that the Company be awarded the successor contract, the HCHD Board of Managers still had to approve all contracting recommendations.

215.    Defendants, through Beverly Ortiz, a coordinator for Defendant Local 1, contacted Harris County Commissioner Sylvia Garcia (who had appointed several members to the Board of Managers, including Dale Wortham, who is a member of the Houston AFL-CIO) and persuaded Garcia to help prevent Sodexo from winning the environmental services contract. Garcia then contacted HCHD's Chief Executive Officer and informed him that HCHD would not be permitted to have Sodexo as its contractor.  Upon information and belief, Garcia also communicated with the Board of Managers and convinced several of them to vote against Sodexo's bid. Ortiz also attended two HCHD Board of Managers meetings, which took place on or about August 26, 2010 and September 30, 2010, and spoke out against Sodexo's bid.

216.    Defendants' interference caused Sodexo to lose its contract with HCHD.  When HCHD and Harris County Purchasing submitted its recommendation to hire Sodexo to the Board of Managers on or about September 25, 2010, Wortham approached HCHD's CEO and told him that the Board had the votes to shoot Sodexo down.  Because Sodexo had submitted the lowest bid, the Board of Managers legally could not select another contractor.  To keep Sodexo from winning the contract, the Board voted in or around November 2010 to discontinue altogether the

practice of outsourcing its environmental services work to a third-party contractor and to bring that function in house.

217.   The loss of the HCHD environmental services contract will cost Sodexo approximately $10 million in revenue over the next three years. Even worse, the loss effectively eliminated the jobs of the 16 managers who serviced the contract, and Sodexo had to act promptly to find them alternative Company employment. Defendants' callous disregard for the job security of these Sodexo employees demonstrates that Defendants' intent is not to protect the interests of Sodexo's employees, but to cause the Company to suffer harm, regardless of the collateral damage they cause.

<b>c.   Other Hospital Activities</b>

218.   ***Cleveland Clinic Laundry***.   Sodexo provides laundry and linen services to the Cleveland Clinic hospital system.   The hospital system's bed sheets and other linens are laundered at Sodexo's Collinwood Yards facility, located in the Cleveland, Ohio area.   Upon information and belief, Defendant SEIU and its agents caused OSHA investigators to visit and inspect Sodexo's Collinwood Yards, OH laundry facility on or about June 25, 2010 by encouraging employees to file a bogus safety complaint with OSHA.

219.   Defendants then sought to use the pending OSHA investigation to generate negative media attention and increase the pressure on Sodexo.   On or about July 9, 2010, Defendant SEIU, through Ashley Wood, published a blog post containing "coverage" of a "press conference" held by Sodexo laundry workers the previous day.   (*See* Ex. 68.)   Other than Defendant SEIU's own media, there was no press covering this "press conference."   Wood, however, claimed that there were "[o]ver 50 workers and community allies" present.   In fact, the majority of those "community allies" were Defendants SEIU's and Local 1's agents.

220.    Throughout her blog post, Wood alleged that "[Sodexo] puts profits above safety."    She supported this statement with a quote from Dallas Sells, Ohio Director of Defendants Workers United/SEIU Chicago Regional Joint Board, who claimed that "Sodexo is a serious repeat violator of federal job safety standards at industrial laundry facilities in Cleveland, Pittsburgh, and Buffalo."    Hyperlinks embedded in the article, which supposedly link to documents demonstrating Sodexo's "serious violat[ions]," actually link to the Clean Up Sodexo website.    Contrary to Sells' misleading statements, a 2009 U.S. Bureau of Labor Report, *Incidence Rate of Total Recordable Cases*, shows that Collinwood Yards' incidence rate is <u>below</u> the average incidence rate for a laundry plant of the same employment size.    In fact, the incident rate at Collinwood Yards has been lower than industry average for the past four fiscal years (2007-2010).

221.    Defendant SEIU caused another public disruption to take place at the Collinwood facility on or around September 21, 2010 and then publicized the event, along with its disparaging allegations against Sodexo, on its blog.    (*See* Ex. 69.)    Following the orchestration and deceptive coverage of this disruption, Defendants' agent, Jobs with Justice, published sensational and despicable allegations regarding Sodexo's laundry services for the Cleveland Clinic hospital system.    In an article titled "Cleveland's Own 'Sweat' Shop," released on or about September 24, 2010, Debbie Kline of Jobs with Justice falsely alleged that Sodexo workers at the Collinwood Yards facility find "used hypodermic needles; human body parts, fluids and excrement; umbilical cords and other hazardous material...on a daily basis."    (*See* Ex. 70.)    Kline's article suggested that patients sleeping on linens laundered at Sodexo's Collinwood facility should refrain from thinking about how they "**are sleeping on the remnants of someone**

-92-

**else's hospital waste**." (*Id.*, emphasis added.)  Kline's intent in making these statements was to create a visceral reaction of disgust and alarm towards Sodexo.

222.    In contradiction to Defendants' wild public allegations, when OSHA issued its inspection report on or about July 27, 2010, it rejected six of the eight claims made in the complaint and cited Sodexo only for two minor violations.  In December 2010, these two remaining minor violations were also deleted by OSHA.  Thus, Defendants' baseless OSHA claim against Sodexo--to which Defendants cited as justification for their attacks--amounted to nothing.

223.    *Lehigh Valley Hospitals*.  Defendants also targeted Sodexo's hospital clients in the Lehigh Valley in northeastern Pennsylvania.  In or around January 2010, Defendants' organizer-in-training Austin Guest misrepresented himself to Sodexo employees as a fellow Sodexo employee in order to obtain their personal information.  Some Sodexo employees reported feeling uneasy about, and even threatened by, Guest's fraudulent advances.

224.    Defendants SEIU and Local 32BJ also orchestrated a protest against Sodexo in Allentown, Pennsylvania on or about April 15, 2010 that was made intentionally to look like a spontaneous uprising of Sodexo employees, when in fact the majority of the "protestors" were students and union organizers, not Sodexo employees.  (*See* Ex. 71.)

225.    Defendants and/or their agents also conducted "hospital food satisfaction surveys" during July and August of 2010 in several Lehigh Valley-area hospitals, despite having no authorization from hospital administrators to do so.  For example, on or about August 3, 2010, one of Defendant SEIU's agents approached a Sodexo employee and asked her if she was willing to take a survey for the "food service."  When asked by the employee who was conducting the survey, the man replied "the Union."  Defendants disguised the survey to resemble a legitimate

attempt to ascertain the quality of the food service at the hospital. After a series of five "yes" or "no" questions, question six asks whether the hospital food served by Sodexo contained "**bugs, rat droppings, mold or flies**," and encourages the person taking the survey to "circle all that apply." (*See* Ex. 72, emphasis added.)

226.    Defendants or their agents approached other hospital employees on or around August 3, 2010 and August 13, 2010 and asked them to complete the same survey. Upon information and belief, Defendants also distributed their survey to hospital patients throughout the summer of 2010. This "survey," and specifically the spurious question regarding foreign items in the food, was calculated by Defendant SEIU to alarm hospital patrons over the safety and quality of the meals they, or their family members, were being served.

227.    Defendants or their agents also were observed on or about August 18, 2010, tampering with and taking pictures of patients' food at several Lehigh Valley hospitals. In doing so, Defendants' agents intentionally and illegally trespassed on patient floors of the hospitals. Defendants hoped to obtain photographic "evidence" that Sodexo was serving unsanitary meals to hospital patients.

### 4.    Government Contracts

228.    Sodexo's federal government contracts are among its most valuable. Fully aware of the damage that interfering with Sodexo's business relations with the federal government would cause the Company, Defendants have focused their campaign intently on the Company's existing and prospective contractual relationships with the United States military, as described below.

229.    *United States Marine Corps.* Sodexo has held two contracts to provide domestic food services to the United States Marine Corps that together have generated over $1 billion in revenue over the life of the contracts. The contracts, one of which covers the Marine Corps' East

Coast garrisons, and the other of which covers its West Coast garrisons, expire at the end of March 2011. The Marine Corps held a bidding competition for the successor contracts, pitting Sodexo against several competitors. Recognizing the effect that losing one or both of the Marine Corps contracts would have on Sodexo, Defendants have made it a Campaign priority to scuttle Sodexo's chances to retain this important business opportunity. Defendant SEIU has no business with the Marine Corps and is not charged by the government, the public or anyone else to be a watchdog over the business affairs and decisions of the Marines.

230.     Sometime on or about April 8, 2010, Defendants or their agents contacted United States Representative Loretta Sanchez, a member of the House Armed Services Committee, and, upon information and belief, suggested that Sodexo had contributed to cost-overruns in the administration of the Marine Corps contracts. Defendants' sole intent in making these allegations was to undermine Sodexo's business relationship with the Marine Corps and cause the Company to lose the contracts.

231.     On or about April 8, 2010, PR Newswire ran a press release entitled "Rep. Loretta Sanchez Calls for Investigation of Military Food Services Contract." (*See* Ex. 73.) The release indicated that Representative Sanchez was asking the Government Accountability Office ("GAO") to "investigate" Sodexo for "excessive waste and possible food safety concerns." The release noted that Sodexo "has been under scrutiny following multiple reports of food safety non-compliance and a drastic, mid-contract change to its operations." The release fails to note that the majority of those "multiple reports" originated with Defendants. Although the purported source of the release is "Office of Congresswoman Loretta Sanchez," the release indicates that it was "distributed by" Defendant SEIU.

232.    The next day, on or about April 9, 2010, Reuters released a news article entitled "Sodexo dips on U.S. contract worries." (*See* Ex. 74.) The article noted that shares of Sodexo's parent entity, which are traded on European financial exchanges, dipped "in an upward market" based on "concerns over a massive contract with the U.S. Marine Corps after U.S. congressional auditors have been asked to review the expiring contract ahead of the award process to replace it." The article quoted an unidentified "trader" as stating, "[t]here is concern that Sodexo's offer is more expensive and less attractive than it was initially."

233.    Defendants then went on the offensive. On or about April 12, 2010, Brad Levinson posted a blog article on the Clean Up Sodexo website titled "Sodexo's Stock Price Dips After Lawmaker Requests US Marine Contract Probe." (*See* Ex. 75.) Levinson's article quoted and linked to both the Reuters press release and to the PR Newswire release "distributed by" Defendant SEIU. The article also included the statement that the recent decline in Sodexo's parent entity's share price "seemed to suggest that investors were nervous" about Representative Sanchez's request of the GAO. Levinson also promised that Defendants would "have more on this developing situation as it unfolds."

234.    On or about August 31, 2010, Representative Robert E. Andrews, Chairman of the House Panel on Defense Acquisition Reform, wrote to Defense Under Secretary Ashton Carter to request that he direct the Marine Corps to postpone the award of its new food service contracts "to allow time to review whether there are adequate procedures in place to control costs and ensure quality, and to develop safeguards to ensure these problems are not replicated." (*See* Ex. 76.) Representative Andrews' letter received substantial media attention. On or about September 2, 2010, CQToday published an article entitled "Sodexo Contract With Marines Draws Scrutiny of House Members." (*See* Ex. 77.) The article summarized Representative

Andrews' call to delay awarding the new Marine Corps contracts pending further review by lawmakers. Defendant SEIU's Assistant Strategic Communications Director Renee Asher is quoted in the article as stating on behalf of Defendant SEIU: "We believe federal contracts should be reserved for companies that do good work, treat workers right and, above all, are careful with taxpayer money."

235. Defendants used Andrews' letter to go back on the offensive. On or about September 17, 2010, Ashley Wood published a blog article on the Clean Up Sodexo website titled "Critics Demand Freeze on Renewal of Marine Corps Food Contract With Sodexo." (*See* Ex. 78.) Wood's article introduced a new aspect of Defendants' scheme to prevent Sodexo from securing the new Marine Corps contracts: another report titled "Cost Creep: The Case for Accountability Over Defense Service Contracts." (*See* Ex. 79.) In order to achieve maximum distribution of their report, Defendant SEIU reposted Wood's article on its main internet site and also linked to the report.

236. "Cost Creep" is created to appear at first glance to be a scholarly analysis of various performance metrics associated with Sodexo's Marine Corps contracts. Much like Defendants' other reports, however, "Cost Creep" distorts key facts in an attempt to portray Sodexo as an irresponsible government contractor that has wasted or monopolized taxpayer funds. While the report's supposed focus is on alleged inadequacies in Sodexo's contracting practices, it contains numerous allegations wholly unrelated to that issue that serve no other apparent purpose than to bias the reader against Sodexo. For example, the report notes that in or around June 2007, the USDA recalled chicken shipped under the contracts that was "***potentially*** tainted with the ***potentially*** deadly Listeria bacteria." (*Id.* at p. 3, emphasis added.) The report also notes that some of the "potentially" tainted product was shipped to several Marine bases.

The report intentionally omits the fact that not a single person reported contracting listeria as a result of these shipments.

237.    The report further alleges that Sodexo's decision to centralize its food preparation for the Marine Corps at a single site "increased the distance the meals were transported before reaching Marine messhalls (sic), thereby increasing exposure to transportation associated with risks including 'temperature abuse.'" (*Id.* at p. 12-13.) The report then cites to the 2001 Food and Drug Administration ("FDA") Code, which suggests that transport vehicles in U.S. distribution chains maintain storage temperatures in the (32° - 38° F) range, and implies that Sodexo's transport vehicles could have exceeded these temperatures. In fact, Sodexo's transport standards are more stringent than FDA requirements, as the Company's transport vehicles maintain continually monitored temperatures of 28° - 32° F during transport. No shipment bound for a Marine installation has ever been cited for "temperature abuse." Defendants intentionally omitted these facts from their report.

238.    Even where the report addresses cost issues, it does so inaccurately. The report includes a sweeping allegation that the contracts, originally estimated to cost the government $881 million, "ballooned" by 36% to over $1.2 billion in total costs. It then claims that Sodexo's contracting practices led to these "overruns." In fact, roughly 93% of the total increase in the contracts' prices was the result of statutory changes in wage rates mandated by the Department of Labor, increases in subsistence prices from the Defense Logistics Agency, incentive payments to encourage and increase small business participation in the program, and program refinements directed by the Marine Corps itself.

239.    Defendants knew, or reasonably should have known, all of the above facts when they circulated "Cost Creep," but distorted them intentionally in order to manufacture concern among lawmakers in Washington and increase the pressure on Sodexo.

240.    On or about September 16, 2010, the Defense Department exercised an existing entitlement to extend its Sodexo contracts through January 2011. Defendants attempted to spin this event for the purpose of leveling further attacks against Sodexo. On or about September 23, 2010, SEIU Capital Stewardship Director Dieter Waizenegger sent an email to an undisclosed group of "colleagues" announcing the delay and claiming innocuously that there had been "a number of questions raised in the United States" about Sodexo's contracts, when, in fact, the genesis of such questions was Defendants. Defendants then published an article on Defendant SEIU's SDXwatch website titled "Update on Sodexo's U.S. Department of Defense Contract Risk." (*See* Ex. 80.) The text of the article is essentially a repeat of Waizenegger's email. It also includes a link to Defendants' "Cost Creep" report.

241.    The contracts were extended in December 2010 for an additional two months and will expire on March 31, 2011. Since this announcement, Defendants have continued their assault, leveling additional allegations regarding Sodexo's "troubled" contracts with the Marine Corps. In their attempt to sensationalize their "reporting" on Sodexo's "troubled" contracts, Defendants highlighted alleged food safety violations on the Clean Up Sodexo website with evocative phrases such as "**Warning - Material may disgust reader**." (*See* Ex. 81.) The allegations described, however, were nothing more than a rehash of the same baseless smears included in Cost Creep.

242.    The Marine Corps' Source Selection Committee, which is located in the Navy Annex in Arlington, Virginia, announced its final decision on or about February 23, 2011.

Sodexo was awarded a contract to operate and manage the 31 Marine Corps garrisons located on the East Coast of the United States. The contract to provide the same services to the 20 Marine Corps garrisons located on the West Coast of the United States, however, was awarded to another contractor. As described above, Sodexo serviced both the East and West Coast garrisons under the prior contracts. The West Coast contract is valued at over $55 million in revenue next year alone, and potentially up to $765 million over the maximum term of the contract.

243. *United States Air Force*. Defendants have attempted to interfere with Sodexo's efforts to secure other government contracting work. In or around July 2010, Sodexo submitted a proposal to the Department of the Air Force to provide food services at a select number of Air Force bases in the United States.

244. On or about November 10, 2010, SEIU employee Chris Schwartz sent an email titled "Food Service Solicitation" to Matt McLean, a contract specialist at the Department of the Air Force. Schwartz began his email with the innocuous claim that he was writing "to provide information relevant to evaluating bidder's past performance and responsibility for a recent solicitation for Food Services posted on FBO.gov." Schwartz then proceeded to level a variety of Defendants' typical Campaign smears against Sodexo. He claimed that contracting with Sodexo could result in "unexplained cost increases" and suggested that Sodexo was plagued with "food safety concerns," "unsafe working conditions," and "possible ethics violations." Schwartz argued at the conclusion of his email that Sodexo had been engaged in a "pattern of conduct" that "provide[d] clear indications that Sodexo may not be living up to the performance and ethical business standards required of Federal Government contractors."

245. McLean apparently recognized Schwartz's email for what it was. Shortly after receiving it, he responded curtly that "It's obvious you have an agenda against [Sodexo.] Please

do not involve me in your agenda or send me any information again." He also suggested to Schwartz that "[I]f the Service Employees International Union has an issue with Sodexo, I suggest you take up the issue with the company." (*See* Ex. 82).

### 5.    Direct Attack on Sodexo's Corporate Headquarters

246.    On or about April 16, 2010, Defendants staged a disruptive protest at Sodexo's corporate headquarters in Gaithersburg, Maryland. The purpose of this event was to generate maximum media attention, disrupt Sodexo's business operations at its corporate headquarters, and send a message to Sodexo's senior leaders that Defendants were making good on their extortionate threats.

247.    To draw attention to their actions, Defendants enlisted the help of Hollywood actor Danny Glover, who has supported union-related causes in the past. The morning of the protest, Glover attended a meeting at Defendant SEIU's Washington, DC headquarters where Defendants and their agents finalized their plans.

248.    To get the word out to their supporters while maintaining the element of surprise, Defendants did not publicize their plans widely. However, they did post messages on a variety of social media to alert followers and supporters and to encourage them to attend the protest. For example, at approximately 9:49 a.m. on April 16th, SEIU employee Joaquin Guerra posted the message: "Are you coming to help cleanupsodexo today?" on his Twitter page. Guerra had approximately 853 "followers," or individuals who have signed up to automatically receive his "tweets," at that time. All of those individuals, to the extent they were "followers" of Guerra's Twitter posts on or about April 16, 2010, would have received his invitation to join the protest.

249.    Defendants also posted a blog article to the Clean Up Sodexo website at approximately 10:06 a.m. titled "International Workers Meet With SEIU Leaders, Sodexo Workers, Danny Glover." (*See* Ex. 83.) The article foreshadowed "this afternoon's culminating

action at Sodexo's U.S. headquarters." It also noted that Andy Stern, "in one of his final acts as president of SEIU," planned to "participate in civil disobedience" during the protest. Stern also is quoted in the article as stating that "[t]he future of the union movement will be determined by this campaign and by others like it." Stern encouraged supporters to show up at Sodexo's headquarters and join the protest via his own Twitter page. At approximately 12:16 p.m., he uploaded the following "tweet" to his Twitter account: "The future of labor is global. Sodexo campaign ground zero." Stern had approximately 3,174 Twitter "followers" around that time. All of those individuals, to the extent they were "followers" of Stern's Twitter posts on or about April 16, 2010, would have received this post.

250.    Defendants transported several busloads of people, including a small number of Sodexo employees, from Defendant SEIU's Washington, DC headquarters to Sodexo's Gaithersburg offices. When they arrived, Defendants commenced their protest, holding picket signs bearing slogans such as "Sodexo Unfair!" and "Clean Up Sodexo." The protestors, numbering about 200, marched directly outside Sodexo's front entrance, chanting disparaging slogans. Defendants also created a "foam pit" over a several hundred square foot area of Sodexo's front drive and then used brushes and mops to "clean up Sodexo." Speakers, including Mitch Ackerman, Glover and Stern, addressed the crowd and made a number of disparaging allegations regarding Sodexo.

251.    Following these events, Stern and Raynor, along with a number of additional agents and employees of Defendants, including Glover, intentionally trespassed on Sodexo property. Despite being asked repeatedly by local law enforcement to step back onto public property, they refused, resulting in their arrest. Kate Thomas, who attended the event, uploaded a "tweet" to her Twitter account at approximately 2:00 p.m. that quoted Glover as saying, "It's a

nice day to get arrested." Consistent with Defendant SEIU's Contract Campaign Manual, Defendants had every intention of breaking the law during the protest for the express purpose of being arrested, in order to further sensationalize their attack and draw additional media attention. Defendants posted running "updates," including photographs and videos, to their Clean Up Sodexo website throughout the day. (*See* Ex. 84.)

### 6.    International Attacks

252.    *2010 Shareholder Protest*.   On or about January 25, 2010, Defendant SEIU picketed Sodexo SA's annual shareholders' meeting in Paris, France.   Although touted as a means to broaden the exposure of its so-called "cause," (*see* Ex. 85), the rally in Paris was nothing more than Defendants' attempt to use their Corporate Campaign to threaten Sodexo's parent company.   Indeed, Mitch Ackerman was cited as "hoping the [Defendant's] complaints [would] cause a stir in France." (*See* Ex. 86.)   Ackerman was further quoted as saying that he wanted to tell a story "to a larger public audience." (*Id.*)   In reality, Ackerman and Defendants wanted to bring the Corporate Campaign to a "larger public audience" in order to increase their threat to Sodexo's business.

253.    *2011 Shareholder Protest*.   Defendants also disrupted Sodexo SA's 2011 annual shareholders' meeting.   On or about January 24, 2011, Defendants and their agents, including USAS, launched a series of disruptions and protests around Sodexo SA's annual meeting in Paris, France.   In the weeks leading up to the meeting, several of Defendants and/or their agents, including Defendant Weintraub, purchased shares of Sodexo SA stock so that they could gain access to the shareholders' meeting itself and directly harass company executives and directors. Defendants and their agents, including members of USAS, then infiltrated the meeting itself and caused significant disruption.   Upon information and belief, during the meeting, Defendants or their agents opened a security door to allow entry to a number of persons who did not have

-103-

permission to enter the auditorium.  When  Sodexo SA's Chairman of the Board began his annual "Chairman's Message" speech, a group of approximately 25 people, including Defendant Weintraub, swarmed the stage, physically confronting and haranguing Sodexo's Chairman about Defendant SEIU's allegations concerning Sodexo's conduct.  The protesters remained on stage for about 25 minutes and did not leave until escorted out of the meeting by security.

254.    Predictably, Defendants posted an article on the Clean Up Sodexo website reporting on the events as if Defendants had no role whatsoever in the preparation and execution of the attacks.  (*See* Ex. 87.)  A USAS national organizer was quoted in press coverage as admitting that USAS proudly participated in the shareholder disruptions and that it had no plans to discontinue its efforts to disrupt Sodexo's business relations and cause the Company financial harm: "Compelling our universities to kick out Sodexo now will send a strong message to Sodexo and the other 'Big 3' corporations that they are no longer welcome on our campuses while they pay poverty wages and bust unions worldwide."  (*See* Ex. 88.)

255.    ***OECD Complaint***. Defendant SEIU has also furthered the Clean Up Sodexo Campaign by inappropriately and deceptively invoking procedures under the Guidelines for Multinational Enterprises of the Organization for Economic Cooperation and Development ("OECD Guidelines") and--in blatant violation of the confidentiality provisions of the Guidelines--publicizing its allegations in order to generate additional media attention around the Campaign.

256.    On or about July 30, 2010, Defendant SEIU and Confédération Générale du Travail ("CGT") of France filed complaints with the National Contact Points ("NCP") of the federal governments of the United States and France claiming that Sodexo and its parent company had violated the OECD Guidelines with respect to labor standards.  Defendant SEIU

and CGT asked the governments to pressure Sodexo to commit to neutrality and to guarantee its employees the right to unionize at the Company's United States operations.

257.    In the United States, the complaint was authored by Defendant Weintraub, on behalf of Defendant SEIU, and submitted to the director of the Office of Investment Affairs at the State Department, which is the NCP in the United States. (*See* Ex. 89.) In the Complaint, Defendants Weintraub and SEIU alleged that Sodexo violated the Employment and Industrial Relations Chapter of the OECD Guidelines. The ostensible purpose of the complaint was to "bring about a resolution to concerns over reported breaches…by Sodexo." (*Id.*) In reality, the complaint was nothing more than another attempt to harass the Company with sham allegations and threaten the prospect of an administrative investigation.

258.    The contents of the complaint show it was filed inappropriately. The purpose behind the OECD Guidelines is to encourage "responsible business conduct consistent with applicable laws." Yet in the complaint, Defendants Weintraub and SEIU asked the NCP to pressure Sodexo to agree to neutrality with respect to unionization of its employees in the United States. Defendants' request of the NCP amounts to a request that Sodexo waive an array of rights available to the Company under existing U.S. labor law.

259.    The OECD Guidelines further provide that individuals and entities submitting concerns under the OECD Guidelines are expected to keep their submissions (and concerns) strictly confidential. Completely disregarding these directives and the spirit of the OECD Guidelines, Defendant SEIU issued a "press release" on July 30, 2010, the same day the letter was sent to the NCP, touting the filing of its complaint against Sodexo for allegedly "violating workers rights." (*See* Ex. 90.) Defendant SEIU has continued to maintain publicity about the complaint to this day on its internet sites, including the Clean Up Sodexo site.

### 7.   Other Attacks

260.   ***2010 Winter Olympics***.   In February 2010, Sodexo was honored with the opportunity to provide food service to the athletes competing in the 2010 Winter Olympic Games in Vancouver, British Columbia.  Defendants seized on this high-profile engagement to smear Sodexo before a world-wide audience.  On or about February 12, 2010, Sasha Rogers posted a blog entry on the Clean Up Sodexo website titled "Concerns of Food Safety at the Winter Olympics." (*See* Ex. 91.)  In the article, Rogers expressed "concern" for the athletes, who would be consuming food served by Sodexo during a "key moment in their sporting careers." However, her "concern" was not only disingenuous, but also supported by misleading reports of food safety noncompliance.  Rogers selectively mentioned incidents of noncompliance over the course of five years at Sodexo facilities, without offering any context or meaningful comparison with the number of violations incurred by other food service providers during that period. Additionally, in a February 22, 2010 posting on the Clean Up Sodexo website, Brad Levinson publicly solicited the approximately 900 workers hired to perform Sodexo's Olympic contract to come forward with information about any failure by Sodexo to pay them their wages.  (*See* Ex. 92.)  Levinson rehashed a number of incomplete or misleading allegations, essentially to suggest that Sodexo did not intend to pay its Olympic workers in accordance with law.

261.   ***Culinary Institute of America***.   On or about March 18, 2010, the Culinary Institute of America ("CIA") hosted a national convention of nutrition physicians in St. Helena, California.  Sodexo was contracted to provide the food service at the convention.  Defendant USWW, through SEIU Local 1877, infiltrated and caused a mass disruption at the high profile conference.  Specifically, agents of Local 1877, including Lead Organizer Tony Maldonado, misrepresented themselves as conference guests to gain attendance.  Once inside, they caused a loud disturbance, throwing dozens of plastic roaches around the conference and even onto the

food being served at the event.  The roaches had "Clean Up Sodexo.com" written on their undersides.  Several of Defendants' agents also became involved in a physical altercation with CIA's security personnel as they were escorted from the premises, prompting unfounded accusations from Local 1877's legal counsel that CIA personnel had assaulted union agents during the disturbance.  Defendants did not file any charges or pursue any legal action regarding this alleged assault.

262.    Following the event, Defendants dispatched a private investigator to surreptitiously learn additional information about CIA, presumably for the purpose of coordinating another attack.  A member of the St. Helena Police Department contacted CIA management on or about March 24, 2010 and warned them that a "private detective" working for SEIU had been "trying to dig up dirt" regarding the events surrounding Defendants' protest the previous week.  Shortly thereafter, CIA's Facilities Office received a phone call from a male caller who identified himself in a voicemail as "Officer Hernandez."  The caller stated that he was calling to discuss Sodexo generally and to ask specific questions about an individual accused of being involved in the altercation with union agents during the events of March 18, 2010, and whether that individual was employed by Sodexo or by CIA.  St. Helena Police later informed CIA management that while an "Officer Hernandez" is employed by the St. Helena Police Department, the officer is female, not male.

263.    *Violent Attack in Brussels.*  Upon information and belief, Defendant SEIU or its agents also caused the No Border group to make a direct and violent attack against Sodexo officials in Europe.  In or around the first week of October 2010, at least a dozen agents of No Border, which was holding an international meeting in Brussels, gained access to the interior of Sodexo SA's corporate office in Audergem, Belgium.  Once inside, they attempted to cause

significant property damage, overturning buckets of hot and rancid cooking oil, grease, paint and glue around the lobby. No Border's agents also left a letter addressed to Sodexo's management, which read in part: "Because you filled your bellies on the exploitation of poverty . . . take this oil, Sodexo, and cook an egg!" Sodexo immediately notified the authorities, and two of the attackers were arrested. Sodexo was well aware that No Border is known for engaging in extremely aggressive and destructive tactics, such as "black bloc" demonstrations and the like. As such, the possibility that No Border was acting as Defendants' agent in the Clean Up Sodexo Campaign caused considerable alarm within the Company. Upon information and belief, No Border acted at the direction and budget of Defendant SEIU when it carried out its violent attack on Sodexo's Brussels office.

264. ***Tampering With Sodexo's Internet Site***. Defendants or their agents also obtained unauthorized access into one of Sodexo's internet sites, www.sodexoeducation.com, and loaded their campaign smears directly onto the site. The Sodexo Education website contains information regarding the Company's various menu options, nutrition information, catering services, and other business information relating to contracts with school clients. It is a password protected site intended to be accessed only by Company employees and agents.

265. On or about September 8, 2010, Defendants and/or their agents gained unauthorized access to the website and tampered with it by embedding within one of its drop down menus a web link to Defendants' smear report "How Sodexo Contributes to Poverty in the United States." Defendants implanted this link into the dropdown menus of 37 different client account pages. (*See, e.g.*, Ex. 93.)

266. Defendants' penetration of Sodexo's computer security network caused substantial concern. To remove the link and protect against further attacks, Sodexo's IT

personnel were forced to remove the links from the 37 infected account pages and to reset the network passwords of 178 Sodexo employees.

267.    Defendants' conduct was illegal under federal law regarding computer fraud and abuse. (*See* 18 U.S.C. § 1030.)

268.    ***Implicit Threat Posted on SDXwatch.***   Defendants have reiterated Defendant Fishman's explicit extortionate demands and threats in a variety of ways, and throughout the course of the Clean Up Sodexo Campaign.   For example, on or about August 18, 2010, SDXwatch posted an article called "The Long Term Risks for Sodexo of Fighting Labor Organizing." (*See* Ex. 94.)   The article noted that over 80,000 Sodexo workers in the United States are not unionized.   It then lobbed a thinly veiled extortionate threat: "If Sodexo continues to fight labor organizing efforts, it faces a series of risks . . . In 2008 the lack of [an organizing] agreement with American trade unions led to a campaign at Aramark - a significant competitor of Sodexo - in which workers engaged in strikes, the company lost accounts and suffered negative publicity.   Similar campaigns may present a direct challenge to Sodexo's reputation in the U.S. and as a global employer." (*Id.*)   Defendants, of course, were in the midst of waging just such a campaign against Sodexo.   Defendants' tactic of citing objectively to their own extortionate attacks as a reason third parties should avoid doing business with a target is a page right out of Defendant SEIU's Contract Campaign Manual and mirrors a tactic used by Defendant Local 1 in its extortion campaign against Professional Janitorial Services, described in Appendix A.

269.    ***Email Attack.***   On or about September 29, 2010, Defendants published a blog article written by Josh Glasstetter on the Clean Up Sodexo website titled "Email Sodexo - Tell Them to Respect Workers in the Dominican Republic and around the World." (*See* Ex. 95.)   The

article accused Sodexo of "aggressively fight[ing] workers who organize" around the world and encouraged readers to email Sodexo's "senior leadership" directly, purportedly to "call[]" on Sodexo to "respect their workers." In fact, Defendants intended that Sodexo's senior leaders would be inundated with email traffic that would disrupt their operating systems.

270. *Global Day of Action.* Defendants announced a "Global Day of Action" on or about September 30, 2010. Josh Glasstetter and Kate Thomas published another blog article on the Clean Up Sodexo website claiming that "Sodexo workers across the U.S." had joined their counterparts in Columbia and the Dominican Republic "to send Sodexo a message: Stop fighting workers trying to organize to get a better life." (*See* Ex. 96.) Once again, Defendants attempted to cast their extortionate attacks as a worker-led movement when in fact Defendants were the driving force behind the "Global Day of Action."

271. *Danny Glover's "International Investigation."* On or about October 4, 2010, Defendants and their agents staged a press conference in Paris to announce Danny Glover's decision to "personally lead an investigation into working conditions and workers' rights" at Sodexo. Glover, who was in attendance, called on Sodexo to "guarantee" the rights of its employees "to unionize." Glover stated that his on-site visits would be "unannounced" to provide a "true vision" of the working conditions at Sodexo and intended to cause Sodexo's executives and management personnel to wonder where and when Glover and his team of SEIU "experts" would strike first. Josh Glastetter posted a blog article on the Clean Up Sodexo website detailing Glover's announcement. (*See* Ex. 97.)

272. Defendants made several other important announcements during the press conference. A representative of a European union allied with Defendants indicated that Defendant SEIU was planning to initiate "strikes" in at least 11 different states in the near

future.[2]  Defendant Weintraub indicated that "Sodexo employees" were planning "actions" in Columbia, the Dominican Republic, and Turkey.  Weintraub ominously referred to an "imminent publication" of an "overall report" regarding Sodexo called the "Black Book," and indicated that Defendants' new "report" would be published both in France and the United States.

273.  **GritTV Appearance.**  Defendants also dispatched Defendant Weintraub to make an appearance on GritTV, hosted by Laura Flanders.  Ms. Flanders interviewed Weintraub and Marcia Snell, a Sodexo employee working at Ohio State University, for a segment that aired on the liberal television station on or about October 21, 2010.  During the interview, Weintraub admitted that Defendants were behind the recent attacks on Sodexo, claiming that "we are in 11 different states in this country taking action."  She also misleadingly referred to Clean Up Sodexo events as led by Sodexo workers, and not the union, and claimed that Sodexo was uniformly retaliating against its entire workforce for trying to "organize a union."  Flanders commented during the segment that Sodexo "won't pay people living wages" and suggested that Ms. Snell's alleged treatment "[wa]s not atypical" of Sodexo's typical human relations practices. Defendants posted a web link to the full interview on the Clean Up Sodexo website.  (*See* Ex. 98.)

F.    **Defendants Have Caused Sodexo Significant Business Injuries**

274.  Defendants' extortionate tactics and active interference with Sodexo's client relationships have caused the Company to suffer significant financial harm.  In addition to the lost business discussed above, Defendant SEIU has bragged on its Clean Up Sodexo website about the extent of the damage Defendants' direct interference has caused.  For example, on or about September 9, 2010, Ashley Wood posted a detailed article on the Clean Up Sodexo

---

[2] These events are described in Paragraph 198 above.

website boasting that "[f]ive major school districts cut ties with Sodexo" as a result of Defendants' Campaign interference. The specific school districts identified were in Boston, Massachusetts; Washoe County, Nevada; Carson City, Nevada; Kansas City, Missouri; and Chapel Hill-Carrboro, North Carolina. In the case of the Kansas City contract, Wood bragged that Defendants' extortionate activities cost Sodexo at least $5.3 million. (*See* Ex. 99.)

275. Wood's article emphasized in particular Defendants' direct role in causing the discontinuation of Sodexo's business relationship with the Carson City School District, noting that a local Nevada newspaper "reported that the Campaign for Quality Services, organized by SEIU to help food-service workers, had been asking Carson City residents to oppose Sodexo, claiming the company would end up costing the school district more money, while bringing in underpaid, undertrained workers." (*Id.*)

276. The loss of the five business contracts referenced in Wood's article has cost Sodexo at least $23 million in annual revenue. The fact that Defendants trumpeted their responsibility for these losses on the Clean Up Sodexo website served as a not-so-subtle reminder to Sodexo that Defendant Fishman and his co-conspirators were making good on their threats to damage the Company.

277. Defendants' actions have cost Sodexo other business. On or about November 12, 2010, Pomona College announced that it was terminating its Sodexo contract on January 18, 2011. (*See* Ex. 100.) School administrators admitted that "union efforts were a factor" in their decision to terminate Sodexo.

278. Sodexo also has incurred millions of dollars in time, person-hours and other administrative expense because of Defendants' unlawful attacks, such as its unauthorized intrusion into Sodexo's computer network, described above.

## EFFECT OF DEFENDANTS' CONDUCT

279.    Defendants have attempted to carry out their scheme to extort Sodexo from behind a mirage of legitimacy.  They have publicly claimed that the Clean Up Sodexo Campaign is about giving a voice to the Company's workers and raising awareness regarding issues that affect the communities in which Sodexo does business.  As demonstrated throughout the Complaint, however, this could not be further from the truth.  Defendants' many unlawful, deceitful, intimidating, and aggressive actions demonstrate that their real motive is to compel Sodexo's submission to their ongoing extortionate demands, without any regard for the wishes of the Company's hourly employees.

280.    Defendants' actions have had a substantial negative effect on Sodexo.  Their extortionate conspiracy has caused Sodexo millions of dollars in lost or reduced business, lost contracts and lost potential new business opportunities.  In many cases, Defendants have harassed, intimidated, or frightened Sodexo's customers to the point that they have either terminated or reduced their business relationships with Sodexo.  As alleged throughout the Complaint, this has been the precise result desired by Defendants.  And worse, Defendants' acts and threats demonstrate clearly that the end of their extortionate conduct is not remotely in sight.  Without judicial intervention, Sodexo will continue to suffer direct and significant business injury at the hands of Defendants and their unlawful scheme.

## FIRST CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(a)) Against Each of the Defendants

281.    Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

282.    Sodexo is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

283.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(b), and 1962(d).

284.    Defendants Change to Win, SEIU, and the Local Union Defendants each are "enterprise[s]" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprises were engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

285.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(a).  Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: that income, in the form of per capita payments, union dues, and other payments, resulting increased salaries and benefits, and other financial concessions, would be received by Defendants Change to Win, SEIU, and the Local Union Defendants;  such income would be derived, directly or indirectly, from a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A), in which Defendants participated as principals within the meaning of 18 U.S.C. § § 1961(1), 1961(5), and 1962(a) -- to wit: multiple, repeated and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Sodexo's property rights described above, at least including, but not limited to, the following: Cal. Pen. Code §§ 518, 519, 524; DC Code §§ 22-3251, 22-3252, 22-1803; Ga. Code Ann. §§ 16-8-16; 16-4-1; 720 ILCS 5/12-6; Mass. Gen. Laws ch. 265 § 25; Md. Code Ann., Crim. Law §§ 3-701, 3-704, 3-705, 3-706; N.J Stat. Ann. §§ 2C:20-5, 2C:5-1; La.R.S. §§ 14:27, 14:66; ORC Ann. 2905.11; Pa. Con. Stat. §§ 901, 3923; Tex. Penal Code §§ 15.01, 31.02-03; Va. Code Ann. §§ 18.2-59, 18.2-26(3).

Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

286.   An object of Defendants' conspiracy to violate 18 U.S.C. § 1962(a) was and is that the income described above, or the proceeds of such income, would thereafter be used and invested in the operation of the aforementioned enterprises for numerous legitimate and illegitimate purposes including, inter alia, the conduct of additional extortionate corporate campaigns against Sodexo and other employers and business entities, the payment of salaries and fees to the other Defendants for the purpose of engaging in future extortionate corporate campaigns and otherwise, and the ongoing operation of the enterprises described above.

287.   Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

288.   As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Sodexo has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina, such losses resulting from Defendants' active interference with Sodexo's business relationships with these clients, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## SECOND CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(b)) Against Each of the Defendants

289.    Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

290.    Sodexo is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

291.    Each of the Defendants is a "person" under 18 U.S.C. §§ 1961(3), 1962(b), and 1962(d).

292.    Sodexo is a corporation organized under the laws of the State of Delaware and is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(b), which enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

293.    Defendants conspired among themselves within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to acquire or maintain, directly or indirectly, an interest in or control of Sodexo through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A), to wit: multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Sodexo's property rights described above, at least including, but not limited to, the following: Cal. Pen. Code §§ 518, 519, 524; DC Code §§ 22-3251, 22-3252, 22-1803; Ga. Code Ann. §§ 16-8-16; 16-4-1; 720 ILCS 5/12-6; Mass. Gen. Laws ch. 265 § 25; Md. Code Ann., Crim. Law §§ 3-701, 3-704, 3-705, 3-706; N.J Stat. Ann. §§ 2C:20-5, 2C:5-1; La.R.S. §§ 14:27, 14:66; ORC Ann. 2905.11; Pa. Con. Stat. §§ 901, 3923; Tex. Penal Code §§ 15.01, 31.02-03; Va. Code Ann. §§

18.2-59, 18.2-26(3). Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

294.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

295.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Sodexo has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina, such losses resulting from Defendants' active interference with Sodexo's business relationships with these clients, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## THIRD CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(c)) Against Defendants Change to Win, the Local Union Defendants and Each of the Individual Defendants

296.    Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

297.    Sodexo is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

298.    Each of the Defendants named in the Fourth Claim for Relief is a "person" under 18 U.S.C. §§ 1961(3) and 1962(c).

299.    Defendant SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

300.    Each of the Defendants named in the Fourth Claim for Relief were and are associated with the SEIU enterprise and has conducted or participated, directly or indirectly, in the management and operation of the affairs of the SEIU Enterprise in relation to Sodexo through a pattern of activity unlawful under 18 U.S.C. § 1961(A), to wit: multiple, repeated and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of the following States: Cal. Pen. Code §§ 518, 519, 524; DC Code §§ 22-3251, 22-3252, 22-1803; Ga. Code Ann. §§ 16-8-16; 16-4-1; 720 ILCS 5/12-6; Mass. Gen. Laws ch. 265 § 25; Md. Code Ann., Crim. Law §§ 3-701, 3-704, 3-705, 3-706; N.J Stat. Ann. §§ 2C:20-5, 2C:5-1; La.R.S. §§ 14:27, 14:66; ORC Ann. 2905.11; Pa. Con. Stat. §§ 901, 3923; Tex. Penal Code §§ 15.01, 31.02-03; Va. Code Ann. §§ 18.2-59, 18.2-26(3). Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

301.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

302.    As a direct result of Defendants' violation of 18 U.S.C. § 1962(c), Sodexo has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina, such losses resulting from Defendants' active interference with Sodexo's business relationships with these clients, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## FOURTH CLAIM FOR RELIEF
### (Violation of 18 U.S.C. § 1962(d) by Conspiring to Violate § 1962(c)) Against Defendants Change to Win, the Local Union Defendants and Each of the Individual Defendants

303. Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

304. Sodexo is a "person" under 18 U.S.C. §§ 1961(3) and 1964(c).

305. Each of the Defendants named in the Fifth Claim for Relief is a "person" under 18 U.S.C. §§ 1961(3), 1962(c), and 1962(d).

306. Defendant SEIU is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise was engaged in activities affecting interstate and foreign commerce at all times relevant to this Complaint.

307. Each of the Defendants named in the Fifth Claim for Relief were and are associated with the SEIU enterprise, and has conspired within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c). Specifically, each of the Defendants agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: to conduct or participate, directly or indirectly, in the management and operation of the affairs of the SEIU Enterprise in relation to Sodexo through a pattern of activity unlawful under 18 U.S.C. § 1961(1)(A), to wit: multiple, repeated, and continuous acts or threats involving extortion and/or attempted extortion, chargeable under the laws of each State in which Defendants' conspiracy, if successful, would result in the obtaining by Defendants of Sodexo's property rights described above, at least including, but not limited to, the following: Cal. Pen. Code §§ 518, 519, 524; DC Code §§ 22-3251, 22-3252, 22-1803; Ga. Code Ann. §§ 16-8-16; 16-4-1; 720 ILCS 5/12-6; Mass. Gen. Laws ch. 265 § 25; Md. Code Ann., Crim. Law §§ 3-701, 3-704, 3-705, 3-706; N.J Stat. Ann. §§ 2C:20-5, 2C:5-1; La.R.S. §§ 14:27, 14:66; ORC Ann. 2905.11; Pa. Con. Stat. §§

901, 3923; Tex. Penal Code §§ 15.01, 31.02-03; Va. Code Ann. §§ 18.2-59, 18.2-26(3). Violations of each of the foregoing statutes are punishable by imprisonment for more than one year.

308.    Defendants' activities described herein have obstructed, delayed, or otherwise affected commerce.

309.    As a direct result of Defendants' racketeering activity and/or otherwise wrongful or unlawful acts undertaken in furtherance of Defendants' unlawful conspiracy described herein, Sodexo has suffered substantial injury to its business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina, such losses resulting from Defendants' active interference with Sodexo's business relationships with these clients, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks described herein.

## FIFTH CLAIM FOR RELIEF
### (Violation of Va. Code Ann. § 18.2-499) Against Each of the Defendants

310.    Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

311.    Defendants have combined, associated, agreed, mutually undertaken and/or concerted together for the purpose of willfully and maliciously injuring Sodexo in its trade or business, all in violation of Virginia Code § 18.2-499.

312.    Overt acts in furtherance of Defendants' conspiracy include, but are not necessarily limited to, the following:

(a)     Defendant Fishman's numerous threats to injure Sodexo's business relations made during a meeting between Defendants Fishman and Weintraub and Sodexo representatives, which took place in Arlington, VA on or about August 17, 2010;

(b)     Defendants' repeated attempts to destroy Sodexo's business relationship with George Mason University, located in Fairfax, Virginia, including but not limited to, engaging in repeated and disruptive protest activity on private campus property; falsely telling Sodexo employees that dining services were closed, so that Sodexo's business would be interrupted; harassing George Mason University's president in an attempt to convince him to discontinue the University's relationship with Sodexo; and attempting to infiltrate the University's student government under false pretenses to generate student opposition to Sodexo's presence on campus;

(c)     Defendant Fishman's threat to injure Sodexo's business relations made during his phone calls with Mr. Macedonia that took place in or around August 2009 and on or about October 12, 2010;

(d)     Defendant Fishman's numerous threats to injure Sodexo's business relations made during a meeting between Defendants Fishman and Weintraub and Sodexo representatives that took place in Washington, DC on or about September 22, 2010;

(e)     Defendants' repeated attempts to cause Sodexo to lose services contracts worth hundreds of millions of dollars with the United States Marine Corps; and

(e)     Defendants' numerous other acts, described in detail above, undertaken throughout the country and with the express and malicious purpose of causing injury to Sodexo in its business or trade.

313.    As a direct and proximate result of Defendants' unlawful conspiracy, Sodexo has suffered substantial damages, including but not limited to: (i) lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina, such losses resulting from Defendants' active interference with Sodexo's business relationships with these clients, and (ii) the costs in time, person-hours and other administrative expense because of Defendants' unlawful attacks. In addition, Sodexo is now suffering and will continue to suffer injury for which it has no adequate remedy at law unless Defendants' activities are enjoined.

## SIXTH CLAIM FOR RELIEF
### (Tortious Interference with Contractual and Economic Relations) Against Each of the Defendants

314.    Sodexo re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

315.    Sodexo has valid business contracts, the prospective likelihood of future contracts, and/or legally protected business interests with its clients and business partners. Sodexo has contractual rights pursuant to said contracts and/or business interests as well as the expectation of future contractual rights.

316.    Each of the Defendants was fully aware of the existence of these contractual relationships, Sodexo's expectation of future contractual relationships, and/or legally protected business interests.

317.    Each of the Defendants intentionally and maliciously induced some or all of Sodexo's clients and business partners identified herein not to perform valid and existing contracts with Sodexo, or to decline to renew, or to decline to enter into future contractual

relationships with Sodexo, or to disregard Sodexo's legally protected business interests. These losses include, but are not limited to, lost contracts with Pamona College; Harris County Hospital District; and school districts in Boston, Massachusetts, Washoe County, Nevada, Carson City, Nevada, Kansas City, Missouri, and Chapel Hill-Carrboro, North Carolina.

318. Defendants had no legal justification whatsoever to induce such clients and business partners not to perform valid and existing contracts with Sodexo, or to decline to enter into future contractual relationships with Sodexo, or to disregard Sodexo's legally protected business interests.

319. The failure of such clients and business partners to perform and/or renew valid and existing contracts with Sodexo, to enter into future contractual relationships with Sodexo, or to disregard Sodexo's legally protected business interests, has caused Sodexo actual damages, including but not limited to lost or reduced sales and distribution, lost or reduced contracts and/or expected contracts. In addition, Sodexo is now suffering and will continue to suffer injury for which it has no adequate remedy at law unless Defendants' activities are enjoined.

## **PRAYER FOR RELIEF**

WHEREFORE, Sodexo prays for relief and judgment against all Defendants, jointly and severally, as follows:

1. Compensatory and consequential damages resulting from injury to Sodexo's business and property in the millions of dollars, such injuries owing to and having been proximately caused by Defendants' unlawful acts under Pub.L.No. 91-452, codified in part at 18 U.S.C. § 1961 *et seq.*, Va. Code § 18.2-499, and the common law, as set forth above and to be further established at trial;

2. Threefold the damages sustained by Sodexo as described above;

3.      The costs of this suit (including reasonable attorneys' fees) and post-judgment interest;

4.      Exemplary and/or punitive damages under applicable State law for Defendants' intentional, willful, wanton, outrageous or malicious misconduct, characterized by their evil or rancorous motive, ill will and intent to injure Sodexo; or Defendants' gross recklessness or gross negligence evincing a conscious disregard for Sodexo's rights;

5.      Equitable relief as might be appropriate pursuant to applicable law, including but not limited to enjoining Defendants from continuing their scheme to extort Sodexo as follows:

a.      Enjoining Defendants from continuing to interfere unlawfully with Sodexo's contractual and/or economic business relationships by wrongfully inducing Sodexo's clients to end and/or not renew their contractual and/or business relationships with Sodexo;

b.      Enjoining Defendants from continuing to make implicit and explicit threats to harm Sodexo unless and until Sodexo delivers to Defendants the property described herein;

c.      Enjoining Defendants from causing, encouraging or directing their employees and/or agents to make violent threats against Sodexo and its employees;

d.      Enjoining Defendants from engaging in independent violations of federal, State and local laws with regard to Sodexo's business relations, including but not limited to the violations of the manner and type described in the Complaint;

e.      Imposing reasonable restrictions on the future activities and conduct of any of the Defendants;

6.      Any other and further relief as the Court deems just and proper.

Dated: March 8 17, 2011

Respectfully Submitted,

SODEXO, INC.

By: _____

Attorneys for Plaintiff:

Thomas J. Cawley, Esq. (Va. Bar No. 04612)
Hunton & Williams LLP
1751 Pinnacle Drive
Suite 1700, Tysons Corner
McLean, Virginia 22102
(703) 714-7400
(703) 714-7410 (Fax)
*tcawley@hunton.com*

Gregory B. Robertson, Esq. (Va. Bar No. 015681)
Kimberlee W. DeWitt, Esq. (Va. Bar No. 47235)
Kurt G. Larkin, Esq. (Va. Bar No. 70730)
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
(804) 788-8200
(804) 788-8219 (Fax)
*grobertson@hunton.com*
*kdewitt@hunton.com*
*klarkin@hunton.com*

Of Counsel:

G. Robert Blakey, Esq.*
(*pro hac motion to be filed*)
Notre Dame Law School
326 Eck Hall
P.O. Box 780
Notre Dame, Indiana 46556
(574) 631-5717
(574) 631-4197 Fax
*blakey.1@nd.edu*

* Notre Dame Law School is cited solely for purposes of address.