# APPENDIX A

# APPENDIX A: Other Victims of Defendants' Extortionate Corporate Campaigns

1.      As described in the Complaint, Defendants use extortionate corporate campaign tactics as a regular way of doing business.  Set forth below are descriptions of several of Defendants' attempts to extort employers--and, in one case, another union--into forced unionization arrangements.

## A.      Prime Healthcare Services

2.      Prime Healthcare Services ("Prime") operates the largest for-profit healthcare system in California and was the only for-profit system listed among Thomson Reuters' Top 10 Health Systems in 2009.  Like many healthcare systems operating in California--and not unlike Sodexo--Prime is caught in the middle of a savage intra-union battle being waged between Defendant SEIU and the leaders of one of its former California locals.

3.      In or around late 2008, the local leadership of SEIU-United Healthcare Workers-West ("SEIU-UHW"), one of Defendant SEIU's largest locals, had a bitter falling out with Defendant SEIU's national leadership over Defendant SEIU's push to centralize power within the Union by systematically merging smaller SEIU locals into larger and more easily controllable "mega-locals."   When SEIU-UHW's local leaders resisted Defendant SEIU's directive that SEIU-UHW merge with another large California-based SEIU local, Defendant SEIU, led by Andy Stern, forced SEIU-UHW into trusteeship for alleged financial wrongdoing and ousted its locally elected officials, accusing them of engaging in financial malpractice and fraud.  SEIU-UHW's former leadership established a new union called the National Union of Healthcare Workers ("NUHW"), and a struggle ensued between SEIU-UHW--now fully controlled by Defendant SEIU-- and NUHW to determine which union would acquire control of

SEIU-UHW's 65,000 members as well as the prerogative to unionize other California health care workers. (*See* Ex. A-1.)

4.       Defendant SEIU has initiated a two-pronged scheme to shut NUHW out of the healthcare industry in California.   First, Defendant SEIU systematically has carried out aggressive and violent attacks against NUHW wherever it has sought to organize new members or recruit existing SEIU-UHW members to join NUHW.  Defendant SEIU has, in its own words, declared "World War III" on NUHW in California. (*See* Ex. A-2.)  Second, Defendant SEIU has attempted to extort major California health care employers into unionizing with Defendant SEIU and/or SEIU-UHW, to the exclusion of NUHW.  As one of the largest for-profit hospital systems in the State, Prime is one of Defendant SEIU's main targets.

5.       According to Prime, Defendant SEIU commenced its attacks in or around early 2010, after Prime refused Defendant SEIU's overtures to enter quickly into a collective bargaining agreement with SEIU at a hospital where Prime's employees already were represented by Defendant SEIU.   Defendant SEIU was seeking to avoid a challenge from NUHW to its representation of Prime's employees.  Defendant SEIU threatened Prime that it would expose "dirt" regarding the company's health and safety practices unless it agreed to capitulate to its contract demands.   Specifically, Defendant SEIU told Prime that it would publicly claim that some of Prime's patients were acquiring blood infections after being admitted to the company's hospitals.

6.       When Prime refused to accede to Defendant SEIU's threats, Defendant SEIU and SEIU-UHW commenced a classic corporate campaign attack on Prime's business interests. SEIU-UHW created a website called "Eye on Prime Healthcare," on which Defendant SEIU and SEIU-UHW have made a variety of disparaging and baseless claims about Prime's business and

safety record, including claims of unusually high rates of "life-threatening illnesses" at Prime facilities, and Medicare fraud. (*See* www.seiu-uhw.org/page/s/prime; *see also* www.seiu-uhw.org/2010/10/eye-on-prime-healthcare.html.)

7.     In or around February 2010, Defendant SEIU enlisted Defendant CtW's assistance in its extortion campaign against Prime. Defendant CtW's Investment Group sent a letter dated February 2, 2010 to Medical Properties Trust ("MPT"), a publicly traded real estate investment trust that serves as Prime's landlord or lender at several of its hospitals. CtW Investment Group's letter made a variety of false claims, including that Prime's hospitals did not comply with State earthquake safety laws, had infection control problems, and engaged in Medicare fraud and faced millions of dollars of potential losses. In order to directly pressure MPT to sever its business relationship with Prime, Defendants SEIU and CtW then wrote to the Securities and Exchange Commission and urged it to interfere with MPT's planned stock offering.    Ultimately, MPT investigated the claims in CtW Investment Group's letter and concluded they were baseless.

8.     In or around June 2010, Defendant SEIU made additional explicit extortionate threats to Prime's senior leaders. Around that time, Defendant SEIU threatened to put Dr. Prem Reddy (Prime's Chairman) and Lex Reddy (Prime's CEO) in jail unless Prime accepted Defendant SEIU's previously made contract demands and further agreed to remain neutral while Defendant SEIU and/or SEIU-UHW unionized the remainder of Prime's California hospitals.

9.     After these tactics did not convince Prime to capitulate, Defendant SEIU and SEIU-UHW published a sensational "study" about the alleged high levels of septicemia infections at Prime hospitals. (*See* Ex. A-3.) The study uses manipulated data and claims falsely that patients were acquiring blood infections after being admitted to Prime facilities and/or that

Prime was "upcoding" certain patients by improperly diagnosing them with septicemia in order to receive higher reimbursements from Medicare. The report, therefore, accuses Prime either of engaging in systematic Medicare fraud, or in the alternative, experiencing a septicemia epidemic in its hospitals. Defendant SEIU and SEIU-UHW were well aware that the Medicare data used in their report is based on the condition of patients upon their <u>admission</u> to the emergency department and therefore that the data necessarily did not address whether any patient acquired a disease after admission to a Prime facility. They also were aware of the fact that Prime operates a model that emphasizes emergency departments and emergency admissions as opposed to admissions, and therefore that Prime treats substantially sicker patients as compared to other California health systems. As they did with their Sodexo reports, Defendants intentionally overlooked or distorted these key facts in order to generate a report that would alarm and outrage Prime's business partners and the California community at large.

10.     Defendant SEIU used its misleading study to generate a firestorm of negative attention and political pressure on Prime and to attempt to scuttle Prime's chances of acquiring new facilities in California. On or about July 1, 2010, U.S. Representatives Henry Waxman and Pete Stark co-signed a letter addressed to the Inspector General of the United States. The letter indicated that they "recently received a disturbing report by SEIU Healthcare about Prime Healthcare Services," and requested that the Inspector General examine the report and commence an investigation into Prime's alleged wrongdoing. (*See* Ex. A-4.) Around the same time, California State Senator Elaine Alquist, who also received copies of Defendant SEIU's report, wrote to the Deputy Director of California's Department of Public Health. Ms. Alquist's letter noted that her office had reviewed data "provided by SEIU-UHW's healthcare analysis team" indicating "abnormally high rates of septicemia reported among Medicare patients treated

at hospitals operated by Prime." Ms. Alquist "urgently" requested that the Department of Health investigate Prime and withhold approval of additional facility licenses for Prime or its related entities pending the investigation's outcome. (*See* Ex. A-5.) Defendant SEIU and/or SEIU-UHW also convinced a progressive media outlet to publish an article about their malicious study and the investigations demanded by government officials. The article was picked up by the Los Angeles Times, resulting in Defendant SEIU's baseless smears about Prime being circulated to an even wider audience. (*See* Ex. A-6.) Defendant SEIU then issued an inflammatory press release announcing these events and reiterating its malicious allegations regarding the septicemia rates in Prime hospitals. (*See* Ex. A-7.)

11.     On or about October 12, 2010, Defendant SEIU sent its own letter to the Deputy Director of the California Department of Public Health. Predictably, the letter included a rehash of the claims in Defendant SEIU's report and referenced the calls for investigations of Prime made by federal and State politicians. It also echoed State Senator Alquist's request that the Department withhold approval of any new building licenses for Prime, and noted disingenuously that "it would be unconscionable to put more patients at risk, especially the frail elderly susceptible to life-threatening infections like septicemia, by allowing Prime Healthcare to operate more hospitals without a thorough investigation of both its patient care and billing practices." (*See* Ex. A-8.)

12.     In November and December 2010, two Medicare accreditation agencies conducted unannounced surveys at 10 of Prime's hospitals to investigate the Medicare fraud and infection control issues raised by Defendant SEIU's study. Both agencies concluded that there was no evidence to support allegations of Medicare fraud against Prime and that there were no serious infection control problems at any of the hospitals surveyed. Frustrated with this result,

Defendant SEIU and SEIU-UHW are now attempting to publish a new "study" that focuses on the alleged level of malnutrition rates at Prime hospitals, proving that they will stop at nothing to force Prime to surrender to their extortionate demands. As with its Clean Up Sodexo Campaign, none of Defendant SEIU's and SEIU-UHW's claims regarding Prime's safety record have been motivated out of a desire to improve patient safety or to call to light alleged billing improprieties. Instead, their claims were made only to smear, pressure and punish Prime because it rebuffed their unionization demands.

13.     Prime continues to refuse to yield to Defendant SEIU's and SEIU-UHW's illicit scheme.  On January 31, 2011, Prime announced that it had made a criminal referral to the United States Attorney's Office in California regarding Defendant SEIU's and SEIU-UHW's illegal and extortionate scheme.

14.     Defendant SEIU and/or SEIU-UHW, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to Cal. Pen. Code §§ 518, 519, 524.

**B.     Justice for Janitors**

15.     In approximately 1986, Defendant SEIU and its affiliated locals set their sights on unionizing the entire janitorial services industry.  To achieve this goal, Defendant SEIU created the "Justice for Janitors" Campaign.

16.     Ostensibly, the Justice for Janitors Campaign was about unionizing janitors to ensure that the janitors were paid fair wages and received benefits.  In reality, it was a calculated effort to bolster membership in Defendant SEIU's waning property services divisions. Defendant SEIU attempted to achieve this goal, not by appealing to the employees of non-union janitorial contractors, but by bludgeoning the contractors themselves.  In doing so, Defendant

SEIU targeted the employer's clients--building owners and corporations--by inciting them to demand cooperation with the union or to terminate their business relationships with the targeted contractors. As indicated in a Wall Street Journal article, the basic idea of the Justice for Janitors Campaign was "to shame, pester and push tenants and landlords into forcing their janitorial contractors to unionize." (*See* Ex. A-9.) One owner of a janitorial services company targeted by the Campaign described his experience as having to negotiate "**with a gun to his head**." (*Id.*, emphasis added.)

17.    Below are just a few examples of Defendant SEIU's Justice for Janitors Campaign in action.

### 1.    Somers Building Maintenance

18.    Somers Building Maintenance ("SBM") is a building maintenance and janitorial services company based in Sacramento, CA. In the mid 1990's, SBM was the largest cleaning contractor in Sacramento, employing roughly 1,200 of the area's 1,600 janitors. SBM also was largely non-union. As such, it was a natural target of Defendant SEIU's Justice for Janitors Campaign.

19.    In approximately 1995, SEIU Local 1877 (which now is affiliated with Defendant USWW) set its plan in motion to force SBM to waive its right to NLRB secret-ballot elections and to allow Defendant SEIU and Local 1877 to unionize the company's non-union employees on the basis of signed authorization cards.

20.    When SBM executives offered to hold a NLRB secret-ballot election to determine whether the employees wanted union representation, Defendants' agents told them, "You don't understand. We will never let your employees vote."

21.    Defendant SEIU's campaign against SBM was especially vicious. Over the course of four years, Local 1877 filed, incited or sponsored five lawsuits, 52 separate charges of

unfair labor practices, four OSHA complaints and a 15-month investigation by the U.S. Department of Labor's ("DOL") Wage and Hour department relating to allegations that SBM failed to pay its employees in accordance with federal wage and hour standards. In keeping with their corporate campaign modus operandi, Defendant SEIU and Local 1877 spun these charges, the vast majority of which were baseless, as part of its virulent public relations campaign to intimidate SBM's customers and business partners and cause them to cancel contracts with SBM.

22.     During a meeting between Local 1877's leaders and SBM management in or around May 1995, the union's representatives handed SBM a packet of press clippings detailing their strong-arm tactics around the Silicon Valley. They then offered <u>to make the DOL investigation, the lawsuits and the NLRB charges disappear</u> if the company would agree to waive its rights under federal law, forfeit a NLRB secret-ballot election, and recognize Local 1877 using a card check procedure. Local 1877's comments in this regard are uncannily similar to Defendant Fishman's promise to Tom Mackall and Dick Macedonia to make the Clean Up Sodexo Campaign "go away" if Sodexo agreed to Defendants' demands.

23.     During the DOL's investigation of the wage and hour complaint, SBM discovered that the DOL's highest ranking California official, *who was a former SEIU officer*, was colluding with Defendant SEIU to extort SBM. After a complaint from SBM, the U.S. Inspector General determined that this official had: (1) improperly provided to Defendant SEIU information about the DOL's investigation of SBM while the investigation was still active, which SEIU then used in its public smear attacks; (2) allowed the investigation to remain active well beyond the point that the lead investigator determined was warranted; and (c) called SBM's clients, including Hewlett-Packard, and <u>threatened to seize their property</u> under the "hot goods" provision of the Fair Labor Standards Act unless they assisted in halting SBM's alleged wage and hour

violations. The U.S. House of Representatives substantiated SBM's complaints, and the Secretary of Labor terminated the official's position. (*See* Ex. A-10.) Ultimately--and ironically--Defendant SEIU's sham DOL complaint resulted in a finding that while SBM underpaid some workers by approximately $300, it overpaid many others by double that amount.

24. In or around 1997, Defendant SEIU and Local 1877 escalated their campaign against SBM. They developed a comprehensive plan to create a crisis for building owners and local politicians and launched a series of weekly protests on the city mall, less than a block from the State Capitol building. The protests targeted a major downtown office building for which SBM provided cleaning services. These protests culminated on or about August 27, 1997 when-- in keeping with Defendant SEIU's extortion playbook--Local 1877 and its coalition engaged in a raucous protest that resulted in the arrest of thirty protesters, who occupied the light rail tracks that traversed the city mall and refused to clear the tracks. The arrest of Defendant SEIU's and Local 1877's employees and agents caused a number of supporters of Sacramento Mayor Joe Serna's reelection campaign to refuse to contribute to his campaign until the City released the protesters.

25. This event, and subsequent protests by Defendant SEIU and Local 1877, caused a considerable escalation of the pressure on the City to "resolve" the "conflict" between SBM and the SEIU. In or around September 1997, the Sacramento City Council passed a resolution condemning SBM and expressing support for the Justice for Janitors Campaign. Defendant SEIU and Local 1877 then staged additional protests designed to force Mayor Serna to act as a "mediator" and to help broker SBM's recognition of SEIU Local 1877 as bargaining agent of its employees.

26.     Defendant SEIU and Local 1877 delivered the capstone on their campaign in or around February 1998, when they organized a protest in Silicon Valley timed to coincide with the annual shareholders meeting of Hewlett-Packard, the same SBM client that had been shaken down several years earlier by Defendant SEIU's "mole" within DOL.

27.     SBM ultimately capitulated to Defendant SEIU's extortionate tactics and, in or around April 1999, agreed to recognize Local 1877 as bargaining agent for its non-union employees, without allowing the employees to vote in a secret-ballot election.   Defendant SEIU's motives were laid bare by Local 1877's then-President, Mike Garcia, who was quoted in the media as saying that in order to unionize SBM: "We had to fight harder than with any other [company] we've ever faced. But we're even more relentless."

28.     In a recent interview, SBM's spokesman, Randy Schaber, described his company's experience with Defendant SEIU's Justice for Janitors Campaign: "It's kind of like a safari, where you have a whole group of zebras, and the lion goes after one zebra, and the others run away, thinking they're safe.   What [the SEIU] want[s] to do, once they break the biggest company, then they'll go to the second-biggest and the third-biggest and so on, and presto! They've organized the city without an election." (*See* Ex. A-11.)

29.     Defendant SEIU and/or Local 1877 through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under state law and punishable by imprisonment for more than one year, at least including, but not limited to, Cal. Pen. Code §§ 518-519 and 524.

### 2.     Professional Janitorial Services

30.     Professional Janitorial Services ("PJS") is a successful janitorial company based in Houston, TX.   In about 2003, Defendants SEIU and Local 1 (which now includes what was then SEIU Local 5), began a major push to organize all major janitorial companies in Texas.   As

part of the Justice for Janitors Campaign, Defendants SEIU and Local 1 succeeded in convincing five of the six largest janitorial employers in Houston to enter into card check and employer neutrality arrangements with Defendants.

31.     PJS was the lone holdout.  Defendants' employees, including Local 1's Vice President Dan Schlademan, met personally with PJS' Chief Executive Officer, Brent Southwell, several times.  They told him that it was in his best interests to enter into a neutrality and card-check agreement with Defendant Local 1 and that the union "will do whatever it takes to protect our contractors."  Southwell also met with Tom Balanoff, President of Defendant Local 1, who made it clear that if PJS did not agree to Defendant Local 1's demands, the Defendants would attack PJS' business relationships and community standing.

32.     Southwell did not agree to Defendants' demands, and in or around June 2006, Defendants SEIU and Local 1 commenced a vicious corporate campaign against PJS replete with all of the hallmarks of the pressure tactics discussed in Defendant SEIU's Contract Campaign Manual.  They set up the campaign by sponsoring a class action wage and hour case against PJS and then by filing a litany of unfair labor charges with the NLRB naming PJS as the respondent. (*See* Ex. A-12.)  Defendants cited to these allegations in the press--concealing the fact that the charges originated with Defendants SEIU and Local 1 and that they had not yet been investigated or adjudicated--and accused PJS of being a "criminal lawbreaker" and of stealing money from its employees.  Defendants further criticized PJS publicly for its alleged poor customer service. Although some or all of these charges were dismissed, Defendants SEIU and Local 1 continued to cite to them in their campaign attacks.

33.     In or around June 2006, Schlademan sent an email to several Houston-based contractors attaching a "report on PJS and their violations of the NLRA and FLSA[,]" (*see* Ex.

A-13), and encouraged the recipients to "distribute this report to any and all interested parties as we have already begun." He also noted ominously that "[w]e expect that more charges will be filed on PJS in the coming period." Defendants then filed a number of additional administrative charges in the subsequent months. Schlademan's actions underscore Defendants' corporate campaign modus operandi: level various legal claims against the target company, cite "objectively" to those attacks to rain additional public scorn upon the target, predict even more "trouble" for the target, and then create such "trouble" and cite to it publicly, demonstrating that earlier predictions have come true. Defendants are masters at creating such echo chambers around corporate campaign targets.

34.    As part of their extortionate attack against PJS, Defendants SEIU and Local 1 and Local 5 repeatedly approached the company's customers, including building superintendents, administrators and managers, and pressured them to drop PJS as their cleaning contractor. (*See* Ex. A-14.) They also contacted investors and pension plans that owned an interest in the buildings that had contracts with PJS and repeated their malicious claims about the company. (*See* Ex. A-15.) They further attacked companies who elected to continue to do business with PJS. (*See* Ex. A-16.) In one case--just as Defendants did in the Clean Up Sodexo Campaign-- they actually cited to the corporate campaign as a reason that investors should avoid buildings serviced by PJS, claiming that those buildings "face heightened risks on two fronts: *increasingly visible protests by janitors that could be undesirable when showing properties to potential investors*, and significant questions about the quality of service provided by PJS." (*See* Ex. A-17, emphasis added.) These "increasingly visible protests" were those orchestrated and carried out by Defendants SEIU and Local 1 themselves.

35.     Defendants SEIU and Local 1 also baselessly accused PJS of "trashing downtown Houston" in attacks designed to cause PJS to lose cleaning contracts at a particular Houston building. A flier distributed to patrons of the building claimed that PJS "dumped trash" on the sidewalk outside the building in violation of a city ordinance. (*See* Ex. A-18.) Seeking to generate fear among the building tenants, the flier then asked: "Are your sensitive internal documents being dumped on the sidewalks of Houston?" Defendants SEIU and Local 1 had no factual basis whatsoever for believing that PJS had exposed confidential documents on "the sidewalks of Houston."

36.     During the pendency of the extortion campaign against PJS, the company's other five competitors all signed a "master" collective bargaining agreement with Defendants SEIU and Local 1. At that point, the object of the extortionate scheme against PJS changed. Defendant Local 1 demanded simply that PJS sign the master collective bargaining agreement and forego completely any showing of interest by his employees in unionization. Defendant Local 1's agent also threatened Southwell, telling him that people at Defendant Local 1's Chicago headquarters "**want me to come down there and kill PJS**." He also offered PJS "insurance" against non-union competition, telling him that if PJS would just "join up," Defendants SEIU and Local 1 would "protect" the company against non-union contractors "trying to take [PJS'] business."

37.     The corporate campaign against PJS has caused the company substantial business losses. At least 14 accounts, worth millions of dollars to PJS, were lost as a result of malicious campaign attacks. PJS has sued Local 5, Defendant Local 1's Vice President, Dan Schlademan and Local 5's Campaign Coordinator, Susan Strubbe, in Texas state court to recover its substantial losses. (*See Professional Janitorial Service of Houston, Inc. v. SEIU Local 5*, Case

No. 2007-27181 (Harris County District Court).)  During the litigation of that action, Strubbe admitted under oath that Defendant SEIU runs corporate campaigns against companies, including PJS, and if the company refuses to sign a labor agreement with SEIU, "**we cost them business**."

38.     Defendants SEIU and Local 1, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under state law and punishable by imprisonment for more than one year, at least including, but not limited to, Tex. Penal Code §§ 15.01, 31.02-03.

### 3.     Executive Management Services

39.     Executive Management Services, Inc. ("EMS"), is a commercial cleaning, facility maintenance, and management company based in Indianapolis, Indiana.  It is a subsidiary of the EMS Group, a property management company that provides commercial janitorial, security and landscaping services throughout the United States. EMS was founded in 1989 by Dave Bego with several thousand dollars and a handful of employees.  By 2006, Bego had built the company into a highly respected regional contractor that employed nearly 5,000 workers in 33 states.  Like SBM and PJS before it, EMS became a prime target of the Justice for Janitors Campaign.  In late 2005, Defendant SEIU and SEIU Local 3 ("Local 3") (which is now a part of Defendant Local 1) began to unionize the Columbus, Cincinnati, and Indianapolis markets as part of an initiative they called "Three Cities, One Future."  EMS had operations in all three markets.

40.     Defendant SEIU and Local 3 commenced their campaign against EMS by dispatching Dennis Dingow, an SEIU contract administrator based in Cleveland, Ohio, to meet with Bego in or around April 2006.  In that meeting, acting on behalf of Defendant SEIU, Dingow threatened EMS with a corporate campaign against it unless EMS agreed to at least the demands that EMS: (1)  remain neutral while Local 3 unionized its workforce; (2) forfeit its right

to NLRB-monitored secret-ballot elections; (3) recognize the union on the basis of signed authorization cards; and (4) sign an "agreement" to that effect.   When EMS expressed unwillingness to enter into such an arrangement, Dingow's response was short and blunt: "We like conversation, but embrace confrontation."

41.   Dingow continued to harass Bego until, in September 2006, he sent Bego's legal counsel a written ultimatum containing the following explicit threat: "If Dave Bego expects special treatment he is about to have a very rude awakening.   If your advice to your client is that they can weather the storm so to speak, then so be it.   Mr. Bego has had at least three months to make his considerations.   We will give him thirty more days . . . I believe in conversation over confrontation [but] the conversation must produce results though; when it doesn't then it may require confrontation.   If Mr. Bego believes that his salesmanship is so much better than everyone else, he has much more to gain than to lose.   That is his choice now."

42.   In or around 2007, Defendant SEIU and Local 3 commenced a series of aggressive and malicious public attacks against EMS.   Like its other campaigns, Defendant SEIU's goal was to bludgeon Bego and EMS into capitulating and allowing Defendants SEIU and Local 3 to unionize EMS' hourly workforce.   In furtherance of this objective, Defendant SEIU and Local 3 engaged in a variety of tactics: (1) distributed literature throughout Indianapolis calling EMS a "rat contractor" and claiming that the buildings its employees worked in were "Houses of Horror";  (2) mirrored allegations featured in the Clean Up Sodexo Campaign by claiming that EMS, despite having above average hourly wages for the region, paid its employees "poverty wages" and violated their "human rights"; (3) prepared and published a disparaging "report" about EMS called: "The Truth About Executive Management Services: A Workers View of the Indianapolis Cleaning Contractor That is Standing in the Way of Better

Jobs"; (4) contacted EMS's customers and made a variety of disparaging allegations about EMS; (5) staged protests at the buildings of many of these customers; and (6) demanded that the building owners fire EMS as their cleaning contractor.

43.    Defendant SEIU's campaign against EMS involved many malicious and deceitful acts. For example, on or about February 9, 2007, Defendant SEIU and Local 3 staged a protest outside the Sallie Mae building in Indianapolis, where EMS provides cleaning services. The protest was intended to cause those watching the demonstration to believe that EMS employees were striking against their employer. However, when Local 3 was unable to convince enough EMS employees to participate in their protest, it recruited a number of individuals living at a local homeless shelter and paid them to stand on SEIU's protest line for the day. Local 3 paid these individuals in cash to conceal deliberately any record of the participation of the homeless in this "employee" protest.

44.    In or around March 2007, Defendant SEIU and Local 3 staged a series of protests outside an EMS customer's building in Cincinnati, Ohio. Union demonstrators used a "prop" at one of the demonstrations designed to look like a jail cell and positioned a person inside wearing a shirt with "EMS Poverty Prison" emblazoned on the front. Other protesters passed out literature claiming "Janitors Sentenced to Life in Working Poverty by EMS Janitorial."

45.    Defendant SEIU and Local 3 staged numerous other disruptions at EMS customer sites. On or about May 18, 2007, they led a group of approximately 40 protesters, including clergy, who occupied the lobby of the Market Tower in Indianapolis. When the protesters refused to leave the premises, they were arrested by local law enforcement. Predictably, and precisely as Defendant SEIU and Local 3 had hoped, the arrest of several members of the clergy generated substantial media attention.

46.     Defendant SEIU and Local 3 also engaged in deception to maximize the effectiveness of their attacks. On or about June 12, 2007, Defendant SEIU and Local 3's agents misrepresented themselves as painters in order to access an office building in Cincinnati occupied by Western Southern, an EMS customer. Before their credentials could be checked, the "painters" raced into the building and positioned a huge banner in public view stating "Western Southern Chooses Corporate Greed Over Community Need - Justice for Janitors." The purpose of this event was to harass and embarrass Western Southern and to cause them to drop EMS as its cleaning contractor.

47.     Defendant SEIU and Local 3 also filed a number of administrative and regulatory charges against EMS. Then, consistent with past campaigns, they publicized the charges and confronted EMS' customers, telling them that the company was "under investigation." For example, on or about March 30, 2007, Defendant SEIU sent a letter to EMS' customers alluding to the charges that the union itself had filed. The letter stated: "EMS is facing increasing scrutiny for charges it engaged in unlawful labor practices and violated federal law. The charges are part of a growing case against EMS that raises questions about the impact of the cleaning company's business and labor practices on workers and the community."

48.     One of Defendant SEIU's and Local 3's more sensational administrative charges was an OSHA complaint in which they falsely alleged that EMS employees working at the University of Cincinnati were being made to carry human body parts out of biology laboratories, that there were hazardous chemicals and dust in the biology lab, and that employees were getting nose bleeds from the poor conditions. Without waiting for any finding from OSHA, Defendant SEIU and Local 3 then publicized their allegations and claimed that EMS was being "investigated" at the University. The University's own internal review of these allegations

confirmed that, in fact, the laboratory in question was a normal college biology lab, no hazardous dust or other materials were found in the lab, and that while animal parts from dissections were present in the lab, no EMS employee touched or disposed of them. After being presented with these facts, OSHA promptly dismissed Defendant SEIU's baseless complaint.

49.     Defendant SEIU also enlisted the services of third parties to pressure EMS and its customers. For example, in or around September 2007, one of EMS' Indianapolis-based customers received a letter from the Islamic Society of North America threatening to interfere with the customer's attempts to open a Sharia-compliant fund on the London and Dubai stock exchanges unless the customer accomplished a "swift and just resolution" to EMS' alleged "reprehensible" treatment of its workers.

50.     Defendant SEIU and Local 3 also directly attacked and harassed Bego, both at his home and in the community. During a local golf tournament in which Bego was playing, they sneaked onto the course, displaying signs stating "Shame on EMS" and chanting "Dave Bego Must Go!" In addition, around Halloween 2007, several children knocked on the door of Bego's home asking for candy while holding fliers given to them by Defendants' agents that contained disparaging statements regarding EMS and one of its customers. The children told Bego that they had been told to give him the flyers. Two agents of Local 3 were observing the children's activities from inside an idling vehicle parked at the foot of Bego's driveway.

51.     Defendant SEIU's campaign against EMS has dragged on for several years, costing the company almost one million dollars in legal fees as well as a number of potential business opportunities. In fact, Bego was informed by an executive employed by Eli Lilly that EMS could not even submit a bid to handle Eli Lilly's cleaning work because that company did

not want to take a chance on any bad public relations that the campaign against EMS would cause Eli Lilly.

52.     In 2009, Bego published a book describing his experiences as a victim of an SEIU corporate campaign, called "Devil at My Doorstep: Protecting Employee Rights." In a recent interview, Bego elaborated on Defendant SEIU's and Local 3's campaign against EMS: "In corporate campaigns, the unions aren't coming after your employees - they're coming after you. It's psychological warfare. Their goal is to get you, as the owner, to capitulate. It isn't about the employee at all. You need to wake up; they're coming after you, and the collateral damage is your employees and your customers." (*See* Ex. A-11.)

53.     Defendants SEIU and/or Local 3, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under state law and punishable by imprisonment for more than one year, at least including, but not limited to, Ind. Code §§ 35-43-4-2; 35-45-2-1.

### C.     Beverly Enterprises

54.     Beverly Enterprises Inc. ("Beverly") was a nursing home company based in Fort Smith, Arkansas. During the 1990's, it operated more than 800 nursing homes, and employed approximately 60,000 employees, throughout the United States. Beverly was acquired by Golden Living Centers in or around March 2006 and its facilities and services are now operated by members of the Golden Living family of companies.

55.     For many years, Defendant SEIU and its CtW affiliate, the United Food and Commercial Workers, waged a corporate campaign designed to extort Beverly into facilitating the unions' opportunity to unionize the company's non-union hourly employees. One SEIU official described their corporate campaign as a strategy to soften the company up so that it would "negotiate" with Defendant SEIU regarding its organizing goals: "Some of the employers

get very angry about [the corporate campaign] because they don't like to have their problems publicly discussed . . . Our goal is to get to a point with employers where they will work with us more directly." (*See* Ex. A-19.)

56.     In furtherance of their scheme, Defendant SEIU conducted numerous public attacks intended to damage the company's reputation and business relations and force it to agree to the union's demands. For example, in 1993, Defendant SEIU attempted to harass and distract the company by filing a wide ranging complaint with the Pennsylvania workers' compensation agency accusing Beverly of "widespread and consistent violations of Pennsylvania's workers' compensation law." John August, president of SEIU Local 1199, stated in a press release that Beverly had engaged in "a pattern of abuse, delay and denial," all in an effort to mislead workers and to deny them legitimate workers' compensation benefits. (*See* Ex. A-20.) The article noted that the "union" was seeking "remedies" from the state agency, despite the fact that a labor union is not entitled to workers' compensation remedies.

57.     Defendant SEIU and its agents also created their own patient care "surveys" in a misleading attempt to "prove" that nursing home residents were unhappy with Beverly facilities. Using these "surveys," Defendant SEIU then published skewed "reports" disparaging Beverly's patient care.   Such reports include "Falling Short: The Staffing Crisis in Beverly Enterprises' Texas Nursing Homes and the Need for a Minimum Standard" and "System Breakdown: How Quality Assurance Failed at Beverly Enterprises, the Nation's Largest Nursing Home Operator," both published in 1995. In these "reports" and in other campaign publications, Defendant SEIU claimed that Beverly employees tied nursing home residents to their beds for hours at time, causing them to become soaked in urine and excrement and riddled with bedsores.   Defendant

SEIU disseminated its malicious allegations as widely as possible, through radio and newspaper advertisements.

58.     Defendant SEIU also attacked Beverly's employee relations practices, "brand[ing]" Beverly as "the nation's leading labor law violator" in a press release entitled "Beverly Enterprises Feeds at Federal Trough While Violating Federal Law." (*See* Ex. A-21.) During a strike that was staged by the unions at several Beverly facilities in Pennsylvania in or around April 1996, SEIU official Rose Trump referred to Beverly as "an outlaw company on the loose in Pennsylvania" and a "vicious, malicious lawbreaker." Andy Stern, who was heavily involved in Defendant SEIU's Beverly campaign, also vowed "to use every means at [SEIU's] disposal to hold healthcare providers accountable to their patients and their workers."

59.     In May of 1996, Defendant SEIU caused the NLRB to file a number of charges against Beverly for allegedly illegally replacing several hundred employees during a strike. SEIU issued a litany of press releases regarding this event. In one, the union claimed falsely that Beverly was "to be prosecuted" for "hundreds of labor law violations." (*See* Ex. A-22.) Defendant SEIU was well aware that NLRB charges are administrative in nature; however, it deliberately phrased its press release to insinuate that Beverly had been charged with hundreds of criminal acts. Stern was quoted in the press release as claiming that Beverly "has proven again and again to be one of the worst labor law violators in the country." He also called Beverly a "corporate outlaw . . . on the loose in healthcare."

60.     Defendant SEIU then sought to capitalize on its malicious claims regarding Beverly's labor practices. It issued another press release on May 23, 1996 aimed at the company's investors. The press release, titled "SEIU Alert to Beverly Enterprises Shareholders Company Facing Significant Financial Loss," claimed that Beverly's "defiant stance" toward

labor issues could cost shareholders as much as 7 cents per share on an annualized basis. (*See* Ex. A-23.) The article claimed this was because: "Beverly ignored the law and declared its intention to drag out any legal proceedings stemming from [the NLRB charges]." It then noted that "**when Beverly loses**, the company will have to rehire all workers and pay them back wages," and calculated Beverly's "mounting" potential legal liability at "$135,000 per week." The point of the press release was to suggest to investors that the cost to Beverly of its NLRB litigation--generated by SEIU in the first place--made the company a risky investment.

61.     Defendant SEIU then attempted to increase the pressure on Beverly by "demanding" that the U.S. Department of Veterans Affairs cease doing business with the company. In a letter to VA Secretary Jesse Brown, Stern insisted that Beverly's many violations of labor law should render it unfit to receive federal VA contracts. A SEIU press release dated June 17, 1996 quoted Stern's letter as follows: "This company simply does not meet minimum standards of business ethics, and should be considered ineligible for federal contracts." (*See* Ex. A-24.) Defendant SEIU's assault on Beverly's VA contract is a prime example of the teachings in its Contract Campaign Manual: file potentially frivolous litigation on the assumption that the employer will not contest it, "create" news around those frivolous actions, then exploit that news with other business interests to maximize the damage.

62.     Contemporaneous objective assessments of Beverly's performance contradicted Defendant SEIU's claims regarding the company. In a news article describing the campaign, a Dean Witter financial analyst observed that Defendant SEIU's objective in attacking Beverly was to gain membership: "It's purely, we want leverage. Let's beat up Beverly while they are down so we can . . . get more of our employees into Beverly homes." Also, a spokesman for the Pennsylvania Department of Health noted that, despite SEIU's salacious claims regarding

Beverly's patient care, the state was not concerned with Beverly's track record: "I would probably characterize Beverly as not a whole lot different than any other corporation with multi-ownership in the state . . . Nothing jumps out at me that would indicate a problem any more severe with them than non-Beverly owned homes." (*See* Ex. A-25.)

63.    Defendant SEIU and the UFCW engaged in a variety of other tactics in furtherance of their campaign. For example, they generated or encouraged frivolous litigation against Beverly, suggesting to former residents who were unhappy with Beverly that they should sue the company or to claim that patients at Beverly facilities received substandard patient care. They also encouraged family members of former Beverly employees to make disparaging comments about the company. They further attempted to pressure Beverly by interfering with its corporate governance, on one occasion, sending letters to individuals holding 1,000 or more shares of Beverly stock and encouraging them to vote against company management's slate of director candidates.

64.    Defendant SEIU and the UFCW also sought to prevent Beverly from expanding its business in Florida. In or around June 1996, they wrote a letter to the Governor of Florida, urging him to deny Beverly's request to build new facilities and add bed space to existing facilities. (*See* Ex. A-26.)

65.    Defendant SEIU and/or the UFCW, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to, Ark. Code Ann. §§ 5-3-201; 5-36-103(a).

### D.    CVS/Caremark

66.    Shortly after its inaugural convention in 2005, Defendant CtW, under the leadership of Defendant Woodruff and the CtW Strategic Organizing Center, commenced a

campaign to unionize the entire American drugstore industry. One target of the drugstore campaign is Rhode-Island-based CVS/Caremark ("CVS"), which is the largest drugstore chain in the country and fills over 1 billion prescriptions annually. CVS became a target after refusing a demand in 2007 by CtW affiliates that CVS allow unionization by waiving its employees' right to a secret ballot election.

67.    Following the standard corporate campaign modus operandi, Defendant CtW's campaign involved widespread publication of negative information over the internet, protests and media events at locations across the country, creation and distribution of scholarly-sounding "reports" about alleged CVS misconduct, and baseless complaints to various regulatory agencies, all for the purpose of harassing CVS until it capitulated to forced unionization. As set forth below, the CVS campaign conduct and its associated allegations and complaints, on their face, were unrelated to union or labor issues such as wages and conditions of employment. Defendant CtW's purpose in conducting these activities and publicizing these tangent concerns was not to promote any change with respect to the actual issues addressed, but to disparage CVS and impose such a high cost on CVS operations that CVS had no choice but to cede to Defendant CtW's demand of forced unionization.

68.    With the support of its affiliates, Defendant CtW established and to date maintains    at    least    three    campaign-related    websites:    www.curecvsnow.org, www.alarmedaboutcvscaremark.org, and www.putpharmacyfirst.org. The first two--"Cure CVS Now" and "Alarmed about CVS Caremark"--are expressly anti-CVS, and the content of each site is devoted exclusively to disparagement of the company. Alleged race discrimination is a major theme of postings on the sites, which claim that CVS discriminates by locating fewer stores in "communities of color" than in "affluent communities" and by using more anti-theft measures in

low-income communities. (*See* Ex. A-27.) A repeated security-related allegation is that in "communities of color," CVS disproportionately displays condoms in locked cabinets, while allowing direct customer access to such merchandise in affluent communities. Defendant CtW's condom-related postings go so far as to suggest that CVS is contributing to the spread of HIV/AIDS by requiring store patrons to request staff assistance to purchase condoms in such stores.

69.     Other common themes in website postings are that CVS: (1) routinely sells expired products, including infant formula; (2) fails to honor advertised prices; and (3) misuses customers' private health information. Some of the other Defendants have republished these claims on their own websites. For example, a "press clip" issued by Defendant Local 32BJ dated April 2, 2009 repeated the same accusations that CVS sells expired goods and locks condoms in stores in low-income neighborhoods. (*See* Ex. A-28.)

70.     These websites are identified as sponsored by Defendant CtW. However, consistent with the typical corporate campaign tactic of minimizing the sponsoring union's role and ulterior motives, the websites omit any reference to Defendants' true goal of forced unionization.

71.     In addition to the website, CtW and its affiliate unions also use the "Put Pharmacy First" concept as a front when contacting CVS employees directly. In the fall of 2009, for example, union operatives identifying themselves as representatives of "Put Pharmacy First" visited CVS workers at their homes. These persons asked workers to sign cards supporting the "Put Pharmacy First" project, but intentionally concealed that the cards were in fact union authorization cards and that the goal of the "project" was unionization in one or more CtW affiliate unions against the will of both the employees and CVS.

72.   Defendant CtW has conducted protests and media events in many locations throughout the United States, during which they repeated all of the above accusations and concealed their true purpose.  In Houston, for example, Defendant CtW's spokeswoman, Loretta Kane, falsely represented to a news reporter that CtW affiliates were not trying to unionize CVS workers and that she was unaware of any card check request.  (*See* Ex. A-29.)  Defendant CtW knew this statement was false but made it anyway to obtain the support of such community leaders as James Douglas, local counsel for the NAACP, who before agreeing to participate asked Defendant CtW to confirm that the event was unrelated to union organizing.

73.   CtW also published several misleading reports about CVS that seek to appear scientific and scholarly, but are in fact negative propaganda lacking adequate evidentiary support: (1) "Cure CVS: From Low Quality to High Prices, CVS is Failing Our Communities," containing the same allegations highlighted on the websites; (2) "CVS Caremark: An Alarming Prescription," criticizing the CVS-Caremark merger and alleging that CVS promoted certain pharmaceuticals over others for financial reasons; misused private patient data; had customer service problems; and engaged in various types of fraud; (3)  "CVS Caremark: An Alarming Merger, Two Years Later," alleging a continuation of the same problems and concluding that the merger resulted in increased health costs at the expense of customers' health.

74.   Defendant CtW invoked the jurisdiction of various regulatory entities over trumped-up claims against CVS.  For example, Defendant CtW sought a government investigation into allegations that CVS charged the U.S. government and federal employees millions more for hundreds of generic drugs than customers at CVS pharmacies who used no insurance at all; lobbied the FTC to investigate the CVS-Caremark merger; and filed claims of insider trading among CVS' senior executives with the SEC.  None of these demands were

motivated by a genuine interest in the outcome of the investigations. All were calculated to harass and pressure CVS to unionize its employees and would not have occurred but for Defendants' self-serving unionization agenda.

75.     Defendants CtW, SEIU, and Local 32BJ, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to, R. I. Gen. Laws § 11-42-2; Tex. Penal Code §§ 15.01, 31.02-03; Md. Code Ann., Crim. Law §§ 3-701, 3-704, 3-705 & 3-706; O.C.G.A. §§ 16-4-1, 16-8-16; and 720 ILCS 5/12-6(a)(1).

### E.     Allied International Union

76.     Defendant SEIU and its affiliated locals have also targeted other unions with their extortionate tactics. Defendant Local 32BJ's conspiracy to destroy Allied International Union is just such an example. Defendant Local 32BJ's attempt to raid and/or destroy Allied is similar to Defendant SEIU's attempt with respect to Sodexo to eclipse UNITE HERE from representing any other Sodexo employees.

77.     Allied International Union ("Allied"), a labor organization based in New York, is a guards-only union that represents security guards in New York City and elsewhere. A "guards-only" union typically does not admit non-guard employees to membership. Guard unions such as Allied are permitted under the NLRA to seek representation elections conducted by the NLRB in connection with their organizing efforts of guards-only bargaining units. Unlike guards-only unions, "mixed guard" unions, such as Defendant SEIU and some of its affiliated locals, are not allowed to petition the NLRB to represent bargaining units of guards. For years, Defendant SEIU and its locals have sought to drive guards-only unions out of the security industry and take

over representation of the guards those unions represent without conducting NLRB elections in those units.

78. In early 2006, Defendant Local 32BJ and its agents, including Defendant Fishman, commenced a corporate campaign designed to force Allied to relinquish its role as exclusive bargaining representative of its security guard members and to turn those members over to Local 32BJ. In order to carry out this scheme, Defendant Local 32BJ embarked on a public assault that closely resembled Defendants' attempts to extort employers.

79. To commence their scheme, Local 32BJ and its agents attempted to infiltrate Allied's internal officer membership. They offered bribes to several Allied members, such as increased pay and benefits, in exchange for their agreement to help Local 32BJ to take over Allied's membership. Defendant Fishman held a number of meetings with these individuals, telling them that Local 32BJ would "take care of everything," including sponsoring their campaigns for elected office within Allied and providing them with legal representation in the event of challenges from Allied's legitimate officers. Defendant Local 32BJ also obtained the assistance of SEIU Local 1877 in connection with its effort to place surrogates in other Allied officer positions.

80. As part of its attempt to unseat Allied's legitimate officers, Defendant Local 32BJ carried out a smear campaign of Allied's three highest-ranking officers. On one occasion, Defendant Local 32BJ and its agents told Allied members that Allied officers were engaged in adulterous sexual activity and that Allied's Vice-President was "corrupt" and a "fake" lawyer. These statements caused Allied's officers to sue Defendant Local 32BJ in New York state court.

81. Defendant Local 32BJ also accosted numerous third parties in an attempt to destroy Allied's business relationships and representative status in and around the New York

City area. For example, Local 32BJ and its agents pressured Fordham University to remove Allied as the bargaining representative of Fordham's security detail. To "help" convince Fordham to remove Allied, Local 32BJ attempted to block the University's plans to expand its Lincoln Center campus buildings. Defendant Local 32BJ received assistance from several elected officials, including U.S. Representative Jerrold Nadler, in its effort to block Fordham's building expansion.

82.     Defendant     Local     32BJ     also     set     up     an     internet     site, www.standforfordhamsummitsecurityofficers.org, on which it published numerous attacks against Allied. For example, the website included a link titled "Take Action to Support Security," which linked to an online petition directed to Fordham's President, urging him to halt the Lincoln Center expansion. The petition baselessly alleged that the planned expansion would create overcrowding, noise and air pollution and would "exaggerate the fortress-like layout of the Lincoln Center campus." (*See* Ex. A-30.) In keeping with Defendants' countless attempts to feign concern over issues unrelated to their financial objectives, Defendant Local 32BJ had no interest in the outcome of Fordham's plans other than to the extent they might be exploited to injure Allied.

83.     In December 2006, AlliedBarton won a contract to provide guard service for the New York City Department of Citywide Administrative Services. At that time, Allied represented the guards who had performed work for the previous contractor. Defendant Local 32BJ pressured AlliedBarton into refusing to bargain with Allied, despite the fact that AlliedBarton would be employing Allied's guards to perform its new contract with the City. Local 32BJ then forced the company to deal exclusively with Defendant Local 32BJ as the guards' representative, even though it did not represent the employees at issue. The litigation

that ensued around this event resulted in a number of AlliedBarton's employees being without union representation for more than a year.

84.     Defendant Local 32BJ brought additional pressure on Allied by trying to damage its relationship with JetBlue.  In or around 2007, approximately 100 Allied members were employed by Summit Security, which provided security services for JetBlue at JFK Airport in New York City.  Defendant SEIU created a website, (*see* www.itsnoteasybeingblue.info), on which it publicized alleged poor customer service and flight delays at JetBlue.  The purpose of this action was to compel JetBlue to replace Allied with Defendant Local 32BJ as bargaining agent of Summit Security's guards.

85.     Defendant Local 32BJ reinforced these attacks with a number of explicit extortionate threats.    For example, Defendant Fishman informed Allied's leadership that Defendant Local 32BJ would do "whatever it takes" to get Allied to cede control of its members to Local 32BJ.  In addition, Neil Diaz, a Local 32BJ organizer, told Allied representatives that it was in Allied's best interest to "give in to us."  Moreover, Tom Balanoff, President of Defendant Local 1, stated in March 2008 that Defendant SEIU was "coming after Allied hard and will crush" Allied.

86.     In an attempt to halt Defendant Local 32BJ's extortionate assault on its membership, Allied filed a civil RICO action against Defendants Local 32BJ and Fishman, as well as others, in federal district court in New York.  (*See Allied International Union v. SEIU Local 32BJ*, Case No. 08-cv-3357 (S.D.N.Y.).)  The facts described above are taken in pertinent part from Allied's Complaint filed on or about April 3, 2008.  The parties settled the matter on or about August 29, 2008.  Although terms of the settlement were not disclosed, Defendant Local 32BJ's 2008 LM-2 filing with the Department of Labor reflects an October 3, 2008 payment to

Allied in the amount of $543,400 for "Jurisdictional and Settlement Agreement," and its 2009

LM-2 filing reflects an October 6, 2009 payment to Allied in the amount of $543,400 for

"Settlement of Litigation Re: Representation Issues." Defendant Local 32BJ's 2009 LM-2 filing

also reflects a payment of $200,000 to Defendant SEIU for "Allied Settlement Agreement." (*Id.*)

As alleged in Allied's Complaint, Defendants Local 32BJ and Fishman, through the conduct

described above, violated 18 U.S.C. §§ 1951-1952.

### F.    Sutter Health

87.     Sutter Health ("Sutter") is a not-for-profit healthcare system that serves over 100

cities and towns in Northern California. Sutter became a major target of Defendant SEIU in or

around 1997.   Around that time, Defendant SEIU and SEIU Local 250 ("Local 250")

commenced what became a long running corporate campaign aimed at pressuring Sutter to

succumb to a forced unionization arrangement in the form of card check recognition and

employer neutrality.

88.     In or around July 1997, Local 250 began a series of periodic publications it called

the "Sutter Scam Sheets." These publications alleged, among other things, that Sutter routinely

violated financial regulations, tax laws, and patient care requirements. Local 250's "scam

sheets," which were distributed to Sutter Health senior management, legislative leaders and the

media, caused Sutter to face a variety of regulatory audits by agencies, such as the IRS, the

DOD, the Department of Health and Human Services, the FTC, the NLRB and various bodies of

the California State Assembly. Defendant SEIU even went so far as to pressure California state

officials to review Sutter's tax-exempt status. (*See* Ex. A-31.) Defendant SEIU's appeals to

these governmental agencies were not undertaken out of concern for Sutter workers or the

community, but rather as a means of bringing regulatory pressure on Sutter.

89.     Also in or around July 1997, Local 250 used its anti-Sutter rhetoric to dissuade a sole community provider hospital in the San Joaquin Valley from becoming a Sutter partner. (*See* Ex. A-32.) As a result of Local 250's efforts, the hospital partnered with another healthcare system and, ultimately, was shut down.    Ironically, Defendant SEIU's Sutter campaign, purportedly aimed at improving worker conditions at Sutter Health through unionization, actually cost employees at San Joaquin Valley hospital their jobs.

90.     Defendant SEIU's campaign against Sutter dragged on for many years.  On or about October 11, 2003, Local 250 president Sal Rosselli called for the California Attorney General's Office to investigate Sutter's 1998 acquisition of the Davies Medical Center.  (*See* Ex. A-33.)  Rosselli expressed "concerns about [Sutter's]...misuse of charitable assets" in the purchase.  Interestingly, Rosselli's "concerns" did not arise until five years after the transaction, and were in spite of the fact that both the state Department of Justice and the Federal Trade Commission were aware of the purchase at the time in took place in 1998.

91.     As it did in its Beverly campaign, Defendant SEIU also tried to bring financial pressure on Sutter by interfering with its expansion plans.  For example, on or about May 18, 2004, Defendant SEIU issued a press release claiming that Sutter was preparing to build a new hospital facility on "toxic sites" in San Carlos, California.  (*See* Ex. A-34.)  Despite assurances that the site was relatively clean and would undergo a clean-up, the press release boldly asserted: "Even more egregious is the fact that patients, especially those with compromised immune systems would be potentially at risk for added health issues as a result of being exposed to possibly environmentally unsafe conditions."   (*Id.*) The release also quoted Karl Krupp, a "Community Health Advocate for Greenaction for Health and Environmental Justice," who expressed his concern "about the possibility that Sutter Health would build a hospital to make

people healthy on top of toxic contamination that could make people sick." In fact, Krupp was an affiliate of Local 250.

92.    Defendant SEIU also launched an anti-Sutter website called "www.suttercorporatewatch.com," which Local 250 publicized in a press release issued on or about July 27, 2004. (*See* Ex. A-35.) Although touted as a "comprehensive resource to assist the public in better monitoring Sutter Health," the website was nothing more than a vehicle through which Defendant SEIU could publish its smears against Sutter.

93.    Defendant SEIU also attempted to oppose expansion of the Sutter General Hospital by filing a California Environmental Quality Act ("CEQA") complaint on or about January 6, 2006. (*See* Ex. A-36.) Despite the fact that the community surrounding the hospital approved of the expansion, Defendant SEIU allegedly had concerns about the project's environmental impact. Sutter spent over $2.4 million on an environmental impact report to assess and address any potentially adverse environmental impacts of the General Hospital project. Defendant SEIU did not participate in the public notice and comment process until the eleventh hour, yet still filed the CEQA complaint. Delays caused by the CEQA complaint were estimated to cost Sutter Health $3 million to $5 million a month, exclusive of legal costs and fees.

94.    Defendant SEIU, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to Cal. Pen. Code §§ 518, 519, 524.

G.    **Catholic Healthcare West**

95.     Catholic Healthcare West ("CHW") is a healthcare system comprised of over 40 hospitals located in California, Arizona and Nevada.   In or around 1996, Defendant SEIU launched a corporate campaign against CHW in an effort to force the organization into a master "agreement" for all of its hospitals insuring, among other things, card check recognition and company neutrality.   In order to maximize the effectiveness of the campaign, Defendant SEIU intentionally exploited the teachings of the Catholic faith in an attempt to turn CHW's religious leadership and executive management against one another.

96.     Defendant SEIU launched its CHW campaign in or around July 1998, when it published a white paper titled "A Time to Break the Silence."  Defendant SEIU's paper claimed that the CHW hospital system was out of touch with the Catholic church's views on unionization. Defendant SEIU distributed its paper to other unions, ostensibly to open discourse about the subject.   However, its real intent was to create a rift between church leaders and hospital administrators that would weaken CHW's resolve to resist the corporate campaign.  To further this effort, Defendant SEIU published a full-page ad in the West Coast edition of The New York Times in or around July 1998 that juxtaposed pro-union statements by Catholic church leaders, including Pope John Paul II, with statements regarding CHW management's alleged anti-union activities. (*See* Ex. A-37.)  The ad's implications embarrassed and infuriated Catholic religious leaders. In order to amplify these tensions, Defendant SEIU and its supporters went so far as to publicly accuse CHW's nuns and chaplains of including anti-union sentiment in their morning prayers. (*Id.*)

97.     On or about August 25, 1998, Local 250 President Sal Rosselli was quoted in the San Francisco Chronicle accusing CHW administration of generating an "atmosphere of terror" for CHW employees allegedly seeking unionization, and claimed that CHW's "hypocrisy" with

respect to Catholic doctrine was "outrageous." (*See* Ex. A-38.) The article also noted that Defendant SEIU expressed hope that Catholic leaders in California would "intercede on their behalf, even though [those leaders] have no direct authority over the women's religious orders that run CHW." (*Id.*) Similarly, in a letter to the editor of the San Francisco Chronicle published on or about January 12, 1999, Rosselli misleadingly stated that the three orders of nuns sponsoring CHW hospitals were "[w]ith one hand...building housing for working families...[and] with the other, they are undermining the dignity of working people in their own hospitals -- and flouting their own values and mission." In a similar vein, Defendant SEIU went so far as to take out Spanish-speaking radio ads accusing CHW and its sponsors of turning its back on the poor.

98.    Upon information and belief, Defendant Mary Kay Henry openly noted at the Catholic Health Association of the United States assembly in 1998 that the teachings of the Catholic church insist upon a just workplace, which she asserted is impossible without union representation. The gravamen of Defendant Henry's publicly shared position was to cast doubt on CHW's and other Catholic healthcare centers implementation of Catholic doctrine and to further Defendant SEIU's campaign efforts.

99.    Defendant SEIU's plan to turn the Catholic church, in essence, against itself, worked.    In or around April 2001, Los Angeles Cardinal Roger Mahony and San Francisco Archbishop William Levada provided "behind-the-scenes pressure" that forced CHW to enter into a unionization agreement with Defendant SEIU on or about April 6, 2001. (*See* Ex. A-39.) A National Catholic Reporter article covering the story astutely noted that "[i]n targeting Catholic hospitals, the union displayed a canny sense of the bind Catholic hospitals are in, given the pro-union stance of Catholic social justice teachings." (*Id.*)

100.    Ultimately, on or about June 1, 2004, CHW entered into a system-wide master agreement with Defendant SEIU that added 14,000 new dues-paying members into the union's ranks.  (*See* Ex. A-40.)

101.    Defendant SEIU, through some or all of the conduct described above, engaged in acts or threats involving extortion and/or attempted extortion chargeable under State law and punishable by imprisonment for more than one year, at least including, but not limited to Cal. Pen. Code §§ 518, 519, 524.

# EXHIBIT 1


**Selbständig & unter 55 ?**
Private Krankenkasse ab nur 99.- € für Selbständige & Freiberufler! Testsieger Vergleich


**Headhunter suchen Sie!**
Experteer.de - Hinterlegen Sie Ihr Profil für über 8.000 Headhunter >> Jetzt gefunden werden!

**Wissensvorsprung!**
Tagesaktuell erfahren, welche Veränderungen es bei Kunden, Lieferanten und Wettbewerbern gibt.


**THE MOB**
Follow the Mob past and present, with the Daily News.

Home  Autos  Real Estate  Jobs  Classifieds  Apps  Place an Ad  Buy Pictures  Buy Tickets  Deal of the Day          Login  Register

NYDailyNews.com
# DAILY●NEWS   Money

SITE  BLOGS  DISCUSSIONS  WEB  Search powered by YAHOO!

**News    Sports    Gossip    Entertainment    Events    Local    Opinion    Life & Style    Photos    More Sections +**

Money  Technology  Discussions  Video  Topics  Blogs  Contests  Deal of the Day  Services  Real Estate

Credit Cards  Markets  Photos  Columnists

Article
Comments
Email
Print
RSS
Share


Juan Gonzalez

## Union shocker: UNITE-HERE boss faces ax in labor war

Juan Gonzalez - News

Updated Friday, May 29th 2009, 10:45 AM



Appleton/News
Bruce Raynor in 2001.
**Related News**

Gonzalez: Bitter battle over $12M splits labor movement

Gonzalez: Union fighting over bank

2 huge unions end year-long feud by dividing up millions of dollars

Gonzalez: Watchdog group urges probe of union big for $15M funds transfer

Last-minute deal averts dreaded doorman strike

Gonzalez: Fierce succession battle shapes up as SEIU leader mulls stepping down

One of the country's biggest labor leaders is about to be expelled from his own union.

At an internal hearing to be held at Chicago's Drake Hotel Friday, officials of UNITE-HERE will review charges that their president, Bruce Raynor, improperly organized a breakaway faction to join a rival labor group, the Service Employees International Union.

Raynor is also accused of conspiring to siphon millions of dollars of UNITE-HERE's assets, including those of the union-owned Amalgamated Bank, for the benefit of SEIU.

American labor has rarely seen such a massive raid by one union against another, or such a public power struggle within a major union.

You'd have to go back to 1942 for anything of comparable scale. That was when the legendary John L. Lewis of the United Mine Workers expelled his second-in-command for forming the independent United Steel Workers Union.

As this contemporary dispute has continued to snowball, it has bitterly divided many longtime labor activists.

The 500,000-member UNITE-HERE was formed five years ago in a friendly merger of textile and hotel workers. Two weeks ago, its executive committee suspended Raynor and accused him of working against the interests of his members.

Early last Friday morning, John Wilhelm, Raynor's co-president and head of the hospitality division, deployed a phalanx of private security guards to seize control of two floors of the union's executive offices on Seventh Ave., where Raynor is based.

The raid was necessary, Wilhelm says, because Raynor's followers had removed hundreds of important files from the headquarters over the past few weeks and were scrubbing vital information from the building's computers.

Then on Tuesday, lawyers for Raynor requested an emergency hearing with Manhattan Federal Court Judge George Daniels, who is overseeing several suits connected to the UNITE-HERE split. Daniels rejected Raynor's request.

Raynor did not respond to calls for comment. Neither did Edgar Romney, the former UNITE-HERE vice president who - with Raynor's blessing - led about one-third of UNITE-HERE's members in breakaway action in March.

The Romney faction then founded a new organization, Workers United, and promptly affiliated with Stern's SEIU.

In their raid, Wilhelm's people found several documents they say show Raynor was subverting his union.

One May 11 memo, for instance, provides Raynor detailed updates from the Workers United breakaway group about its plans and finances.

That memo notes with alarm that Workers United is incurring deficits of more than $300,000 a month and that those losses are expected to grow.

"The $1 million loan we received from SEIU will help absorb some of the shock, but only for approximately three months," the memo adds. It urges a new appeal to SEIU for up to $1.3 million a month in subsidies through suspending any dues payments to the national union.

SEIU spokeswoman Michelle Ringuette confirmed that her union had loaned $1 million to Workers United and is considering additional aid.

"What our members need most right now is to see (these) issues resolved through binding arbitration so we can all move forward and get back to the business of challenging hostile employers and winning better wages and benefits for our members," she said.

Veteran labor watchdogs like Herman Benson of the Association for Union Democracy have been stunned by the ferocity of the fight between Stern, Wilhelm and Raynor.

"SEIU is bankrolling a secession inside another union," Benson said. "That's just not done. As for Raynor, he set up his own dual union, which is considered one of the biggest crimes by organized labor. No wonder they want to throw him out."

jgonzalez@nydailynews.com

**Related Topics**
Bruce Raynor
Service Employees International Union
John Wilhelm
Labor Unions
Jobs and Labor
Business
Edgar Romney
George Daniels
Herman Benson
Amalgamated Bank
Chicago
John Lewis