# EXHIBIT 3

# Justice For All. Pass it On.

Recommendations
to the SEIU 2008
Convention



SEIU Convention 08 • San Juan, Puerto Rico

# Justice for All. Pass It On







Working people are facing a once-in-a-lifetime, historic opportunity.

After decades of what is clearly now a failed economic theory of deregulation, worship of the free market, and tax breaks for the richest 1% and the largest corporations, the tide is turning and Americans are ready for change.

There is a broad public consensus that our society is out of balance between people that work and people with wealth, and it is now realistic that we could win...

- A new American Dream that rewards hard work; ensures healthcare for every man, woman, and child; provides a secure retirement; and allows our children to live better than their parents.

- Reliable funding toward which everyone, including corporations and the wealthy, pays their fair share.

- Restoring the middle class by re-establishing the freedom of all working people to form a union without interference from their employer.

- Comprehensive immigration reform, including a clear path to citizenship for all hard-working, taxpaying immigrants.

For the past 12 years, SEIU members and leaders have made strategic choices that have put us in a position to take advantage of this historic opportunity and to help build the pro-worker political majority it will take to turn these dreams into reality.

Together, we have...

- Built the most effective advocacy organization for working people in North America and the leading voice for workers in our country.

- United a million more workers with us, building our strength to nearly 2 million.

- United and won economic gains for hundreds of thousands of workers and the communities they serve in new sectors such as home care, child care, and private security.

- Created the most effective political organization in the United States.

- Developed far-reaching alliances in our communities and the political arena.

- Become the leading voice for affordable, quality healthcare for all.

- Maintained and improved standards for SEIU members in our industries for pay, healthcare, retirement, and working conditions.



3







- Made members' voices a far stronger force in our cities, states, and country on all the issues that make a difference in our daily lives — healthcare, education, housing, transportation, public safety, immigration reform, retirement security, and much more.
- Given working people more of a voice in the South and Southwest and other parts of the country that are growing fastest.

Now, with our new strength and our expanded voice, coupled with a country ready for change and the chance to elect a new U.S. president, Congress, and many new governors and local public officials, we are at an historic turning point where we can imagine making progress we have only dreamed of all our lives.

We have the opportunity—and the responsibility—to make new, bold choices that will let us continue to make history.

We believe that we can achieve such goals only if we stand for "justice for all" and not for "just us."

- It is part of our core mission to unite and win a better life for all working people and to pass on a better world to our children and grandchildren.
- In addition, today's union members cannot expect to maintain and improve our living standards and working conditions if the percentage of union workers in our industries and our society continues to decline.

We also believe that our key goals to improve workers' lives depend on the active voice and participation of current union members, retirees, and millions more workers we must help to join our movement.

With those key principles in mind, this report contains detailed recommendations developed over the past two years by thousands of SEIU members and elected local union leaders.

Underlying these recommendations are a few key choices we must make together:

- How can we best increase our unity to increase our strength?
- How can we stand not only for "Just Us" but for "Justice for All" workers in our industries and in our country,

recognizing that we cannot seize this historic moment without uniting the nearly 90% of workers who have no union?

- As we grow bigger and stronger, how can we continue to build a responsive union in which more members take action, play a leadership role, and make and carry out democratic decisions?
- How can we build a permanent pro-worker political majority that can win and sustain a more just and humane society?

Our children and our grandchildren are counting on us to answer these questions. They are the work force of the future–and the choices we make today will determine what kind of world they inherit.

We have a once-in-a-lifetime opportunity to win justice for all working people and to pass it on to future generations. The choice is ours.



# Historic Achievements, New Challenges

## Uniting Our Strength Has Won Larger Gains for Workers

The doubling of our membership strength in 12 years to improve pay and benefit standards for all of us is a remarkable, historic achievement that no other modern union has ever matched. From 1997 to 2007, we added the strength of nearly 100,000 workers per year, more than triple the rate in the previous period from 1988 to 1996.

This success has been made possible by extraordinary sacrifice on the part of tens of thousands of not-yet-organized workers, union members, staff, leaders, and community allies.

But all that effort and sacrifice wouldn't have made as much difference if we hadn't also made a series of bold and difficult choices at SEIU's 1996, 2000, and 2004 Conventions about strategy, priorities, and structure:

- **Increased focus and resources.** In 1996, the International Union raised spending on organizing for greater strength from 20% to 50%. The local union 10-15-20% program began so that by 1999 many locals had increased organizing spending from an average of less than 5% to at least 20%. We focused our efforts on uniting workers who do the same type of work in healthcare, property services, and public sector and publicly funded services.

In 2000, the local union delegates to the SEIU Convention adopted the New Strength Unity Plan, part of which dramatically increased resources from members for their local unions and created the Unity Fund for major breakthrough strategies.

- **Increased unity and accountability.** For the past ten years, elected local union leaders increasingly have been serving not just as heads of their local affiliates but as the collective leadership responsible for a national strategy to unite and improve the lives of workers in their industry and ensure quality services for our communities.

At the 2004 SEIU Convention, the delegates increased accountability and coordination within the SEIU divisions that are made up of local unions in each industry.

In 1996, delegates passed the first SEIU members' bill of rights.

By moving, step by step, toward pooling our strength—bargaining, political, membership, and financial capital—we have been able to develop new models of organizing that unite workers on a far greater scale for everyone's benefit.

- **Home care.** Our members' combined political strength in California and the combination of local, state, and national resources made it possible to help 74,000 home care workers in Los Angeles establish their legal right to a union,



Average Number of Workers Per Year Organizing to Join SEIU

96,000

30,000

Since 1996, workers have been organizing to unite with us three times faster, giving us all new strength to improve workers' lives.

1988-1996          1997-2007



**The New York Times**

**A Union with Clout Boldly Stakes Its Claims on Politics**

SEIU members have become the leading force for affordable, quality healthcare for all. Early in the U.S. presidential campaign, we challenged all candidates to produce specific healthcare reform plans if they wanted to be considered for our support. All of the Democratic candidates did so.

which in turn led to a coordinated effort to help 345,000 of their counterparts in the rest of California, Oregon, Washington, Michigan, Illinois, Massachusetts, Ohio, and parts of Wisconsin to do the same. With each contract, home care workers are "invisible no more," gaining more pay, health coverage, and other improvements.

- **Child care.** Building on that experience, we pooled our financial and political strength to help 49,000 child care providers in Illinois to win their right to a union, and then began spreading that model to Oregon, Washington, Maryland, Maine, and Pennsylvania. To date, we have united more than 75,000 family child care providers to win pay and benefit increases, and have active campaigns in Massachusetts, California, Connecticut, and Rhode Island to unite an additional 120,000 providers.

- **Security.** We pooled our strength, including global relationships with unions in other countries, to win an agreement with the largest security company in the world—based in Sweden—and then worked to organize other companies as well to help thousands of mostly African

American security officers to raise wages and gain healthcare.

- **Janitors.** We used our existing strength in dealing with national building owners and cleaning contractors to help janitors in nonunion markets such as Houston and Miami to win improvements and lay the groundwork for more victories in the South, while winning the best contracts ever in the industry in the last four years.

- **Nursing homes.** By coordinating strategy, we won agreements with national nursing home chains that led to respect for workers'

rights and common efforts to win badly needed funding. Workers at Extendicare, Longwood, Gem, and other chains across the country have a new opportunity to join SEIU through a fair process, and we won funding increases in nine states for nursing home care that total more than $1 billion.

- **Hospitals.** By pooling resources and strategy across the union, we were able to reduce employer interference with workers' freedom to form a union at hospitals in California, Colorado, Connecticut, Florida, Iowa, Illinois, Maine, Michigan, Minnesota, Ohio, Oregon, Pennsylvania, Nevada, New York, Tennessee, Washington, and Wisconsin, as well as Puerto Rico and Canada. In all, we helped more than 33,000 nurses and other hospital workers to unite with us so they could negotiate improvements for themselves and their patients.

- **Multiservice.** SEIU local unions, together with another union, UNITE HERE, helped unite workers in the multiservice industry that is dominated by three huge global corporations that contract to provide a wide range of support services to governments, businesses, hospitals, local school systems, universities, and other institutions. Together, we have won agreements with two of



6

the three largest multiservice firms to respect workers' freedom to form a union through majority sign-up. We have already helped 14,000 workers gain a union so they can begin the climb to more economic justice with improved pay and benefits.

- **South-Southwest.** We decided at the 2004 Convention to jointly commit serious resources and effort to unite workers in our industries in the South and Southwest, with the result that we now represent more than 100,000.

- **Puerto Rico.** The support of SEIU members throughout North America has helped members in Puerto Rico win public sector collective bargaining and gain new public sector contracts.

- **Canada.** In just the past three years, increased unity and strategic focus has helped 13,000 more workers join us and led to a major affiliation of a new local union. These gains have built workers' strength in healthcare and property services

and made us the fastest growing union in Canada.

- **Global strength.** As a result of coordinated campaigns with global labor federations and about 20 unions around the world, 18,000 more U.S. workers have SEIU representation and improved working standards and about 60,000 workers in multinational corporations in SEIU industries in other countries now have a voice at work.

In all, **of the 1 million more workers who have united with us since 1996, more than two-thirds did so as a result of campaigns that involved not just their local union but support from the rest of SEIU** in terms of financial resources, staff and members, political strength, capital strategies support, and/or member bargaining strength.

If we had not acted more and more like one organization—and not just a collection of loosely federated locals—most of the newly organized 1 million would probably not be members today.

# Future Challenges Require More Unity, Larger Scale

We have a great opportunity today as polls show that about **50%** of U.S. workers would choose to have a union if they didn't face employer opposition. That's at least **40 million** who don't have one now.

But taking advantage of this opportunity to strengthen all working people requires overcoming some stark realities:

- **The organizing process established by the National Labor Relations Act can no longer be counted on to protect workers' freedom to form a union.** In most cases, it takes too long, leaves too much room for employer interference and intimidation, and imposes little or no penalty for violations of the law.

- **Most employers refuse to respect workers' freedom to form a union without management intimidation.** In many cases, we have had to conduct a corporate social responsibility campaign that holds the employer accountable for the full range of ways that its policies and practices affect the larger community. That takes money, political strength, and the ability to campaign effectively throughout the nation or even around the globe.

- **Our industries and employers increasingly operate on a regional, national, or global basis.** They can move capital from one place to another. They plan how to drive down pay and benefit standards in one place as a step toward driving them down everywhere. Their increased size allows them to bring to bear far more political pressure than a purely local employer can.

- **Capital is now blurring the lines across industries and between the public and private sectors.** Already, more than 5 million people work for companies controlled by corporate buyout firms that have no



**SEIU's work to unite private security officers is the largest campaign to improve the lives of African American workers and their communities in U.S. history.**

industry focus but only an interest in moving and manipulating money to maximize profits for a limited group of executives. In the past few years, corporate buyout firms have taken ownership of the nation's largest office building landlord, Equity Office Properties; the nation's largest for-profit hospital chain, HCA; the nation's largest nursing home chains, including HCR Manor Care, Beverly Living Centers, and Mariner Health Group; and the largest U.S.-based provider of cleaning and food services, Aramark. Earlier this year, a buyout takeover of one of the largest national child care providers, Bright Horizons, was announced. The buyout firms' latest target is public infrastructure (roads, bridges, and lotteries) that has involved work performed by public employees that could be outsourced to companies the buyout firms control.

- **The percentage of unionization in the private sector has dropped below 8%,** and two-thirds of public employees have no union either. In the healthcare and property services industries, 90% of workers have no union.

- **Virtually all population growth in the U.S. in the next 20 years will be in southern and western states where unionization is lowest.** Those states increasingly will have an economic impact on pay and benefit standards for the nation, so if we don't help workers there unite to win improvements, pressure will be greater to reduce standards in the rest of the country.

- **Industries that are growing fastest generally are those with the least unionization.**

- **It takes huge amounts of resources to persuade some of the largest and most powerful corporations in the world to respect workers' rights, and yet...**
  - While we have doubled spending on organizing

in four years, we have not doubled results.

- Our spending to help each new worker join us has increased greatly, which jeopardizes our ability to unite more workers faster.

- Spending per member on representation and other non-organizing activity increased significantly since 1999 but without clear increases in member satisfaction.

- While many SEIU local unions are spending at least 20% of their budget on organizing, on average only 45% of the total 20% is being spent for that purpose. That is at least $37 million that is badly needed to help pay for larger scale strategies.

- **The experiences of some of the major industrial, construction, and transportation unions are a stark reminder that SEIU cannot expect to win or maintain high union standards for just us, as an island in an increasingly nonunion economic sea.** While not long ago SEIU

was only 8% of America's union movement, by 2012 we will be 20% if current trends continue and other unions continue to decline. We have to work with our partners in Change to Win to unite the 50 million service workers in the U.S. whose jobs are difficult to move overseas—in transportation, retail, food production and distribution, construction, hospitality and tourism, as well as healthcare and property services.

SEIU members and our allies have shown that we can overcome all obstacles if we choose to unite our strength behind a bold common strategy.

We have the **chance** of a lifetime if we make the **choice** of a lifetime. The recommendations that follow give us a real opportunity to win a better future for all working people.



After more than 50 years of gradual decline as a percentage of the U.S. work force, changes we are making together with other unions are laying the groundwork for new strength and unity for working people.



# Recommendations

A chieving historic goals such as healthcare for all and restoring the American Dream will require even more unity and commitment from all of us.

Over the past few years, thousands of SEIU members and elected local union leaders have met in committees and larger groups to analyze both our successful and less successful strategies, our structures, trends in our industries, and experiences of other unions and allied organizations.

Based on their research, much debate, extensive discussion about our future vision in each SEIU industry division, town hall meetings with members of local unions in every region, and input from other SEIU members, the following are their recommendations to the elected local union delegates to the 2008 SEIU Convention.

These recommendations have been adopted by the elected leaders from throughout the union who make up the SEIU International Executive Board.

## 1. Unite Working People to Change Our Lives

We have united over a million more workers with us since 1996, making us all stronger and helping current members achieve more at the bargaining table, in politics, and in our communities.

But 90% of healthcare and property services workers and two-thirds of public employees still don't have a union.

We need their strength to make major progress for all of us. And we have a responsibility to help them raise their pay and benefit standards up, before employers use them to bring SEIU members' standards down.







**A. Involve all local unions to jointly develop one national strategy for uniting more workers with us to win gains for working people on a much larger scale.**

1. **SEIU will have one strategy for uniting more workers and raising standards for all workers in our industries that is based on the integrated plans of each division, their locals, and the South-Southwest, and also includes opportunities and challenges that cross industries and regions.** Local unions will continue to have organizing programs as part of an overall division plan. The overall SEIU strategy will include a number goal for the whole union, each division, the South-Southwest, cross-division opportunities, and each local union and will be approved by the International Executive Board.

   By 2012, SEIU will have united more than 500,000 more workers, the largest four-year increase in strength by any union in modern history. That will make SEIU the largest and strongest union that includes private sector workers that North America has ever seen, with more than 2.5 million members. It is also expected that if we are able to enact the Employee Free Choice Act (EFCA) with a new U.S. Congress and president we will unite a total of at least a million more workers by 2012.

2. **Local union leaders will collaborate as national leaders for their industry to make a united national strategy for their division based on a long-term vision and an initial 4-year action program.** Through the divisions, local unions will collectively decide–instead of deciding individually—where to prioritize efforts for the best chance of large-scale gains for workers. Each division strategy will spell out how the International Union and local unions will blend their efforts, resources, and political, bargaining, and membership strength to win gains for more workers than any local union can win alone. Decisions will be made by consensus when possible, and by majority rule when necessary. This decision-making process that will ensure that all points of view are heard is spelled out in Appendix A.

3. **Every local union will set aside 20% of its post per capita budget to organizing** in a separate fund. These local union resources will be blended with the division's dedicated Unity Fund of at least $12 million as the primary resources to carry out a division's plan. That plan will include each local in order to maximize focus on where it will make the most difference in uniting more workers and changing workers' lives.

4. **The International Union's resources will be used to implement the one national strategy** approved by the International Executive Board rather than being automatically allocated in rigid percentages.

5. **All levels of the union will be accountable for their contribution to the strategy.** Once decisions are reached through the collaborative process, everyone will work together to carry them out.

6. **There will be a regular unionwide review and evaluation of progress,** leading to adjustments in resources as well as in strategy.

## B. Involve Current Members in Helping More Workers to Unite with Us for Everyone's Benefit

1. **Involve far more members and other activists in our campaigns.**

- **MOR (Member Organizing Reserves).** SEIU members have been very effective at reaching out to not-yet-union counterparts who do similar work and are organizing to unite with us. MOR will be a new program to expand member involvement in organizing campaigns and will work with the divisions to help staff large campaigns primarily with member organizers.

- **SEIU Organizing Corps.** This will be a new group of temporary organizers modeled after the Peace Corps or Teach for America. It will be aimed at people interested in doing social justice work for a portion of their life, but who are unsure of what work they want to do long term.

2. **Give high priority to providing members the opportunity to go to nonunion locations** and meet with not-yet-union workers.

3. **Use our bargaining and political strength to unite more workers with us for everyone's benefit.** Mechanisms for involving current members to use their strength to help more workers at national employers to unite with us should be developed nationally through the divisions. Divisions may designate key strategic global/national/ regional employers or sectors/subsectors where a comprehensive unionwide strategy offers the potential for breakthroughs in uniting more workers and raising standards. In those cases, democratic procedures for negotiating those agreements are spelled out in Appendix B.

## C. Help Build a Stronger Union Movement, as We are All Stronger Together

1. **Help other unions in Change to Win** to unite more workers in their industries.

2. **Increase our capacity to conduct campaigns involving multinational corporations** in other countries on behalf of members in SEIU and Change to Win industries.

3. **Work with union allies in other countries** to increase the capacity to unite workers to improve living standards and working conditions in common industries and multinational corporations.

4. **Deepen the involvement of SEIU local union activists** in SEIU's global work.

5. **Track employer globalization trends** in all SEIU divisions.



# 2. Member Action and Leadership to Win for Working People

To take advantage of a once-in-a-lifetime opportunity to change workers' lives, SEIU members and leaders are committed to an all-out effort to unite all workers in our industries, build a permanent pro-worker political majority, and win affordable, quality healthcare for all; an economy that rewards work, including the freedom to form a union without employer interference; comprehensive immigration reform; and quality services in our communities with fair, reliable funding.

Achieving goals as important and large-scale as those requires an unprecedented level of involvement and action by SEIU members, families, and retirees. We can all be proud of the thousands of members who have been actively involved as member organizers, contract action team members, political activists and COPE contributors, worksite leaders, and stewards. But we must build on that record to involve 200,000 members (10% of SEIU members) in leadership roles and 1 million members (a majority of SEIU members) in member action if we are going to truly achieve a society with justice for all.

Member action and participation on a whole new scale also will further expand democracy in our union. Real worker democracy includes majority participation in the actual activities of the union that aim to improve workers' lives.

At the same time, every union member deserves an effective and responsive union that provides high quality representation, prompt answers to our questions, and support in our own language every day of the year—24/7.

SEIU local unions' ability to both unleash members' skills and talents and provide quality and responsive representation

has been limited by antiquated systems of representation and administration that, according to a survey of locals, are too often manual, unreliable, and inexpertly managed.

SEIU members and leaders commit to the following steps to get a majority of members involved in member action, ensure that members play a leadership role, support stewards and other member leaders, and provide responsive, quality representation to every member:

1.  **Increase opportunities for members to lead the way.** Members must be able to use their skills, talents and passions to take action and lead in the building of our working family movement. By 2012, at least 10 percent of SEIU members should play a leadership role in the union, and a majority of members should be involved in working to achieve our core goals.

2.  **Increase responsiveness and member satisfaction by establishing Member Resource Centers.** Local unions that have already established member resource centers are now providing members prompt access to trained organizing staff that provide members information in their own language, help solve job-related problems using 21st century technology 24/7, and engage members in the core activities of our union. All members should have the opportunity to access member resource centers, and local unions must ensure that members receive quality and responsive representation for their worksite issues and are provided opportunities to participate in the life of the union.

3.  **Retrain and redirect local union field organizing staff.** Local union members, leaders, and staff should develop ways to focus on giving members far greater opportunities and training to win







at work; unite workers in our industries; forge community alliances that work for reliable, quality services for all; and build a working family movement.

4. **Free individual local unions from administrative tasks by pooling administrative functions.** Using 21st century technologies to provide locals with high quality operations can free up resources to expand our focus on member action, uniting workers in our industries, community alliances, bargaining, and other vital work. With today's technology, it is more efficient and cost effective for local unions to share secure common platforms and systems for tasks such as list management, accounting, dues processing, and information technology.

To make these vital changes to increase member strength and unity, we will work together to achieve the following goals:

• During 2008 and 2009, we will work together to evaluate, test and pilot member resource centers (MRCs). We will determine the most effective and efficient manner in which to implement MRCs and to provide high quality member representation. Using what we learn from the pilot, we shall implement member resource centers across the union. By 2012, a majority of members will have *24/7 access to quality information and services from member resource centers*. These member resource centers will be organized at the highest, most effective and efficient level. Member resource centers will meet unionwide standards for cost, quality and outcomes such as quality of service to members, ease of access, multiple language capability, support available to member leaders and staff, and quality of data to support SEIU programs and strategies.

• During 2008 and 2009 we will also conduct *comprehensive administrative services pilots.* As part of these pilots, we will use a secure and independent shared service organization for administrative services such as dues processing, accounting and financial reporting, communications, and data storage and list management. Local unions that participate in pilots will share information on current systems and future needs, and in some cases test software and systems developed during the pilot.

• By 2009, based on the findings of the pilot, the union shall establish a shared service organization to provide *state-of-the-art administrative services.* These administrative services shall be cost effective and of high quality and shall be provided under conditions consistent with SEIU's values. By 2012, a majority of SEIU members shall receive administrative services provided by this shared service provider.

• As members access member resource centers and their locals access shared service center resources, resources freed up by the conversion to 21st century technology and systems will be measured, tracked and redirected to member action programs.

**13**

- Between now and 2012, local unions will meet **new standards for member action and leadership.** By 2012, but preferably beginning as soon as MRCs are implemented, local unions shall have:

  a) a yearly written plan with numerical goals for member action and leadership;

  b) a full-time staff person (who may already be in place) who is responsible for coordinating member action and leadership;

  c) a mechanism for members to help design and develop strategies to increase member action and leadership;

  d) staff roles focused on supporting and increasing members' ability to lead, participate, and decide;

  e) systems in place to measure local union levels of member action and leadership;

  f) resources redirected to member action and leadership, made possible in part by implementation of member resource centers and pooled administrative services. By 2012, at least 5% of post-per capita resources should be freed up to directly support efforts to increase member action and leadership.

- Beginning in late 2008, SEIU shall establish a **Member Action and Leadership Committee** of local leaders, members, and key staff. This committee shall advise the union's member action and leadership program. The International shall also establish a new **Member Action and Leadership Center.** This center will help local unions work together and learn from each other and will develop and monitor year-to-year plans, serve as a resource for locals as they establish pilots, and provide technical and developmental expertise. Tapping into the creativity of SEIU members, leaders, and staff, we will sponsor experiments and pilots; develop and recommend standards and measures; share best practices; support local union programs to engage members and implement member resource centers; and track and report results.

- By 2012, 10 percent of SEIU members will play an active leadership role in the union and a majority of members will be involved in helping to achieve our core goals.



# 3. Strengthen Our Political Voice on Work and Community Issues

Millions of U.S. voters are fed up with policies that benefit only a few at the top and not hard-working, taxpaying families and retirees.

With a new U.S. president and new Congress, we will have a once-in-a-lifetime opportunity to win affordable, quality healthcare; rebuild the American Dream and the middle class by passing the Employee Free Choice Act to restore the freedom to form a union; enact comprehensive immigration reform; and ensure quality public services with fair, reliable funding.

Seizing this opportunity requires building a permanent pro-worker political majority in the United States. As the leading advocacy organization for working people in North America, SEIU has both the opportunity and the responsibility to play a leadership role in building that majority coalition based on issues important to working people rather than the interests of particular political parties or candidates.

Building the political strength that working people need at the local, state, and federal level to change our lives, our communities, and our country will take…

A. Increased action and leadership by SEIU members, retirees, and families.

B. Unity and resources.

C. Stronger alliances with others who share our goals.

D. Even more emphasis on holding public officials accountable after they are elected and not just hoping that they will stand up for working people.

## Federal Priorities

- Build a two-year campaign (2008–2009) to pass universal healthcare reform and the Employee Free Choice Act into law in 2009.

- Continue our work to pass comprehensive immigration reform, comprehensive pension reform, fair and reliable funding to support quality services in our communities, and a commitment to a specific Iraq War exit strategy in 2008 or 2009 that brings our troops home and allows redirecting war spending to vital needs at home.

## Electing Pro-Worker Public Officials

- Elect a pro-worker U.S. president and get to 60 or more votes in the U.S. Senate as a result of SEIU's election campaign work with allies in 2008.

- Elect two to three new pro-worker governors in 2008—2009 and three to five additional (over and above the current number of) pro-worker governors in 2010.

- Develop and implement a strategic unionwide plan for redistricting with a focus on key state legislatures,




governors, and other relevant elected office holders to ensure that working people and all communities are fairly represented.

- Coordinate a monthly strategy call of local union political directors and state council directors involved in state ballot initiative work and develop a plan for proactive and counter initiatives.

## Local Union Resources

- All local unions (LUs) will continue to dedicate at least 10% of their LU resources to political work in 2008–2010, at least 11% in 2011, and at least 12% in 2012. SEIU Divisions may choose to set these standards higher.

## State Councils

- Speaking with one voice is essential to winning for workers. State councils should function as coordinating and convening bodies that allow local unions to communicate and collaborate with each other. They should assist in capacity building and facilitate common interests to move the state and locals forward and help build a progressive infrastructure.

- Local unions are responsible for political activity and capacity building, but the state council provides the vehicle that strives to ensure that everyone around the decision-making table is on the same page. The state council shall establish and coordinate a candidate endorsement process for all of the locals within the state.

## COPE

Locals and divisions will work collaboratively to ensure that:

By December 2009, 20% of every local union's members should be giving at an average of at least $7 per month to COPE.

Once a local has achieved this 20% goal, the local should increase the number of members giving at an average of $7 or more per month by at least 10% each year until a majority of members are giving at this level.

In order to ensure locals achieve this goal, locals are strongly encouraged to set the COPE giving levels at $5, $10, and $15 per month with a minimum level of at least $5 per month.

## Member Volunteers

- Member Volunteers—3% of local union (LU) membership in 2008 and 2009, 6% of LU membership in 2010 and 2011, and 10% of LU members in 2012.

- Member Political Organizers (MPOs)—0.5% of local union (LU) membership in 2008 and 2009, 1% of LU members in 2010 and 2011, and 2% of LU members in 2012.

## Civic Participation

- Local unions, state councils, and the International Union will work together to promote civic participation of communities of color and immigrant members and families, including encouraging citizenship and voter registration, challenging the U.S. Citizenship and Immigration Services' (USCIS) fee increases and processing backlogs, and insisting that the federal government and Congress expedite the process.

- Locals, state councils, and the International Union should expand capacity to hold citizenship and voter registration drives and educational voter forums in 2008 and beyond.

- SEIU will help expand the work of nonprofit entities such as *Mi Familia Vota, Strengthen Our Lives (SOL),* and *The American Dream Fund* so that all working people, including immigrants, will be active and united.

## Member Voter Registration

- Local unions will register to vote at least 70% of their eligible membership in 2008, at least 75% in 2009, at least 80% in 2010, at least 85% in 2011, and at least 90% in 2012.
- Local unions that are already above their annual goal should increase their voter registration percentage by 5% per year until they are at 95% or higher.

## Building a Progressive, Pro-Worker Majority.

- Continue to expand the electorate by providing leadership in America Votes' state-based and national coordinating bodies and the equivalent state/local coalitions.
- Help build a significant network of donors to finance the progressive infrastructure and media/messaging expertise needed to win big for workers.
- Continue to support technology and information-based organizations that assist in the development of new technologies, strategies and techniques to strengthen the progressive movement.

## Political Accountability

- Commit at least $10 million to 2008–2009 post-election political accountability work.
- Build a multilevel grassroots rapid response system that includes emails, text messages, phone trees, and worksite communication to hold members of Congress and local elected officials accountable.

- Invest additional resources in issue-based and electoral accountability campaigns that SEIU leads and/or works in coalition with, including *They Work for Us* and *Working for Us PAC* and other state-based political accountability coalitions.
- Increase by 10 congressional districts and/or states in 2008 (above the current 15) and 5 congressional districts and/or states annually in 2009–2012 the number of SEIU members participating in the Grassroots Lobbying Accountability Program.

## Programmatic Development

- Political Communications—Continue to build a multi-channel communication system that includes an email rapid response system for political campaign work and incorporates the identification and training of SEIU member leaders as spokespeople for SEIU's campaigns.
- Political Technology—Deploy the Voter Activation Network (VAN) systems with SEIU in 36 states in 2008 and the use of additional volunteer tracking software, and continue to make improvements to these voter information and tracking systems and SEIU's access to these systems after 2008.
- SEIU GOP Advisory Committee—Increase by 25% per year in 2009–2012 the number of locals that are developing GOP member programs and increase GOP member involvement within active locals by 10% per year in 2009–2012.




- SEIU Retiree Advisory Council—Increase retiree membership within Retiree Advisory Council (RAC) locals by an average of 5% per year in 2009-2012 and identify and recruit three new locals each year into RAC in 2009–2012.
- SEIU Members Running for Office Program—Identify, recruit, and train at least 20 more SEIU members to run for elected office in 2008, 30 more members in 2009–2010, and 40 more members in 2011–2012.

## Community Strength

SEIU and its local unions shall increase workers' community strength by developing a program in which…

- Members' existing community relationships are systematically identified.
- Members are provided training and encouragement to deepen and expand their leadership role in the community.

- Local unions, state councils, divisions, and key geographic areas within the union develop annual community strength plans with clear goals, staffing, and budgets that unite and coordinate our relationships with key partners and allies.
- By 2012, local unions designate community strength leads to coordinate work within and across locals who are provided with training and mentoring to build effective programs.
- We follow written criteria for funding or participating in long-term community partnerships.
- Key elements of the community strength program, such as member action and leadership, staff training and development, and organizing and issue work, are integrated with the overall union programs in those areas.

The adoption of these Justice for All recommendations by the elected local union delegates to the 2008 SEIU Convention can set the stage for four years of the most historic progress working people have made in generations.

When we meet again for our next Convention in 2012, we could be living in a world in which:

- Millions more workers have joined our movement and made us all stronger in our industries, our communities, and our country.
- Everyone has affordable, quality health care.
- We go to work every day knowing we will have the resources and training we need to provide quality services of which we can be proud.
- Hard-working, taxpaying immigrants have been brought out of the shadows and have a clear path to citizenship.

We can build that kind of world if we unite our strength, get a majority of members involved, help millions more to join us, and build effective alliances with everyone who shares our goals.

We can win Justice for All working people—and we can pass it on to future generations. The decision is in our hands.



# Appendices

## Appendix A
## Division Decision-Making

SEIU members and local unions in the same industry unite their strength and strategy through their industry division. The following spells out a decision-making procedure that ensures that all points of view are heard and that decisions made by a democratic majority are carried out by all.

### Division Leadership Board
Each industry division, as defined by the International Executive Board, shall have a division leadership board. (Currently the industry divisions are healthcare, public services, and property services.) **The Division Leadership Board will be the highest decision-making body for an industry division, and among other matters, will decide those issues assigned an industry division under the SEIU Constitution.**

### Composition of Division Leadership Board
Each division leadership board shall be comprised first of representatives elected to the International Executive Board at the SEIU Convention, and those subsequently filling a vacancy as an executive vice-president, vice-president, or International Executive Board member. Each International Executive Board member will be asked to serve as a representative of one industry division leadership board subject to policies and procedures adopted by the International Executive Board.

Following their election at the International Convention, the members of each division leadership board shall meet to determine if the division leadership board should be expanded. It will take into consideration locals not represented, size of locals, industry sectors, occupations, geography, diversity, employer relations, and strategic areas for uniting more workers with us. The division leadership board will make recommendations for expansion to the International president for approval by the International Executive Board. Absent an approved alternative recommendation, the division leadership board will consist of representatives elected at the International Convention and the Chair appointed by the International president, and will function in accordance with these procedures.

### Executive, Sectoral, Occupational or Other Committees
The division leadership board can recommend to the president that subcommittees be established to assist the division leadership board in its responsibilities. The number of committees, their purpose, role, and responsibilities will be determined by the division leadership board, and then recommended to the president and subject to the approval of the International Executive Board.

### Chair of the Division Leadership Board
The chair of the division leadership board will be appointed by the president and can be a full-time officer of SEIU. The chair will only vote in cases where it makes a difference.

### Voting
A majority of the members of the division leadership board shall constitute a quorum, and decisions of the division leadership board shall be decided by majority vote of those present and voting once a quorum is present.

### Alternative Structure and Voting Mechanisms
Divisions can recommend to the president alternative voting mechanisms or structures subject to the approval of the International Executive Board.

# Appendix B
## Strength through Unity in Employer Relations

### Core Values
SEIU members and leaders approach strategy questions regarding agreements with employers based on the following core values:

1. **Strength through unity.** What working people achieve has always depended on building a broad movement and speaking with one voice. That is all the more important today when unions represent only 1 out 10 healthcare and property services workers and only one-third of public service employees, and when our employers increasingly are regional, national, or global.
2. **Justice for all.** Our mission is to unite and win for all working people in our industries and in our society. In the long run, that's the only way to improve and maintain gains for current members as well.
3. **Quality service and strong communities.** We seek a wide range of improvements that ensure that we can provide the public with accessible services that we can be proud of and that meet the needs of all working people.
4. **Democratic decision-making and accountability.** SEIU members and leaders make decisions by democratic majority rule and hold each other accountable for carrying them out.

### Strength through Unity in the 21st Century
SEIU members value and respect our rights and responsibilities within our own locals to determine our own bargaining culture, structures, and processes for developing contract proposals, establishing bargaining committees, and conducting strike and ratification votes. **As a basic guideline, bargaining is primarily the responsibility of local unions and conducted through members' democratically determined processes at the local union level.**

Our review of local union bargaining practices demonstrates that locals have well-established, and in many cases long-standing, policies that have served their members well. Some local union constitutions include provisions on bargaining that give wide latitude in size and organization of bargaining teams.

**The International Union constitution requires member approval of all collective bargaining contracts, and appropriately leaves to local union members the decision on what policies, structures, and practices best serve the local's members.**

In 2000, the elected delegates to the SEIU Convention adopted the New Strength Unity Plan, which established the principle that local union leaders through their divisions could strategically decide in certain circumstances that the interests of members were better served when we united members' strength to speak with one voice with an employer where more than one local union had members or was engaged in helping workers at that employer to organize. These circumstances most frequently arise with key strategic global/national/regional employers, where a comprehensive unionwide strategy offers potential for uniting more workers with us and improving standards.

In 2004, the elected SEIU Convention delegates called for the union to further expand its efforts to coordinate and engage in national bargaining, again generally working through the industry divisions.

As our industry employers consolidate and grow in size and resources, and buyout firms gain ownership of companies in multiple SEIU industries, we know our union must develop employer relations strategies that best enable workers to gain the strength to organize and bargain to improve their working lives in this new environment across local unions.

Over the past four years, SEIU has experimented with a range of employer relations strategies in an effort to gain more strength by uniting more workers in our industries, improve members' pay and benefit standards, and work for quality of services with strategic employers within our industry divisions. Our Subcommittee on National Bargaining/Employer Relations has examined the benefits and challenges of these different approaches.

To create clarity and unity we recommend the following principles and process to guide future employer relations with "strategic employers" within our industry divisions. **The following applies only to those limited situations involving a designated "strategic employer" within an industry division. It does not affect the regular day-to-day practice of collective bargaining that local unions will continue to conduct with most employers.**

The committee had the opportunity to learn from the experiences of other national unions that had a history of national bargaining. We learned from them creative ways to build bargaining structures that enabled democratic decision-making at a national level and member action and leadership at the local level. We also took to heart the shortcomings that allowed the false hope of maintaining standards for a diminishing membership to stifle the need to organize and raise and maintain standards for all workers in an industry.

## Strength and Democracy Begin with Member Action and Leadership

The foundation of our strength through unity and our democratic decision-making and accountability is the involvement of SEIU members. SEIU local unions have a rich tradition of member action and leadership that is expressed in our **Member Bill of Rights and Responsibilities, including:**

- the right to have opinions heard and respected;
- the right to be informed of union activity;
- the right to be educated in union values and union skills;
- **the right to participate in the union's bargaining efforts and approve union contracts;**
- the responsibility to help build a strong and more effective labor movement ; and
- the responsibility to support the organizing of unorganized workers.

## Uniting More Workers to Build Strength for All

Global/national/ regional employer relations with strategic industry employers are now key to achieving long-term gains for all workers. In this ever changing global economy, we cannot let employers divide us —we must meet the challenge and create our own organizational structures so we are more unified than the employers we confront.

The issue of standards has two dimensions. The first is raising standards for "some of us" or raising standards "for all of us" regionally, nationally, and globally. The second issue on standards is that labor history has taught us that unions that tried to maintain standards in one geography or one company have seen those workers' standards eroded over time.

Uniting more workers with us is essential to achieve and maintain increased standards for pay, healthcare, retirement security, working conditions, and quality

service for all workers in our industries, including current members.

Building strength in numbers and achieving higher standards are not competing goals. Each is essential to the other. Without uniting more workers with us, we cannot raise and maintain standards in today's world. Without raising standards, we cannot expect to maintain and increase our strength in numbers. Winning these standards requires building real power for workers through organizing the unorganized as well as developing a collective bargaining program that will win these standards at the bargaining table.

Our relations with strategic industry employers should focus on division-identified organizing agreements, labor relations accords, and contracts that provide:

- **Uniting more workers with us.** A primary goal in agreements with employers is that they provide for the right and ability of more workers to unite with us within identified markets and individual employers or sectors. One fundamental test of any agreement should be that it speeds the day when all workers in healthcare, public sector, and property services industries can be united in our union.

- **Raising standards.** Agreements must open the way to improve economic standards for our members, including wages that reward work, healthcare benefits, retirement security, and dignity on the job, and have a clear path for achieving industry standards and full bargaining rights as their collective strength grows.

- **Political strength for workers and communities.** Agreements should recognize that in those industries that depend on public funds or public contracts, vehicles for effective political partnerships are essential for improving workers' lives and the services we deliver.

- **Consumer support.** Improving the quality of the work we do is important to broadening the support for workers in our industries and the communities they serve.

- **Workers' voice.** Members must have the right to approve collective bargaining agreements which directly impact their current wages, benefits, and working conditions. It is important that members' voices are heard on issues involving the quality of the services they provide as well as their working conditions, and we should utilize a range of avenues for accomplishing this.

## Unity and Speaking With One Voice at All Levels of the Union

We build the most collective strength for members and all workers in our industries when members are engaged and, after consultation and debate, we adopt and implement unified goals and strategies. It will take the highest level of commitment, coordination and unity possible to implement our strategy in the global/national/regional employer relations arena. Our ability to change workers' lives is determined by our unity of purpose and action.

Based on our common understanding that uniting more workers with us and raising standards must go together, our employer relations must be aligned with a clearly defined, articulated, and communicated organizational plan and strategy to minimize competing agendas and maximize our ability to improve workers' lives.

Our strategy, priorities, field campaign, and communications must be united. Global, national, and/or regional bargaining of contract terms covering bargaining unit members and future members must be accompanied by a comprehensive and unified campaign of member action and leadership at all levels of our union.

## Recommended Processes for Strength through Unity

In order to achieve our twin goals of uniting more workers and raising standards with maximum unity, we need processes that are open and clear. Consolidation of industrywide, multiemployer or single employer multistate bargaining and organizing not only gives rise to greater worker bargaining power, but also serves as a vehicle to drive industry standards designed to improve the lives of workers.

We believe our employer relations strategy should be accomplished through our industry divisions

and pursued as an integral part of their "Strategic Unity Plans."

Therefore we recommend the International Executive Board adopt the following processes for members and their local unions to unite their strength.

### A. Division Delegates Day at the SEIU Convention

The highest representative body of the division membership, the division convention delegates at division day of the SEIU Convention, after input, consultation and debate, adopts their overall "Strategic Unity Plan" for uniting more workers and raising standards for the division. Recognizing that bargaining is primarily the responsibility of local unions and conducted through their democratically determined processes, the division convention delegates may identify in their plan those key strategic global/national/regional employers or sectors/subsectors where a comprehensive unionwide strategy offers potential for breakthroughs in uniting more workers and raising standards.

### B. On-going Evaluation by the Industry Division Leadership Board

The industry division leadership board (to be defined) has the responsibility to implement their "Strategic Unity Plan" adopted by the division convention delegates. The ongoing responsibilities of the division leadership board shall include continued assessment and recommendation to the International president of strategic industry employers for global/national/regional employer relations. The division leadership board may pursue an individual employer or sector-wide/market approach.

### C. Designation of Strategic Employer Relations Category

The division leadership board will designate the type of employer relations/bargaining that applies to each situation; that is, which category best describes the strategic employer(s) from the division's perspective: virtually no union/organizing agreements; low density; or high density employer relations.

Each category requires a different balance of the need to act decisively to take advantage of breakthrough opportunities with the need for meaningful engagement at multiple levels of union leaders and members.

## D. National Bargaining Process

In carrying out this work, the division will use three vehicles to insure effective bargaining and meaningful participation from affected local union leaders and members. They are:

- National Bargaining Teams.
- National Bargaining Councils.
- Local Bargaining Councils.

## 1. National Bargaining Teams

Upon the recommendation of the division leadership board, the International president acts and utilizes his/her authority under the SEIU Constitution to authorize national bargaining and appoint a national bargaining chair and team for the strategic employer(s). The chair is responsible for implementing the strategic plan of the division and is the chief spokesperson. The make-up of the other team members will depend on the category of strategic employer relations designated by the division leadership board.

**a. For situations involving virtually no union or a pure organizing agreement, the process is streamlined.**

After input from the division leadership board, the International president appoints the National Bargaining Chair and additional bargaining team members whom he/she determines is best situated to accomplish the strategic plan of the division.

Organizing agreements, including model contract guidelines impacting potential members, shall be submitted by the National Bargaining Team to the division leadership board for approval before final recommendation for execution by the International president and should be shared with the cross-division committee.

**b. For situations involving low density or high density employers that will address both organizing and the negotiation of contract terms affecting current members, the process shall be expanded to assure that the voice of members is heard.**

- **Low density setting:** The International president acts upon the recommendation of the division leadership board and appoints the

national bargaining team chair and after input from the division leadership board appoints division representatives and representation from locals with bargaining unit(s) of the employer(s) covered by the collective bargaining agreements and serving on the national bargaining council (elected/selected by the local and affirmed by the national bargaining council).

- **High union density setting:** The International president appoints the chair, division representatives and local union representative from each local with members covered by the collective bargaining agreement (elected/selected by the local and serving on the national bargaining council). The number of division representatives shall not be greater than the number of team members appointed from the local unions.

**c. National bargaining teams operate by consensus where possible, under the guidance of the chair. When consensus is not achieved:**

- In the virtually no-union or low density union setting, differences on a bargaining team are resolved by one vote per bargaining team member. The chair may use his/her discretion to refer a significant dispute within the bargaining team to the division leadership board or the International president.

- In the high union setting, differences on a bargaining team are resolved by the bargaining team using the same decision-making formula as used by the division leadership board.

2. **National Bargaining Councils**

Once the division leadership board decides on whether to proceed on an individual employer or sectorwide/market approach for its strategic employers, it will establish national bargaining councils for all national bargaining that has a shared goal of uniting more workers and negotiating standards for existing members.

National bargaining councils (by employer or sector) shall consist of two representatives from every local (selected/elected by the local) with members or potential members from the employers/ sector within that national bargaining council's jurisdiction.

The national bargaining council has the responsibility of adopting bargaining goals for uniting more workers and raising standards consistent with the overall division plan at the start of pattern contract bargaining and shall approve tentative collective bargaining agreements. The division leadership board shall approve agreements before they are submitted for ratification by the affected membership.

3. **Local Bargaining Councils**

Once national bargaining councils are established, the division leadership board will develop a plan for local bargaining councils to be integrated with the national bargaining councils' work at the local membership level.

Specifically, for all locals with members covered by a collective bargaining agreement that is designated part of national bargaining, a local bargaining council shall serve as a vehicle for members/ workers to have a voice, exercise leadership and take action around the organizing and contract campaign as part of a unified national employer relations strategy.

Local unions determine the structure of their own local bargaining councils.  Each local bargaining

council, operating in unity with the other local bargaining council(s) and the applicable national bargaining team, is responsible for member action including surveys, ongoing education, mobilization and ratification as part of the unified national strategy.

*Note: Representation on the national and local bargaining councils.*

Members at the local level select/elect delegates to their local bargaining councils. Those local delegates elect/select one leader/one member to the relevant national bargaining council(s).

**E. Cross-Division National Employer Relations Committee**

A cross-division national employer relations committee shall be established as a standing committee of two representatives from each division plus additional representatives appointed by the International president from the Executive Committee of the International Executive Board. This committee is responsible for blending the national employer relations strategies of the divisions and resolving any tensions or problems arising from our ambitious plans. The committee will continue to monitor, evaluate and make recommendations for improved processes and is responsible for reviewing and approving recommendations for process modification from the division leadership boards. [The International president may also initiate modifications as he/she deems appropriate and necessary.] When requested by the International president, the cross- division committee shall help resolve significant disputes with the national bargaining team or aid other decision-making. The cross-division committee will oversee policy issues that may arise in labor relations accords.

**F. Members approve their collective bargaining agreement,** as required by the SEIU Member Bill of Rights and Responsibilities.

# APPENDIX C

This report grows out of thousands of conversations by members in the union and not-yet-union members at their worksites, meetings and communities throughout North America from which the following committees have helped shaped a series of recommendations:

**Local Strength Committee**
Anna Burger, SEIU Secretary-Treasurer, Chair
Mitch Ackerman, SEIU Local 105
Ed Burke, Florida Public Services Union
Jaime Contreras, SEIU Local 32BJ
Damita Davis-Howard, SEIU Local 1021
Thomas DeBruin, SEIU Healthcare Pennsylvania
Mike Fishman, SEIU Local 32BJ
Leslie Frane, SEIU Local 503
Byron Hobbs, SEIU Local 20
Gerald Hudson, SEIU Executive Vice President
Roberto Pagan Rodriguez, SEIU Local 1996SPT
Gregory P. Pullman, SEIU
Dave Regan, SEIU District 1199 WV/KY/OK
Susana Segat, SEIU Local 888
Sheila Velazco, SEIU

**Organizing Review Committee**
*General Committee*
Andy Stern, SEIU President
Anna Burger, SEIU Secretary-Treasurer
Mary Kay Henry, SEIU Executive Vice President
Gerald Hudson, SEIU Executive Vice President
Eliseo Medina, SEIU Executive Vice President
Tom Woodruff, SEIU Executive Vice President
Kirk Adams, SEIU
Scott Courtney, SEIU
Mike Fishman, SEIU Local 32BJ
Tyrone Freeman, California United Homecare
 Workers
Amy Gladstein, 1199SEIU United Healthcare
 Workers East
Jill Hurst, SEIU
David Kieffer, SEIU
Eileen Kirlin, SEIU
Neneki Lee, SEIU
Stephen Lerner, SEIU

Valarie Long, SEIU Local 32BJ
Jim Philliou, SEIU
Dave Regan, SEIU District 1199 WV/KY/OK
David Rolf, SEIU Healthcare 775 NW
Monica Russo, SEIU Healthcare Florida
Debbie Schneider, SEIU
Sharleen Stewart, SEIU Local 1.ON
Norman Yen, SEIU Local 5H

*Organizing Technologies*
Jim Philliou, SEIU, Co-Chair
Jill Hurst, SEIU, Co-Chair
Stephen Abrecht, SEIU
Mitch Ackerman, SEIU Local 105
Joseph Geevarghese, SEIU
Michelle Healy, SEIU
Bill Hulme, SEIU Local 1.ON
Neneki Lee, SEIU
Mary Ann Parker, SEIU
Beth Pointer, SEIU
Barbara Rosenthal, 1199SEIU United Healthcare
 Workers East
Gregory P. Pullman, SEIU
Dan Schlademan, SEIU Local 1
Steven Ward, SEIU
Wendy Weiner, SEIU
Rebecca Williams, SEIU District 1199 WV/KY/OK
Norman Yen, SEIU Local 5H

*21st Century Alternative Models*
David Kieffer, SEIU, Co-Chair
Stephen Lerner, SEIU, Co-Chair
Kim Cook, President, SEIU Local 925
Thomas DeBruin, SEIU Healthcare Pennsylvania
Tyrone Freeman, California United Homecare
 Workers
Gina Glantz, SEIU

George Gresham, 1199SEIU United Healthcare
  Workers East
Keith Kelleher, SEIU Local 880
Robert Lawson, SEIU
David Rolf, SEIU Healthcare 775 NW
Monica Russo, SEIU Healthcare Florida
Cathy Singer-Glasson, SEIU Healthcare-
  Local 199 Iowa
Sheila Velazco, SEIU

### Organizing Review & Planning 2008-2012
Kirk Adams, SEIU, Co-Chair
Eileen Kirlin, SEIU, Co-Chair
Scott Courtney, SEIU
Mike Fishman, SEIU Local 32BJ
Amy Gladstein, 1199SEIU United Healthcare
  Workers East
Derrick Hamilton, SEIU
Jill Hurst, SEIU
Rickman Jackson, SEIU Healthcare Michigan
Neneki Lee, SEIU
Dave Regan, SEIU District 1199 WV/KY/OK
Tom Woodruff, SEIU Executive Vice President
Norman Yen, SEIU Local 5H

### Global Organizing
Debbie Schneider, SEIU, Chair
Nicholas Allen, SEIU
Tom Balanoff, SEIU Local 1
Michael Crosby, SEIU
Hector Figueroa, SEIU Local 32BJ
Christy Hoffman, SEIU
Valarie Long, SEIU Local 32BJ
Roberto Pagan Rodriguez, SEIU Local 1996SPT
Rocio Saenz, SEIU Local 615
Sharleen Stewart, SEIU Local 1.ON

### Political Strength Committee
Anna Burger, SEIU Secretary-Treasurer
Tom Balanoff, SEIU Local 1, Co-Chair
Dennis Rivera, SEIU Healthcare, Co-Chair
Eileen Connelly, SEIU Pennsylvania State Council

Alice Dale, SEIU Healthcare Oregon
Hector Figueroa, SEIU Local 32BJ
Tyrone Freeman, California United
  Homecare Workers
David Holway, SEIU Local 5000
David Rolf, SEIU Healthcare 775 NW
Sal Rosselli, SEIU Healthcare-United Healthcare
  Workers West
Monica Russo, SEIU Healthcare Florida
Jon Youngdahl, SEIU

### Employer Relations Subcommittee
Anna Burger, SEIU Secretary-Treasurer, Chair
Mary Kay Henry, SEIU Executive Vice President
Gerald Hudson, SEIU Executive Vice President
Tom Balanoff, SEIU Local 1
Mike Fishman, SEIU Local 32BJ
Leslie Frane, SEIU Local 503
Annelle Grajeda, SEIU Local 721
Dave Regan, SEIU District1199 WV/KY/OH
Dennis Rivera, SEIU Healthcare
Sal Rosselli, SEIU Healthcare-United Healthcare
  Workers West
Monica Russo, SEIU Healthcare Florida
Judy Scott, SEIU

### Community Strength Committee
Gerald Hudson, Co-Chair, SEIU
Eliseo Medina, Co-Chair, SEIU
Kyle Bragg, SEIU Local 32BJ
Jaime Contreras, SEIU Local 32BJ
Merle Cuttitta, SEIU Local 500
Tyrone Freeman, California United
  Homecare Workers
Mike Garcia, SEIU Local 1877
Keith Kelleher, SEIU Local 880
Jane McAlevey, SEIU Nevada
Pamela Martinez, SEIU Healthcare-United
  Healthcare Workers West
Rahaman Muhammad, SEIU Local 617
Dian Palmer, SEIU Healthcare District
  1199 Wisconsin

*Community Strength Committee, continued*

Monica Russo, SEIU Healthcare Florida

Jay Sackman, 1199SEIU United
  Healthcare Workers East

Rocio Saenz, SEIU Local 615

Marchel Smiley, SEIU Local 722

Gilda Valdez, SEIU Local 1021

# EXHIBIT 4

CONSTITUTION
(As amended September 2009)

## PREAMBLE and MISSION STATEMENT

The members of the unions and worker organizations of Change to Win unite to renew hope, opportunity, and prosperity for American people and their families.

We believe that only by uniting millions more workers in a strong and innovative union movement can we ensure that work is valued and rewarded in America, hold global corporations and elected public officials accountable to working people, improve the services we provide to our communities, and create hope for a better future for our children and grandchildren.

We believe that uniting workers of every race, religion, ethnicity, gender, age, sexual orientation, ability, gender identity and expression, national origin and immigration status is the only way to realize the hopes and aspirations of all working people.

We believe that uniting workers' strength in each industry is key to building a democratic workers' movement that can change America.

We believe in uniting workers across national borders to eliminate poverty, raise and maintain living standards and security, and spread peace, justice and democracy here and around the globe.

To these beliefs, we pledge the full measure of our organizations to coordinated and united action in accord with the principles of this Constitution.


## ARTICLE I
## NAME

This alliance shall be known as the Change to Win. It shall consist of affiliated national and international labor organizations and other labor organizations that are chartered by the alliance as provided by this Constitution.

## ARTICLE II
## OBJECTS AND PURPOSES

The Objects and Purposes of this alliance are to promote the coordination, cooperation and united action of its affiliated organizations to accomplish the following:

1.    To unite working people for economic, political, and social justice.

2.    To ensure that work and working people are valued and rewarded for playing a central role in creating economic well-being, political democracy and stable families and communities.

3.    To raise working and living standards for all working people and to win paychecks that support a family; affordable, quality health care; a retirement with dignity; safe and healthful working conditions; and fairness at work through the unionization and united action of all workers in an industry, including industries where there is little union tradition.

4.    To ensure equal opportunity and rights for all women and men of every race, religion, ethnicity, age, sexual orientation, ability, gender identity and expression, national origin and immigration status.

5.    To provide for expanded economic and educational opportunities for workers and their families through training, apprenticeship, tuition programs and fair access to promotions at work, through support in the political process for public funding of a high quality educational system, and through the removal of barriers of discrimination.

6.    To fight for fair treatment and legal protection for immigrant workers in this country.

7.    To improve the quality of the services and products working people provide to our communities.

8.    To coordinate workplace, political, and social action with worker organizations worldwide to establish cross-border standards for decent working and living conditions.

2

9.     To cooperate and coordinate with worker organizations and other allies that may not be members of this alliance on behalf of the purposes set forth above.

10.     To take all actions necessary and appropriate to furthering and achieving these goals on behalf of working people and their families.

## ARTICLE III
## AFFILIATED LABOR ORGANIZATIONS

Section 1.     The International Brotherhood of Teamsters, Laborers International Union of North America, Service Employees International Union, United Brotherhood of Carpenters and Joiners of America, United Farm Workers, United Food and Commercial Workers International Union and UNITE-HERE shall be the initial charter affiliates of this alliance. This alliance shall be composed of additional national and international labor organizations and other labor organizations that may hereafter be chartered as provided by this Constitution. Affiliation shall require appropriate action as provided by the affiliate's constitution.

Section 2.     The Leadership Council shall have the sole authority to issue additional charters and provide for the affiliation of labor organizations with the alliance. Labor organizations seeking affiliation must demonstrate that they meet minimum standards with respect to organizing, collective bargaining, political action and membership mobilization or indicate willingness to develop the necessary capacity in these areas.

Section 3.     Upon the affiliation of a national or international labor organization, the Leadership Council shall have authority to provide for reconsideration of the jurisdiction of any Sector Coordinating Committee and any organizing plan, bargaining goals or contract standards adopted by an SCC that involve or are related to the interests of the new affiliate. Reconsideration of the jurisdiction of any Construction Industry Sector Coordinating Committees shall be governed solely by a subcommittee of the Leadership Council comprised of affiliates with substantial construction industry membership. Reconsideration of any organizing plan, bargaining goals or contract standards adopted by any Sector

Coordinating Committee in the Construction Industry shall be governed solely by each such Committee.

Section 4.   Each affiliate of this alliance agrees that it shall be bound by the terms of this Constitution and any decisions, policies, rules, standards or other directives issued in accord with its terms.  In particular, each affiliate agrees that it shall not allow any dispute, issue or other matter subject to this Constitution to be submitted to, heard, decided or be the subject of any action by any other labor group or federation.

ARTICLE IV
CONVENTION
(Suspended by Leadership Council until further action)

Section 1.   The Convention shall be the supreme governing authority of the alliance and shall have plenary power to regulate and direct the policies, affairs and organization of the alliance.

Section 2.   The Convention shall be held every two years at such time and place as may be designated by the Leadership Council upon the recommendation of its Chair.  The Secretary-Treasurer shall issue a Call for the Convention not less than ninety (90) calendar days prior to the date of meeting, unless otherwise directed by the Leadership Council.

Section 3.   Each affiliated Labor Organization shall be entitled to one delegate for each 25,000 members (as defined in Article XI, Section 1) or major fraction thereof and to alternate delegates equal to at least one-half the number of delegates.  In order to be entitled to representation at the Convention, an affiliate must have satisfied all financial obligations of membership in the alliance, including the payment of per capita tax, before the opening of the Convention.

Section 4.   Each chartered state or regional labor alliance shall be entitled to one delegate and one alternate delegate.  The members of the Leadership Council shall each be *ex officio* delegates to the Convention.

Section 5.   The Chair, in consultation with the Leadership Council, shall establish such committees as are necessary to carry out the affairs of the Convention, including committees on credentials, rules and the constitution.

4

Section 6.    All resolutions, constitutional amendments or appeals proposed by a chartered body of the alliance must be received by the Secretary-Treasurer thirty days prior to the Convention.  The Leadership Council may present resolutions, constitutional amendments, appeals or other matters to the Convention at any time.

Section 7.    The Chair of the Leadership Council shall preside over the Convention and may be assisted by a Parliamentarian.

Section 8.    The Rules governing the preceding Convention shall be enforced from the opening of any Convention until new rules have been adopted by action of the Convention.

Section 9.    At the discretion of the Chair, questions may be initially decided by voice vote, show of hands or division.  A roll call vote shall be taken at the discretion of the Chair, or upon the request of thirty percent of the delegates present, or upon the request of delegates representing thirty percent of the membership of the alliance by per capita.  Any roll call vote shall be conducted by the Chair.  The Chair shall first call upon the chair of the delegation from each national and international union in alphabetical order and shall announce the per capita votes entitled to be cast by the delegation.  The delegation chair shall then announce the union's vote either as a bloc or as the delegation has determined. Each delegate from a chartered state or regional labor alliance shall be entitled to one vote.  The Chair shall have discretion to end the roll call once the requisite number of votes have been cast to determine the pending matter.

Section 10.  Unless otherwise specified, any action taken by the Convention shall take effect immediately upon adoption.

Section 11.  The Leadership Council may call a Special Convention for a specific purpose by a two-thirds vote.  In such a case, the same provisions as contained herein shall apply to the special convention, to the maximum extent possible.  In particular, the Leadership Council may call a Special Convention on less than ninety days notice.  The issues to be addressed by a Special Convention shall be stated in the Convention Call.

5

ARTICLE V
LEADERSHIP COUNCIL

Section 1.   The Leadership Council shall be the principal governing body of this alliance between Conventions.

Section 2.   The Leadership Council shall consist of the principal officers of the labor organizations affiliated with this alliance and three at-large members, plus such additional members as necessary to insure that each affiliate with a million members or more shall have two seats on the Leadership Counsel. Any such additional member shall be named by the affiliate in accord with its constitutional process. The at-large members shall be national officers of an affiliated union and shall reflect the race, color, religion, sex, age, physical ability, national origin, sexual orientation and gender diversity of the affiliated unions and of working men and women. The at-large members shall be elected by the other members of the Leadership Council and shall serve during the same term of office as the Chair and the Secretary-Treasurer. Any vacancies among the at-large members of the Leadership Council shall be filled in the same manner. Each principal officer may designate a representative on either a permanent or temporary basis who shall have full authority to act on his or her behalf.

Section 3.   The Leadership Council shall meet at least once every two months at times and places set by the Chair. A quorum shall consist of a majority of the members of the Leadership Council both by number of Leadership Council members and per capita. All action by the Leadership Council shall be approved by a vote based on a simple majority unless otherwise specifically provided elsewhere in this Constitution.  In conducting all votes under this Constitution, the Leadership Council shall cast one vote per member of the Leadership Council unless a member calls for a per capita vote, in which case the vote shall be based on the per capita membership of each union within the Leadership Council.  Per capita shall be based on a union's membership as defined in Article XI, Section 1, and shall be determined on the most recently paid per capita tax as certified by the Secretary-Treasurer.

Section 4.   The Leadership Council may act by telegram, letter, telephone conference, electronic or other equivalent means of communication. The Chair or Secretary-Treasurer may obtain the approval of the Leadership Council by telegraphing, writing, telephoning or electronic or other communication to the members of the Leadership Council, and the members of the Leadership Council may take action on the matter brought to their attention in the same manner.  Any

action taken by means other than in-person meeting shall be confirmed at the next regular meeting of the Leadership Council.

Section 5.     The members of the Leadership Council shall receive no compensation, except that they may be paid or reimbursed for expenses incurred in the performance of their duties.

Section 6.     The Leadership Council is authorized to take all action and render all decisions necessary and appropriate to carry out the objects of this alliance, including the direction and management of the affairs of this alliance, and to enforce the provisions of this Constitution. This shall include the authority to make rules and policies to govern matters consistent with this Constitution. The Leadership Council shall, in particular, have the authority to:

(a)     Interpret this Constitution and any decisions, rules or policies issued pursuant to this Constitution.

(b)     Approve an annual budget for the operation of the alliance, including the budget for the Strategic Organizing Center.

(c)     Delegate, consistent with this Constitution, to any of its officers or agents any of the functions and powers herein set forth, except the power to fill vacancies in office.

Section 7.     Should the number of labor organizations affiliated with the alliance increase to the point that the Leadership Council determines, in its sole judgment, that the Council has become an ineffective or unwieldy decision-making body, the Leadership Council shall have the authority, as provided in Article XVIII (Amendments), to amend the Constitution to create a suitable smaller governing body, such as an Executive Board or Executive Committee, with such membership and authority as it deems advisable and to amend this Article, as the Leadership Council believes appropriate to serve the best interests of the alliance and its affiliates.

## ARTICLE VI
## OFFICERS

Section 1.    The officers of the alliance shall consist of the members of the Leadership Council.  The members of the Leadership Council shall select a Chair and a Secretary-Treasurer.

Section 2.    The Chair and the Secretary-Treasurer shall be chosen by majority per capita vote of the Leadership Council from among its members at the time of the founding Convention and by the Leadership Council at each subsequent biennial regular Convention.  Any vacancy in the positions of Chair, Secretary-Treasurer or the at-large members shall be filled by the Leadership Council by majority per capita vote.

Section 3.    Officers shall receive no compensation, except that they may be paid or reimbursed for expenses incurred in the performance of their duties.

## ARTICLE VII
## CHAIR

The Chair shall be the chief executive officer of the alliance.  The Chair shall supervise the affairs of the alliance, sign all official documents, and preside over all meetings.

## ARTICLE VIII
## SECRETARY-TREASURER

The Secretary-Treasurer shall be the chief financial officer of the alliance. The Secretary-Treasurer shall be responsible for receiving and collecting all moneys due the organization, for notifying the Leadership Council of scheduled meetings, for keeping minutes of all meetings and other actions of the Convention and Leadership Council, and for maintaining all monies, books, records, files and other documents of the alliance.  The Secretary-Treasurer shall report the status of the alliance's financial affairs to the members of the Leadership Council in writing at the end of each quarter and shall be responsible for preparing an audited financial statement of the alliance's affairs each year.  The audited financial statement shall be provided to each affiliated Labor Organization.

## ARTICLE IX
## COMMITTEES AND STAFF

Section 1.   The Chair, subject to the approval of the Leadership Council and within the approved budget, may create such committees and staff positions as necessary and appropriate to carry out the objects of this alliance or to implement the actions, directions, rules or policies established by the Leadership Council. The Leadership Council may appoint an Executive Director to supervise and conduct the day-to-day affairs of the alliance and to supervise its employees and agents.

Section 2.   The membership of any committee shall be determined by the Chair subject to the approval of the Leadership Council.   Committees shall be composed of members of the Leadership Council or any other person appointed by the Chair with the approval of the Leadership Council.   Committee members may be paid or reimbursed for expenses incurred in the performance of their duties. This provision shall not apply to committees established under Article XII.

Section 3.   The Chair, or the Chair's designee with the approval of the Chair, shall hire, discharge and establish the duties, compensation and benefits for all staff positions and retain the services of appropriate consultants and professionals, subject to the approval of the Leadership Council.   Staff shall work at the direction of the Chair or the Chair's designee in accordance with the policies established by the Leadership Council.

## ARTICLE X
## BUILDING WORKER POWER THROUGH
## STATE AND REGIONAL LABOR ALLIANCES

Section 1.   The Leadership Council may charter State and Regional Labor alliances for the purpose of building effective local programs to elect candidates who support labor issues; move legislative agendas on working family issues; educate members and the general public on issues of concern to working families and neutralize employer opposition to organizing.   These State and Regional Labor alliances shall support organizing efforts by mobilizing community and political support and through building alliances with community based organizations.   The Leadership Council shall establish standards designed to insure that State and Regional Labor alliances maintain effective programs to support candidates who

9

support labor issues, to promote legislation on working family issues, to educate the public on worker issues and to coordinate the activities of local affiliates.

Section 2.    State and Regional Labor alliances may be chartered upon a state or other basis as deemed advisable by the Leadership Council. The Leadership Council shall insure that the jurisdiction granted by these charters is designed to maximize worker power through effective coordination of activity at the state and local level.

Section 3.    All local unions and other subordinate bodies of national and international unions affiliated with the alliance may affiliate with the State and Regional Labor alliances within their jurisdiction in accordance with the policies and guidelines established by the Leadership Council.

Section 4.    Membership in the State and Regional Labor alliances shall be extended to nonaffiliated unions and other appropriate organizations, in accordance with the policies and guidelines established by the Leadership Council, where such membership would strengthen the overall effectiveness of the activities of State and Regional Labor alliances on behalf of workers.

Section 5.    The Leadership Council shall establish programs, provide appropriate assistance, and adopt rules and procedures to insure the effective functioning of the State and Local Labor alliances.

## ARTICLE XI
## FINANCIAL OBLIGATIONS

Section 1.    A per capita tax shall be paid to the alliance upon the membership of each affiliated national or international union. For purposes of this Article and other appropriate provisions of this Constitution, the term "member" shall include agency fee payers and comparable fee payers, but shall not include associate members or retiree members paying less than full dues. Only members holding membership in the United States and its territories and possessions shall be included in determining the number of members for any per capita payment.

Section 2.    Each national or international union shall pay on or before the fifteenth day of each month, for the preceding month, a per capita tax of 25 cents ($0.25) per member per month, beginning the month of October 2005 (due

November 15, 2005). This per capita tax rate may be changed by a two-thirds vote of the Leadership Council.

Section 3.    Any affiliated organization that does not pay its per capita tax on or before the fifteenth of the month, and assessments when due and payable, shall be notified in writing of that fact by the Secretary-Treasurer. Any affiliated organization that is three months in arrears in payment of per capita tax or assessments, and is so notified in writing, shall, unless it has returned to good standing within 20 days of such notification, be suspended automatically from the alliance and can be reinstated only after such arrearages are paid in full.

Section 4.    The Leadership Council may implement an emergency assessment for a specified period of time by a two-thirds vote of the Leadership Council according to the voting method set forth in Article V, Section 3.

Section 5.    At least 75 percent of all per capita paid to the alliance shall be dedicated to the operation of the Strategic Organizing Center and to organizing. In addition, the Leadership Council is authorized to propose additional funding from those affiliates participating in an SOC campaign, on a monthly or other periodic basis, based on the relative per capita of the affiliates involved in the campaign and the anticipated increased membership expected to result from the campaign. This additional funding shall be subject to the consent of each of the affiliates involved in the campaign, but once determined, any periodic obligation must be paid until the campaign is completed or terminated or unless otherwise decided by the Leadership Council.

Section 6.    Funds may only be expended with authorization of the Chair and Secretary-Treasurer or their designated substitutes as approved by the Leadership Council.

## ARTICLE XII
## BUILDING WORKER POWER:
## SECTOR COORDINATING COMMITTEES,
## CORE JURISDICTION AND BARGAINING STANDARDS
## [SCCs]

Section 1.    The Leadership Council shall designate Sector Coordinating Committees (SCCs) for principal industries in which affiliates represent or seek to represent workers. The SCCs shall be comprised of affiliates of this alliance. The

11

Leadership Council shall determine the core jurisdiction of each SCC based on industry, employer, sector, area or occupation, provided that the jurisdiction of the Sector Coordinating Committees established in the Construction Industry shall be determined solely by a subcommittee of the Leadership Council comprised of the affiliates with substantial construction industry membership.  Every affiliate with members within the jurisdiction of a particular SCC shall be entitled to participate in that SCC.

Section 2.    Each SCC shall propose standards and procedures for conducting their business.  These standards and procedures shall be subject to the approval of the Leadership Council, provided that the standards and procedures of the Sector Coordinating Committees established in the Construction Industry shall be established solely by each such Council.

Section 3.    Each SCC shall work to coordinate organizing among affiliates within the SCC.  The affiliates who comprise the SCC shall develop appropriate strategic organizing plans and shall set appropriate bargaining goals and/or contract standards.  Such plans, goals and/or standards shall focus on key target areas important to increased market density and shall not be required to cover the entire jurisdiction of the SCC.  Any final strategic organizing plans, bargaining goals and/or contract standards adopted by an SCC outside the Construction Industry must be approved by the Leadership Council.  Final strategic organizing plans, bargaining goals and/or contract standards adopted by an SCC in the Construction Industry shall not require approval by the Leadership Council.

Section 4.    (a)  Each affiliate shall respect the jurisdictions of the SCCs. The Leadership Council shall adopt appropriate rules to protect the jurisdiction of SCCs and to protect organizing plans established by any SCC.  Rules with respect to the jurisdiction of SCCs and with respect to organizing plans in the Construction Industry shall be subject to approval by a subcommittee of the Leadership Council comprised of affiliates with substantial construction industry membership

(b)  Any complaint alleging a violation of this section or of the rules established to protect SCC jurisdiction or appropriately approved SCC organizing plans shall be filed and resolved pursuant to Article XVI (Procedures for Resolving Disputes).

Section 5.    (a)  The Leadership Council shall establish a procedure to review the jurisdiction of each SCC on a periodic basis and shall re-designate the jurisdiction of SCCs as appropriate, provided that any matter concerning the

12

jurisdiction of Sector Coordinating Committees in the Construction Industry shall be governed solely by a subcommittee of the Leadership Council comprised of affiliates with substantial construction industry membership. The Leadership Council may also, as appropriate, establish new SCCs for jurisdictions which are essentially unorganized and designate affiliates to participate in such new SCCs.

(b) If any affiliate seeks clarification of whether a certain group of workers is within the core jurisdiction of a SCC, it may file a request for clarification with the Chair. The Chair shall refer the request to whichever SCCs may potentially be affected.

(i) If only one SCC is involved, it shall forward to the Chair its recommendation on whether the workers in question are within its core jurisdiction within 14 days of notice of the request. The Chair may shorten or extend the period of time the SCC has to make its recommendation. The recommendation must be approved by a majority vote of the Leadership Council if the workers in question are to be considered within the jurisdiction of the SCC.

(ii) If more than one SCC may be affected, representatives from those SCCs shall confer and attempt to reach an agreement as to which SCC has core jurisdiction over the workers in question. If the SCCs are unable to agree within 14 days or within such other period of time as the Chair may determine, the request for clarification shall be referred to a person chosen by the Leadership Council to perform fact finding and to make a report and recommendation to the Leadership Council. The Leadership Council shall then determine which SCC should have core jurisdiction over the workers in question.

Section 6.    (a) No affiliate shall negotiate an agreement that violates bargaining goals or contract standards set by an SCC in the Construction Industry or set by an SCC outside the Construction Industry and approved by the Leadership Council without just cause. Any affiliate that negotiates an agreement for a specific unit of workers who were covered by a contract prior to the establishment of an SCC with jurisdiction over that unit shall not be considered to violate this provision as long as the affiliate has acted in good faith and has coordinated its bargaining efforts to achieve these standards as requested by the applicable SCC. The Leadership Council shall issue guidelines to assist affiliates in identifying what constitutes a good faith bargaining effort, taking into account the various practical realities which may apply.

13

(b)  Any complaint alleging a violation of this section shall be filed and resolved pursuant to Article XVI (Procedures for Resolving Disputes).

# ARTICLE XIII
## STRATEGIC ORGANIZING CENTER
## [SOC]

Section 1.    The alliance shall establish a Strategic Organizing Center to develop and implement comprehensive organizing campaigns to advance worker strength.  The Leadership Council shall appoint a Director who shall be responsible for carrying out the responsibilities of the Center.

Section 2.    The Center shall conduct appropriate strategic research to assist affiliates and the alliance in effectively targeting and allocating organizing resources with respect to both individual and multi-union campaigns.  The Center, in consultation with any Sector Coordinating Committee or affiliate with jurisdiction related to the proposed campaign, shall create individual and multi-union campaigns designed to strengthen the labor movement, increase the membership of affiliates and enhance worker power.  The Center shall propose such campaigns to the Leadership Council for approval.  In presenting any such campaign to the Leadership Council, the Center shall indicate the extent to which the campaign affects the jurisdiction of any Sector Coordinating Committee or affiliate.  Once approved by the Leadership Council, the Center shall coordinate, assist and direct such Strategic Organizing Center individual and multi-union campaigns.

Section 3.    No affiliate shall organize or attempt to represent workers in a manner that conflicts or interferes with a campaign developed by the Center and approved by the Leadership Council.  If the Center believes that the activity of any affiliate conflicts or interferes with such a campaign, the Center may bring the matter to the attention of the Chair who shall either refer the matter directly to the Leadership Council for resolution or to the procedures of Article XVI (Resolving Disputes).

Section 4.    The Center, upon request, shall assist Sector Coordinating Committees in establishing strategic organizing plans within their jurisdiction, and coordinate and assist organizing activities of affiliates.

## ARTICLE XIV
## MAXIMIZING ORGANIZING RESOURCES:
## DETERMINING EXCLUSIVE ORGANIZING RIGHTS OF AFFILIATES
## [Organizing Rights]

Section 1.   (a) In order to resolve organizing competition in those situations which are not governed by Article XII or Article XIII, the alliance shall maintain a procedure for determining organizing responsibilities. This procedure shall not apply with respect to disputes regarding the organizing of workers doing building and construction industry work (including, but not limited to, commercial construction, residential construction, industrial construction, interior systems, heavy highway, millwright work, tenant improvement, maintenance work on turbines, generators and related machinery, any work covered by the Davis Bacon Act or similar construction or prevailing wage laws and/or Section 8(f) of the NLRA).

(b)  The affiliate which can best serve the interests of the affected workers in the industry or industries involved considering all of the facts and circumstances shall be awarded the exclusive right to organize the workers involved.

(c)  Any complaint alleging a violation of this Article shall be resolved pursuant to Article XVI (Procedures for Resolving Disputes).

Section 2.   Where all the affiliates that are organizing or taking steps to organize a particular worker group are parties to a written agreement providing for the resolution of organizing disputes, the provisions of such agreement shall be complied with prior to invoking the procedures set forth in Article XVI (Procedures for Resolving Disputes) for an alleged violation of this Article. If such agreement provides for final and binding arbitration and an affiliate that is a party to such agreement claims that another such affiliate has not complied with a decision under that agreement, the aggrieved affiliate may file a complaint under Article XVI, Section 7 (Non-Compliance).

ARTICLE XV
PROTECTING WORKER STANDARDS:
RESPECTING ESTABLISHED BARGAINING RELATIONSHIPS
**[Established Bargaining Relationships]**

Section 1.    (a)  Each affiliate shall respect the established collective bargaining relationship of every other affiliate.  No affiliate shall organize or attempt to represent employees as to whom an established collective bargaining relationship exists with any other affiliate.  For purposes of this Article, the term "established collective bargaining relationship" means any situation in which an affiliate, or any local or other subordinate body thereof, has either (a) been recognized by the employer (including any governmental agency) as the collective bargaining representative for the employees involved for a period of one year or more, or (b) been certified by the National Labor Relations Board or other federal or state agency as the collective bargaining representative for the employees.

(b)  In all disputes involving two or more conflicting established collective bargaining relationships, decisions shall promote industry and area standards and market density, and shall reflect the impact on the current organized membership in the industry as well as the job security of the employees affected by the dispute.

(c)  This Article shall not be applicable to disputes involving construction work (including, but not limited to, commercial construction, residential construction, industrial construction, interior systems, heavy highway, millwright work, tenant improvement, maintenance work on turbines, generators and related machinery, any work covered by the Davis Bacon Act or similar construction or prevailing wage laws and/or Section 8(f) of the NLRA)..

(d)  This Section shall not be applicable to any unit within the core jurisdiction of a SCC that was organized, after the establishment of the SCC, by an affiliate that was not a participant in that SCC, provided that the SCC member affiliate seeking to organize the unit is doing so pursuant to a strategic organizing plan of the SCC or a Strategic Organizing Center campaign approved by the Leadership Council.

Section 2.    (a)  Each affiliate shall respect the established work relationship of every other affiliate.  For purposes of this Article, an "established work relationship" shall be deemed to exist as to any work of the kind that the members of an organization have customarily performed at or around a particular plant or

16

worksite, whether their employer is the plant operator, a contractor, or other employer. No affiliate shall by agreement or collusion with any employer or by the exercise of economic pressure seek to obtain work for its members as to which an established work relationship exists with any other affiliate, except with the consent of such affiliate.

(b) This section shall not be applicable to disputes involving construction work (including, but not limited to, commercial construction, residential construction, industrial construction, interior systems, heavy highway, millwright work, tenant improvement, maintenance work on turbines, generators and related machinery, any work covered by the Davis Bacon Act or similar construction or prevailing wage laws and/or Section 8(f) of the NLRA).

Section 3.   (a) In the event that any affiliate believes that such special and unusual circumstances exist that it would violate its basic jurisdiction or be contrary to basic concepts of trade union morality or to the constitutional objectives of the alliance or injurious to accepted trade union work standards to enforce the principles in this Article that would apply in the absence of such circumstances, such organization shall nevertheless observe such principles unless and until its claim is upheld in the manner prescribed in subsection (b) of this section.

(b) Any affiliate that claims justification under subsection (a) of this section for action that would, in the absence of such justification, violate the provisions of this Article shall process its claim, prior to taking action, under the provisions of this Section. Such claim shall set forth the basis upon which the claim is made and the action that the affiliate proposes to take. The claim shall thereafter be processed as provided in this Article except that the determination as to whether the facts justify the proposed action shall be made by an Arbitrator appointed by the Leadership Council. The Arbitrator shall determine whether the proposed action would violate the provisions of this Article in the absence of justification, shall find the facts with respect to the claim of the justification, and shall submit a report and recommendation to the Leadership Council. The Leadership Council shall determine on the report of the Arbitrator whether the proposed action would violate the provisions of this Article in the absence of justification; and, if the Leadership Council concludes by majority vote that the proposed action would so violate it, the Leadership Council shall find such justification by a two-thirds vote.

17

Section 4.   No affiliate shall, in connection with any organizational campaign, circulate or cause to be circulated any charge or report that is designed to bring or has the effect of bringing another affiliate into public disrepute or of otherwise adversely affecting the reputation of such affiliate or the alliance.

Section. 5.   Dispute settlements and determinations under this Article shall not determine the general work or trade jurisdiction of any affiliate but shall be limited to the settlement or determination of the specific dispute on the basis of the facts and considerations involved in that dispute.

ARTICLE XVI
PROCEDURES FOR RESOLVING DISPUTES
**[Dispute Resolution]**

Section 1.   All disputes arising under Articles XII, XIII, XIV and XV shall be resolved pursuant to this Article.

Section 2.   Procedural Rules and Policy Statements.

(a)  The Leadership Council shall establish procedural rules for the handling of complaints to be resolved under this Article so that all affiliates involved in or affected by a dispute will have full and adequate notice, will have full opportunity to settle disputes voluntarily, and, in the event that the dispute cannot be settled, will have a full and fair hearing before an impartial Arbitrator. The rules shall be designed to insure the speedy and early disposition of all complaints arising under this Article.

(b)  The Leadership Council shall have full and final authority on its own motion or at the request of any affiliate to consider policy questions under Articles XII, XIII, XIV and XV and to issue from time to time policy statements having prospective effect on the implementation of these Articles, which statements shall, from the date issued, supersede inconsistent prior policy statements and case decisions.

(c)  Whenever, in the judgment of the Chair, pressing reasons require an accelerated settlement or determination, the Chair may shorten or eliminate the mediation process or refer the dispute directly to an Arbitrator.

18

(d) The Leadership Council shall appoint one or more permanent Arbitrators to act pursuant to this Article and shall establish their terms of employment. Where circumstances require, the Leadership Council may appoint Ad Hoc Mediators and Ad Hoc Arbitrators to resolve cases.

Section 3.    Initiation of Proceedings

(a) Any aggrieved affiliate may file a complaint with the Chair alleging a violation of Article XII (SCCs), Article XIII (SOC), Article XIV (Organizing Rights) or Article XV (Established Relationships).

(b) Any SCC affected by a violation of Article XII (SCCs) may file a complaint with the Chair against an affiliate that has violated that Article.

(c) Any affiliate that is actively engaged in organizing a group of workers not covered by an SCC and seeking to become their exclusive representative may file a request with the Chair for a determination affirming its ability to do so without being subject to ongoing competition by any other affiliate pursuant to Article XIV (Organizing Rights).

Section 4.    Mediation of Disputes.

(a) Article XII (SCCs), Article XIII (SOC) and Article XV (Established Bargaining Relationships).

(i) In all cases governed by the requirements of Articles XII, XIII and XV, the parties involved in the dispute shall meet and confer in an effort to resolve the dispute.

(ii) If the parties are unable to resolve the dispute voluntarily within 14 days or such other period of time which the parties may agree to, the dispute shall immediately be referred to an Arbitrator as provided in Section 5(a) of this Article.

(b) Article XIV (Organizing Rights). All complaints governed by the requirements of Article XIV (Organizing Rights) shall be referred to a combined mediation and arbitration as provided in Section 5(b) of this Article.

Section 5.    Arbitration and Remedy

(a) Disputes arising under Article XII (SCCs), Article XIII (SOC) and Article XV (Established Relationships):

(i) All cases referred to arbitration shall be heard by an Arbitrator appointed by the Leadership Council pursuant to Section 2(d) of this Article. The designated Arbitrator shall have discretion to conduct the hearing in a suitable manner subject any procedural rules issued by the Leadership Council pursuant to Section 2(a) of this Article.

(ii) The Arbitrator shall be empowered to fashion an appropriate remedy if the arbitrator finds that a violation has occurred or is about to occur. The available remedies shall include an order to cease and desist, an order to disclaim interest, an order to abrogate a collective bargaining agreement, or other appropriate equitable relief. In determining a remedial order in cases governed by the requirements of Article XII (SCCs), the Arbitrator shall give substantial weight to the recommendations of the appropriate SCC on how to safeguard the workers' interests in that jurisdiction in the future.

(iii) If an affiliate has been determined to have violated bargaining goals or contract standards as provided in Article XII, it shall lose its protection and right to file complaints under Article XV (Established Bargaining Relationships) for the unit or units involved.

(iv) All decisions by Arbitrators in cases governed by Article XII (SCCs) and Article XIII (SOC) shall be final and binding. There shall be no appeal.

(b) Disputes arising under Article XIV (Organizing Rights):

(i) The Arbitrator shall first attempt to mediate the dispute. If the parties cannot reach a voluntary settlement through mediation, the Arbitrator shall immediately conduct a hearing and render a decision.

(ii) After hearing, the Arbitrator shall award the exclusive right to organize the workers in question to one of the affiliates participating in the proceeding based on what is in the best interests of the affected workers in the industry or industries involved considering all of the facts and circumstances.

20

(iii)  If the Arbitrator finds that all factors indicate that the best interests of the workers would be equally well served by the affiliates involved in the dispute, the Arbitrator shall award the exclusive right to organize to the affiliate that first had a substantial full-fledged drive to organize the workers in question.  All activity by an affiliate that has the purpose of achieving representation and increasing bargaining power on behalf of the workers involved shall be considered organizing activity for the purposes of the Arbitrator's decision under this subsection.

(iv)  Such exclusive right to organize the workers in question shall run for a period of one year or such shorter or longer period as the Arbitrator for good reason establishes.

(v)  All decisions by Arbitrators governed by Article XIV (Organizing Rights) shall be final and binding.  There shall be no appeal.

Section 6.    Appeals

(a)  Any affiliate adversely affected by a determination of the Arbitrator involving a violation of Article XV (Established Relationships) shall have the right to appeal to the Leadership Council only if it can show that the determination is clearly contrary to the purposes of this Constitution or is clearly erroneous, arbitrary or capricious.  Any such appeal must be filed with the Chair within five days of the date on which the affiliate receives the determination and must be supported by a brief statement demonstrating that the appeal satisfies the standard set forth in the preceding sentence.  Any such appeal shall be referred by the Chair to the Leadership Council which shall consider the case itself or refer it to such individual or individuals as the Leadership Council shall designate.  The Leadership Council or the individual or individuals designated by the Leadership Council shall review the appeal, conduct a hearing if deemed necessary and issue a final and binding decision thereon affirming, reversing or modifying the Arbitrator's decision.  This provision will expire at the end of two (2) years unless explicitly extended by the Leadership Council or the Convention.

(b)  If no appeal is filed from a determination of the Arbitrator within five days, the determination shall automatically go into full force and effect.

21

Section 7.   Non-Compliance

(a)  Any affected affiliate may file a complaint with the Chair alleging that another affiliate has not complied with an effective determination of an Arbitrator or the final determination of the Leadership Council upon appeal. Upon receipt of such a complaint, the Chair shall immediately refer the matter to the Arbitrator who initially determined the dispute.  The Arbitrator shall conduct a hearing on the issue of noncompliance and make a report to the Leadership Council on whether the Affiliate is in compliance and make a recommendation on what the Affiliate must do to come into compliance.

(b)  If the Arbitrator finds noncompliance and the Affiliate does not immediately come into compliance and so notify the Chair, the Leadership Council shall consider the recommendations of the Arbitrator and shall inform the non-complying affiliate of the action it must take in order to be in compliance and the date by which it must be in compliance.  If the affiliate fails to come into compliance as so directed, the Leadership Council shall notify each affiliated national or international union and SCC, and each affected state and local central body, of such non-compliance.

(c)  Immediately upon the issuance of notification of non-compliance, the non-complying affiliate shall not be entitled to file any complaint or appear in a complaining capacity in any proceeding under this Article or to invoke the procedures and protections of Articles XII, XIII, XIV and XV.  In addition, the Leadership Council is authorized, in its discretion, to order such other penalties as it deems appropriate including but not limited to revocation of the affiliates charter, expulsion from a SCC, denial of voting rights on the Leadership Council, SCC or other body of the alliance.

Section 8.   Restoration of Rights.  Any affiliate that has been found to be in non-compliance and that has been deprived of its rights under Section 7 above may apply for restoration of such rights.  Notice of such application shall be given to all of the affiliates involved in the determinations as to which there is non-compliance. If such affiliates consent, the Leadership Council shall be authorized to restore the rights of the non-complying affiliate after it states its intention in writing to comply with the provisions of this Article.  If any affiliate involved in the cases of non-compliance opposes the application, the rights of the non-complying affiliate shall be restored only under the following conditions:

22

(a)  The non-complying affiliate states its intention, in writing, to comply with the provisions of this Article and the Article which it has been found to have violated;

(b)  The non-complying affiliate has undertaken whatever measures may be necessary and practicable to remedy the situation; and

(c)  The application for restoration of rights is approved by a two-thirds vote of the Leadership Council, or by a majority vote of the Convention.

Section 9.   Exclusive Remedies

The determinations made pursuant to this Article with respect to the resolution of disputes shall constitute the sole and exclusive method for settlement and determination of such disputes, and none of these Articles or any determination rendered hereunder shall be enforceable in a court of law.

## ARTICLE XVII
## MUTUAL AID AND SUPPORT

Section 1.   Each affiliate of this alliance agrees that it shall not divide workers' strength by engaging in activity that disrupts the established representation rights of any affiliate or by assisting any other labor organization in disrupting such representation rights.

Section 2.   In the event that any labor organization outside of the alliance attempts to interfere with the established bargaining relationship as defined in Article XV (Established Bargaining Relationships) of an affiliated union or attempts to interfere with the designated organizing rights under Articles XII, XIII, XIV or XVI, or otherwise interferes with an affiliated union's strategy to unite workers within its core industries, all of the affiliated unions within the alliance, acting through the Leadership Council, shall use the full power and the resources of the alliance to protect the interests of the aggrieved union and the affected workers.

ARTICLE XVIII
AMENDMENTS

This Constitution may be amended at any time by a two-thirds per capita vote of the members of the Leadership Council or by a two-thirds per capita vote of the delegates at a regular or special Convention.

ARTICLE XIX
SAVINGS CLAUSES

Section 1. This Constitution shall not confer any rights upon any other person, entity or party, except for the alliance itself and its chartered labor organizations. No other person, entity or party shall have any right to seek enforcement of this Constitution or to seek relief for an alleged breach.

Section 2. If any provision of this Constitution shall be declared invalid or inoperative by any competent authority of the executive, judicial or administrative branch of a state, provincial or federal government, the Leadership Council shall have the authority to suspend the operation of such provision during the period of its invalidity and to substitute in its place and stead a provision which will meet the objections to its validity and which will be in accord with the intent and purpose of the invalid provision. If any Article or Section of this Constitution should be held invalid by operation of law or by any tribunal of competent jurisdiction, the remainder of this Constitution or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid shall not be affected thereby.

ARTICLE XX
FISCAL YEAR

The fiscal year shall run from January 1 through December 31.

# EXHIBIT 5

LABOR RESEARCH REVIEW #18

# The Pressure is On:

## Organizing Without the NLRB

■ *Joe Crump*

Ask the typical union organizer to define success and he or she will probably say, "Winning elections." Many labor organizations, including ours, have found out that winning a National Labor Relations Board [NLRB] election does not mean that the workers involved are going to receive the benefits of a union contract. One third of representation elections won by unions do not result in a collective bargaining agreement.

In fact, just winning an NLRB election is a tough proposition. In 1990 the union win rate was only 47.6%. Even more alarming is the drop in the number of elections held in 1990—3,423, the lowest since 1984. In the 1960s and '70s, there were twice this number of elections each year. This trend is truly alarming when you consider that at the end of 1990 unions represented only 16.1% of the nation's workforce—quite a drop from 35% of workers with a union contract in the mid-1950s. What can the labor movement do to reverse the trend of fewer and fewer workers being represented by unions?

---

■ Joe Crump is Secretary-Treasurer of United Food and Commercial Workers Local 951, based in Grand Rapids, Michigan.



imunity
ITY

## THE UFCW WAY: AVOIDING THE BOARD

We need to start by redefining what we believe successful organizing to be. It is not "winning NLRB elections." Since 1987 the United Food & Commercial Workers (UFCW) has adhered to a publicly stated policy of avoiding the use of NLRB elections as a way to organize workers. This position is based on the belief that since the beginning of the 1980s, the NLRB has become, for the most part, an advocate of management's rights and does everything it can to frustrate workers' attempts to unionize.

The UFCW policy of not using the NLRB has produced favorable results. In a period when most unions are losing members, the UFCW is experiencing membership gains. More specifically, from 1987 to 1990 the UFCW organized 417,085 workers. Only 7.4% of these joined our union through a Board election.

My local, UFCW 951 in Michigan, subscribes to this policy by defining successful organizing agreement with a previously nonunion employer or a significant curtailment of a nonunion operator's business, including by shutting the business down. Neither of these outcomes will occur by relying on the NLRB.

Our definition of successful organizing came about after we lost an NLRB election in 1988 at a supermarket chain in Kalamazoo, Michigan, called Family Foods. During the six-month campaign, Family had carried out the typical anti-union strategy. Union supporters were singled out for various types of "special treatment"—discharge, threats, refusals to promote or transfer, surveillance, coercion, etc. We, of course, filed numerous charges with the NLRB, and the Board eventually ruled in our favor on virtually every violation we laid the employer appealed the Board's ordered another election and the days and months dragged on, decision. In the meantime, many quit and others were co-opted by some committee members. The high turnover typical of the supermarket management. The high turnover typical of the industry hurt us too.

We realized that the traditional method of organizing wasn't going to work, but we didn't want to walk away from this campaign. After thorough research, we decided to launch a consumer boycott. We took our message to various groups that made up part of Family's customer base and asked them not to patronize a corporate "law breaker."

When talking to senior citizens' groups, the issue of siphoning off excess pension funds was very effective. Information on how to spot and receive rebates for Family's violations of the state item

pricing laws went over well with shoppers on a budget. The absence of minorities in management positions and the termination of a long-term minority employee was used to galvanize support in the African-American community. Of course, many area local unions supported the boycott strictly because of the unfair labor practices, but we found that labor support is not automatic. We had to "sell" other unions' members on the boycott. Just because union officers say they are with you doesn't mean the bulk of their members are.

After a three-year struggle, the battle with Family Foods is over. Do we represent this struggle? No. The company went out of business. The good news is that some of the stores were purchased by companies already under a Local 951 contract. A couple stores are empty, but I am sure that many of their former patrons are now shopping in unionized stores. Perhaps even more important is the message that has been sent to nonunion competitors: There is no "free lunch" in our jurisdiction.

## ORGANIZE EMPLOYERS, NOT EMPLOYEES

Nonunion employers have no fear of violating the National Labor Relations Act. They have two advantages—little or no enforcement of the law and, when they occasionally get caught, penalties that are laughable. It's no wonder that the standard advice most union-busters give their clients is to break the law. The almost guaranteed reward of a "union free environment" is certainly worth the possibility of a posting on the wall, a re-run election or a few dollars in back pay. As with most things in business, thwarting workers' organizing drives is a matter of money, not morals. Nonunion employers are convinced that it is cheaper to oppose unionization than it is to provide fair and equitable working conditions for their employees through a collective bargaining agreement.

Nonunion employees, on the other hand, have a lot to lose by signing an NLRB authorization card—like their jobs, their very livelihoods. Though we say the Labor Relations Act protects them, we know it often doesn't.

The need for a change in our mindset about organizing is clear. Who do we really need to convince of the advantages of being union? Employees or employers?

Organizing is war. The objective is to convince employers to do something that they do not want to do. That means a fight. If you don't have a war mentality, your chances of success are limited. Organizing without the NLRB means putting enough pressure on

employers, costing them enough time, energy and money to either eliminate them or get them to surrender to the union. This is what the UFCW calls a pressure campaign.

Before beginning a pressure campaign, a power structure analysis must be done. Simply put, a power structure analysis is the process of determining the strengths and weaknesses of your opponent.

The power structure of any corporation is a series of relationships with people and organizations outside the company. No employer operates in a vacuum. If you can have an impact on enough of these relationships in ways that adversely affect the company, you may find that a violently anti-union employer will decide that being fair to workers isn't such a bad way to conduct business after all.

If you think of the targeted employer as being the sun and all the entities that have dealings with that employer as being planets surrounding the sun, then you have a model of what a corporate power structure looks like.

**Power Structure Analysis**



Among the planets revolving around this corporate sun are: suppliers/vendors, creditors/lenders, shareholders, owners, board of directors, competitors, analysts, the media, the courts, regulatory agencies, consumers, politicians, community groups, labor organizations, churches, and the employees of the company.

Which of these various entities is the employer least concerned about? Which is the lowest priority? The answer in most cases is the employees. Who do we spend the most time and resources on during an NLRB-style organizing drive? The answer: employees.

Let's take a look at employees for a moment. What do employees want? Do they feel free to change their minds about what they want? At any time? For any reason? Do they all want the same things? Are they influenced throughout the organizing process? Does a commitment to sign an authorization card mean that the card is going to be signed? Is a signed authorization card a guarantee of a "yes" vote on election day? Is a vote in favor of unionization an indication that a majority of the workers are "with" the union and will make whatever sacrifice is necessary to prevail against their employer?

Now let's take a look at employers. Question: What do employers want? Answer: Money. Call it profit, net income, return on investment or any other fancy term, but the bottom line for virtually all American businesses is getting as much hard cold cash as they can lay their hands on. Will that ever change? Probably not in our lifetimes!

Conclusion: Employees are complex, and unpredictable. Employers are simple and predictable. We can use these conclusions to our advantage in a pressure campaign.

**ELEMENTS OF A PRESSURE CAMPAIGN**

Pressure campaigns to convince anti-union employers to "do the right thing" should be viewed as an alternative to, not a replacement for, traditional organizing.

When we are lucky enough to find "hot shops," then it makes sense to develop rank-and-file shop committees who sign up their co-workers, pass out educational leaflets, go on house calls, take on the boss in captive audience meetings, and take on whatever leadership roles are required. But when a nonunion competitor is beating your brains out and the union employers are looking for concessions or, worse, going out of business, then I don't believe we have the luxury of sitting around and hoping that employees trapped in a "union free environment" will come knocking on our door looking for a solution to their problems.

If organizing is the lifeblood of the labor movement, then we have to create our own reality, by making our own breaks. And that means focusing on employers and making them pay for operating nonunion.

Pressure campaigns are complex and multifaceted, and each campaign is different from every other because it must be developed around the strengths and weaknesses of a targeted employer. I can do little more here than outline some of the key elements of such a campaign.

### Research:

You can't mount a successful pressure campaign without good, solid, ongoing, comprehensive research. If you are going to shirk or shortcut in any area, don't do it in this one. You have to know everything that it is possible to know about a company in order to identify its strengths and weaknesses, develop a plan of attack, and effectively implement the plan. A power structure analysis cannot be formulated without the information that comes from good research.

What is the targeted employer's source of capital? Are they profitable? What's their market share? Who are their suppliers? Customers? Officers? What about regulations must the employer comply with? Are they in compliance? What's the employer's image in the community? Is image important to their business? Are lawsuits pending? Who are the plaintiffs? Who is the employer connected to in the community? With whom? Are charitable contributions made? To whom? These questions and many others need to be answered before any action is taken. Research doesn't end when the campaign begins; it should be continuous. But it needs to be thorough from the start.

### Using All the Laws:

Virtually all companies are wholesale law breakers. Even "good" ones, even organized ones. Talk about the law to the average organizer, and he or she will cite you chapter and verse of the National Labor Relations Act. What about all the other laws and regulations employers are supposed to follow?

There's civil rights laws and right-to-know. Unemployment compensation and Social Security. plant workers compensation requirements, and Social Security. plant closing and pension laws. There's public health and environmental laws. And at the local level, there's zoning and fire codes and various ordinances. At all levels, there are tax laws.

Why are most employers so cavalier about violating the law? Because they know their competition is doing the same thing. If a company complies with every single regulation and its competitors don't, the extra cost will hurt profitability, curtail expansion and maybe even put it out of business. Besides, what are the chances of getting caught? Enforcement of most corporate laws depends on knowledgeable, fearless employees who know their rights or on government agencies with aggressive inspectors who have a manageable workload. Most employers correctly assume that the risks of detection aren't that high. A pressure campaign can exploit this situation.

In 1987 the UFCW won an NLRB election at Delta Pride Catfish Farm in Mississippi in spite of the typical unfair labor practices that occurred during the campaign. The company wasn't very concerned about the NLRB complaints and both the company and the union knew there wasn't support for a strike. The employer's strategy was to drag out "negotiations" for a year, show the employees how fruitless their attempt to unionize was, and eventually have the union decertified. This strategy was derailed by the union's creative use of another law.

Workers at Delta Pride were required to be at work at a specific starting time and then wait anywhere from one to three hours for the fish to be delivered for processing. They were not paid during this waiting period. The union developed a form that could

## 40   Labor Research Review #18

be used to determine each employee's potential losses and that authorized the UFCW to represent the employee in a lawsuit under the Fair Labor Standards Act (FLSA). Organizers and rank-and-file committee members were dispatched to get the forms signed by all 1,220 active employees and by as many former employees as could be located. A special handbill and mailing was distributed. Even workers who had opposed the union signed up for the "free money."

Under FLSA you can go back two years to collect lost pay and three years if the violation is deemed willful. Some 1,800 people signed the UFCW forms: 1,800 times 12 hours, times $6 an hour (at time-and-a-half, times 150 weeks. Wow, that's a lot of cash!). The potential liability was estimated at several million dollars. All of a sudden Delta Pride no longer wanted to stall, and a firm contract for the employees seemed like good business. The cost of wage increases, benefits and fair working conditions was cheaper than retaining an army of lawyers and paying damages.

### Consumer Boycotts:

A consumer boycott can be a powerful part of a pressure campaign. It can be particularly effective in the retail food industry because of the union's ability to have direct and sometimes face-to-face contact with the customer. In retail food, with its miniscule profit margins and its need for high volume and repeat business, the customer is worshipped. If a supermarket loses 10% of its customers, its profitability is probably eliminated. Any more than that over a protracted period, and it's out of business.

Consumer boycotts are sometimes referred to as "reverse marketing." The idea is to give customers as many reasons as possible why they should not patronize the targeted employer. In order to do this effectively, the union must communicate in as many ways as possible. Because consumers have different backgrounds and attitudes, the messages the union sends must be as diverse and multifaceted as well. Unless you are lucky enough to be in a heavily unionized marketing area, the theme "don't shop here because it's nonunion" is the least effective appeal. Instead you can do municating what your problem is and what the customer can do to help you, the message should be why it is in the customer's, or the community's interest for this employer not to be patronized.

UFCW Local 1 in Utica, New York, conducted a campaign around the issue of short-weighted food items like meat and produce, and also questioned the store's use of publicly funded Industrial Revenue Bonds. Customers were provided with a special form, "Help Stop Food Shopper Rip-Offs" and were asked to send them to the Governor's Office and the Consumer Affairs Com-

mittee of the state assembly.

After researching the employer and deciding what issues have a chance of appealing to customers, the most effective way of communicating with them must be determined, given the financial and people-power constraints of the union. Television may be the most effective medium, but unless you have a lot of money, purchased TV time is out of the question. However, if you dig up some "juicy" information on a targeted employer's business practices, a local TV investigative reporter may be interested in revealing the details to the viewing public.

Paid radio advertising is surprisingly cost effective. We have purchased "drive time" 60-second spots for as little as $39 per spot in a town of 100,000 people. A UFCW local in a small town in Missouri did an entire radio campaign for less than $400. Radio also gives you the ability to target specific audiences.

A tactic we call telepicketing can also be part of the customer communications process. This is where you really need your members to be part of the campaign. In the supermarket industry, the typical marketing area is in a 4.4-mile radius around the store. That is a lot of people to contact, so you need lots of volunteers working the phones over a relatively short period of time for maximum impact. The idea is to talk to as many people in the marketing area as possible to convince them to consider shopping elsewhere.

For those of you who are nostalgic about the "good old days" of organizing or believe that the only way to be successful is through a "fair" NLRB, I recently ran across some information that you might find enlightening. In 1937 more than 3 million workers joined unions in this country. Of those, only 2,470 used NLRB elections as the vehicle to gain their collective bargaining rights. The rest employed "other means."

Getting invited to speak to various civic, church, neighborhood, union and consumer groups is a time-consuming, but inexpensive way to get your message out. Addressing groups that your members and their families belong to is a good place to start. Membership participation is an obvious necessity for this approach also. All of these communication methods are designed to influence customers before they make the decision to go to a store. Picketing and handbilling should be used to educate and dissuade customers

who are already at the employer's place of business.

Because a successful consumer boycott requires support from the community, it you haven't already done so, get involved with community groups now. Don't wait for a crisis to be your catalyst. It's a lot easier to go to friends for help rather than strangers, no matter how just your cause is.

## PRESSURE CAMPAIGN ADVANTAGES

One of the concerns organizers might have about waging economic war on an unorganized company is that it might turn employees against the union. I look at it this way: If you had massive employee support, you probably would be conducting a traditional organizing campaign. Additionally, it always amazes me how easy it is to talk to employees about the benefits of unionization when their employer has adopted and enforces a position of neutrality on the "union question."

Besides, the advantages of a pressure campaign in today's environment overwhelm whatever problems you might think of:

1) They get the attention of the employers you already have under contract. You can show your unionized employers that you have the ability to make war without having to kill the goose that lays the golden eggs. Plus they love to see their nonunion competitors having such a tough time.

2) It's an opportunity to build membership participation in the local union—through handbilling, rallies, picketing, tele-picketing, letter writing, assisting with research, attending stockholder meetings, contacting politicians and community groups and other unions, and all the tasks that potentially need to be carried out as part of a pressure campaign. It is also an effective way to educate the rank-and-file about the reality of the marketplace.

3) You don't have to wait for a "hot shop" to organize. You create your own reality by determining what nonunion company is hurting your organized shops and by taking action to protect your members' working conditions. It allows you to be proactive rather than reactive. You aren't forced to wait for the "right time."

4) It can help prevent concessionary bargaining by:

a) causing the nonunion employer to spend unbudgeted money to fight you. [Sometimes they even give out wage and benefit increases in an attempt to keep the union out.]

b) curtailing the unorganized employer's expansion, causing reductions in existing operations, or even putting them out of business.

5) If you research and target properly, it's cheaper in the long run.

6) You can avoid subjecting union supporters to the "ultimate test" of risking their jobs in order to win the union.

7) You don't need a majority, or even 30% support among the employees. A few people inside and outside are all that's necessary to be successful. [Note: Fired employees are a great source of information. They're not afraid and they're motivated!]

8) If you do get a contract, it not only benefits the new members, it makes it easier to bargain with organized employers in the same industry and it brings new resources [including an enhanced reputation] into the local union to help escalate the fight elsewhere.

9) Finally, practice makes experts out of amateurs. Look at how long it took for us to become proficient at enforcing the National Labor Relations Act. We are just getting our feet wet on this type of organizing approach. Some of us are going to get very good at it.

## CONCLUSION

According to the AFL-CIO publication *The Changing Situation of Workers and Their Unions,* "The norm is that unions now face employers who are bent on avoiding unionization at all costs and who are left largely free to do so by a law that has proven to be impotent and a Labor Board that is inert." Pressuring nonunion employers to "do the right thing" by making it more costly to be unfair to their employees than it is to provide decent wages and working conditions is one way to counter the decline in organizing by most American unions.

For those of you who are nostalgic about the "good old days" of organizing or believe that the only way to be successful is through a "fair" NLRB, I recently ran across some information that you might find enlightening. In 1937 more than 3 million workers joined unions in this country. Of those, only 2,470 used NLRB elections as the vehicle to gain their collective bargaining rights. The rest organized "other means." It worked then, and it can and does work now. ■

# EXHIBIT 6

**THE OUTLOOK: Not-So-Big Labor Enlists New Methods For Greater Leverage**

By Timothy Aeppel
29 August 2005
The Wall Street Journal
A2

AT FIRST GLANCE, it doesn't seem labor has much to celebrate this Labor Day.

A majority of Americans, 53%, feel unions are weakening, a 12-percentage-point increase from last year, according to a recent Gallup Poll.

But the labor movement isn't lying down. It is fighting back with a different approach to organizing and muscle-flexing that could shape labor relations for years to come.

The split-up of the AFL-CIO earlier this summer underscores labor's shifting approach. Unions that broke with the alliance, including the fast-growing Service Employees International Union, have honed a style in which battles are fought as much in boardrooms as on shop floors, and often entail using public relations as a weapon rather than traditional strikes.

"I've been telling employers that if you think this is the death knell of organized labor, you're making a big mistake," says Philip Rosen, managing partner of the New York office of law firm Jackson Lewis LLP and head of the firm's national labor practice, which means he works with companies fighting unionization drives. Mr. Rosen expects an upswing in organizing.

Here is how it works: Rather than following the old game plan of collecting signatures from workers and petitioning the federal government for a union election, the union goes to the company asking for voluntary recognition. Often they have already gathered signatures from most of the workers and use those to prove they have worker support.

This "card check" approach, referring to the index-card-sized slips of paper workers sign, makes it easier and cheaper to organize. In a formal election, held under the auspices of the National Labor Relations Board, companies mount bare-knuckle counter-campaigns, which helps explain why unions won only 56.5% of the 2,299 elections held last year.

Unions see card-check campaigns as one way to stanch the decades-long decline in their ranks. It isn't a new approach, but it is expected to be undertaken with growing vigor as unions step up their organizing in the wake of the AFL-CIO's latest erosion.

Stewart Acuff, national organizing director for the AFL-CIO, says, "Most of the unions that have large-scale organizing capacity are moving as much as they can away from the NLRB organizing process." Numbers tell the story: About 80,000 workers were organized last year through NLRB elections, he says, while more than three times that many were added through card-check campaigns.

MANY COMPANIES argue that card-checks aren't as democratic as the election process because they deprive workers of the chance to cast a secret ballot on whether to organize. "A secret-ballot election is the best process for assuring free choice," says Mr. Rosen, adding that many workers feel pressured when someone sticks "something in front of you and says, `Please sign.' "

So why would a company ever agree to recognize a union on this basis? That is where the other arm of this strategy often comes in, the "corporate campaign." Because their traditional method of

muscle-flexing, the threat of a strike, has lost much of its bite -- as evidenced by the largely muted impact of the Northwest Airlines strike -- a growing number of unions have turned to advertising campaigns and other initiatives aimed at undermining a company's image and standing in the broader community. A model of this is Wal-Mart Stores Inc., where unions have done such things as joined with community groups to oppose the construction of new stores and urged students and teachers across the country to buy school supplies elsewhere.

"We're in a movement that doesn't have a lot of leverage, so we need to marshal our resources," says Mike Casey, president of Local 2 of Unite Here, representing hotel and restaurant workers in San Francisco. "We need to reorient ourselves with how we look at these companies. You can't deal with global companies with local fights anymore."

A key demand in his union's current contract talks is an agreement from the hotels to accept card checks and remain neutral on union organizing of new workers. Moreover, the union wants the expiration of the contract to coincide with the expiration of hotel-union contracts in a number of other U.S. cities, potentially making it easier for the union to threaten hotel chains with a nationwide strike. Meanwhile, the union phones up trade associations and others, urging them to not hold their conventions at the offending hotels.

John Budd, an industrial-relations professor at the University of Minnesota's Carlson School of Management, says unions have to be careful with this big-picture approach. "Unions need to fight corporations on a centralized level," he says. "But they also have to engage workers on a local level."

But union leader Mike Fishman says new approaches are working. "We don't do elections," says Mr. Fishman, president of Local 32BJ of the SEIU, which represents more than 75,000 window cleaners, doormen and janitors in New York, New Jersey, Connecticut and Pennsylvania. Mr. Fishman's group in recent years has pressed employers in whole regions -- such as janitorial companies in the suburbs of New Jersey outside New York City -- for card-check agreements that allowed them to rapidly add new members.

# EXHIBIT 7

# Planting Liberally

Strengthening the progressive movement through liberal entrepreneurship

## YearlyKos: Catching up with Change to Win

Sun, 2007-08-05 17:39 — admin

Last Friday night at YearlyKos, the Change to Win labor federation hosted a dinner for myself and about twenty other bloggers who discuss labor issues, in some form or another. I had a chance to speak with staff from the policy development and strategic organizing groups within CtW, and I'll give you a summary of some of those conversations here, as well as my brief thoughts about how the progressive movement can work together with CtW to help strengthen the labor movement.

First, a bit of background: Change to Win is a federation of six labor unions, which was formed in 2005 after some of them broke away from the AFL-CIO federation. While some folks refer to Change to Win as "the other labor federation", our hosts were quick to rebut that characterization. CtW is a labor federation, they say, but it's not just an alternative to AFL-CIO; it's fundamentally different, and its approach to organizing is fundamentally different. (AFL-CIO and CtW do collaborate on legislative and electoral work, however.)

I spoke in some detail about legislative priorities with Deborah Chalfie, the Deputy Director of Issue Campaigns. For a little while now, I've been concerned that the labor movement's recent singular focus on the Employee Free Choice Act would blind the movement to other low-hanging fruit - opportunities like expanding NLRB's budget for enforcement, and things like that. Fortunately, I was wrong. Chalfie tells me that CtW worked diligently to add teeth to NLRB through the budgeting process, although we didn't have a chance to talk specifics. There is a reasonable chance the reforms will survive the Senate, but of course, Bush has promised a veto.

Chalfie's highest priority at the moment is reforming the tax code to make abuse of independent contractors more difficult. Miscategorization of employees as independent contractors is a huge problem for the labor movement, because independent contractors cannot form unions (indeed, if independent contractors work together to fix the price of their labor, they are violating anti-trust law). The Teamsters are running up against this problem in their drive to organize FedEx workers, for example - FedEx drivers are categorized as independent contractors, each of them technically running their own small business (despite the fact that the trucks are owned by FedEx and branded as such.) There are similar practices at play in the construction industry. Apparently, there are loopholes in the tax code which makes this kind of abuse much easier than it should be, and CtW is working to close those loopholes.

Incidentally, the fact that independent contractors cannot unionize is a big issue in organizing the



creative class, many of whom are correctly classified as independent contractors when they sell their services to other companies. We discussed this issue a bit, and the related question of how bloggers can organize in order to ensure that ad rates don't fall too low. I'm sorry to say I had to miss the YearlyKos panel on forming a blogger's union; if anyone cares to chime in below with a summary of the panel, I'd love to hear more. I'm really curious to learn more about how unions can organize independent contractors, because it's a fairly big problem that is only going to get bigger in the next decade or so. The best that anyone's done so far (that I know of) is to put together a voluntary association capable of bargaining for health care and other benefits, notably the Freelancer's Union in New York City. This organization is great, but I worry that this approach undermines, to some degree, the ethos of solidarity that is the core of the labor movement. From what I understand, SEIU's new organization, Qvisory, is preparing to provide services similar to the Freelancer's Union, but on a national scale, so I guess we will soon see whether I'm worrying needlessly or not.

I also spoke, a bit too briefly, with Joseph Geevarghese, who works in CtW's strategic organizing center. He gave me a very broad overview of the new thinking within strategic organizing, which is that it's no longer sufficient to use a strike or other work disturbance to pressure a company to do the right thing. Increasingly, it's necessary to pressure a company by causing a crisis of confidence among its customers, shareholders, directors, or other constituents. I actually find this very interesting, because doing that kind of work is, or can be, very similar to the work that bloggers do. Bloggers are keenly capable of reaching niche audiences like these, and are further capable of causing just enough of a micro-disturbance among these niche audiences to pressure companies to act. We didn't get a chance to really talk nuts and bolts about actual collaborations, unfortunately, but hopefully I'll have a chance to do that soon, and will be able to post a follow-up here.

The one topic I couldn't get a really straight answer on was the topic of industry-wide organizing. Organizing whole industries at a time was the main promise of CtW when it formed, and there has been precious little of that kind of organizing in the intervening years - or so it seems to me. (One exception, I think, was the Hotel Workers Rising campaign, which planned to organize large swaths of the hotel industry through synchronized contract expirations in major cities around the country; it was mildly successful, but it didn't quite organize the whole industry.) No one from CtW seemed to have a really good answer for what industry-wide organizing looks like in the early 21st century, except to say that they are using neutrality and card check agreements in order to bypass the broken NLRB election process.

This might have been an actual answer that got lost in conversation. Andy Stern discusses the role of neutrality agreements in industry-wide organizing in A Country that Works: SEIU, in the late 90's, pioneered an approach whereby it locked up neutrality agreements with trigger clauses among major players in a given industry. Each agreement stated that the company would agree to a card-check organizing campaign, given that other players in the industry were willing to do the same. That's a fairly sophisticated and drawn-out model, and it could be that similar efforts are underway within other CtW unions; but it's difficult to see if that's actually happening.



Jason Lefkowitz, CtW's blogger, has since forwarded me a press release from UFCW, discussing their approach to organizing grocery workers as an industry. Their approach is basically this: when a single UFCW grocery workers local is approaching a contract fight (or, I'd imagine, when a group of unorganized grocery workers is in the midst of an organizing campaign), the local enlists the help of both community members, and other UFCW locals throughout the country, to put nationwide pressure on the grocery chain. This is a noteworthy, and it's similar in many ways to SEIU's campaign for Houston Janitors a couple years ago. Is it scalable, i.e. capable of organizing a significant chunk of grocery workers in the entire country? Is it transferable, i.e. applicable to workers in other, less consumer-facing industries, where community support might be harder to gather? I don't know, but I'm glad to see it working well for UFCW. I'd certainly like to learn more about those aspects of the strategy.

This post is, in a way, an elaboration on last week's more abstract piece, about how the labor and progressive movements can collaborate in much deeper ways than simply sharing electoral and legislative goals. I think it's important for progressive bloggers to support the issues that are crucial to the labor movement - living wage, universal health care, pension reform, labor law reform in the form of EFCA, etc. But I also think it's important for progressive bloggers to use our skills and smarts to help labor with its organizing campaigns - whether it's micro-targeting to pressure a company's clients, or evaluation of various industry-wide organizing strategies. I'm looking forward to collaboration along these lines in the future.

admin's blog    Add new comment                                Workplace and Unions

Site content may be used for any purpose without explicit permission unless otherwise specified.
Powered by Drupal.

