# EXHIBIT 8



# Contract Campaign Manual

**Service Employees International Union
AFL-CIO, CLC**

# Pressuring The Employer

## Part 3 At A Glance

Escalating Pressure Tactics .................................................. 3-4
Evaluating Possible Tactics .................................................. 3-6
Worksite Activities.............................................................. 3-9
Organizing Successful Rallies And Demonstrations....................... 3-14
Lockouts ............................................................................ 3-17
Outside Pressure.................................................................. 3-18
Legal/Regulatory Pressure ...................................................... 3-21
Political/Legislative Pressure .................................................. 3-25
Pressure On Individual Officials ............................................... 3-27
Workers' Role In Researching Pressure Points............................ 3-29
Strikes ............................................................................... 3-30
Strike Planning .................................................................... 3-31
The Law On Replacing Strikers ................................................ 3-34
Mutual Support Committee ...................................................... 3-36
Headquarters Committee ......................................................... 3-37
Picket Committee .................................................................. 3-38
Keeping A Strike Strong .......................................................... 3-44
Ending A Strike .................................................................... 3-46
How To Work With Lawyers ..................................................... 3-47
Community Action ................................................................. 3-50
Other Unions Dealing With The Same Employer ......................... 3-55
Using The Media ................................................................... 3-56
Organizing Your Media Campaign ............................................. 3-58
Let Members Do The Talking ................................................... 3-59
Researching Media Outlets ...................................................... 3-61
Educating The Media.............................................................. 3-62
Helping Reporters Do Their Job ................................................ 3-63
Creating News ...................................................................... 3-65
Comparing Good And Bad News Releases..................................... 3-69
Using Free Time And Space ..................................................... 3-70
Paid Advertising.................................................................... 3-72

# Pressuring The Employer

It's not enough to be right. You need might as well.

Union proposals will usually cost the employer money or reduce management's flexibility and control over the work force—and that means the employer generally will resist unless you create meaningful pressure to reach agreement.

When many people think of union pressure they think of strikes—and strikes are one form of pressure that may become necessary in some contract campaigns. But many other kinds of pressure are possible as well. For example:

• Workplace activities, such as surveys, petition campaigns, and demonstrations can show management that workers will not be satisfied and productive without a fair settlement.

• Job actions, such as refusing to do more than the bare minimum required by the contract or engaging in short work stoppages or on-again, off-again "rolling strikes," can demonstrate workers' willingness to take stronger action if necessary.

• Outside pressure can involve jeopardizing relationships between the employer and lenders, investors, stockholders, customers, clients, patients, tenants, politicians, or others on whom the employer depends for funds.

• Legal and regulatory pressure can threaten the employer with costly action by government agencies or the courts.

• Community action and use of the news media can damage an employer's public image and ties with community leaders and organizations.

In planning ways to pressure the employer, consider the following:

• Assume that pressure tactics will be necessary, and start planning for them well in advance. It may be tempting to wait to see if you can reach an acceptable settlement without going to all the trouble of developing possible pressure tactics. Unfortunately, by then time will be on management's side because most pressure tactics take considerable time to organize effectively.

When management sees that you are preparing to apply pressure it becomes less likely that you will have to use those tactics, while failure to prepare invites management to test the union's strength.

• Your choice of tactics must be determined by a clear analysis of the employer's weaknesses. It is easy to confuse activity for activity's sake with a genuine strategy. For each activity you should be able to clearly explain how it is expected to lead to increased pressure on the employer.

• Learn from the union's experience with pressure tactics used against this employer in the past. Make sure that the discussion includes both those who helped devise those tactics and those who may feel freer to be more critical.

Make the discussion as specific as possible. For example, if someone says, "Well, we tried that but it didn't work" or "We couldn't do that because the membership wouldn't support us", discuss why that was so.

• No tactic is always successful or always unsuccessful; it depends on the particular employer and situation. Depending on the situation, for example, a strike may be the only way to win a good contract or a sure way to destroy the union. To some employers, media coverage is very important; to others, it makes little difference.

• Workers often give strongest support to actions they developed. Staff can make useful suggestions, but if workers themselves are not fully committed to a proposed action, it will fail.

• The threat of action often has more psychological effect on management officials than the action itself because they don't know exactly what the impact will be.

• It often takes a combination of tactics to win. It is rare that you can find the single, perfect tactic that will bring management to its knees.

More often, you have to put pressure in many ways so that the total cost of your campaign to the employer begins to outweigh the benefits of rejecting your proposals.



# Escalating Pressure Tactics

How do you get workers to take action to pressure the employer? And how do you apply pressure in a way that will make management more willing to negotiate?

The key is "escalation"—implementing tactics one step at a time. In the area of on-the-job actions, for example, you can start with something mild like days when all workers wear the same color clothing, move to a one-minute moment of solidarity, then to a work-to-rule campaign where everyone does only the bare minimum required by the existing contract, and finally to some form of work stoppage if needed.

Step-by-step escalation has a number of benefits.



● It builds members' confidence and commitment. At the beginning of the campaign, many members may not believe that they have the power to take on management or that other workers



*Rallies build confidence and prepare workers for stronger actions, if needed.*

or community allies will stand by them if they do.

By escalating tactics, you don't ask them to make a leap of faith all at once. Instead, you start with an activity that is relatively easy to organize and has little risk—but that shows workers that organized action is possible.

Once workers have taken part in one campaign activity, many will begin to see the campaign and the union as their own. If management responds to, say, a petition or rally by refusing to negotiate reasonably, workers will begin to see this as an insult to *them* rather than a response to "the union." Filled with increased confidence and emotional commitment, they will be ready to try the next step.

● It keeps the blame for increased confrontation on management, where it belongs. Members, the news media, and allies in the community can see that each new tactic was adopted only when management failed to respond to milder demonstrations of workers' determination.

● It gives management incentive to settle. If management officials feel that you are determined to provoke the maximum possible confrontation no matter what, then they may have no reason to negotiate seriously. If they feel that you already have used your most powerful weapons, they may sit back and test your staying power.

If, on the other hand, you successfully carry out a series of stronger and stronger actions, management knows it can avoid further pressure but only by offering to compromise.

# A Step At A Time: One Local's Story

Until 1983, most state welfare workers in Pennsylvania who belong to SEIU Local 668 believed that their union had little power in contract negotiations.

Local members had struck in 1975, and the general feeling afterward was that the strike had failed. The local was not the largest state workers' union, and social service workers were not in a position to shut down state government by themselves.

For the 1983 negotiations, the local conducted a contract campaign designed to gradually build members' confidence and willingness to take stronger action. Activities were designed to make workers believe in each other as well as to send a message to management. Examples include . . .

• Days on which workers all wore special buttons, T-shirts, or armbands.

• Discussions held at the same time on the same bargaining issue in offices throughout the state.

• Press conferences held at the same time at locations around the state.

• A campaign to send postcards to the key management official.

• A coordinated effort to leaflet every appearance by the governor in the state.

Bulletins distributed by the local included photos of activities and clippings from the news media from all parts of the state so that workers could see what other members were doing.

After the 1983 settlement was reached without a strike, the local planned a campaign for the 1985 negotiations which built on workers' growing sense of solidarity. When management came to the bargaining table demanding severe concessions, the local responded with tactics to increase members' feeling of power, including . . .

• A statewide "Stress Day" with local news conferences and membership meetings to announce the results of a union-sponsored, professional survey linking poor working conditions to high rates of stress-related illnesses.

• A Father's Day rally two weeks before contract expiration, in which workers presented a huge greeting card at the governor's mansion. The rally included workers from all the unions participating in a coalition called State Workers United for Fairness. Each union's members wore a different color shirt so that workers could see the broad range of support.

• A media campaign which included a half-hour TV show featuring members of the coalition unions talking about the bargaining issues.

When the contract expired with management still pushing many of its proposed takeaways, workers went on strike. It had taken two years of build-up, but local members had reached the point where they believed that they could stand up as a group to demand a fair contract.

# Evaluating
# Possible Tactics

## 1. What purposes will this tactic serve?

● Costing the employer money. Can you threaten to or actually . . .

☐ Reduce productivity?

☐ Increase costs?

☐ Affect a private company's relationship with sources of income, such as customers, clients, investors, or lenders?

☐ Affect a public employer's relationship with legislators or top government executives such as the governor or mayor?

☐ Create bad publicity which would, in turn, affect the relationships described above?

☐ Cause the courts or regulatory agencies to enforce laws or regulations the employer has failed to obey?

☐ Directly affect the careers or other interests of individual management officials?

● Building solidarity among workers or between your members and potential allies. Will the tactic . . .

☐ Make the campaign more visible?

☐ Increase group spirit?

☐ Increase workers' sense of their own power?

☐ Show workers that they have the support of allies, and draw those allies into making a stronger commitment to the campaign?

● Making daily life difficult for management. Will the tactic . . .

☐ Distract management officials from other work they need to do?

☐ Embarrass them in front of their superiors, associates, families, neighbors, or friends in the community?

Be clear about the purpose(s) of an activity so members will have appropriate expectations. For example, it might be appropriate to hold a rally to increase membership solidarity, knowing that it wouldn't have much effect on that particular employer. But if you give members the impression that this rally is really going to shake up management and they find that it doesn't, they may become demoralized.

## 2. Will the tactic be fun for members to carry out?

Of course, most tactics involve hard work, but if a lighter side is built in, members will look forward to each new activity.

## 3. Will the tactic surprise management?

A tactic which catches management off guard has an effect both because of the action itself and because of the surprise factor.

## 4. Does it target people in management who control the decisions?

Particularly in the public sector, different officials in management—from politicians like governors or mayors to career labor relations negotiators—may have different long-term interests and career concerns. You have to figure out who really holds the power and tailor your tactics to affect them.



*Props and costumes make a demonstration more fun as well as more effective in communicating workers' concerns.*

### 5. How long will it take before the pressure would be felt?

Compare the lead time you have to the time a tactic would take to become effective.

For example, a strategy to discourage customers from dealing with your employer might only be taken seriously by management officials if they knew you had enough time to organize community support.

### 6. Will the tactic teach members new skills and build the union?

Union leaders must look at not just one campaign but at workers' long-term goals as well.

If potential tactics will involve members in doing research, taking collective action at work, reaching out to other allies in the labor movement and the community, pressuring politicians, and similar activities, then the union will be stronger and better prepared for the next contract campaign and other battles.

A tactic which depends primarily on a handful of lawyers, lobbyists, communications consultants, or other professionals may help pressure the employer in the short run but not build membership solidarity and skills.

### 7. What will the tactic cost in terms of money, staff time, and volunteer efforts?

Do you have the necessary resources? If not, are there other unions or community groups that also would want to contribute?

## 8. Could the tactic backfire?

For example, could it turn a potential long-term ally in the community against you? Or could it be used by management to pit one group of workers against another?

If so, that may not be a reason to drop the tactic but rather to be careful in the way you set up your campaign to use it.

For instance, let's say you are considering a work-to-rule campaign which would include refusing voluntary overtime, but you have in the unit some workers who depend on the extra income. If you don't prepare carefully, you may find the work force split, with some refusing overtime, some not, and workers fighting each other instead of uniting to win a good contract from the employer. In this case, you would first have to get members together to discuss the possible tactic, why it is necessary and worthwhile, and how to minimize the financial impact on workers.

## 9. Would the tactic expose workers to job loss or other discipline or the union to legal liability?

If so, that possibility should be thoroughly discussed by workers, union leaders, and attorneys ahead of time.

On the one hand, everyone should realize the risks they may be taking.

On the other hand, people must weigh the possible benefits and judge how likely it is that the employer will actually use discipline or take legal action.

For further discussion of legal considerations and how to get and use advice from attorneys, see "How To Work With Lawyers."

# Worksite Activities

The following are examples of types of activity to consider.

## Worksite communications

As described in Part 2 of this manual, these include one-on-one contacts, worksite meetings, and distribution of leaflets and surveys.

These activities not only communicate information but also help show management that the membership is involved and committed.

## Demonstrations of solidarity

This includes any activity which shows the membership is prepared to take organized action.

It could be a large rally or demonstration, a petition on a bargaining issue or other workplace problem, or on a particular day having members all wear union pins, buttons, stickers, or the same color clothing.

It also could involve informational picketing at the employer's offices or other location where it would be possible to draw public attention. Informational picketing means displaying signs and distributing literature which expose the employer's behavior without asking employees to stop work or customers to withhold their business.

(Before conducting informational picketing, check with a union attorney, particularly in cases involving health care institutions.)

## Contract enforcement

A contract campaign can be a good time for members to file grievances over every possible contract violation.



*Days on which workers all wear union T-shirts or the same color clothing help build solidarity.*

This tactic reminds the employer of the difference between labor peace and the kind of labor trouble that can develop if a fair contract settlement can't be reached.

It also reminds members of the importance of their contract rights.

Organizing a contract enforcement effort may require a special meeting/training session for stewards to prepare them to make sure each worker is contacted either in person or through a phone tree.

Each worker should be provided with a short leaflet which explains the purpose of the contract enforcement effort and the sections of the contract which management is most likely to violate.

Where possible, large numbers of members affected by a problem can go together to present a mass grievance, further demonstrating solidarity to both management and the members themselves.

## Mini-campaigns on workplace issues

Some locals prefer to pressure the employer on workplace issues without relying on the formal grievance procedure. They feel that in the midst of a contract campaign the grievance procedure can involve too much delay and too much emphasis on officials who are removed from the worksite. They also are concerned about piling up a backlog of formal grievances which could remain after a contract settlement and distract the local from efforts to implement the new agreement.

Instead of using the grievance procedure to pressure the employer, you could organize a mini-campaign which might include the following:

- **Identify a workplace problem** to be solved. Ideally, you would start with an issue which reinforces the union's bargaining proposals, is of concern to a large number of workers, and has a clear solution which is winnable.

- **Conduct a survey** in order to document the problem and educate workers about the issue and your efforts to do something about it.

- **Involve the affected workers, stewards, and committees** in developing union proposals for a solution.

- **Circulate a petition** summarizing the survey results and promoting the union's proposed solution.

- **Organize protest actions** in an escalating pattern, starting with symbolic protests like button days and building toward mass meetings or refusal to do certain tasks until the problem is solved.

- **Claim victory** if the employer agrees to a solution. If the employer refuses on grounds that workers have no right to the proposed change under the current contract, point to the refusal when organizing support for the union negotiating team.

### Working to rule

In many cases, the most powerful worksite tactic is for members to do only what they are required to do by the

---

### Mini-Campaign On Health Issue Builds Bargaining Strength

At the All-American Gourmet frozen dinner factory in Atlanta, Ga., workers who wanted a union contract contacted SEIU Local 579.

Soon, workers began to pressure the employer on workplace issues. For example, a delegation of more than a dozen workers went to the manager's office to complain that double-duty assignments that took them from the hot kitchen to the ice-cold processing line were making many of them ill.

When the company gave in on that issue, other workers began using similar tactics to protest their poor working conditions.

These pressure tactics helped build workers' confidence in themselves and the union, and they voted by a large margin for SEIU representation.

Then, management refused to negotiate a contract. Instead, management lawyers used legal maneuvering to delay certification of the union by the NLRB.

Workers prepared to hold demonstrations at supermarkets, urging consumers not to buy All-American Gourmet products because of rat droppings in the food and other problems discovered by workers and documented in U.S. Department of Agriculture inspection records.

Knowing that the workers were well enough organized to carry out their threat, management agreed to drop its stalling tactics by not appealing decisions by an NLRB administrative law judge.



union contract and no more. In some worksites, this means that workers . . .

- **Refuse voluntary overtime** or optional assignments as temporary supervisors.

- **Follow supervisors' instructions to the letter**, even when those instructions are wrong or the supervisor has mistakenly left out key steps.

- **Do not make any suggestions** or take it upon themselves to solve problems that come up. They wait until the supervisor tells them what to do.

- **Insist on strictly following all of the employer's rules.** For example, let's say that to please its insurance company the employer has posted safety rules which say that "no employee shall lift excessive loads."

Workers may now decide to strictly enforce this rule, insisting on being provided with lifting devices or having other workers pulled off their jobs to help with excessive lifting.

- **Report every equipment problem** and insist that it be taken care of before work can proceed.

- **Stop talking to supervisory personnel** except when it would be a clear act of insubordination not to respond to a question or directive. Workers cut off such contacts with supervisors as engaging in small talk on the job, sharing rides to work, or eating together during breaks.

(In large public employee settings where some immediate supervisors might be sympathetic to union goals, an alternative might be to invite them to

> ### Workers Refuse Overtime, Threaten Strike
>
> Workers at 15 Hillhaven nursing homes in California wanted pay increases and common expiration dates for their contracts, but management wouldn't agree.
>
> When these members of SEIU Local 250 threatened a strike, they backed up the threat by refusing to work overtime at some locations. This work-to-rule action caused staffing problems for management and proved that workers would join together to sacrifice to achieve their bargaining goals.
>
> Along with other tactics, the overtime refusal helped convince management to agree to settle without a strike.

participate in union rallies, fundraising drives, and petition campaigns.)

- **Refuse to participate in employer-sponsored social events, charity campaigns, awards dinners**, or other activities which are designed to make the employer look good and are not part of workers' jobs.

In some cases, workers have chosen to attend these activities but to bring along leaflets, large buttons with contract campaign slogans, or other items which focus attention on union members' concerns instead of the employer's public relations goals.

Work-to-rule tactics obviously require careful preparation, training, and consultation with union attorneys. Workers must understand the difference between doing the bare minimum that is required, which is legal, and a work slowdown or refusal to follow directions, which generally is not.

Since most people like to feel that they do their job well, many workers will be uncomfortable working to rule unless they have thoroughly discussed

with others the need for it as a way to win better treatment and working conditions.

Some workers may say such tactics are "unprofessional" or "disloyal" to customers, clients, or patients. It may help to point out that what is really unprofessional or disloyal to members of the public is to accept poor working conditions, low morale, and shoddy service or products.

Like other tactics, working to rule is best done by large numbers of people so that the employer cannot easily single out one or two for discipline.

## Job actions

In most cases, a number of stronger pressure tactics are possible short of a full-scale strike.

For example, workers might stop work for a brief "unity break"—a minute, five minutes, an hour—which is calculated to be long enough to prove a point to management and the members themselves but short enough not to provoke employer retaliation.

Workers also may find that many of



Actions like unity breaks (above) or sit-ins (right) demonstrate membership solidarity. By proving that workers can organize united actions, these tactics may make an employer decide to settle in order to avoid a strike.



them need to use personal days off at the same time, or that work is disrupted because entire departments are too sick to report for duty.

## Work-ins

In several campaigns, SEIU members have tried the opposite of a strike or work-to-rule campaign. They have confounded the employer by refusing to *stop* work in order to draw attention to workplace issues.

## Working without a contract

Some locals have discovered a tactical opportunity in cases where a strike would not be an effective tactic and there either has never been a first contract or the old contract has expired.

If no contract is in effect, workers are not obligated to use a formal grievance procedure to complain about problems (unless they are public sector workers covered by a civil service grievance procedure). Yet if workers are legally represented by a union, management has a legal obligation to negotiate with the workers over working conditions.

Workers covered by the National Labor Relations Act have the right to engage in "concerted activity"—action by or on behalf of two or more workers—to improve working conditions.

Therefore, when a problem comes up concerning working conditions, workers may decide to go as a group to

---

### Work-Ins Surprise Employer, Attract Media

In **Denver**, building owners responded to an effort by janitors to win a union contract with building service contractors by replacing union contractors with non-union firms and attempting to put the janitors out of a job.

The janitors reported for work anyway and had themselves arrested for conducting a "clean-in." They gained great publicity and made the building owners look ridiculous.

In **Oregon**, state social service workers drew attention to their highly stressful workloads by refusing to leave their offices at the end of the day and conducting appointments with clients until late in the evening.

Television coverage showed the dedicated workers trying to keep up with their work, while management weakly tried to explain why workloads were so huge.

---

talk to top management. If management refuses to meet and threatens to fire them, the workers return to their jobs and the union files an unfair labor practice charge for refusal to bargain.

The next time someone has a problem, the same procedure is followed, with the result that much of workers' time is spent going to, attending, and returning from meetings with management.

Of course, management could decide to respond by resolving the problem, which will be new proof of workers' collective power.

Workers planning to engage in concerted activities should consult a union attorney first, as the way the activities are carried out may make a difference in whether workers are legally protected.

# Organizing Successful Rallies And Demonstrations

Well-organized rallies can be one way to pressure the employer by demonstrating worker solidarity and support from allies and by attracting public attention. Rallies also can boost group spirit by letting workers see proof of their strength in numbers.

However, rallies which are poorly attended and poorly run can be worse for morale than no action at all.

• Don't assume that people will come just because you gave them printed material advertising the event. Instead, organize a network of on-the-job contact or a phone tree to remind each worker.

• Involve members in making banners, signs, or other props ahead of time. Keep the message simple and in large enough type to read at a distance and to show up well in photographs or on TV.

• Consider balloons with slogans printed on them as a way to make the event seem more spirited.

• Give people an opportunity to play an active role by singing, chanting, or marching. Otherwise, instead of feeling pumped up people may feel like they've watched someone else's rally on TV.

☐ Arrange for musicians to lead the crowd in singing before and after the speeches and, if appropriate, once or twice between speeches.

☐ Get some members and staff to brainstorm ideas for chants ahead of time.

☐ When possible, incorporate a short march into the event.

• Include among the speakers members of the unit and, if appropriate, members' spouses—all of whom can talk from the heart about what the campaign means to them.

• Negotiate with speakers ahead of time about what they are going to say and how long they have to say it. For example, if politicians are going to speak, get their agreement that they will use the time to clearly endorse the union's position. Send a message to all



By giving workers an active role, demonstrations like this "Hands Across The County Building" action are more likely to attract participants than rallies in which people simply listen to speeches.



*Sing-alongs, skits, and humor can liven up a rally.*

the speakers by interrupting the first speaker who runs over the prearranged time limit.

• Consider using humor to make some of the points that might otherwise be buried in serious speeches. For example, you could ask one of the members to dress up as the top management official and give a "speech" that parodies management's positions.

• Talk to local police well in advance about permits you may need.

• For a big rally, train marshals to keep order and help anyone who becomes ill or lost. Provide arm bands to identify the marshals.

• Test the sound system enough in advance that you can get other equipment to the scene if something is not working properly.

• Make sure someone calls each media outlet and invites the appropriate reporter to attend. Offer to have a member meet the reporter at a particular time and place and stay with the reporter throughout the event to provide any necessary help such as identifying workers to interview or explaining something one of the speakers said.

• Arrange to have photographs taken by a professional or by an experienced volunteer with 35mm equipment. For people who didn't attend, pictures will show better than words what the event was like. Generally, you will use black-and-white photos in newsletters and leaflets, so have the pictures taken that way to begin with. Volunteers also may be available to videotape the event in case you need to put together a video about the campaign for members or the community.

• End the rally with a clear statement of what the next step is and how people can get involved.

# Group Spirit For A Song

Music can liven up many worksite activities.
- Try making up new words for familiar tunes.
- Pass out word sheets like the samples shown below.
- See if any worker or family member plays the guitar or other instrument. They may be too shy to volunteer that information, so you have to ask.

**1988 Negotiations Support Committee**

**I'VE BEEN WORKING FOR THE COUNTY**
(Tune: "I've been working on the railroad")

I've been working for the County
Now my contract's did,
I've been working for the County
And I've got news for you.

We hear that things aren't moving
Little progress made
We want things to start improving
For we're great at our trade.

County won't you move,
County won't you move,
County won't you move
some dough, some dough.

County won't you move,
County won't you move,
We're workers, eat your fee.

Someone better go tell Sally
Someone better say we need relief
Someone better go ask Sal-ly—
"Sally, where's the beef?"

Fee, Fi, Fiddley, I, O,
We don't believe there ain't
no dough
Fee, Fi, Fiddley, I, O —
Bargain fair and we won't go!

**THE 12 DAYS OF BARGAINING**

On the first day of bargaining, the County gave to me,

1st   One half a percent
2nd   Fewer holidays
3rd   No travel time
4th   One year probation
5th   No Realignments
6th   Bad grievance language
7th   Fewer differentials
8th   No more comp time
9th   Less retiree health pay
10th  No unpaid leave
11th  No reallocations
12th  Less ed reimbursement

*Often the best way to get workers to sing is to give them song sheets with new words to familiar tunes.*



3-16

# Lockouts Instead Of Strikes

In some situations, worksite activities such as working to rule and job actions can lead an employer to lock out workers who otherwise would have to go on strike.

If an employer finds that, because of union tactics, productivity is down, costs are up, yet workers are still drawing full pay, it may decide to lock out the workers and try to bring in replacements.

Possible advantages to workers of a lockout compared to a strike include . . .

● It's easier to get unemployment benefits and food stamps.

● Media coverage and public opinion are likely to be more favorable.

● You don't have to be as concerned about those workers who might not support a strike, since it is now management which is telling them not to come to work. (Of course, you will have to do a good job of organizing and one-on-one communication to keep these workers from blaming the union for forcing the lockout.)

To win a lockout, you need the same



*Blame for a lockout should be placed squarely on management.*

ingredients as to win a strike: enough pressure through picketing and community support to keep the employer from operating normally with replacement workers, plus other, broader tactics to put economic pressure on management.

# Outside Pressure

Pressure at the worksite is often not enough to win a good contract. In many campaigns, workers must find other employer weaknesses and union strengths.

● An employer may depend on lenders, investors, customers, clients, tenants, patients, or government agencies to provide funds. The most effective outside pressure tactics are often those which could put that flow of funds in jeopardy.

● Individual owners and management officials typically value their time, reputations, and privacy. Tactics which distract them from their primary duties and draw public attention to their activities may help pressure them to reach a fair settlement.

Outside pressure tactics obviously depend on the type of employer you are dealing with. The following are some examples to stimulate your thinking.

## Lenders/Investors

A private company generally depends on money it raises from banks, insurance companies, stockholders, or other wealthy investors to pay off old debts, buy new equipment, expand its advertising and marketing efforts, acquire other businesses, or other purposes.

If those lenders/investors decide that because of your dispute it is not worth their while to help finance the employer, the employer may have increased incentive to settle.

Sometimes this can be done by showing the financial backers that your dispute with the employer is leading to a strike or other action which will be bad for business and therefore bad for investors. However, investors often will support a management strategy to defeat the union now in order to make higher profits later.

Therefore, you may have to investigate lenders or investors to see if you might have disputes over their practices. For example, a bank which helps finance the employer might find that you have decided to investigate the loan department's practice of discriminating against women or minority communities.

## Outside pressure means that, instead of this . . .



. . . you try to create this . . .

## Customers/clients

You may be able to threaten the relationship between a company or agency and the customers, clients, tenants, or patients it depends on for income.

In some cases, you may be able to persuade customers not to do business with the employer because the employer is not being fair to workers. Often, however, not enough customers will care about workplace injustice. Therefore, it is often necessary to show how *they* are affected by, employer practices—how prices or taxes are higher, products or services are of lower quality, or public health or safety are threatened.

## Suppliers

The employer may depend on certain suppliers who in turn expect the

> **Workers Spotlight Bank Connection**
>
> When the A.W. Schlesinger nursing home in Beaumont, Tex., demanded concessions from members of SEIU Local 706, the union focused attention on First City National Bank of Beaumont, which provided the nursing home with some of its financing. The business ties between the two institutions were so tight that three of the same people sat on the boards of directors of both.
>
> Workers leafleted bank customers and demonstrated at its branch offices, urging depositors to tell the bank that they did not approve of mistreatment of low-paid nursing home workers.

*Appeals to customers should show how they are also affected by management policies.*



BE CAREFUL ABOUT WHERE YOU SLEEP IN NEW ORLEANS.

## Union Members Show Customers Their Common Interests

Answering service workers in Boston who were forced to go on strike kept calling the switchboard to demand a fair settlement. With the phone lines jammed, customers became aware of the dispute. and of the inconvenience caused by not having the regular operators on the job.

employer to maintain a steady flow of orders. The supplier might put pressure on the employer to settle with the union if a long dispute would cost the supplier money or force it to look to other customers to buy its supplies.

In addition, the supplier might indicate that the union will now begin investigating the way it does business.

## Merger or acquisition partners

The employer may be trying to acquire, be acquired by, or merge with other companies. The union might get involved in that process by . . .

● Bringing information to the attention of any regulatory agencies which have to approve the merger or acquisition.

● Providing information to the merger partner about labor-management disputes, management practices, or problems the employer faces.

● Negotiating with the employer over improvements and guarantees workers will require before making agreements that would insure that the merger or acquisition could go forward.

For example, the employer would need union agreement to make changes in pension and benefit plans in order to match the plans with those provided by a merger partner.



*You often must target the real source of money behind the employer—in this case, the insurance company/landlord which hired the contractors who employed the janitors.*

# Legal/Regulatory Pressure

Employers are required to obey a variety of laws and government regulations.

Many employers also need permits, licenses, low-interest public financing, or other government action in order to operate.

By investigating violations of employers' legal obligations, you may find useful evidence to support your bargaining demands.

Moreover, even if the violations are completely unrelated to bargaining issues, your investigations may give management added incentive to improve its relationship with you. Management officials may find that, because union members have started looking for employer abuses, the employer now is facing . . .

● Extra expense to meet regulatory requirements or qualify for necessary permits or licenses.

● Costly delays in operations while those requirements are met.

● Fines or other penalties for violating legal obligations.

● Damage to the employer's public image, which could jeopardize political or community support, which in turn could mean less business or public funding.

Some violations are easy to prove and get action on because they involve practices union members know about. In other cases, legal and regulatory strategies take a long time and involve considerable expense for specialized attorneys and other experts.

Violations fall into two basic categories: those which involve failure to treat workers as required by law and those which involve failure to meet obligations to customers, clients, patients, stockholders, or general public health and safety.

Violations of federal, state, and local laws protecting workers usually can be investigated using readily available union expertise. SEIU staff usually can help find someone in the area or from the International union to help investigate possible violations involving . . .

● Safety and health hazards on the job.

● Discrimination on the basis of race, gender, age, ethnic origin, or sexual preference.

● Failure to pay overtime or minimum wage as required by federal, state, or local fair labor standards laws.

● Subcontracting of public employees' work in violation of state or local charters, codes, or constitutions.

Violations affecting the broader community might involve . . .

● Failure to provide enough staffing or cutting corners in other ways that threaten public safety.

● Evasion of taxes on property or income.

● Failure to live up to commitments made when obtaining low-interest public financing such as industrial revenue bonds.

● Failure of hospitals to meet obligations under federal Hill-Burton legislation to provide care to patients who cannot afford it.

- Failure of nursing homes to meet patient care standards or to make changes in their facilities to accommodate handicapped patients as required under federal anti-discrimination regulations.

- Environmental hazards such as toxic waste dumping or exposed asbestos in office buildings.

- Failure to disclose information to the public as required by laws or regulations.

## Investigating legal/regulatory problems

- Find out which federal, state, or local agencies enforce standards the employer must meet. The SEIU Research Department can help.

- Make a request for copies of that agency's files for any cases involving this employer. (Even if the agency can legally withhold some of the reports in the file, the documents you do obtain will give valuable clues on what cases to investigate further.)

- Ask for copies of the regulations which would apply to this employer.

- If workers at the regulatory agency are unionized, meet with their union leadership and ask for help understanding the requirements the employer must obey.

- Look for citizens' groups which have sued the employer, claiming violations of legal obligations to consumers, clients, or the general public.

One way to find such groups is to look at the records of any hearings held by government agencies which enforce laws the employer must obey. Some of the groups which testified may be ones you should be getting to know better.

Meet with them to find out what their concerns are. If their goals match yours, maybe you can help them by publicizing, endorsing, and perhaps even financially supporting some of their activities, and they can help you by sharing their research and speaking out publicly to show that more community people than just union members are concerned.

## Organizing on legal/regulatory issues

Bringing pressure by raising regulatory or legal issues, like other possible pressure tactics, requires organizing. Without citizen pressure, enforcement agencies often are friendlier to the employers they are supposed to regulate than to workers and the community. Even if some officials are willing to take action against an employer, without outside pressure the process may take too long to be of value. Therefore, even if you have documented violations by the employer, you generally can't simply present the evidence to the enforcement agency and wait for results.

Possible tactics to use instead of or in addition to filing charges in court or with regulatory agencies include the following . . .

- **Approach the employer.** Your approach might be something like this: "We have documented X, Y, and Z violations. Normally we would be willing to work directly with you to get

these corrected, without having to involve outside agencies, the community, or the news media. But right now our members are so concerned that you are not going to agree to a fair contract settlement that they may not be in a mood to do it that way. We wanted to bring this to your attention, and give you a chance to respond."

Caution: If this kind of approach helps the employer decide to settle your contract dispute, be sure that you offer only to give the employer a chance to eliminate legal and regulatory violations without charges having to be filed or without publicity—as opposed to offering to ignore the violations entirely. For the union to know about violations and not insist that they be corrected is not only a violation of our moral obligations to members and the community, but may in some cases make the union liable to legal charges itself. For example, a union that fails to demand employer action on discrimination or health and safety hazards that the union knows about may be sued for failing to meet its "duty of fair representation."

● Give information to the news media. If approaching the employer is not successful, well-documented information about employer violations may be of interest to reporters.

In some situations, you will want to make clear to the reporter that you want the union to get credit for having provided the information. In other cases, you may want to give a reporter the information with the condition that the source will not be disclosed   as long as

you are sure the employer will realize where the story came from.

● File grievances. Employer violations of the law can often be grieved as violations of the contract. Sometimes processing a grievance may be faster and more likely to result in a fair decision than pursuing charges through a regulatory agency or the courts.

## Public, Private Employers Targeted For Legal/Regulatory Pressure

In Pittsburgh, SEIU Local 29 and the International union hit Mellon Bank with a series of legal charges when the financial giant helped set up a new non-union cleaning company at two of its largest office buildings.

The new contractor hired many of the same janitors but slashed their pay, hours, and benefits.

While union members organized community pressure on the bank and the union sponsored a media campaign, union lawyers charged Mellon with violating laws on antitrust, age discrimination, and worker rights under the NLRB.

When it became clear that union tactics would succeed, Mellon agreed to a new contract and $850,000 back pay.

In California, SEIU Local 715 wanted to negotiate pay equity increases for city workers in Palo Alto. Discrimination charges filed by the union with the Equal Employment Opportunity Commission (EEOC), coupled with a campaign for community support, helped persuade the city that it would be better to resolve the issue at the bargaining table.

In the nationwide Beverly Enterprises campaign, SEIU and the United Food and Commercial Workers discovered that a key part of the company's business plan for growth was to buy existing nursing homes—which required approval by state regulatory agencies. The unions presented evidence to those agencies in Michigan and Georgia, successfully urging that company plans be rejected.

In Massachusetts and Ohio, the union was able to defeat company proposals for public Industrial Development Revenue Bond financing.

- **Apply worksite pressure.** Many of the tactics discussed earlier, such as petitions or work-to-rule campaigns, can focus on employer violations as the issue.

- **Apply political pressure.** Employer violations of laws or regulations may provide politicians—even those who do not want to openly enter the debate over your contract dispute—with a good issue on which to hold hearings, make speeches, or send angry letters to management.

- **Ask for community support.** Community organizations also may be able to help take the lead in challenging employer violations—particularly in cases where you can show that the violations affect other community residents and not just your members.

# Political/Legislative Pressure

Political pressure may be used in two ways.

First, you may be able to draw politicians into the public debate on negotiating issues.

Second, you can show management officials that, if they don't bargain fairly, union members will be more inclined to push for legislative action on other issues that would affect management. For example, management may find that angry union members and their allies are preparing to mobilize for changes in the way employers are taxed, awarded public funds, or required to provide service.

In a public sector campaign, the most useful politicians to involve obviously are those who oversee the negotiators you are dealing with. In a private sector campaign, key politicians would be those who play an important role in

---

## Politicians Feel The Heat, Help Union

**In Anaheim, Calif.,** members of SEIU Local 786 were faced with a job classification study which recommended freezing wages for about 600 city workers.

The five-member city council was deadlocked on the issue, with two members on each side and one seat vacant.

Locals of SEIU and other unions in the area joined together to help elect an anti-freeze candidate to the open position. At its first meeting after the election, the council voted not to freeze wages and fired the anti-union city manager who had promoted the plan.

**In Washington, D.C.,** SEIU's Justice for Janitors campaign issued a study showing that major office building owners were using a city appeal system to gain huge cutbacks in their property taxes.

The report, which was featured on the front page of the *Washington Post*, showed that reduced corporate taxes threatened city services and shifted the tax burden to other D.C. residents.



As a result, politicians in the city began to feel increased pressure to support the janitors' campaign, more churches and community groups became the union's political allies, and building owners became more aware of the political price they would pay if janitors' demands for justice were not met.

When the tax bills were sent out for the following year, the number of special deals for office building owners was substantially reduced.

## Let Them Know Why You Deserve
### *EVERY OTHER WEEKEND OFF*

**The County Says**

"No, you can't have every other weekend off because it will cost us more money for features to cover weekend shifts."



**The Rest**

"While it will cost a little more for weekend features, there are very good reasons why they should find the money."

### Let The County Know Why You're Worth It

### Send a Letter to the Board of Supervisors

We want every LVN, RN, Nursing Assistant, Respiratory Therapist and Housekeeping Worker to write a letter to the Board of Supervisors, to let them know why you need and deserve to have every other weekend off. They need to know that someone supports this idea.

**In your letter you should mention things like:**

- It's only fair! Highland workers already get it. Why not Fairmont?

- How your present work schedule keeps you from spending time at home with your family. Mention specific child care problems that could be eased with an every other weekend off schedule.

- Private hospitals have it. Some people won't take a job at Fairmont because of the schedule – which worsens the County's ability to recruit nurses during a nursing shortage.

- Mention anyone you know who left Fairmont because of the bad schedule.

*See other side for supervisors' addresses and sample letter →*

SEIU Local 250
3422 Mariner Square Loop #100
Alameda, CA 94501



SEIU Local 616
100 17th Street, #100
Oakland, CA 94612

---

*Even sympathetic politicians need to know that members are organized to use pressure to support their demands.*

writing or enforcing laws and regulations that apply to that employer or in providing public subsidies, grants, tax credits, or other funding.

Mobilizing political pressure generally requires organizing union members and allies to take action. Even politicians who are sympathetic usually need to be pressured into introducing legislation, holding hearings, speaking at rallies, or making public appeals for a fair

settlement. Some pressure tactics may include . . .

- **Mass lobbying.** Large numbers of members, their families, and other allies can crowd into the buildings where politicians have their offices to make their views known. The visit should be orderly, but if there are more people than can fit into the politician's office, so much the better.

A few rank-and-file spokespeople—not just top union officials or staff—should be chosen ahead of time to express the group's feelings. Through applause after they speak and by carrying signs, others can show they support those who have spoken for them.

The politician may be presented something as a symbol of workers' concerns—a tool of the workers' trade, a copy of a report backing up the union proposals, or a humorous gimmick that makes fun of management's position.

- **Demonstrations/rallies** held near the job site, with politicians invited to speak, or near where the politicians have offices. (For tips on organizing rallies, see page 3-14.)

- **Petition campaigns** aimed at politicians or aimed at the employer with copies presented to politicians to show workers' concern.

- **Active use of the news media** as described elsewhere in this part of the manual.

- **Incorporating the political/legislative issue** into the ongoing community outreach program.

# Pressure On Individual Officials

One way to encourage management decisionmakers to be more reasonable is to make life more difficult for them as individuals.

This kind of strategy is most effective if you can identify the key individuals with the power to bring about a settlement. These might include top executives, negotiators, labor relations directors, stockholders, or members of the board of directors.

Pressure on these individuals can take several forms.

## Disruption

Key management officials may find that they or their staffs are unable to do their normal work because they must spend so much time responding to the union campaign.

Tactics such as mass visits or sit-ins in management offices or large numbers of phone calls protesting management practices can help make top officials long for labor peace.

## Publicity in the community

Many top management officials care about their image as individuals in the community and among business associates. They may not want publicity about their involvement in controversial policies or activities.

If they have built a good reputation through involvement in community service or religious organizations, for example, both they and those groups may find it potentially embarrassing to be linked to racism, sexism, exploitation of immigrants, or proposals that would take money out of the community for the benefit of distant stockholders.

Leafleting outside meetings where they are speaking, their homes, or events sponsored by community organizations they are tied to are some ways to make sure their friends, neighbors, and associates are aware of the controversy.

## Investigations of individual managers

It may be a violation of the mail and extortion laws to threaten management officials with release of "dirt" about them if they don't settle a contract. But there is no law against union members who are angry at their employer deciding to uncover and publicize factual information about individual managers.

Managers usually argue in negotiations that employees must work harder, be more responsible, and help cut costs, and that there is no need for new worker rights to protect against management abuses.

With those claims in the background, it can be interesting to investigate individuals on management's side in such areas as . . .

● **Abuse of employer funds.** If they know you are looking for it, your own members and other sympathetic employees may be able to provide this information.

● **Involvement in lawsuits,** as shown in records on civil, divorce, and criminal cases kept at local courthouses.

● **Membership in clubs that discriminate against women or minorities.**

Local newspapers or social directories available at public libraries may provide leads.

• Ties to other businesses which have been involved in controversies, as shown in public records on property ownership, partnerships, and incorporators of businesses.

• Controversial activities in past jobs. The employer might provide an interested reporter or student with resumes for particular officials. Do officials' claims about their backgrounds hold up to investigation? Why did they leave previous jobs?

• Links with politicians. Federal, state, and local election agencies usually have information on campaign contributions. Are certain management officials involved with unpopular politicians? Have management officials given money to politicians and received favors in the form of grants, tax breaks, or contracts?

# Workers' Role In Researching An Employer's Pressure Points

The advantages of involving workers in research which were discussed in Part 1 of the manual are particularly true of research on employer pressure points.

An important research technique is to interview workers and family members about employer practices and individual management officials. Often, workers know more useful information than they realize. An experienced SEIU leader, assisted by members who are being trained to do research, should ask workers questions like the following:

- Has anything happened at the worksite that management would not want customers, government agencies, or upper management to know?

- What outside businesses or other activities are management personnel involved in?

- What tensions are there between particular managers?

- What local controversies have the employer or particular managers been involved in?

- Have there been disputes between the employer and customers or suppliers?

- Has the employer been visited by inspectors from government agencies or insurance companies?

Workers being interviewed on subjects like these should be encouraged to report any leads they may have, even if what they have heard is only rumor. Clearly, no information should be circulated by the union unless it has been investigated and proven. But often that investigation will show that there is at least a grain of truth in many rumors.

In addition to helping to interview other workers and family members, volunteer researchers can help staff by talking to . . .

- Disgruntled supervisors or workers who are not represented by SEIU— while being careful not to say anything that shouldn't get back to management.

- Friendly attorneys in the community who may know about an employer's legal problems or have inside information about management plans or personnel.

- Friendly public officials, such as tax assessors, health and safety inspectors, or members of the city or county legislative body.

- Friendly journalists who may have investigated the employer in the past and who may know more than has been published or broadcast.

## Using Research By Students

College students who come from union families or are interested in getting experience as interns with the union may be able to help research an employer's plans. Often, employers will talk more openly with a young person who appears to be easy to impress and not involved with the union.

Of course, some employers have discovered this research method as well, so carefully check out anyone who approaches the union offering to help.

# Strikes

A strike, like any other pressure tactic, should be used only when you have done the necessary planning and analysis to insure that it has a good chance of working.

In many situations, you have a number of obstacles to overcome in planning a successful strike.

- The employer may be a large private company with many other operations to provide financial resources needed to withstand a strike.

- High unemployment in the area may make finding strikebreakers easier.

- New technology in the workplace may make it easier for management personnel to keep operations running.

- Courts probably will be quick to issue injunctions against mass picketing and most strikes by public employees.

- Public opinion often can be turned against "greedy" union workers who are disrupting service to customers or the general public.

These obstacles don't necessarily mean that "unions can't win strikes anymore," however. Many SEIU locals have won strikes in recent years—in some cases by using innovative ways of striking—and others have won good contract settlements in part by threatening effective strike action.

In addition to the general principles about pressure tactics discussed at the beginning of this part of the manual, the following may be helpful in planning a strike.

*SEIU locals have won strikes in recent years through good organization and innovative tactics.*



# Strike Planning

**1. Make sure workers understand that** *they* **made the decision to strike.** Using the two-way communications tools discussed in Part 2 of the manual, make sure that workers understand that they determined the bargaining goals, have chosen and tried less drastic pressure tactics, and now are in control of the strike decision.

Locals often take a strike authorization vote before a strike becomes necessary. The vote involves the membership at an early stage in considering the strike alternative and sends a message to management about the consequences of not reaching a settlement. While the union leadership could call a strike later based on the authorization vote, many locals go back to the members for a specific strike vote to demonstrate further that the members are the ones choosing to take action.

Depending on the unit, you may take a strike vote at a meeting, where it is easier to build unity and to answer questions. But there also are advantages to conducting the strike vote at convenient polling times and places near the work-site or even by mail. Management will try to describe the strike as being called by "the union," local officers, "a small group of hotheads," or the International union. Going the extra mile to make sure everyone feels they had the chance to vote may help insure that this charge doesn't ring true.

Steps to get a higher turnout also will give you a better picture of your true level of support.

Another way to emphasize workers' role in the strike decision is to avoid statements to members or the public

that say that "such-and-such SEIU official has announced that a strike will begin at midnight on Monday." Instead, say that "a strike called by the members of SEIU Local X will begin at midnight Monday."

**2. Build up to a strike through gradual escalation,** as discussed earlier in this part of the manual.

It's easy for the most active union leaders to have an inaccurate picture of the willingness of other union members to take action—to mistakenly say either that the membership is ready to strike or that the membership isn't ready for anything.

Instead of using a strike to test membership determination, see how ready members are to take action by trying less risky tactics first.

Escalating tactics building up to a strike also put added pressure on management to settle. For example, workers



*If workers have been personally involved in less drastic pressure tactics and have seen management fail to negotiate seriously, they are more likely to be ready to take the next step.*

in one local posted a strike countdown calendar on the union bulletin board, marking off each day as contract expiration approached, and held weekly strike benefit fundraisers. These activities made the strike threat increasingly real to supervisors and higher management officials.

**3. Consider a variety of tactics to keep the employer off balance (but be sure to consult with union attorneys first).** For example, SEIU members have had success in some situations with "rolling strikes" in which workers at different locations of the same employer went on strike at different times. Operations are disrupted yet the employer cannot plan for replacements and workers lose little income.

A rolling strike also allows you to strike first at locations where your support is strongest and build momentum for action at other places.

In "selective strikes," certain operations of an employer are targeted because strike action there would cause the most disruption. Other workers continue to work and to provide financial support to the selective strikers.

Where members have been enjoined by a court from mass picketing, family members or community supporters to whom the injunction did not apply sometimes have conducted picketing of their own.

Some workers also choose to engage in civil disobedience, such as occupying their workplace or the offices of management officials until a fair settlement is reached.

*Innovative tactics require advance*

consultation with legal counsel so that everyone understands the possible consequences and the degree of support the union can and cannot provide.

**4. Give proper notice as required by the National Labor Relations Act and your contract.** If the employer is a healthcare institution, meet the legal requirement to give 10 days' advance notice of a strike or picketing. *(See Part 4 of the manual for details on notice requirements.)*

**5. Plan in advance what else you need to do besides striking.** It can be disastrous to launch a strike, decide after a few weeks that it isn't going to bring management to its knees, and then start looking for other ways to pressure the employer.

A strike should be viewed as only one of a combination of tactics. Planning should be done from the start on the other tactics discussed in this part of the manual, including other kinds of economic pressure, community outreach, legal and regulatory pressure, and political and legislative strategies.

**6. Choose your timing carefully.** If you must strike, the timing should be dictated not by management but by what is best for union members.

Pick a time when there will be the least strain on workers (not during December's holiday season, for example) and when the employer will be most vulnerable. For instance, you might want to strike . . .

• Building services companies when they are about to renew their contracts with building owners.

- Healthcare facilities when they are about to be inspected for certification or in the early fall when patients seek medical care they postponed during the summer.

- Educational institutions at the beginning of terms when they are enrolling students.

- Retail sales companies during the holiday shopping season.

- Public employers when key politicians are up for re-election.

Timing for future strikes should be considered when settling on the expiration date of a new contract. If the expiration date you have now is not favorable, consider extending the agreement or working without a contract until a better time to strike.

7. Encourage workers to plan how to make themselves as hard to replace as possible. For example, if workers have created their own procedures or devices for getting the job done, there is no reason why they have to leave them behind. In institutions and offices where records are kept on computer, supervisors and other replacement personnel may find it difficult if files and codes are understood only by the regular work force.

8. Prepare workers for employer tactics during a strike. Tell them in advance that . . .

- The employer will probably try to test workers to see how long they are willing to strike. If management feels that workers are expecting to strike only for a few days, it will wait that long and watch for signs of low morale.

Therefore, union leaders and members should not launch a strike unless they are prepared to stick with it for a long period. In many cases, management will not reach a settlement until it is convinced that union members will not cave in anytime soon.

- The employer will probably try to provoke picket line incidents in order to obtain an injunction against violence or "mass picketing" by large numbers of strikers. Strikers should strongly discourage strikebreakers from crossing, but should not allow themselves to be goaded into actions—such as destruction of property or threats of violence—that will make it easier for the employer to get an injunction.

Workers should assume that employers will be able to obtain an injunction, and plan a response ahead of time. What will be the cost to the strike of obeying the injunction and making it easier for the employer to continue operations? What will be the cost of disobeying the injunction and facing very large fines and even jail terms?

- They may lose not only pay but benefits such as health coverage, vacation, and sick leave. (You should research this to find out what the employer can legally cut off. Look at the actual contract and benefit plan language.)

- The employer may try to replace strikers. If the strike is legally determined to be an "economic strike" over contract demands rather than an "unfair labor practice strike" over the employer's refusal to bargain in good faith, the employer could make any replacements permanent. This would mean that strik-

ers would not have to be rehired until vacancies became available.

● The employer may attempt to directly communicate with workers through letters or contacts by supervisors. These communications may include a distorted explanation of the bargaining positions of management and the union and may include threats and promises to workers.

● Since union members who cross authorized picket lines are in violation

## The Law On Replacing Strikers

Whenever possible, strikes should be called to protest unfair labor practices (ULPs) rather than to support demands for higher pay and benefits. Under the National Labor Relations Act:

● Workers who strike over unfair labor practices which the union can prove to the NLRB—such as refusal to bargain in good faith—have a right to get their jobs back from replacements when the strike ends. The employer must lay off or fire replacements if necessary to make room for returning strikers.

● Workers who strike for a better contract (economic strikers) must be reinstated if their jobs were not taken by permanent replacements—for example, if the company hired a strikebreaking firm to supply temporary labor.

An employer does not have to make room for economic strikers by firing permanent replacements, but when openings become available, the company must hire the strikers unless they have found comparable jobs elsewhere or there is some strong business reason why they can't be hired.

The employer does not have to rehire any strikers who take part in illegal activity or strike misconduct, such as intimidation and coercion of workers attempting to cross a picket line. The NLRB has even allowed employers to refuse to rehire strikers who made serious verbal threats to other workers.

Because workers conducting an unfair labor practice strike have more rights than economic strikers, the union must be very clear at every step about the reason a strike is being called.

● Officials speaking at union meetings where a possible strike is discussed must make clear that ULPs are the strike cause.

● The strike resolution adopted by union members should say that, "Whereas (employer) has engaged in unfair labor practices, the members of SEIU Local _____ hereby call a strike, to continue until such time as management stops engaging in unfair labor practices and negotiates in good faith with our union . . . "

● Picket signs should say, "(Employer) Unfair To Organized Labor."

● All printed materials, such as newsletters, leaflets, and posters, should identify ULPs as the reason for the strike.

A strike can start out as an economic strike and then be converted to an unfair labor practice strike if the NLRB upholds ULP charges against management. But workers should never base campaign strategy on the assumption that ULP charges will be upheld, since the NLRB often rejects charges that seem crystal clear to the union. The fact that union members call their strike an unfair labor practice strike does not make it one in the eyes of the law; only the NLRB can do that.

*(More information on how to identify and document employer unfair labor practices is contained in Part 4 of the manual.)*

of their duties as members, the employer will encourage workers to resign from the union in order to avoid possible fines by the union.

Sometimes union leaders feel that they shouldn't prepare workers for employer tactics because such talk might scare people. But SEIU locals have found that workers are less likely to panic when the employer's counterattack begins if they know what to expect.

9. Have a plan for what it will take at the bargaining table to settle the strike, as discussed in Part 4 of the manual.

10. Set policy in advance on union-provided legal representation for strikers. For example . . .

- Will it cover members only or members' families and supporters invited to take part in picketing or other actions?
- Will it cover unauthorized actions?
- Will the union arrange bond? To what limit, if any?

11. Encourage workers to learn what they can about the employer's specific strikebreaking plans, including . . .

- Professional firms that may be used.
- Strategy for recruiting strikebreakers.
- Plans to stockpile supplies or finished products.
- Plans to transfer struck work to other locations.
- Instructions to supervisors for operating during a strike.

This information can be gathered from workers in a position to know, management officials, members of other unions, and suppliers.

If strikebreakers may be used, check to see whether your state has any laws requiring employers to give notice before using strikebreakers, prohibiting bringing strikebreakers across state lines, or imposing any other restrictions or requirements on the use of strikebreakers.

12. Obtain official strike sanction from the International union and from the AFL-CIO central labor council. Approval by the International is required under the SEIU constitution, and sanction by the labor council means that other unions in the area must respect your picket lines as permitted by law.

Contact the SEIU Field Services Department if you don't have the appropriate form for requesting strike sanction from the International.

13. Send delegations or have members phone to let employment agencies know not to refer anyone to the employer during a strike.

14. Make plans to collect dues directly from workers. It is in workers' interest to keep the union as strong as possible during a strike. If a few members need to postpone payment until the strike is over, their request can be handled through the mutual support committee.

Note: Your dues collection plan should be ready as soon as the contract expires in case management claims you have reached impasse and imposes its final offer, including taking away dues check-off.

# Mutual Support Committee

The Mutual Support Committee (or Hardship Committee, Survival Committee, or Financial Support Committee) coordinates efforts to . . .

- **Organize workers well in advance to save money in case of a strike.**

## Sample Mutual Support Policy

### Benefits

1. No funds will be available until two weeks after last paychecks are received. (Exceptions, if any, must be approved by the Mutual Support Steering Committee.)

2. To receive any funds, must be a member and must be fulfilling all strike duties as shown by records of picketing or committee work.

3. Must have exhausted all other resources.
- Public benefits.
- Community resources.
- Bank accounts.
- Credit cards.
- Stocks or bonds.
- Other job or business.
- Friends and relatives.

4. Priorities:
- Two people from household on strike.
- Sole support of family.
- Families with most dependents and smallest paychecks.

5. Maximum benefit: $_____ per week.

### Administration

1. Only the Local Executive Board has authority to decide overall policy.

2. Only the Mutual Support Committee has the authority to decide benefits in individual cases. Decisions must be made by no fewer than _____ members of the committee.

3. The Mutual Support Committee will provide a specific accounting for all spending to the Local Executive Board at least once per week.

4. All information provided by individual members shall be kept strictly confidential by the Mutual Support Committee.

Workers should be told that strike benefits will not make up for all of their lost income and they will need financial savings of their own. Point out that if the employer knows people are saving, a strike will be less likely.

If the local does not have a defense fund, it should establish one. Establish guidelines for contributions and benefits ahead of time so there is no confusion during a strike.

- **Meet with management to figure out how strikers will receive paychecks they may be due for pre-strike work. Be prepared to take quick legal action if the employer attempts to delay those payments or to insist that workers come in for some propaganda along with the paycheck.**

- **Contact local businesses, banks, and credit unions about allowing late payments in the event of a strike. By doing this before a strike begins, you can both put pressure on management and explain to the community the issues and your efforts to resolve them without a strike.**

- **Identify needy families from the unit who will need special assistance, and find volunteers to help them. As the saying goes, a chain is only as strong as its weakest link. If some members cannot afford to stay on strike, that becomes everyone's problem.**

- **Prepare a guide for workers on how to obtain public benefits, surplus food, or support they or their families are entitled to. SEIU staff or the local AFL-CIO central labor council can help you obtain that information.**

# Headquarters Committee

This committee should prepare a central location where picket captains and other picketers can report problems, volunteers can get assignments, strikers can get answers to questions, and supplies and materials can be stored and readied for distribution.

A clear schedule should be established so that a responsible leader is always on duty and in charge.

Arrange for supplies, phone lines, and equipment so that they will be in place and ready for workers to use if a strike begins.



*The making of hand-lettered signs provides a chance to involve workers.*

# Picket Committee

This committee must carry out the following duties or make sure that other committees are set up to do so:

• Setting up a schedule for picketers. Factors to take into account include the following:

☐ Sharing the burden fairly.

☐ Taking individuals' family responsibilities into account to the extent possible.

☐ Using natural social groupings (people who know each other and work together, for example) so picket line duty will be more comfortable and pleasant. (On the other hand, picket duty can be an opportunity to make workers from one department or work area more familiar with the concerns of workers from other areas.)

☐ Mixing more experienced and less experienced union members to insure

## Sample Strike Duty Survey

In order to win our strike, every member must take part in picket duty.

This survey will help your picket committee make the best use of your skills and interests and make your picket duty assignment as convenient as possible.

Please return it to _____ by _____

Your name _____ Work location _____

Normal hours of work from _____ to _____

Home mailing address _____

Home phone number _____

Tell what times you prefer for picket duty:

1st choice (Check one)   ☐ Days   ☐ Evenings   ☐ Nights

2nd choice (Check one)   ☐ Days   ☐ Evenings   ☐ Nights

Can you help with the following?

☐ Driving (delivering food, supplies, and newsletters)

☐ Supplying a truck or van for that purpose

☐ Doing office work

Child care   ☐ in your home   ☐ in another location

Other ways you would like to help _____

Other members of my family can help on: (days and hours) _____

_____

that individuals who can provide leadership are always present.

• **Choosing picket captains** to be in charge of each picket line at all times. Picket captains should be respected, experienced union leaders. Choosing them provides a good opportunity to show each subgroup in the unit that their participation is valued.

Picket captains must be given total authority to remove picketers who engage in improper conduct. At the same time, worker complaints about picket captains should be investigated and resolved quickly before morale is affected.

Picketers should be told to pick a captain if for some reason their designated captain is not there.

Picket captains should report to strike headquarters by phone or in person after every picketing shift. *(See checklist.)*

• **Training workers who will be picketing.** A brief training session should cover the schedule, guidelines for conduct on the line, and the need to refer reporters or any other visitors to workers designated for that purpose.

Special training should be held for picket captains to stress their responsibility to maintain order and report on incidents, attendance, and suggestions or questions from workers.

• **Making sure that supplies** such as signs and food are at the right location at the right time.

• **Identifying nearby restrooms** and pay phones so picketers don't have to enter struck buildings for either pur-



pose. In some cases, a rented portable toilet facility may be necessary.

• **Organizing cooperative child care** and transportation as needed.

• **Planning for picket line activities.** For example, a basic list of chants should be prepared which will be fun to say and will express workers' feelings about strike issues.

*If workers think about picket line chants ahead of time, they are more likely to develop some that will be fun to say.*

**Chant Sheet**

We work hard and that's O.K.
But in exchange we want FAIR PAY

Hey...hey...Ho-ho
Fill anything's got to grow

They say CUT-BACK... We say FIGHT BACK

2 ... 4 ... 6 ... 8
Make the County NEGOTIATE

We're gonna BEAT...BACK...the County attack
We're gonna BEAT BACK the County attack

PATIENT CARE that's our goal
For less than that we won't be sold

# Checklist for Daily Phone Reports By Picket Captains To Strike Headquarters

☐ How many pickets appeared?

☐ Did any workers or replacements cross the line? If so, how many? Who?

☐ Did news reporters, management officials, or unidentified outsiders visit or observe the picketing?

☐ What questions should be answered or topics covered in strike bulletins?

☐ What factors are strengthening or weakening worker morale? If morale is low, what should be done?

☐ Which workers, if any, need special attention from the Hardship/Mutual Support Committee because of financial problems or family difficulties?

☐ Are any supplies needed?

Someone should be prepared to teach picketers simple labor songs that fit the situation. Often, the best way to come up with songs is to take popular songs everyone will know and write new lyrics. Try to identify a worker, family member, or union supporter who could come to the picket line with a guitar.

● Keeping accurate records on who fulfills their picket duty. Locals normally make picket duty a requirement for receiving strike benefits, and that rule cannot be enforced without accurate records.

In addition, failure to show up for duty as reflected in the records may signal either a lack of support for the strike or personal problems (such as lack of child care or transportation) that should be dealt with.

● Establishing communication with law enforcement officials. Attempting to get to know them probably won't help if the employer demands action against picketers, but it might at least mean that you get some advance warning of police plans.

● Making sure the picket line always includes a camera and someone trained to use it in case you need independent evidence of incidents or employer tactics.

If you want to publish photos of workers taken at the picket line, be sure to obtain their permission.

(Management also has the right to photograph or videotape picket line incidents, but it is an unfair labor practice for management to take pictures of legal, peaceful picketing.)

## Picketing separate entrances or "gates"

If the employer sets up a separate entrance for workers, suppliers, or customers of a neutral employer (for example, a construction subcontractor at a hospital), the NLRB says you cannot picket those other "gates."

The only way to get around this requirement legally is if the other gates are "tainted" because you catch your employer using them for its workers, suppliers, customers or other people the gates were not intended for. Photographs are the best evidence.

## Sample Format For Weekly Picketing Reports

Location _____

Covering Monday_____ through Sunday _____

Shift from _____ to _____

Picket captain _____

How many people working? _____

Who are they?

| Name | Date | Time Started | Time Finished |
|------|------|--------------|---------------|
| | | | |
| | | | |

Problems at picket line? _____
_____

Suggestions? _____

Supplies needed? _____

Picketers:

| Name | Home phone | Mon | Tues | Wed | Thurs | Fri | Sat | Sun |
|------|-----------|-----|------|-----|-------|-----|-----|-----|
| | | | | | | | | |
| | | | | | | | | |

(Use additional sheets if necessary)

Please turn in to strike headquarters by Friday at 6 p.m. Thanks!

## Sample Rules For Picketing

Picketing is an important activity. By picketing, we protect our jobs, build our own unity, and send a message to management and the community.

Misconduct on the picket line by a few individuals could cause us to be hit with court injunctions and could damage our image in the community.

Please observe the following rules. The picket captain has the authority to enforce these rules, and to remove anyone who does not follow them.

• Report to the picket captain when you arrive and when you leave. Records will be kept of all picket duty performed.

• Be on time. If each group of pickets arrives on time, then everyone will be able to leave on time as well.

• Don't leave your post until the next group is there to relieve you.

• You may be asked to change location or shift depending on our needs. Please cooperate. These requests are made to keep our lines as strong as possible.

• Talk to people who cross the line and try to convince them to support the strike. Think about what would convince you if you were in their shoes.

• Refer any strangers, media people, employer representatives or police to the picket captain, even if they appear friendly. Statements made by uninformed pickets may be used against the union in court or in the news media.

• Report any unusual incidents to the picket captain, who in turn makes reports to strike headquarters.

• If rumors threaten to disrupt the picket line, ask the picket captain to check them out with strike headquarters.

• Wear comfortable clothing and shoes, and be prepared for the weather.

• Rotate rest periods so the line is always strong.

• Do not enter the struck facility for any reason.

• There will be no drugs, no alcohol, no weapons, and no violence on the picket line.

• Don't litter or lounge in front of the building. Plastic trash bags will be available. We want members of the community to respect us for what we stand for and the way we conduct ourselves.

• In an emergency, call the following number_____



## The Law Against Targeting A 'Secondary' Employer

According to the U.S. Supreme Court, a union with a dispute with one, "primary" employer can boycott or leaflet customers of another, "secondary" company. However, the union cannot conduct coercive picketing designed to physically discourage customers. This may be interpreted to mean no marching, chanting, or carrying of signs.

A union can engage in normal picketing or boycott activity . . .

• If the secondary employer is handling "struck work" that wouldn't have been farmed out if it weren't for the strike against the primary employer.

• If the two employers are so closely allied that they have common ownership and control over operations and labor relations policy.

Consult experienced organizers and attorneys when facing decisions about potential secondary picketing or boycott activities. These decisions can be very complicated, depending on the particular facts of the relationship between the employer and the other company.



# Keeping A Strike Strong

• **Maintain a system for contacting each striker by phone or in person** as if you were in an organizing drive. Home visits or a phone tree often are the only reliable way to prevent the spread of rumors and to discover problems or doubts individual members may have.

Weekends are the most important time to renew contact with each worker, since most people who decide to cross the line do so on Mondays.

*Targeted home visits and phone calls can be as important in a strike as in any organizing situation.*




• **Publish daily strike bulletins.** Daily one-page bulletins help you control rumors, answer questions, and keep workers from losing sight of the larger effort the picketing fits into.

Bulletins may include cartoons or jokes about management, examples of ways that members are helping to keep the strike strong, and information about progress in negotiations, bargaining issues, support received from other organizations, and the need for volunteers for particular tasks. The color of the paper should be changed each day.

• **Arrange frequent picket line visits by union leaders.** Even if there is no progress to report, negotiating committee members, officers, and contract campaign committee leaders must take turns visiting the picket lines to boost workers' morale, answer questions, and stay in touch with what workers are thinking.

If leaders don't join the picketing, workers feeling the stress of being on strike may take out their frustrations on their leadership: "Wonder what they're doing anyway? You don't see *them* walking around out here in the rain . . ."

• **Publicize a phone number workers can call for the latest information** so they don't have to rely on rumors.

• **Use the strike as an opportunity to provide union education** for members and their families. For example, a strike may be an occasion when they have the time and interest to learn how to produce leaflets or to speak to community groups, attend workshops on



*Frequent strike bulletins help build momentum and respond to management tactics.*

pay equity or health and safety, or take part in extra stewards' training.

• **Use entertainment to educate and keep up spirits.** You could show labor-related films and videos or arrange concerts by local musicians. Invite members of other unions and the general public as a way to build community support and raise money.

Sundays are a good time to hold such events in order to build momentum for the following week and keep workers from deciding to cross the line.

• **Don't automatically assume you can't reach the replacement workers,** especially if they are not professional strikebreakers. Sometimes replacements are not aware of the issues involved, and a peaceful, reasonable conversation at their home or near the job site may affect their views.

If not, stronger tactics such as picketing their homes may discourage them from strikebreaking.

*Other activities which relate to strike activity—such as use of the news media and ways to generate community support—are described later in this part of this manual.*

# Ending A Strike

Just as *escalation* is needed to build workers up to the point where they will strike or take part in other strong contract campaign actions, *de-escalation* is needed to prepare workers psychologically for a settlement.

• Having been pushed by management into drastic action involving loss of income and a spirit of confrontation, some workers will be too angry to welcome a compromise with management—and could turn on union leaders for "selling out" no matter what the tentative agreement provides.

• If the union has used a rolling strike or selective strike, different groups of workers may be in different frames of mind. Those who have been on strike may have a more negative attitude toward a settlement because they are afraid the agreement will not be worthy of the sacrifice they have made, or they may be more eager than other workers to get the strike over. Those who have not been on strike may be eager to get their turn before a settlement is reached,

or because they didn't strike they may have less emotional commitment to continuing the struggle.

Ways to handle a settlement are discussed in Part 4 of this manual. Key points to emphasize about settling in an emotionally charged strike situation include . . .

• **Prepare workers for a settlement and start getting everyone on the same wavelength.** Some locals start sending the membership signals as soon as they realize an agreement is likely. They report every sign of movement and give workers time to get used to the idea that the strike may be over.

• **Don't formally reach agreement until you have had a chance to let your key worksite leaders know that a settlement may be near.** Often, workers who might otherwise have been pleased with the terms of a settlement become angered because they first hear that there is a settlement from the news media or from management officials.

# How To Work
# With Lawyers

Most of the pressure tactics described in this part of the manual should be discussed with legal counsel during the planning stages. Employers may claim that union members are violating laws on secondary boycott, libel, slander, or extortion.

Lawyers may be able to advise you on . . .

• The risk to members of arrest, fines, or disciplinary action.

• The risk to members' dues money due to potential lawsuits or fines against the union.

• Ways to design campaign tactics to minimize the risks.

At the same time, keep in mind that the laws are written primarily to protect employers, and that our union might never have been established in the first place if our founders had not used tactics which violated those laws.

Union members sometimes must act in the tradition of Dr. Martin Luther King and Mohatma Gandhi and disobey laws which are used to enforce injustice against working people.

The job of lawyers is not to make the decisions about when and how to obey the laws. Their job is to tell you what the laws are and how they are likely to be interpreted by the courts.

Using that advice, union members and their elected leaders must then weigh the risks and benefits of potential actions. Workers often have a complicated judgment to make because they can lose *either* by engaging in unwise illegal acts or by not doing what it takes to win a fair contract.

In evaluating the possibility of legal or disciplinary action by an employer, you should discuss not only the question of *could* the employer win but *would* the employer take action in the first place. In many situations, employers may have strong incentives not to take legal action against workers or their union.

For example . . .

• Disciplining workers sometimes may strengthen the determination of other workers, hurt employee morale and productivity, or cause major staffing problems for the employer.

For example, if a hundred workers stop work for five minutes as a show of solidarity, they might be in violation of their contract, but that doesn't automatically mean that it will be in the employer's interest to fire them and have to find replacements. The employer might have the legal right to dock them for the missed work time, but management would have to consider whether that would further unite the workers and cause significant extra paperwork.

• Legal action, no matter who initiates it, may expose an employer to the process of "discovery," which means that the union has the legal right to subpoena employer documents and witnesses in order to prepare its case. The employer may feel that revealing inside information through that process is too risky.

• Lawsuits also may mean more publicity, which the employer may not want.

• Certain acts which might technically be illegal might be seen by the public,

news media, customers, or other potential worker allies as justifiable and not something the employer should be challenging.

For example, let's say workers obtain inside information showing that the employer has polluted the environment or cheated on its taxes. Revealing that information might technically expose workers to charges of possessing stolen documents, but that doesn't necessarily mean that the employer would consider it smart to bring charges.

- Even if workers or the union might be found guilty, you have to consider what the penalty is likely to be. If a civil lawsuit might be involved, what damages could the employer actually prove and collect?

## Giving lawyers the facts

Regardless of what course of action you think you want to take, give your attorney all information that could possibly be relevant before he or she gives you advice. While you don't always have to follow that advice, you do want the most informed, honest analysis you can get. You don't want a lawyer merely to tell you what you seem to want to hear, nor do you want to influence the advice by withholding key information.

## Planning what lawyers say to others

In most cases, it is not a good idea to have attorneys meet with members or committees without a prior discussion between union leaders and the attorneys regarding the issue at hand. Bring-ing a lawyer cold into a meeting of the membership or the negotiating committee can mean that the lawyer may . . .

- Only hear some of the facts from those at the meeting.

- Feel pressured to give advice without doing the necessary research and analysis.

- Give advice which, intentionally or not, sways people toward a decision they would not have reached in a more structured, better prepared discussion.

This is not to say that members or committees don't have a right to know what legal advice the union has received; they do. It is also not to say that lawyers should be asked to give advice publicly which is contrary to their best professional judgment; they should not. But union leaders and attorneys do need the chance to discuss that legal advice first and plan how it will be presented.

Similarly, any occasions for attorneys to speak at the negotiating table should be planned in advance. While in general union leaders should speak for themselves, there may be times when it would be psychologically useful to have an attorney make a particular point. Union leaders, not the attorney, should determine when those times are. If the attorney feels that a legal issue needs to be discussed among the union negotiators, he or she can pass a note to the chief negotiator suggesting a caucus.

If a management negotiator says to a union attorney, "What is your legal opinion on this issue?", the attorney should be instructed to say, "That is something I will discuss with my client if I am asked to do so."

## Not *relying* on legal action

SEIU locals have become increasingly aware in recent years that we can rarely win against employers by relying primarily on legal strategies such as filing charges with the National Labor Relations Board.

Even if we win when we file unfair labor practice charges, for example, the penalty usually is that the employer is asked not to violate the law anymore—and even that ruling may take months or years to obtain.

Here again, you have to work with attorneys to realistically discuss not just what the law says on paper but how it is likely to be enforced and how long that process is likely to take.

In general, workers should be told from the beginning that, while legal charges do need to be filed and documented, workers' own activities are the heart of the campaign and they cannot rely on lawyers to win for them.

## Evaluating lawyers

The best way to evaluate lawyers is to consult others who have worked with them in the past.

Did they prove to be committed to the labor movement, so that they had a personal interest in helping the union

figure out how to achieve its goals?

Did they clearly explain in simple language the choices and possibilities, and leave it to the union to decide what action to take?

Were their cost estimates accurate?

Were they available when they were needed?

Was work that should be done by experienced attorneys in fact done by them, or was it handed off to less experienced lawyers to save the firm money?

Do they have experience with the particular legal questions on which you need advice? For example, do they have the expertise you need on immigration law or on enforcing fair labor standards rights for overtime pay?

Have they given advice based on the interests of the client and not their own self interest? For example, do past clients feel they were advised to embark on a long, complicated legal road in part because it would mean a lot of paid work for the lawyers?

Or, in contrast, did a lawyer on a fixed retainer or staff salary give cautious advice perhaps because of a desire to avoid the potential workload a client's proposed strategy might involve?

*If you need help finding the right lawyer, the International Legal Department may be able to help.*

# Community Action

Often, an SEIU local is not strong enough by itself to take on the employer and needs allies in the community.

Allies can provide . . .

- Information.
- Money.
- People to take part in actions.
- Moral support.
- Publicity.
- Political pressure.
- Influence with the employer or its sources of funds.

Each local should have an ongoing community action program which identifies potential allies and builds ties to those groups or community leaders. If potential allies believe you are only interested in working with them when you are facing a crisis, you may not get much help.

If, on the other hand, you have proven to be a reliable friend, ready to contribute what you can to community causes in terms of money, volunteers, use of a union hall, or statements of support, you will get more enthusiastic help when you need it.

SEIU locals should be active in the AFL-CIO central labor council in their area. Taking part in council activities can be a good way to meet other unionists and establish ties that will prove useful later.



## 1. Information

Other organizations in the community may already have disputes with the employer and may already have done research and organizing you can take advantage of. For example . . .

- Other unions which have problems with the same employer.

- Renters' organizations which may be able to share information and strategies in dealing with a building service company.

- Groups of students, people who receive government benefits, or other "consumers" of public services who may be organizing to demand improved services or benefits.

- Patients' rights groups which may

be able to join forces in pressuring healthcare institutions.

• **Environmental organizations** which may already know about problems the employer has with pollution or permits.

• **Consumer groups** which may have complaints about a company's practices affecting price, quality, or other issues.

• **Organizations of women, minorities, poor people,** or others who may be challenging employer practices involving discrimination.

• **Religious groups** which may be concerned about the employer's mistreatment of communities in the U.S. or in other countries.

• **Senior citizens** who are particularly sensitive to employer practices which mean higher prices, taxes, or fees.

• **Professional associations** of doctors, nurses, social workers, or lawyers whose work or professional standards are affected by the employer's policies.

• **Civic groups** such as the League of Women Voters who may feel that employer practices are not in the community's interest.

## 2. Money

• **Joint funding.** If you find allies who want to join in pressuring an employer on one or more issues, they may be willing to help finance a joint campaign.

• **Emergency aid.** In addition to boosting strike funds or helping to finance other contract campaign activities, donations from allies are helpful for building morale.



*Religious leaders can add inspiration and credibility to the campaign.*

You are far more likely to get fund-raising help if your local contributes money or volunteers when unions and community groups in your area have difficult battles on issues most important to them.

One effective emergency aid tactic is an "adopt a striker" program. Other organizations can be asked to link groups of their members with striking families who need food, clothing, and moral support.

## 3. People to take part in actions

Other unions or community groups may be able to beef up demonstrations or rallies by supplying demonstrators

# Sample Community Action Membership Survey

One way that we can win a good contract is to organize support from people in the community.

The most effective way is to contact people and organizations our members already know.

Please take a few minutes to answer these questions and return this survey to your bargaining support team member.

1. List any community organizations in which you or your family are active (such as churches, PTA, ethnic clubs, political advocacy groups, senior citizen or service organizations, etc.)

Organization _____   Your role (member, volunteer, officer?)

_____

_____

2. Do you know other people in the community who would be good to contact? (reporters, other unions, politicians, community leaders, celebrities)

Name and organization _____   Telephone (if known)

_____

_____

_____

3. Would you be willing to help contact one or more of the people or organizations you have listed to explain our goals and ask for support? (A bargaining support team member could do this with you.)

Organization to contact _____   Contact person(s) _____   Telephone (if known)

_____

_____

4. Your name _____

   Address _____

   Telephone (w) _____   (h) _____

   Work schedule _____   Best time to reach _____

_____

who are not afraid of losing their jobs, are used to confronting authorities, or have more convenient schedules.

## 4. A boost for morale

Often, workers feel less isolated and powerless when they see labor and community allies supporting their cause.

## 5. Publicity

Other organizations may have relationships with reporters which can be helpful in generating news coverage.

In addition, organizations can help you tell your story to their members through such means as . . .

• Speakers' bureaus. By arranging for workers to speak at meetings or rallies of other organizations, you can give your members valuable experience while building support and stronger ties between your groups. Make sure that you regularly invite other unions and community groups to send members to speak at your meetings as well.

• Articles in organizational newsletters. You can provide interviews with your members for newsletters of other unions and community groups. Again, you will get a better response if you have made it a practice to use space in your own publications from time to time to publicize the activities of other groups.

## 6. Political pressure

In a particular community, other organizations may have more political clout with public officials.

## 7. Influence on the employer or its sources of funds

The employer may depend directly on one of your allies for business, contributions, endorsements, or other support.

## Working with allies

In evaluating allies, you must consider . . .

• Are they viewed as a group with clout by the employer? By the community? Are they seen as a reliable, responsible organization?

• Are their goals and attitudes compatible with those of your union's members?

• Can a smooth working relationship based on communication and trust be developed, or are they too likely to go off in their own direction?

If you find that you do have common interests, all allies should make clear from the start what the terms of the alliance are. If you are talking to a group about a campaign against an employer on a common issue, that group needs to know what you will do if you settle your contract dispute. If you are not committed to continuing on the other issue once you have a new contract, your allies should know that ahead of time.

Similarly, you should agree on how decisions will be made, who will speak for the alliance, who will be responsible for funding joint activities, and other issues.

Throughout a contract campaign,

you should use briefings or newsletters to keep potential allies informed about your goals and activities.

• If people have met your members face to face and discussed your campaign, they feel more of a personal commitment to help.

• Most leaders of other organizations will appreciate being kept informed so they can answer questions about your situation that may be raised by their members.

• If people know what you are doing, they may be able to give you suggestions or offer to help.

Remember to keep presentations or educational materials brief, to tie your struggle into the concerns of the target audience, and to let your members do the talking.

## Allies Join Forces With SEIU

**In Cleveland,** part-time workers at Cuyahoga Community College asked for community support to protest the college's refusal to negotiate a first SEIU contract.

Local labor leaders helped the workers pressure the County Commissioners who appointed a majority of the college's board members. They also reminded the college president that in the past they had negotiated management-funded training programs to be conducted at the college and had organized voter support for increased tax income for the school. A union which held conferences at the school threatened to cancel its next one.

**In Kansas City and in northern California,** SEIU members who work for Health Maintenance Organizations have appealed to other unions to help pressure the employer during bargaining.

In both cases, union-related health and welfare funds were major customers of the HMO. In Kansas City, the central labor council contacted management and helped bring about a settlement. In the Kaiser strike involving SEIU Local 250 in California, 100 unions wrote letters to management and about 30 funds withheld premium payments totaling about $10 million per month.

**At a number of Beverly nursing homes,** workers were able to involve community residents in drives to collect blankets and food for the patients.

At a time when the union was trying to get government agencies to deny the company licenses because of inadequate care, these drives showed that union members were not the only ones concerned about mistreatment of nursing home patients.



*Workers demonstrating at meetings of the Cuyahoga Community College board organized community pressure as well.*

# Other Unions Dealing With The Same Employer

In addition to coordinating strategy with unions bargaining at the same time (see Part 2), you should work for the support of other unions which deal with the same employer but bargain at different times.

What can you tell them about how your fight affects their future battles? Can you assure them that your members would help them if needed in the future?

Talk realistically with them about what they might do. Could they contribute money, volunteers, and people to take part in actions? Could they apply worksite pressure, such as a work-to-rule campaign?

If you are forced to strike, could they legally honor those picket lines? They should determine their rights only after talking to legal counsel, but in general the National Labor Relations Board says that . . .

- Employees can honor a legal picket line by other workers.

- Management can permanently replace—but not fire—workers who observe a picket line by economic strikers, and cannot permanently replace workers honoring an unfair labor practice strike.

- A no-strike clause in a union contract does not mean that workers give up their legal right to observe other workers' picket lines unless the clause specifically says so.

- The law does not give workers the

right to refuse to cross a picket line out of fear for their safety, although they may have language in a union contract which does.

Even if other workers have the legal right to honor your picket lines, would their members be willing to do so? If so, could you provide those workers with emergency economic assistance?

If there are unresolved differences between your two unions over the way each of you dealt with the employer in past rounds of bargaining, conflict of interest involving jurisdiction, or natural divisions along lines of race, gender, or type of job (white-collar vs. blue-collar, for instance), try to bring those problems out in the open and show each group that those divisions will only benefit management if allowed to continue.

---

### Another Union's Work-To-Rule Campaign Helps Janitors

When SEIU members went on strike against a building service contractor at a Brown and Williamson tobacco factory in Macon, Ga., management brought in replacements for the striking janitors.

The unionized production workers, however, refused to do anything they weren't absolutely required to do to make it possible for the replacement janitors to do their jobs.

Without the cooperation of the factory workers, the replacements had a hard time keeping track of supplies, coping with spills, and moving efficiently through the plant.

Management quickly agreed to settle the strike and to reinstate 12 fired workers with back pay.

---

# Using The Media

Use of the media can put pressure on the employer and support all of the other tactics discussed in this part of the manual. For example, media coverage and advertising can help to . . .

- Maintain morale among your members as they take part in worksite activities, job actions, and/or strikes. It helps them to have their families, friends, and neighbors seeing their activities in a favorable light through the media. It also makes them feel that their activities are seen as important by the outside world.

- Give customers, clients, investors, and others in the community reasons to cut off economic ties with the employer. Media attention can convince the community of the justice of your cause, or can make businesses or individuals feel that they don't want to be involved with the employer while it is getting such bad publicity.

- Encourage politicians and regulatory agencies to take actions that support your campaign or to at least stay neutral. They may be influenced by knowing what the voters are learning from the media.

- Encourage members of other unions and community groups to get involved in strike support activities. They are more likely to help if they are frequently reminded through the media of your struggle.

- Make individual managers nervous about the effect bad publicity may have on their careers and reputations. If they see that you have the ability to use the media successfully, they may worry that you will be able to publicize unfavorable information about their activities.

Successful use of the media also is important to counteract management's propaganda. Management will be using the media to portray the union as a greedy, outside institution which doesn't care about the community and is making trouble for its own purposes.

## Communicating three key messages

To support other pressure tactics and counteract management's propaganda, your media efforts must get across three basic messages:

### 1. What we are asking for is fair.

Some ways to show that may include . . .

- We are productive.
- Vivid descriptions of our workloads (such as what it is like to work in a hospital emergency room).
- Figures that compare productivity to past years, or other similar units elsewhere.
- Figures that compare number of workers accomplishing X amount of work today vs. more workers accomplishing same or less work at some point in the past.

- We aren't compensated fairly.
- Salary survey showing workers are underpaid compared to other people in society who do similar jobs or com-



pared to workers who do the same job in other parts of the industry, region, or nation.

## 2. Management can afford what we are asking.

- Figures on size or increase in profits for private employer.
- Analysis of revenue and budget for public employer.
- Point out that the employer (if a private company) has refused to "open the books," which it would be legally required to do if it were claiming it could not afford our proposals.
- Figures that show tiny percentage impact of our proposals on overall costs.
- Make point that better pay or working conditions might save money because of increased efficiency or reduced turnover.

## 3. What we want is also good for the community.

- Our proposals would mean better service or a better product (for example, by increasing staffing, reducing turnover, or improving training) or could reduce costs (such as by limiting contracting out).
- When workers are paid better, more money goes to local businesses and is paid in local taxes, supporting jobs and



*Special costumes can help workers draw attention to their cause. Here, janitors protest arrests during previous demonstrations.*

prosperity for everyone. Similarly, take-aways hurt the local economy—particularly when the money goes instead to stockholders outside the area.

- We're trying to settle without a strike because a strike would be costly to the community as well as to workers and the employer.

Research sources listed in Part 1 of this manual can provide most of the information you need. SEIU International union staff also can give you advice on where to look and how to analyze and present the facts you find.

# Organizing Your Media Campaign

## Who will coordinate the effort?

You will need a media committee to coordinate outreach to the media and any paid advertising you decide to do. That committee should be provided training by SEIU staff and members who have experience in successful media relations, using the SEIU Practical Press Guide and this manual.

The committee should meet with the negotiating committee and bargaining support committee or representatives of those committees to discuss

• Issues the union will be raising and how to explain to the media why your proposals are fair and in the community interest.

• Issues management will raise and how to get to the media first with your side of those issues.

• Pressure tactics that may be used and how media work can support them.

• The likely timetable for each step of the campaign.

• Themes and slogans that express your issues (see Part 1 of the manual).

The committee also should meet with local officers and staff to find out what funds, if any, are available for advertising.

## Who will actually talk to reporters?

Reporters need someone to call for information, help lining up interviews, and quotes on short notice concerning the latest developments in negotiations.

Meanwhile, you want to make sure that the union is speaking with one voice and not giving out inaccurate or contradictory information or opinions.

People you designate to talk to the media must be . . .

• **Available to talk.** If the local president or negotiating committee chairperson are going to be in meetings a lot of the time, reporters who often work on tight deadlines will become frustrated because they can't get quotes from the union when they need them.

• **Informed about the latest developments.** Your spokesperson must be told of each new campaign development as soon as it happens—even if he or she is instructed not to give the news to the media yet. If reporters feel that they are not getting accurate or up-to-date information, they will either rely more on management's version or start going around your system to talk to individuals in the union who may not be properly prepared.

• **Someone who gives the union the right image.** To many reporters, "the union" will be the individual they talk to regularly. If you use a member instead of a staff person, and if you choose someone who is typical of workers in the unit in terms of gender and race/ethnic background, you will reinforce the idea that "the members are the union." If you choose someone who is reasonable and likeable, you make the reporters' job more pleasant and counteract stereotypes about union "militants."

# Let Members Do The Talking

Members should be trained to handle contacts with the media in order to leave the correct impression that "the union" is its members and not a self-interested institution. This means . . .

● At rallies, community meetings, and other events, have members speak. The natural result will be media accounts of the event that focus more on members' concerns.

● At news conferences and in news releases, feature members giving examples or personal stories to support the main points you are making.

● Continually offer to put reporters in touch with members to interview regarding personal experiences related to bargaining issues.

Of course, to make sure this approach doesn't backfire you have to prepare those members to communicate a clear, consistent message. Encourage them to . . .

● Work with union leaders to develop a sheet of talking points which lists the major themes and facts the union needs to communicate. Workers should be trained to stick to those points rather than being drawn into a discussion of issues that are not union priorities.

● Stick to stories that show why the union's bargaining positions are right—and avoid personal gripes, such as complaints about a particular supervisor, that are not relevant or will confuse the issue.



*When workers are featured in media coverage, everyone is reminded that they are the union.*

3-59



*Members who talk to the media will be most effective if they are trained first.*

• Review the union's arguments for why its proposals are fair and how they are in the public interest. Show how those arguments apply where they work.

Ways to train members to talk to the media include . . .

• Talk to them individually when arranging for them to be interviewed.

• Hold one or more training sessions at which interested members can role play talking to the media about bargaining issues. Ask members hostile questions, and give them practice developing answers which bring discussion back to the union's positive themes.

• In newsletters or leaflets describe for members the media campaign you are undertaking, including its basic messages and where, if at all, you will be advertising.

One simple technique is to distribute or post copies of favorable newspaper articles or reduced, leaflet-sized versions of newspaper ads. By distributing this information, you make it more likely that members will . . .

□ Not be surprised by questions from neighbors or friends who have seen or heard the union's message.

□ Reinforce the message when they talk to others in the community.

□ Feel a sense of pride and get a boost in morale.

# Researching Media Outlets

Members of the media committee should compile or update a list of media outlets in the area, including mailing address, phone number, and name of reporter(s) likely to cover the contract campaign.

This information can be compiled by . . .

- Using the local telephone directory.
- Asking other unions or friendly organizations which already have lists.
- Checking listings of TV and radio programming in local newspapers.
- Visiting a large newsstand to see what local publications they sell.
- Checking with a public library to see if there is a commercially published local media guide.

The committee should ask each newspaper, station, and magazine for an advertiser's packet. The packet will give you information not only about the cost for advertising but also about who and how big the audience is.

Rate information also should be obtained from billboard companies and bus companies if appropriate.

Committee members should develop a profile of each reporter you will be dealing with. This can be done by reviewing articles reporters have written about the union or other subjects, asking other unions or community groups what their experiences have been in dealing with particular reporters, and arranging get-acquainted background briefings with individual reporters. The more you know about reporters' experiences, personal background, biases, and work habits, the more you will be able to help them do their job and to shape your message to their way of looking at things.

# Educating The Media About The Campaign

One key to improving media coverage is to *get an early start.* If you can get to know reporters and their bosses and explain your issues *before* they swallow management's propaganda, it is more likely that they will keep an open mind throughout the campaign.

● **Prepare a media packet well in advance of the start of negotiations.** Normally you would include factsheets on the following subjects . . .

☐ Background on the union and its members, including who you represent, what jobs they do and how they serve the community, and how they control union decision-making through democratic processes from deciding bargaining proposals through contract ratification.

☐ The history of relations between the union and this employer, emphasizing how reasonable the union has been in its proposals and efforts to reach settlements without strikes, and, if appropriate, how unreasonable management has been.

☐ A clear explanation of the union's proposals, supported by the evidence discussed earlier on 1) why the union's proposals are fair and affordable while management's are unreasonable and unnecessary and 2) how the union's proposals and efforts to avoid a strike are good for the community, while management is acting against the public interest.

Ideally, the media packet should be delivered by hand at the briefings discussed below. If that is not possible, it can be mailed to the top news executive of each media outlet.

● **Meet with top news executives of each newspaper, magazine, and radio or TV station.**

At newspapers, this often can be accomplished by a meeting with the "editorial board," which may include the editor of the paper, his or her assistants, editors of sections of the paper, and staff who write the paper's editorials.

At TV and radio stations, top officials may include a general manager, program manager, news director; and public affairs director—although at some stations one individual does several of these jobs.

These meetings give you a chance to explain the background of negotiations to the people who will be shaping news coverage, to ask that they support you in their editorials, and to request the chance to appear on talk shows or write guest columns.

Members of your media committee should be trained to do the talking at these meetings (see *"Let The Members Do The Talking"*) and should plan who will explain particular union positions, who will link union concerns to community concerns, and so on.

Committee members must be prepared for the possibility that media managers may be hostile to unions. Instead of getting into an argument, committee members should stick to explaining union positions and asking that the paper or station give their audience fair, balanced coverage.

# Helping Reporters Do Their Job

• Meet well in advance with reporters who will be covering the campaign. If they were not included in meetings you held with news executives, they will need their own media packet and their own chance to get acquainted with the issues and your members.

At least for the major media outlets, give reporters the chance to be briefed on campaign background individually rather than in a group. They are under pressure to compete with other media outlets, and will feel more comfortable with an individual briefing where they get to ask their own questions and not have to share the answers with other reporters.

• Give reporters the facts so they don't have to hunt for them. The easier you make their job, the better coverage you are likely to get.

• Before an interview or in planning a statement for a news release or news conference, develop a catchy way of expressing your main messages so reporters can come away with the good, short quotes they need.

• If you want a reporter to cover a particular event such as a rally or community meeting, call to invite him or her. The news release you sent may have been lost in the mail or may not have stood out from other notices received.

Tell the reporter that you can provide a member to conduct a briefing before the event, line up interviews, and stay with the reporter during the event to answer questions.

• Ask reporters about schedules that are most convenient for them. For example, scheduling a news conference for late in the afternoon may be convenient for your members but may come at a time when most reporters must have already completed their stories or are hard at work finishing their reports for the day. Reporters who have to cover evening events may not appreciate being asked to attend an early morning briefing session.

• Don't lie and don't guess. Even if you get reporters to use inaccurate information once, eventually they will find out and be angry that you put them in an embarrassing position. If you don't know an answer, find out and get back to them.

• Don't assume that any statement is truly "off the record." A reporter's



**PRESS PACKET**
Alameda County Negotiations
1987

*A media packet with detailed background information makes it easier for reporters to quickly understand the union point of view.*

first loyalty is to "getting a story," not to your campaign. If you don't want to see a particular fact in print or on the air, don't give it to the media in the first place.



*Reporters are workers, too. If they make mistakes, try to calmly point out the errors.*

• Don't be upset that reporters report what the other side has to say. That's their job.

• Don't assume reporters understand anything about the labor movement, the jargon you use, your local's history, the work your members do, or the background of your negotiations. Constantly offer to explain the basics.

• If you are dissatisfied with the fairness or accuracy of coverage, try to make an appointment with the reporter at which a group of members can calmly explain their concerns. If you can't get a meeting, explain your concerns on the phone.

Don't take a hostile approach or cut off contact with the reporter; that only hurts your chances of getting better coverage in the future.

If talking to the reporter doesn't work, try approaching his or her editor. Again, take a small group of members along if possible, provided they are trained to stress the issues and not attack the paper's staff.

# Creating News

## Events

For the most part, getting free news coverage depends on creating "newsworthy" events—events that can be *shown visually*, that are *unusual* in some way, that involve *action* by large numbers of people, or that involve *well-known public figures*.

Examples of events that may get media attention include . . .

- **A rally or demonstration** at the offices or homes of management officials.

- **A public debate** between union members and management. If management refuses to show up, then either leave an empty chair as a visual symbol or have one of your members parody what management officials would have said if they had come.

- **A public forum** at which experts discuss some of the underlying issues you are bargaining over—such as stress, health and safety, or pay equity.

- **A candlelight vigil or parade.**

- **Events directly tied to particular bargaining issues.** For example, members bargaining for child care services might hold a "stroll-in" at which they would march with their small children.

- **Events tied to times of the year.** For example, you could give a mock giant turkey to a top management official at Thanksgiving or sponsor a hunt for justice in the worksite at Easter.

## News conferences

A news conference allows you to reach many reporters at the same time. It also may create a feeling among reporters that "something important" is being announced and if they don't cover



*Media events such as this arrest of the Easter bunny can be tied to times of the year.*



*News conferences should be used only if you have important news to announce.*

it someone else will.

However, calling a news conference also can backfire if reporters and their editors decide that what you have to say is not newsworthy. A poorly attended news conference demoralizes members and staff and makes those reporters who did come think twice about covering your events in the future.

Therefore, call news conferences only when you have genuine news. Examples might be . . .

● A major change at the negotiating table.

● Release of a major survey that supports your demands on health and safety, stress, contracting out, patient care, pay equity, or other bargaining issues.

● Unveiling significant new information about management practices.

To be safer still, try to include as part of the news conference one or more celebrities. For example, a news conference on a new pay equity study might

include leaders of local women's organizations or even a local TV personality who could briefly endorse the comparable worth concept. Or a major church leader might serve as master of ceremonies for the news conference.

Alert reporters to a coming news conference as far in advance as possible, and give them an idea of why it will be newsworthy.

As discussed earlier, have members do as much of the talking as possible. To make reporters' job easier, provide a media packet with . . .

● Factsheets giving background about the union, the jobs members do, and the issues in bargaining.

● Written statements or quotes from union members and elected leaders.

● Past news coverage that you liked (reporters are likely to be influenced by the way the story has been covered before).

## News releases

When a news conference is not warranted but you have information to convey to a large number of reporters at once, send a news release which provides the facts, quotes from members, and a heading and first ("lead") paragraph that show why the story is interesting. (See "Comparing Good and Bad News Releases.")

Be sure to get your releases to wire services, such as Associated Press and United Press International, which provide news to other media outlets.

Smaller media outlets without large staffs—particularly radio stations and

weekly newspapers—may use a news release almost the way you wrote it, so write it with that possibility in mind.

## Radio feeds

Many radio stations will work into their news reports short statements by union leaders that you tape and play for them over the phone. An electronics supply store can show you the jacks and cords you will need so you can playback from your tape recorder directly over the phone line.

As part of the media committee's survey of media outlets, they should find out which stations take taped "feeds" and who the contact person would be at each interested station. Members of the committee can then take responsibility for getting the right equipment, making the tape when the union has something significant to say, and calling the stations to offer the feed to them.

Stations are most likely to take statements from a news conference they couldn't send a reporter to or from a union leader announcing a major development in negotiations. They are most likely to actually use the statement if it contains a clever or unusual quote that sums up what the union has to say. Overblown, predictable rhetoric is least likely to be used.

In addition to the taped statement, you must provide stations with the same facts that would go into a news release so they know what to say before and after the statement you have provided. Instead of reading that information to a reporter at the station, try recording that too as an introduction to

the statement. That will save both of you time since you are playing the statement over the phone anyway, and the reporter always can ask more questions if necessary.

In other words, you might tape the following:

*[Media committee member's voice as introduction]*

Two hundred county employees today picketed the home of John Doe, chairman of the county board of supervisors. The members of Service Employees Local Union X were protesting the board's refusal to negotiate seriously on a package of "Work and Family" proposals put forward by union members in talks on a new contract covering county workers. Union members are asking for a county-sponsored child care program, parental leave rights, and more flexible work schedules. Local X President Jane Smith made the following statement . . .

*[Local president's voice]*

"We're picketing John Doe's home to point out that other families in this county should be considered just as important as the families of county leaders. Our Work and Family proposals are not only cost effective and would meet the needs of county workers' families, but they would mean better, more reliable services for all families in this county because they would cut down on county workers missing work and experienced people having to leave to take other jobs."

3-67

## Unexpected Visual Gimmicks Draw Media Attention

**In Philadelphia,** janitors for a contractor cleaning the electric company organized for a year to win a union contract.

Their breakthrough came when management told cleaners to buy toothbrushes and hand mirrors so they could clean properly behind toilets.

They took the story to a writer for the *Philadelphia Daily News*, whose column started a back-and-forth exchange in the paper that kept the controversy in the public eye and prompted other papers to cover it.



To build on this publicity, the janitors scheduled a Super Toothday demonstration on the steps of the electric company building, complete with a 5-foot toothbrush. This action was expected to draw further media attention.

Moments before the demonstration was to start, management caved in and agreed to a contract providing pay levels of $7 and $8 per hour—compared to $4 when the campaign started—and the first fringe benefits the workers had ever enjoyed, including medical and dental insurance, paid holidays, and vacations.

**In Alameda County, Calif.,** county workers from three SEIU locals were in tough negotiations with management seeking pay increases, realistic workloads, and an end to harassment over the use of sick leave.

To put management on the defensive, union members came to work a week before the contract expiration date with bandages, crutches, and other visual symbols of illness and injury. A half dozen of the workers then held a news conference during break time.

Thanks in large part to the props the workers used, the event received prominent coverage in the local news media.



The Daily Review
Workers express ill will on county policy

# Comparing Good And Bad News Releases

Local 1234
Service Employees International Union
First Street
Unionville, USA 12345

FOR IMMEDIATE RELEASE

For further information:
Jane Smith (100) 555-1212 (SEIU)
or (100) 666-0000 (home)

## Negotiations Over Staffing Will Affect Patient Care At ABC Hospital, Study Shows

Community residents who use ABC Hospital have a major stake in the outcome of the current contract negotiations between ABC management and Service Employees Local X, according to a new study of staffing levels and patient care at the hospital.

"You can't cut corners with people's lives," said Local X President Jane Doe in releasing the study. "People in this community deserve health care they can trust—and that's what we're asking management to provide."

The study, conducted by Professor Jim Jones of City University, compared the number of nurses in each department of the hospital five years ago with the number today. Professor Jones found that, on the average, departments have 15 percent fewer nurses now, with some departments as much as 25 percent shortstaffed.

Jones then surveyed nurses on the impact of short staffing. He found that 93 percent of nurses with five or more years experience say that the quality of care has decreased because of reduced staffing.

Examples they provided included the following:
• Longer waiting periods in the emergency room.
• Longer waits before checking on the health status of patients.
• Less time to answer questions or provide information for patients' families.

Marilyn Alvarez, a nurse at the hospital for 12 years and a member of the nurses' elected negotiating committee, said the nurses' proposals to management would require increased staffing and improved training and would attract more nurses to ABC by offering more competitive pay and benefits. So far, however, management has refused to agree to action to deal with the nursing shortage.

"This study proves that we have a patient care problem but that it can be solved," Alvarez said. "The hospital had its largest budget surplus in history last year, so the money is there. We hope the community will help us convince management to start solving the nursing shortage now."

### Statement by SEIU Local X President Jane Doe

It is time for ABC Hospital management to stop its blatant delaying tactics and meet its legal obligation to bargain in good faith with our union. Management's latest proposals do not include pay improvements, any significant increase in benefits, or guarantees of increased staffing levels. Their proposals are a slap in the face to our nurses who work so hard to provide quality patient care.

▲ **Bad Release**

◄ **Good Release**

# Using Free Time And Space

Each media outlet provides some free time or space you should try to use during your campaign.

## Talk shows

Your media committee should find out which radio or TV stations have talk shows on which union leaders could appear. Often, those appearances have to be arranged well in advance.

In talking with staff at the station, don't emphasize that you want a chance to make your case on the air. Instead, point out how a show with SEIU leaders as guests would be interesting for listeners. Also, promise to publicize that show among your members.

If union leaders are going to be on the show, role play the likely questions and answers, using the principles already discussed in this part of the manual.

Also prepare union members and their families and friends to call in with good questions.

Union members can also use free air time on talk shows whenever there are guests whose topic could somehow be related to bargaining issues. ("Listening to this discussion of the changing role of women in our society makes me think of the situation where I work. I'm a member of Service Employees Local Y and we're in negotiations with _____ and we're facing . . . ")

## Guest editorials or "op-ed" pieces

Newspapers and TV and radio stations sometimes allow community leaders to present guest editorials or, in newspapers, write opinion pieces on the page opposite the editorial page ("op-ed" page). Here again, your pitch in asking for that opportunity is not that you have a right to give your views but that the audience will be interested in this important subject.

Sometimes time or space is provided for the specific purpose of responding to an editorial the station or newspaper has presented. But even if you are given time or space for that reason, don't feel that you have to respond to every point the editorial made. After all, many in the audience don't remember the original editorial anyway. For the most part, use the opportunity to make the points you want to make.

## Letters to the editor

Some newspapers receive far more letters than they can publish. To take advantage of the free space, you have to take steps to make it more likely that letters giving the union viewpoint will be among those chosen.

● Monitor the letters page to see whether the paper seems to prefer letters from "average citizens" or from heads of organizations or prominent community leaders. Then decide whether to submit letters signed by local union officers or by rank-and-file members.

● Include some simple, dramatic facts and not just emotional rhetoric.

● Keep letters short so editors will be more likely to have room for them and less likely to cut out key parts of your message.

● Relate letters to articles or other letters the newspaper has published. Edi- 

tors like to have dialogue in their paper: "Your recent article on the decline in our local economy really hit home. I'm a member of Service Employees Local X, and we're now in negotiations on a new contract with _____. Jobs and prosperity in this area would be threatened further if management gets what they are asking for. For example . . . "

## Cable television

Many cable stations are hungry for free or low-cost material to broadcast. They also have a legal obligation to broadcast some programs on public interest issues, although they have control over which programs to use.

The International's Education Department may be able to help you obtain films or videos on subjects related to your bargaining issues. You could then provide those to cable stations for free. Suggest that they show all or part of the film or video and then host a panel discussion with local people, including a representative of your local union.

## Community publications

Weekly newspapers, alternative publications, church newsletters, and ethnic papers or magazines in other languages are other media outlets which are often looking for articles and photographs to fill their pages.

# Paid Advertising

Paid advertising can help boost membership morale and communicate a clear, unedited message as part of a strategy to pressure the employer. Many Americans are used to getting information from advertising, and view the fact that the union is sponsoring ads as proof that the union's campaign is legitimate.

However, advertising also can be a knee-jerk reaction when union leaders feel the need to "do something" to show strength.

Because advertising can be expensive, you should always be clear about why you are doing it. Real strength comes from the employer seeing that you have a winning strategy. Advertising that just makes everyone feel good for a day or two while draining your treasury may actually make you seem weaker, not stronger, in the employer's eyes.

*When possible, ads should feature members and show readers how their interests and workers' interests coincide.*





Questions you should ask include the following . . .

● **Are we taking out ads primarily in order to reach our own membership?** If so, why? To strengthen workers' pride in their cause? To reinforce themes we are communicating at the worksite?

Are there other ways to reach them (discussed earlier in the manual) that cost less, are more sure to reach each person, and provide more opportunity for members to ask questions and give feedback?

● **Are we trying to reach customers, clients, investors, suppliers, or others in the community?** If so, is this part of an organized strategy that includes other ways of organizing support for the campaign?

Are we sure there isn't a way to get a mailing list or phone list of the specific people we want to reach or to distribute the information to them in person?

Assuming that paid advertising is needed to pressure the employer, observe the principles outlined earlier in this part of the manual, such as highlighting the community interest, not merely justice for workers, and letting members do the talking. Subjects for ads also were listed earlier in the discussion of arguments you can use to bolster your case.

For newspaper ads, resist the temptation to fill the space with a long essay answering every charge the employer has ever made. Think about what the average, uninformed member of the public really will care about and absorb.

For radio spots, have your target

audience firmly in mind when you choose which stations and at what times to air your spots.

Billboards and signs on subways or buses can communicate a very simple theme and reinforce other advertising such as radio spots. Passers-by often have so little time to read the message, however, that you should not expect to educate anyone on the issues through those media.

Locals bargaining for tens of thousands of workers at a time have sometimes bought radio time in order to conduct special call-in programs. Members from a large geographical area can phone in their questions, get answers from union leaders, and listen to the views and concerns of other members.

Writing and producing effective ads requires training and experience. If you want members of your media committee to learn how, arrange for them to work along side SEIU staff or consultants. Too much is at stake for them to learn by trial and error.

## Sample Radio Spot

**Announcer:** Members of Local 250 of the Service Employees Union are still on strike at Kaiser hospitals and clinics in Northern California and union members want you to know why.

**Member #1:** Well, I would say to Kaiser plan members to remember that we are striking for you also. We voted to go on strike because we feel that our patient care is being compromised.

**Member #2:** Because of their concern of profits, Kaiser's patient care is really falling downhill.

**Member #3:** They're making profits hand-over-fist; they're the most profitable HMO around. The first thing that I'd like the Kaiser plan members to do is to make sure that, if there's something wrong with them or they're sick, is to make sure that they go in and see the doctors.

**Member #4:** We want patients to cross the picket line because the more patients that go in to be seen the harder it's going to be on people that they have staffing.

**Member #5:** We want people to cross the picket line.

**Announcer:** If you want to help the striking Kaiser workers—don't take no for an answer. Demand from Kaiser the services you have paid for and deserve The members of Local 250 of the Service Employees Union will applaud you as you cross the picket line.

*Radio spots in which members speak for themselves are often more interesting and more credible.*

3-73

# EXHIBIT 9

June 15, 2009

To: Andy Stern

From: John W. Wilhelm, President

## THERE IS A PATH TO PEACE

I am responding to your latest in a long line of calls to solve the UNITE HERE – SEIU dispute through binding arbitration.

First, let's recap.

Notwithstanding your repeated attempts to characterize this as an "internal" UNITE HERE struggle, beginning last fall if not earlier, you and other top SEIU officers conspired to split UNITE HERE, promote secession of thousands of members, remove assets, and organize in UNITE HERE's core hotel, gaming, and food service jurisdictions. You enlisted your long time confidant Steve Rosenthal, who was paid by Bruce Raynor $500,000 in UNITE HERE dues money to conduct a months long massive communications program that directed hundreds of thousands of mailers and phone calls into our members' homes all across North America. Top SEIU officers, including Anna Burger, Tom Woodruff, Mike Fishman, and you, advocated secession at UNITE HERE membership meetings. You used a private investigator to pry into my family's personal affairs as well as the personal affairs of other key leaders of UNITE HERE.

You used "shock and awe" in hopes we would submit, so you could steal UNITE HERE's members, jurisdiction, and assets.

We publicized these well-worn SEIU tactics in a research report, titled "Growing Pains," which documented no fewer than seven separate raids by SEIU on other unions since 2001 (http://oneunitehere.org/documents.asp). So we understand the SEIU raid game plan.

Now that we have control of our own International Union offices in New York City, we have ample documentation of all these matters, and also of the fact that Bruce Raynor emptied the Union's treasury in his drive to split the Union, in violation of our Constitution and Federal law.

It is extraordinary that you have the audacity to say that we are hurting workers, when it is you who sponsored and carried out this raid. Indeed, UFCW President Joe Hansen,

who worked so hard to mediate this dispute, stated in a recent letter that SEIU's involvement has made a solution more difficult.

Now, you have launched a public relations offensive to persuade us to arbitrate UNITE HERE's membership, jurisdiction and treasury. An analogy comes to mind.

Suppose a burglar broke into your house, stole your property, and demanded ransom. Then the burglar contacts you to demand that a third party be given the right to divide up the stolen property. Would anyone accept such an offer?

You and Raynor plotted to break up UNITE HERE, remove assets from the Union's control,

and organize in UNITE HERE's traditional industry jurisdictions. Having made this attempted burglary you now want to have a third party divide up the spoils. Only UNITE HERE would be at risk in such an arbitration – SEIU would have no risk.

No victim of a theft would ever agree to such a proposition.

No International Union would agree to put its future members, its jurisdiction, and assets in the hands of an arbitrator.

Moreover, because of President Hansen's written mediator's recommendations (which have been widely circulated), we already know the views of a respected, impartial leader who spent an enormous amount of time understanding this dispute. Who could possibly be better qualified to identify the path to peace?

President Hansen's recommendations provided a clear path to settlement. SEIU rejected the heart of those recommendations: that the hotel and gaming membership and organizing jurisdiction belong in UNITE HERE, and that UNITE HERE must have sufficient assets "for the future viability and health of the union."

President Hansen's ringing endorsement of UNITE HERE's core industry jurisdiction echoes a founding principle of Change to Win. In his words:

*"I believe workers have the best opportunity to improve their lives when they join together throughout an industry as one union. Carving up core industry jurisdiction weakens the ability of a union to combine its resources in organizing and bargaining with national employers – and it diminishes the voice workers have on the job."*

How ironic that SEIU rejected this path to a settlement – rejecting in the process what SEIU and Change to Win claim to stand for.

cc: Bruce Raynor

Edgar Romney


Harold

---

This e-mail, attachments included, is confidential. It is intended solely for the addressees. If you are not an intended recipient, any use, copy or diffusion, even partial of this message is prohibited. Please delete it and notify the sender immediately. Since the integrity of this message cannot be guaranteed on the Internet, SODEXO cannot therefore be considered liable for its content.

# EXHIBIT 9A

# UniteHere!

Organize Here. Win Here.   Organicemos Aquí. Ganen Aquí.

| To: | The UNITE HERE Family |
| From: | John Wilhelm, President |
| | Tom Snyder, Chief of Staff |
| Date: | December 22, 2009 |
| Re: | One Year Later |

It has been one year since Bruce Raynor, backed up by SEIU, went public with their scheme to sidestep UNITE HERE's democratic constitution, split UNITE HERE, seize members, and take financial assets to SEIU, prompting many inside the labor movement to wonder about the future viability of UNITE HERE.

We did not choose this struggle, and it is not over, but we have achieved enough success to feel very confident that we can continue our SEIU struggle while aggressively carrying out our primary tasks of representing our members' interests and organizing the unorganized in our core industries.

Fortunately, the strength of UNITE HERE's members, combined with the skill and dedication of our Local Unions and staff, has reversed SEIU's perceived advantages and early momentum.

We know what Stern and Raynor's game plan was because we experienced their takeover attempt first-hand. But we also recovered volumes of hard evidence dating from the Fall of 2008 documenting their intentions and strategy.

When we compare the Stern-Raynor strategy memos from the Fall of 2008 to the reality of what actually transpired since then, we see that the tables have been turned on their design. We now know that Stern and Raynor both promised their loyalists that we would be forced to sue for peace on "their terms." Instead, today it is SEIU/WU that is on the defensive. A war that they chose to start has become a war that they cannot win, although it is not yet ended.

Meanwhile, UNITE HERE is on course to recover its members in the hotel, gaming, and food service jurisdictions. 55,390 members from UNITE HERE's traditional hotel, food service and gaming jurisdictions have abandoned SEIU to return to UNITE HERE. Less widely understood is the fact that over ten thousand members from UNITE's traditional laundry, manufacturing, and textile jurisdictions have turned their backs on Stern and Raynor and have voted to remain with UNITE HERE.

What follows is a summary analysis of this incredible inter-union battle from the vantage point of one year's experience.



### *The Stern-Raynor 7- Point Scheme*

A strategy document[1] recovered from Bruce Raynor's former office at UNITE HERE shows that the plan to split UNITE HERE and take the union's assets commenced in the Fall of 2008, if not earlier, while the Obama campaign was underway. Their document laid out 7 key strategic "campaign components" that they believed would ensure their victory. One year later, the record shows they have achieved none of their goals and in many cases, saw their strategies backfire on SEIU/WU. The following are the key strategies outlined in the "Major Goals" document.

### 1. "Solidify the UNITE Base"

> *"Have UNITE affiliates kick out HERE staff. Key places: Phoenix, San Antonio, Mid-Atlantic, Philly, Indy."*

In each and every one of the named locations that Raynor and Stern attempted to "kick out" UNITE HERE staff, UNITE HERE members have rejected them.

> *"Re-establish ILGWU as an entity."*

This strategy has backfired. Despite Raynor's attempt to use the legacy of the historic ILGWU as a rationalization for his attacks, he has been rejected by the members who actually built the ILGWU.

Retired members, organizers, and officers of the ILGWU have publicly called on Raynor to stop misusing <u>their</u> legacy, demanding of Raynor specifically that he "stop his lies about the hard-fought history of the assets of the ILGWU and for all assets to return to UNITE HERE."

Jean Dubinsky, daughter of legendary ILGWU leader David Dubinsky, sued Raynor and Workers United last month.

---

[1] See "Major Goals" chart - http://www.unitehere.org/files/majorgoalsWU.pdf

# UniteHere!

Organize Here. Win Here.   Organicense Aquí. Ganen Aquí.

> *"FOUR as an ally and key communication vehicle."*

The former UNITE HERE staff union, FOUR, did in fact carry out some of SEIU's dirty work. Unfortunately for their strategy, once FOUR was exposed as a tool, UNITE HERE staff members voted by over 80% to disaffiliate from FOUR and create a new staff union called Union of UNITE HERE Staff (UUHS) that would actually serve their interests.

> *"Laundry and Food Service – Control strategy"*

Stern and Raynor had lofty plans to "control" the laundry and food service division of UNITE HERE - to no avail.  2,000 UNITE HERE members in the national bargaining unit of Delaware North airport workers rejected SEIU/WU.  Likewise, their attempts to "control" food service workers have been thwarted in Charlotte, NC; Texas; Phoenix, AZ; Detroit; Minnesota; St. Louis; Philadelphia; across New York state; and in Michigan, to name just a few.

## 2.  "Retain Control of Key Assets"

Stern and Raynor contrived to tie up UNITE HERE's financial assets in legal proceedings so that neither side has access to them.  However, we can be confident that in the long run our legal case is superior to theirs and we ultimately will regain control of our members' assets.  Meanwhile, it is WU/SEIU, not UNITE HERE, which has been forced to undertake deep layoffs due to its declining financial straits.

## 3.  "Use Administrative and Financial Powers"

None of the named tactics was successful, with one exception.  Raynor did manage in January 2009 to secretly and unlawfully transfer at least $10 million in IU funds to his favored Joint Boards, and to have stolen or tied up other UNITE HERE assets.

## 4.  "Field"

Under "Field," Stern and Raynor outline a strategy to "move program of direct mail, robo call, etc. to members" as well as a target a long list of local unions they are presumably going to target for takeover.

Stern and Raynor, with the assistance of Stern confidante Steve Rosenthal and Stern Special Assistant Josie Mooney, did deploy a months-long rolling torrent of scurrilous telephone and direct mail appeals to hundreds of thousands of our members nationwide and in Canada.  But the communications barrage on our

**UniteHere!**

Organize Here. Win Here.   Organicemos Aquí. Ganen Aquí.

members had the opposite of Stern's intended effect: it awakened in UNITE HERE's rank and file members a deep commitment and drive to fight back. Not a single Local targeted for the communications blitz gave any traction to SEIU.

### 5. "Turn the Labor Movement Against Them"

Far from turning the labor movement against us, the polar opposite has occurred. Virtually the entire labor movement has publicly joined our cause, and repudiated Stern's hostile raid tactics.

> *"Line up key CtW Presidents on message to Wilhelm to settle"*

Instead, most Change to Win Presidents signed a solidarity pledge calling on SEIU to stop raiding.

> *"Line up CtW to indicate they will be kicked out"*

There was no need for Stern to implement this strategy since UNITE HERE withdrew from Change to Win on its own.

> *"AFL-CIO strategies locally and nationally"*

It is not clear what those "strategies" were going to be. What is clear is that 27 national union presidents signed a solidarity pledge supporting UNITE HERE against SEIU; 29 Central Labor Councils and State Federations passed resolutions against SEIU's raiding; and newly-elected AFL-CIO President Richard Trumka is firmly standing with UNITE HERE.

### 6. "Legal Action"

We know from first hand accounts that Raynor never intended the several law suits he filed to go anywhere, believing we would cave in under the prodigious cost of legal defense. Here again, he miscalculated and we are confident in our legal position.

### 7. "Negative"

Far from damaging UNITE HERE's reputation, SEIU's public relations campaign against us has boomeranged on Stern, leaving him and SEIU with a badly tarnished brand - thanks also to SEIU's mounting troubles in California health care and ongoing federal corruption probes in California, Michigan and elsewhere.



## *Workers United Is Disappearing*

What Stern and Raynor originally conjured up to be an "independent conference" within SEIU meant to raid UNITE HERE's hotel, gaming, and food service jurisdictions is steadily being consumed, and ultimately lost, within the huge SEIU structure.

While they stubbornly cling to the fiction that 150,000 UNITE HERE members voted to move into an "independent" WU conference within SEIU, nothing could be further from the truth. We have Raynor's then-chief of staff's (now SEIU Deputy Chief of Staff) written memo from May 2009 in which he documented that WU at that time had just 103,000 dues-paying members – and falling!

Since that time, UNITE HERE has continued to whittle away inside its traditional industry jurisdictions in places like Indiana, Philadelphia, Detroit, and dozens of other locations. While it is impossible to pinpoint the precise WU membership inside SEIU, there is no question it has sunk well below the 100,000 figure.

As a consequence of its diminished size, large-scale layoffs at WU are well underway. Whole WU departments have already, or are being, eliminated. Key Raynor lieutenants (his Chief of Staff Keith Mestrich, Chief Financial Officer Randi Farber, Executive Assistant Ed Vargas, Communications Director Amanda Cooper, Senior Researcher Ahmer Qadeer, and Political Director Abbie Illenberger) have been moved out of WU into other SEIU positions or have left the union altogether. And a number of Joint Boards are on the verge of merging wholly into existing SEIU locals.

WU's hoped-for identity as the worthy offspring of three of America's iconic unions, the International Ladies Garment Workers Union, the Amalgamated Clothing Workers Union, and the Textile Workers Union, is in tatters. In choosing this suicidal path, Raynor is destroying the heritage and identity of these great unions.

### *Conclusion*

Thinking back, few outside observers believed UNITE HERE could endure the surprise attack unleashed on our members on so many simultaneous fronts between December 2008 and April 2009. After all, UNITE HERE was facing the "largest and fastest growing union in North America" and its "visionary leader" Andy Stern.

Instead, the members and staff of UNITE HERE can take immense pride in having weathered SEIU's "shock and awe" campaign, and in being on a course to recover most all that Stern and Raynor attempted to take.

The chart below indicates the number of members who have left former Raynor-controlled Joint Boards during and after the "secession" votes of March 2009.

Organize Here. Win Here.   Organicemos Aquí. Ganen Aquí.
# UniteHere!

| Location/Local | Former WU/SEIU Joint Board | Industry | Number of members |
|---|---|---|---|
| Delaware North (National Unit, multiple Locals) | Various | Airport | 1,400 |
| Texas (Dallas, San Antonio, Houston) | Southwest Regional | Hotel, food service, airport | 1,500 |
| Detroit - Local 24 | Chicago & Midwest | Hotel, gaming, food service | 7,400 |
| Pittsburgh - Local 57 | Pennsylvania | Hotel, food service, airport | 1,800 |
| Minnesota - Locals 17, 21, 1483 | Chicago & Midwest | Hotel, food service, airport, manufacturing | 4,000 |
| Baltimore and Washington, DC - Locals 7, 25, 27 | Mid-Atlantic | Hotel, food service, airport | 7,970 |
| St. Louis – Local 74 | Chicago & Midwest | Hotel, gaming, food service | 2,400 |
| Phoenix - Local 631 | Western States | Hotel, food service, airport | 1,700 |
| Philadelphia - Local 634 | Philadelphia | Food service | 2,300 |
| Indiana - Local 2261 | Chicago & Midwest | Gaming | 600 |
| Chester, PA - Local 54 | Philadelphia | Gaming | 600 |
| Airport, Racetrack, and Allied Workers Joint Board | N/A | Airport, various | 4,000 |
| Syracuse - Local 150 | Rochester | Hotel, food service | 250 |
| New England Joint Board | N/A | Manufacturing, distribution | 9,000 |
| Kansas City - Local 64 | Chicago & Midwest | Airport | 400 |
| Charlotte, NC | Southern Regional | Airport | 700 |
| New Orleans - Local 166 | Southwest Regional | Hotel & food Service | 440 |
| Puerto Rico - Local 610 | Concilio de Locales PR | Gaming, hotel | 1,000 |
| Rochester Airport | Rochester | Airport | 30 |
| Bay City, Michigan - Local 688 | Chicago & Midwest | Food service | 400 |
| Toronto, Local 75 | Ontario Council | Hotel, food service | 7,500 |
| TOTAL | | | 55,390 |

# EXHIBIT 10

## CLEAN UP SODE O

Email Address

Zip Code          SIGN UP

**BLOG**   **ABOUT US**   **POOR MANAGEMENT**   **QUALITY OF SERVICE**   **MISPLACED PRIORITIES**   **ANTI-WORKER RECORD**   **MEDIA**

**WORKERS**   **HIGHER ED**   **PARENTS**   **EDUCATORS**

EN FRANÇAIS

# What is "Clean Up Sodexo"?

Brad Levinson   1:27 PM - November 22, 2009 | 0 Comments

Hi, and welcome to Clean Up Sodexo. It's a new initiative by workers of Sodexo and SEIU.

Sodexo is one of the largest contracted food and facilities companies in the world. It's a company - and a brand - that's backed by a healthy public relations budget and a robust "corporate social responsibility" campaign. This campaign is designed to portray Sodexo as a socially responsible company that employs a diverse workforce and is working to "break the cycle of poverty."

But when you talk to Sodexo's workers, they'll tell you that...

- The "cycle of poverty" that Sodexo claims it wants to end starts with a job at Sodexo.
- Sodexo's "commitment to health and wellbeing" stops when its workforce doesn't have access to affordable healthcare.
- Sodexo's effort to build "leadership for diversity and inclusion" fails when, even after thousands of black employees are forced to file a race-bias suit that's eventually settled for $80 million, lawsuits alleging unfair treatment continue to be filed.
- Sodexo's "longstanding policy of non-retaliation that ensures employees can safely report their good-faith concerns without fear of retribution" wears thin when an employee alleging sexual harassment on the job is fired.
- Sodexo's pledge to provide nutritious meals falls short when the parents of students who eat Sodexo's food question its quality, referring to it as "pre-packaged, processed food you would find in the freezer section."

Clea nUp Sodexo serves as the online voice of the workers at Sodexo. For too long, the workers that make Sodexo's profits possible have witnessed Sodexo's practice of promoting one thing to the public, and doing something else to its workers.

Clean Up Sodexo's goal is to demonstrate to Sodexo's workers, the community that its practices affects, and to the company itself that Sodexo needs to spend far less time talking about ideals and more time listening to its workers and practicing what it preaches.

Take a moment to get involved by signing up to join our campaign here: http://action.seiu.org/page/s/sodexocleanup

ShareThis          Categories: Blog

**TAKE ACTION**

Spread the word about our campaign

Tell Sodexo to respect workers

Submit a tip

Follow us on Twitter

Become a fan on Facebook

**FEATURED VIDEO**

Sodexo Workers' Poverty Tour: Columbus, Ohio

All CleanUpSodexo Videos

**SEARCH**

[                    ]  Search

# Leave a comment

Name

Email Address

URL

☐ Remember personal info?

Comments (You may use HTML tags for style)

Community Guidelines

PREVIEW    SUBMIT

**Issues**
Blog
About Us
Poor Management
Quality of Service
Misplaced Priorities
Anti-Worker Record
Media

**Site Resources**
RSS Feeds
Privacy Policy

**Partner Sites**
SEIU
Campaign for Quality
Services

**Social Networks**
YouTube
Twitter
Facebook

CLEAN UP SODEXO
SEIU (WWW.SEIU.ORG) 1800 MASSACHUSETTS AVE NW, WASHINGTON, DC
NATIONAL CAPITAL AREA: 202-730-7000; TOLL-FREE: 800-424-8592
© 2009 SEIU - SERVICE EMPLOYEES INTERNATIONAL UNION, CTW, CLC