# A-1



# Ousted Labor Leader Rosselli Forms Own Union, Targets SEIU Workers -- and Doesn't Expect SEIU to Play Nice

**By Matt Smith**

published: Mon., Feb. 2 2009 @ 1:20PM





This summer, the Service Employees International Union plans to spend some $50 million to ensure passage of a labor-friendly law that would allow any workforce to join a union if more than half of its employees sign a petition. Currently, workers approve whether a union should represent them in elections which, labor leaders say, can be easily manipulated by employers.

Renegade labor leader Sal Rosselli today said the SEIU, America's largest union, has an opportunity in California to achieve the goals of the Employee Free Choice Act without spending a cent. How?

"Just step out of the way," said Rosselli, during a Monday conference call with reporters.

Last week Rosselli and other union representatives were fired from their jobs representing 150,000 health care workers under the banner of SEIU affiliate United Healthcare Workers-West. SEIU national boss Andy Stern accused Rosselli of financial improprieties. Rosselli says the charges are bogus, and called his firing a power grab.

In response, Rosselli and his allies last week turned around and formed a new union, National Union of Healthcare Workers. During the past five days, workers with the new union have circulated 64 petitions at hospitals, nursing homes, and other facilities.

Rosselli says that at worksites representing 9,000 employees, more than half of the workers have signed petitions stating their wish to switch from SEIU to Rosselli's new union.

"Additional signatures are being collected as we speak, and we are sure that all of them will be majority status in a day or two," he said.

If the SEIU were an employer, and if the proposed Employee Free Choice Act were in effect, the union would be compelled to step aside and allow workers to join the new union, Rosselli said.

"This is what we predict: Later today or tomorrow, Andy Stern will launch the most outrageous anti-union campaign against these workers. The Employee Free Choice Act has broad support from members of Congress, and it's the number one priority of the labor movement, because the playing field is so uneven for working people who want to join unions. It's the position of of elected officials in our union that where workers are wanting to join a union, employers, and unions, should recognize that."

**Showing 1 comments**

 **grinding teeth**   7 months ago

I am considering pursuing Dentistry School. However, I would still need to work full time. Do you think it would be possible to be successful at Dentistry School and still work full-time?

# A-2

February 3, 2011

This is the print preview: Back to normal view »

## Randy Shaw

Author, Beyond the Fields: Cesar Chavez, the UFW and the Struggle for Justice in the 21st Century

Posted: May 20, 2010 11:59 AM

# SEIU to "Create WWIII" to Drive NUHW Out of Hospitals

According to published minutes from an April 10, 2010 SEIU-UHW meeting, SEIU plans to "Basically create WWIII" in order to drive NUHW organizers and supporters out of California hospitals. SEIU specifically intends to closely coordinate with Kaiser Security and Human Resources Department to "remove NUHW" from hospital cafeterias and other areas, and to act "as a GROUP" in making NUHW supporters - who are currently SEIU members - "uncomfortable."

SEIU is aggressively carrying out this strategy. On May 10, SEIU's Latasha Winslow-Beavers sent a fax to Kaiser Roseville HR Director Karen Martins alerting her to the planned visit of legendary UFW leader and NUHW supporter Dolores Huerta to Kaiser Modesto Medical Center on May 14. Martins forwarded the fliers to Henry Diaz, who heads Kaiser's Northern California HR Dept. Diaz told NUHW the next day that Huerta's planned visit was a "violation of our solicitation policy," even though the event flier that SEIU faxed to him never mentioned Huerta would be "soliciting" workers for signatures. When Huerta appeared, met with workers and refused to leave hospital grounds, Kaiser called the police.

After landslide defeats to NUHW in the first set of Kaiser Hospital elections, SEIU has turned to desperate measures to prevent the loss of an additional 50,000 Kaiser workers later this year. These measures include SEIU's coordinating with Kaiser management to drive NUHW out of hospitals, and regularly using intimidation and even violence against NUHW supporters (who are current SEIU members).

From "Implosion" to "WWIII"

When SEIU international was battling with its former SEIU-UHW leadership in 2008, it drafted a strategy designed to cause its third-largest local to "implode." Now SEIU is going further, implementing a plan to "Basically create WWIII" inside Kaiser Hospitals.

SEIU's plan is outlined in its "UHW Steward Council Meeting Minutes, Baldwin Park Medical Center, April 7, 2010." Although the meeting focused on strategies to defeat NUHW, contract specialist Selma Rodriquez - paid by Kaiser to deal exclusively with contract issues - was present throughout and Kaiser paid the workers during the meeting.

Angela Hewitt, SEIU-UHW's Baldwin Park Coordinator, urged that SEIU "Basically create WWIII." She and the group agreed that SEIU must "let NUHW know that they have no right to be here, and this is UHW territory." Hewett suggested that SEIU supporters tell Kaiser's Human Resources (HR) Department that they were "upset" by the presence of NUHW, and that the rival union should be removed from the workplace (click here to view page 5 of the minutes, which includes these statements.)

As a model for how SEIU should deal with NUHW, Hewitt cited SEIU's success at forcing NUHW out of St. Francis Medical Center in Lynwood, where SEIU backers acted as a group and "confronted NUHW and made them feel uncomfortable." She noted how SEIU had succeeded by calling HR to "demand NUHW is removed," and by calling hospital security to "Remove NUHW."

SEIU's citing of St. Francis Medical Center in Lynwood as its model is telling. The NLRB found SEIU guilty of an unfair labor practice there for threatening to have the hospital terminate workers "because they engaged in activities in support of the National Union of Healthcare Workers."

But SEIU's intimidation activities extend to many other facilities as well. On June 7, 2010, the NLRB will hold a trial against six SEIU staff members for illegally threatening and intimidating NUHW supporters and violating their rights under federal labor law.

SEIU/Kaiser Battle Dolores Huerta

The joint SEIU-Kaiser strategy is best seen it their campaign against allowing Dolores Huerta to meet with workers. Here's how it proceeded:

On May 10, SEIU's LaTasha Winslow-Beavers faxed to Kaiser HR Director Henry Diaz fliers produced by NUHW announcing hospital visits by Huerta and NUHW's Ralph Cornejo. Less than 24 hours later, Diaz emailed Cornejo saying the planned visits were "in violation of our solicitation policy, and will not be permitted."

On May 14, Huerta appeared at the Modesto Hospital cafeteria and met with workers. Kaiser asked her to leave, but she refused. In response, Kaiser closed the cafeteria, forcing Huerta to continue meeting with workers outside the building.

It is worth noting that at no time did Huerta ask any worker to sign any decertification papers or other documents, the conduct that would constitute "solicitation." Nor did the fliers sent by SEIU to Kaiser suggest she would be soliciting, yet Kaiser's HR Director immediately concluded that Huerta would violate its solicitation policy.

While Huerta was meeting with workers outside the building, Kaiser security appeared and told Huerta that if she does not leave they will call the police. She refused, Kaiser called the police, and Huerta left to avoid further conflict.

Mission Accomplished?

At one level, SEIU succeeded on May 14 in using Kaiser's HR Department and security staff to "remove NUHW" from Modesto Hospital - if only for a few hours. But SEIU could pay a steep price for this "success."

First, Dolores Huerta has appeared at hundreds of events on behalf of SEIU workers over the years. In my book, Beyond the Fields, I describe how she went to the University of Miami in 2006 to support an SEIU organizing campaign among campus janitors. Huerta went to Miami at the request of her old UFW colleague, Eliseo Medina, and helped persuade the school's President Donna Shalala to do the right thing.

Medina is now an SEIU Executive Vice-President and the co-trustee of the SEIU-UHW local that is faxing documents to Kaiser to prevent Huerta from talking to workers. After years of enlisting Huerta as a credible ally in its campaigns, SEIU's collusion with Kaiser management to suppress her speech could strike many as hypocritical.

Second, when Medina was a young UFW organizer, he saw how Central Valley growers aligned with the Teamsters union in order to prevent the UFW from representing farmworkers. The growers preferred the Teamsters because they got weaker contracts, no prohibitions against dangerous pesticides, and did not have to deal with a union backed by a broad social movement.

In light of SEIU's alliance with Kaiser management to "remove NUHW," Kaiser workers could wonder what concessions SEIU is giving Kaiser in exchange. The Teamsters aligned with growers because it had no base among workers in the fields; it would seem that if SEIU had the majority support of workers, it would not need management's help to defeat NUHW.

I asked longtime UNITE HERE Local 2 President Mike Casey if his union ever asked the Hilton or another hotel's HR or security staff to remove rival unions from the premises, or threatened to coordinate with hotel management to fire unionized workers. Casey said his union would "never" contact the employer in such cases. He said that there was an "unwritten code" that inter-union differences are worked out without involving the employer, and that SEIU had clearly "crossed the line."

Casey also told me, "This is exactly how a company union operates. Rather than putting workers interests first, SEIU is acting by all means necessary to annihilate NUHW, even if it means aligning with management."

SEIU's Thuggery and Intimidation

Unfortunately, the analogy between SEIU and the Teamsters of the 1960's and 70's extends to their mutual reliance on thuggery and intimidation. Consider what SEIU meant when it began invoking its "WWIII" plan:

* At the same Modesto hospital where Kaiser sought to bar Huerta, a busload of 70 SEIU staff entered the cafeteria three weeks earlier and encircled a group of NUHW supporters; Kaiser security did nothing to intervene.

*At Kaiser Sunset, whose nurses have already chosen NUHW and technicians will vote later this year, SEIU activist Darren "Tree" Wallace confronted a registered nurse who was talking to a worker about NUHW. Wallace is about 6ft 5 inches tall, and serves the intimidator role that burly Teamster goons once served against UFW organizers in the fields.

Wallace makes a practice of taking pictures of NUHW supporters. When the nurse - at least a foot shorter than Wallace - put her hand up to block her face, Wallace grabbed her arm. She called the police and charges against Wallace are pending.

*At Kaiser's Roseville Hospital, a group of nine SEIU workers and staff - one of whom was another Kaiser-paid contract specialist (Audrey Martinez) whose duties are supposed to be limited to contract administration encircled NUHW supporter Frank Engles and tried to remove his NUHW lanyard from

his neck and replace it with an SEIU lanyard. Two other NUHW supporters were also encircled, and one was pushed in the chest.

*In early May NUHW organizer Gary Guthman was eating lunch with two NUHW leaders at Kaiser South Bay when they were surrounded by twelve hostile SEIU stewards and reps, three of who sat at their table and refused to leave. Kaiser security and HR representatives did nothing to stop them.

*On the night of May 18, CNA member Robert Marth was handing out decertification petitions to NUHW supporters at Kaiser Hayward Hospital. An SEIU staffer grabbed the petitions, shoved Marth in the chest. Marth has filed a police report.

There are many more such incidents. If they sound familiar, it is because they are part of SEIU's common playbook designed to "remove NUHW" and "Basically Create WWIII."

Fred Ross, Jr., who witnessed Teamster intimidation as a UFW organizer and went on to organize hospitals for SEIU before leaving in 2009, says that "SEIU's pattern of violence and bullying tactics directed at Kaiser workers, and its collusion with Kaiser management, is shameful."

SEIU President Mary Kay Henry and SEIU-UHW Trustee Eliseo Medina must be held accountable for SEIU's practicing thuggery and intimidation against its own members. A union that won widespread media and academic support as representing the "next wave" of the labor movement has sadly returned to the worst tactics of Teamster hooliganism and employer collusion to maintain its power.

Randy Shaw is the author of Beyond the Fields: Cesar Chavez, the UFW and the Struggle for Justice in the 21st Century, which will be out in paperback in July.

# A-3

*Prime Healthcare Services, Inc. is a privately held for-profit company that operates 13 acute care hospitals in California. The company is known for aggressive business practices but has vaunted its success in making money where others have failed, and has widely advertised its quality awards, including several recognitions in Thomson Reuter's "Top 100 Hospitals" series. A new analysis by SEIU points to a high probability of serious breakdowns in patient care and/or possible Medicare fraud at Prime hospitals, raising troubling questions about the source of Prime's profitability, and casting a shadow over Prime's apparently ill-gotten awards.*

# Septicemia at Prime Hospitals

In 2008, a single health system—Prime Healthcare Services, Inc.—operated five (5) of the six (6) hospitals with the highest septicemia rates[i] in the United States.

Also called a blood infection or blood poisoning, septicemia is a life-threatening condition frequently acquired in a healthcare setting. It is also a condition for which Medicare providers can be highly reimbursed, and inaccurate billing for septicemia when patients actually have less-complex conditions (such as urinary tract infections) has been a subject of enforcement efforts for more than a decade[ii].

Whatever the cause — real infections, inaccurate billing, or a combination of the two — the rate of septicemia among Prime's Medicare patients in 2008 was more than three times the national average, and far exceeded any other health system. Comparing all 111 U.S. health systems of comparable size or larger, Prime's septicemia rate (15.7%) was 70% higher than the second-highest health system (9.2%).

The following analysis reports on the high septicemia rates at Prime hospitals.



**Septicemia Rate, 2008**
Normalized for apples-to-apples comparison

This chart compares all 111 health systems with at least 10,000 qualifying Medicare claims in 2008

Prime, with 16,874 claims included, is a national outlier

● Prime Healthcare
  Other Health System
━National Median

# Contents

- **Background**

- **Key findings:** Septicemia at Prime hospitals

- **Probable Explanations**
    - Billing problems
    - Quality problems
    - A combination of the two

- **Other Possible Explanations**
    - Could the septicemia arise somewhere other than Prime hospitals, such as local nursing homes?
    - Could Prime be treating a higher burden of sicker patients than other local hospitals are treating?
    - Do high infection rates exist at these hospitals before Prime takes over?

- **Medicare reimbursement:** How septicemia rates at Prime have boosted payment

- **Dubious Distinction:** How extreme rates lead to false quality scores

- **Real infections?** Drilling down on infection rates

- **Conclusion**

## Background

SEIU-UHW is engaged in a labor dispute with Prime.

Prime's anti-worker and anti-labor policies have produced a terrible record of callous treatment of workers' rights and community needs. Labor disputes have arisen at Prime facilities at Garden Grove, Shasta Regional, and Centinela Medical Center, among others. The Union has proceeded to interest arbitration, to district court, and to bankruptcy court battling Prime and its tactics. The Union has also filed numerous Unfair Labor Practice charges with the National Labor Relations Board regarding Prime's activities. At Prime hospitals, the company has cut the workforce, reduced wages and benefits, and attacked worker protections that were once guaranteed by collective bargaining agreements.

The findings presented here raise serious concerns about worker and patient safety. In addition, if Prime's corporate billing practices—rather than actual infections—are driving the problem, coding staff and other bargaining unit staff are being placed at risk.

3

# Key findings: Septicemia at Prime hospitals

Prime hospitals have the highest septicemia rates in the United States. Of all 2,912 U.S. hospitals included in an analysis of 2008 Medicare inpatient stays[iii], Prime operated five (5) of the six (6) hospitals with the highest septicemia rates in the country. All 12 hospitals Prime operated through the end of FFY 2008 were in the top ten percent, with 11 of the 12 in the top 5% of hospitals, nationally[iv].

Table: Septicemia at the 12 hospitals operated by Prime by the end of Federal Fiscal Year 2008[v]

| Prime Hospital | Total Inpatient Discharges | Total Septicemia Discharges | Septicemia Rate | Standard Deviations Away from Mean | National Percentile Ranking, FFY 2008 |
|---|---|---|---|---|---|
| Montclair Hospital Medical Center | 589 | 147 | 25.0% | 7.3 | 100.0% |
| West Anaheim Medical Center | 2,344 | 540 | 23.0% | 6.6 | 99.9% |
| Sherman Oaks Hospital & Health Center | 1,610 | 363 | 22.5% | 6.4 | 99.9% |
| Desert Valley Hospital | 1,248 | 253 | 20.3% | 5.6 | 99.9% |
| Chino Valley Medical Center | 1,521 | 301 | 19.8% | 5.4 | 99.8% |
| Garden Grove Hospital And Medical Center | 869 | 125 | 14.4% | 3.5 | 99.1% |
| San Dimas Community Hospital | 349 | 47 | 13.5% | 3.1 | 98.8% |
| Huntington Beach Hospital | 1,142 | 132 | 11.6% | 2.4 | 97.4% |
| Encino-Tarzana RMC - Encino Campus | 1,620 | 173 | 10.7% | 2.1 | 96.5% |
| Centinela Freeman RMC - Centinela Campus | 3,177 | 338 | 10.6% | 2.1 | 96.4% |
| Paradise Valley Hospital | 1,499 | 147 | 9.8% | 1.8 | 95.1% |
| La Palma Intercommunity Hospital | 906 | 76 | 8.4% | 1.3 | 90.9% |
| | | | | | |
| National Average | | | 4.6% | | |
| National Median | | | 4.1% | | |
| Standard Deviation | | | 2.8% | | |

4

The volume of septicemia cases at Prime hospitals is startling. In FFY 2008, Prime's Montclair Hospital billed Medicare for 589 qualifying inpatient stays[vi]. Of these, 147 – one in four – were for septicemia. The corresponding national rate was 4.8% – less than one in 20.

**Figure: Septicemia rates at U.S. hospitals, 2008**



This chart compares all 2,912 U.S. hospitals with at least 500 qualifying Medicare claims in 2008

**Prime operated 5 of the top 6 hospitals in 2008**

Across all 12 hospitals operated by Prime by the end of FFY 2008, there were 16,874 qualifying Medicare admissions and 2,642 were for septicemia. This represents a system-wide septicemia rate of 15.7%. At the national average rate of 4.8%, only 810 of the patients would have been treated for septicemia – a remarkable 1,832 fewer septicemia patients than were actually seen at Prime hospitals.

Comparing overall septicemia rates for all 111 U.S. health systems of comparable size or larger[vii], Prime's overall septicemia rate (15.7%) was more than three times the national average, and 70% higher than the second-highest health system in the country (9.2%).

## Probable Explanations: Billing and/or Quality Problems

Several possibilities are suggested by the extreme septicemia rates at Prime hospitals. One possible explanation is that the much higher rates at Prime hospitals reflect coding errors or, more specifically, upcoding. Upcoding occurs when a provider bills inaccurately for healthcare services, leading to higher reimbursement than is justified by the care needed or received[viii].

In other words, it may not actually be the case that all of the patients to which the Prime hospitals assigned a septicemia DRG had septicemia, but rather that the septicemia DRG was used in order to generate higher reimbursements. This type of behavior was documented in a 1999 study by the Office of Inspector General of the U.S. Department of Health and Human Services (OIG)[ix].

In its 1999 study, the OIG honed in on hospitals where more than 3% of their discharges were due to septicemia, and where the proportion of septicemia discharges to total discharges had more than doubled from 1993 to 1996. These criteria flagged 120 hospitals, which collectively billed for 13,450 septicemia discharges in 1996, exceeding national norms "by approximately 7,345 cases". The OIG characterized the difference as "questionable billing," estimated potential overpayments to be "as high as $16.6 million," and referred the 120 hospitals to its Office of Investigations.

The septicemia rate at every Prime hospital has at least doubled from 2004 to 2008, and all were far greater than the 3% rate employed by OIG. However, not all septicemia results from questionable billing. A second possibility is that Prime hospitals have real problems with infection control. Septicemia may occur when bacteria enters a patient's bloodstream, and this bacteria could come from being exposed to any number of other infections that patients would commonly be treated for in a hospital setting. If proper precautions for infection control are not employed—especially when using invasive devices such as catheters—then the risk of developing (and spreading) septicemia increases[x]. All that said, it is difficult to understand how infection rates could reach this level at all 12 hospitals Prime operated in 2008. A third possibility—perhaps the most likely—is that the high infection rates at Prime hospitals stem from a combination of questionable billing and real quality problems.

In the following section we test possible explanations *other than* billing or quality problems.

## Other Possible Explanations

### *Could the septicemia arise somewhere other than Prime hospitals, such as local nursing homes?*

Septicemia is often acquired in a healthcare setting, but not always in a hospital. If a single hospital had a high rate of septicemia discharges, a probable explanation could be that some other community provider—such as a nursing home—might be the source. The likelihood of this explanation is diminished by the universal pattern of elevated septicemia rates at every hospital the company operates.

The possibility is then effectively eliminated by comparing hospital septicemia rates among a limited group of patients—those patients coming to the hospital through its emergency department, and doing so *directly from their homes*. This information is not available in the Medicare data; however, it is reported by providers to the California Office of Statewide Health Planning and Development (OSHPD).

Using the OSHPD inpatient data we can exclude patients coming from other hospitals, nursing homes, prisons, etc., and focus on patients coming to the hospital directly from their homes.

With the OSHPD data we can apply the same rules as we applied to the Medicare data, including all Medicare fee-for-service patients 65 and older, treated for a medical condition in a non-specialty MDC. We can then add the requirement that we only want to look at patients coming into the hospital through the ED *from their homes*. This will eliminate patients coming to the hospital from other healthcare providers in the community.

6

The result is that Prime operates 6 of the top 8 hospitals in the state, ranked by septicemia rates[xi], and overall, the resulting septicemia rate at Prime hospitals (13.6%) is double that of the rest of the state.

Therefore, it does not appear to be a possibility that the elevated infections are originating at local nursing homes or at other community providers.

## Could Prime be treating a higher burden of sicker patients than other local hospitals are treating?

Although the elevated infection rates at Prime hospitals are driven by patients coming from their homes to the hospital, it remains a possibility that patients with blood infections tend to end up at Prime hospitals, rather than at other community hospitals. It seems an unlikely possibility for septicemia patients, although this type of pattern certainly arises for some groups of patients—such as chest pain patients and trauma patients—due to respective hospital specialties. While we do not know of any marketing initiative or specialization that could lead to such a concentration of septicemia patients, we can address the possibility nonetheless, this time utilizing OSHPD data to analyze local septicemia rates by the zip codes in which patients live.

If Prime hospitals are somehow seeing a higher concentration of septicemia patients, then it follows that other local hospitals should be seeing lower concentrations. In this circumstance, taken as a whole, regions served by Prime (and by other providers) should not show a pattern of elevated septicemia. Instead, where Prime hospitals have unusually high rates of septicemia, other hospitals should have unusually low rates, and overall septicemia rates among patients living in the region should be unaffected.

However, that is not what we observe. On the contrary, septicemia rates are elevated among seniors living in zip codes that are heavily served by Prime hospitals (See figure, below).

Taking the analysis further, we mapped out septicemia rates (among *all* hospital inpatients) near Prime hospitals by patient zip code (See maps, below). High septicemia rates are observed near Prime facilities. Septicemia rates in the same regions were then mapped a second time with Prime discharges removed from the data set and more typical septicemia rates are observed.

These patterns strongly suggest that high septicemia rates at Prime are not caused by any factor that would simply increase the likelihood of septicemia patients ending up at Prime hospitals. On the contrary, high rates at Prime hospitals appear to be "driving up" overall infection rates among the population.

Lastly, it is worth noting that there is no reason to believe that Prime hospitals operate in population centers that are somehow demographically atypical in some way that could lead to housing an unusual number of people susceptible to septicemia. In FFY 2008, Prime operated 12 hospitals of varied sizes, which served varied demographics in 5 Southern California counties: San Diego (1 hospital), Los Angeles (5), Orange (4), San Bernardino (3), and Riverside (1).

7

**Figure:** Elevated septicemia rates among seniors living in zip codes that are heavily served by Prime hospitals. Source: California OSHPD data set.



Figure: Regional Septicemia Rates near West Anaheim, Garden Grove and La Palma, **with Prime**

Figure: Regional Septicemia Rates near West Anaheim, Garden Grove and La Palma, **without Prime**



Figure: Regional Septicemia Rates near Desert Valley, **with Prime**



11

Figure: Regional Septicemia Rates near Desert Valley, **without Prime**



Septicemia Rates
Too Few Claims
<4%
4%-6%
6%-8%
8%-10%
10%-12%
>12%

Desert Valley

12

*Do high infection rates exist at these hospitals before Prime takes over?*

This table compiles four years of MedPAR data, showing septicemia rates at hospitals operated by Prime as of the close of FFY 2008. Hospitals in orange were operated by Prime for at least 6 months of the fiscal year. While some Prime hospitals had high septicemia rates before Prime took over, the septicemia rate at every single Prime hospital increased from 2007 to 2008.

| Prime Hospital | 2005 | 2006 | 2007 | 2008 |
|---|---|---|---|---|
| Desert Valley Hospital | | | | |
| Chino Valley Medical Center | | | | |
| Sherman Oaks Hospital | 4% | | | |
| Montclair Hospital Medical Center | 19% | | | |
| Huntington Beach Hospital | 3% | 6% | | |
| La Palma Intercommunity Hospital | 4% | 3% | | |
| West Anaheim Medical Center | 11% | 15% | | |
| Paradise Valley Hospital | 3% | 4% | | |
| Centinela Hospital Medical Center | 4% | 4% | 6% | |
| Encino Hospital Medical Center | 2% | 5% | 6% | |
| Garden Grove Hospital and Medical Center | 7% | 12% | 13% | |
| San Dimas Community Hospital | 7% | 9% | 11% | |
| Overall Septicemia Rate | 6% | | 13% | 15% |
| Percent Prime ownership by number of claims in denominator | 10% | | 61% | 100% |

| Legend | |
|---|---|
| Hospital operated by Prime at least 6 months | |
| Other Hospital | % |

13

## Medicare reimbursement: How septicemia rates at Prime have boosted payment

Medicare pays for inpatient care by classifying every hospital stay into a category that is meant to reflect the average resource utilization for the patient. The category is called a Diagnosis Related Group (DRG), or, more recently, a Medicare Severity Diagnosis Related Group (MS-DRG). Each MS-DRG has a weight, and the higher the MS-DRG weight, the higher will the reimbursement be for the given inpatient stay.

A patient is categorized into an MS-DRG using a computer program called an MS-DRG Grouper. Information from a hospital bill is run through the grouper software, and out pops the MS-DRG. The key pieces of information that go into the grouper are the diagnoses and procedures billed by the provider, as well as the patient's age and sex.

In order to get paid thousands of dollars more for septicemia than for a urinary tract infection (UTI), a dishonest provider could simply report the first diagnosis code on the bill as 038.9 ("Unspecified septicemia") instead of 599.0 ("Urinary tract infection site not specified").

Without additional complicating factors, the UTI code would result in an MS-DRG of 690, which had a weight of 0.8 in FFY 2008. Conversely, without additional complicating factors, the alternative code would result in MS-DRG 872 ("Septicemia w/o MV 96+ hours w/o MCC"), which had a weight of 1.3783. The Medicare FFY 2008 base rate was $5,387. So, without including add-ons and geographic adjustments, the provider would get approximately $3,162 more for changing the code:

| | | |
|---|---|---|
| Septicemia payment: | $ 5,387 x 1.387 = | $ 7,472 |
| UTI payment: | $ 5,387 x 0.8 = | $ 4,310 |
| Difference: | = | $ 3,162 |

If in fact Prime is manipulating diagnosis codes to obtain higher reimbursement, it is not possible to calculate the exact costs to the federal government, because without reviewing the charts (and potentially interviewing doctors and patients) one cannot determine what the appropriate codes really were. However, some indication might be found by looking at the average DRG payment at Prime hospitals and comparing it to the average DRG payments at other health systems.

As before, because hospitals have varying surgical and specialty practices, we limit the analysis to all other claims. Using that same denominator, we can compare the average reimbursement with comparable health systems[xii], normalizing to the standard $5,387 base payment. The result is striking: Prime's standardized reimbursement is 4.53 standard deviations above the mean. The second health system down is at 2.23.

14

Figure: Prime Healthcare obtains far higher standardized Medicare reimbursements than comparable health systems



These figures raise the question of how much more Prime obtained from Medicare than it would have if it were billing at average complexity levels. The following calculation shows that Prime was paid $18M more for its non-surgical, non-specialty inpatient care than one would expect, assuming that Prime should have had the same MS-DRG case mix as the average health system of comparable size. The calculation includes all 111 health systems with at least 10,000 qualifying Medicare inpatient stays.

**Calculation: Possible Excess Reimbursement to Prime Healthcare in 2008**

| Health System | Qualifying Inpatient Stays | MS-DRG weights for Qualifying Stays | Actual Reimbursement | Average MS-DRG Weight |
|---|---|---|---|---|
| Other Health System | 6,143,583 | 6,631,694 | 34,374,030,690 | 1.079 |
| Prime | 16,874 | 21,109 | 130,585,943 | 1.251 |
| **Calculations** | | | | |
| Difference in weights per DRG | 0.1715 | | | |
| Reimbursement to Prime per DRG weight | 6,186 | | | |
| Number of excess weights | 2,894 | | | |
| Possible excess reimbursement | $ 17,903,152 | | | |

## Dubious Distinction:  How extreme rates lead to false quality scores

With the highest infection rates in the United States, it seems to be ironic—as well as to be a disservice to consumers and competitors—that Prime Healthcare is able to advertise itself using multiple recognitions in Thomson Reuters' "Top 100 Hospitals" series. As it turns out, these awards are a side effect of Prime's outlier status.

The short explanation is this: Prime is being rewarded for having good outcomes **among** its septicemia patients. The troubling fact that Prime has **so many** septicemia patients is not addressed by the awarding company, which takes Prime's word for the patients' condition.

Specifically, in its "Top 100" methodology, Thomson Reuters explains[xiii] that they put patients into groups, based on factors including the patient DRG (and the Refined DRG, a similar system using another proprietary grouper). Within these groups, analysts calculate certain "expected" outcome rates, including mortality rates. This is used for comparison with the facility's "actual" outcome rates.

If a facility upcodes patients from a low-mortality DRG (like UTI) to a high-mortality DRG (like septicemia), the mortality rate among the incorrectly marked "septicemia" patients is very likely to be lower than expected, and the length of stay will very probably be shorter. Similarly, if a facility is getting healthier patients sick, it is possible that the healthier patients, once sick, will have a relatively low mortality rate for the hospital-acquired infections. In either of the two scenarios, counterintuitive as it may be, the offending hospital will actually benefit from its behavior in the Top 100 quality rankings, as can be readily gleaned from the relative mortality rates among septicemia patients at Prime.

| Health System | Septicemia Stays | Septicemia Deaths | Mortality |
|---|---|---|---|
| **Other Hospitals** | 293,126 | 60,170 | 21% |
| **Prime Hospitals** | 2,642 | 352 | 13% |

In other words, the septicemia mortality rate at other hospitals was 54% higher than the septicemia mortality rate at Prime. This makes Prime look very good by comparison to its competitors, due, ironically, to its high infection rate.

On the other extreme, if we do not adjust for patient mix at all, but simply look at the naive mortality rate across the entire set of qualifying[xiv] hospital stays, Prime does not stand out:

| Health System | All Qualifying Stays | Deaths among Qualifying Stays | Mortality |
|---|---|---|---|
| **Other Hospitals** | 6,143,583 | 288,420 | 4.7% |
| **Prime Hospitals** | 16,874 | 755 | 4.5% |

**Prime Healthcare is not the first company that has benefited this way.** The Top 100 award series has recognized other hospitals that were later cited for extreme utilization rates or for upcoding in the past. One of the most notorious examples in the country comes from Redding Medical Center, which was named one of the Top 100 Cardiovascular Hospitals by HCIA, Inc. in 1999[xv] HCIA is the same Top 100 Hospitals list as the later-branded Solucient, and which is now called Thompson Reuters.

A Congressional Disaster Analysis report reflects what was really going on at the hospital:

> For much of a ten-year period between 1992 and 2002, the cardiac program at this 240-bed ... hospital in Redding, a small city at the northern tip of California's Sacramento Valley, was performing an extraordinarily high number of cardiac procedures. These eye-catching statistics on catheterizations and coronary bypass operations were reported annually in the Dartmouth Atlas of Health Care and were well known to federal and state officials. Yet no agency sought as much as an explanation. It was not until 2002, when a skeptical heart patient called the FBI that an investigation began. One key finding that emerged from the investigation was that corporate officers, the administrators of Redding Medical Center, and the directors of the cardiology and cardiac surgery programs, Dr. Chae Hyun Moon and Dr. Fidel Realyvasquez, respectively, totally blocked peer review in the cardiac programs. As a result, hundreds of patients underwent unnecessary bypass and valve surgery from which some suffered debilitating injuries and others died.
>> Rogan, G. et al. "How Peer Review Failed at Redding Medical Center, Why It Is Failing Across the Country and What Can Be Done About It." DISASTER ANALYSIS REDDING MEDICAL CENTER CONGRESSIONAL REPORT. June 1, 2008.

In essence, patients who did not actually need cardiac surgeries were getting them. Although there were some unnecessary deaths as a result, another side effect was the overall appearance of excellent care in the claims data, and Redding's subsequent appearance on the Top 100 list. This result occurs because people who do not need surgeries tend to survive them better.

As may be the case at some Prime hospitals, real quality problems were "masked" by the high number of relatively healthy patients in the group for whom quality is being measured. At Redding, this group was "patients who needed bypass surgery", and at Prime the group is "patients who get septicemia." In both cases, the percentage of patients who die of the condition is relatively low, most likely because they were healthier patients to begin with.

**A second example is St. Joseph's Hospital** in Atlanta, Georgia, which still[xvi] boasts its recognition by the same Top 100 awards series (then branded Solucient's Top 100 Hospitals). St. Joseph's paid the U.S. $26 million to settle False Claims allegations, "where services that should have been billed as 'outpatient visits' were charged at the higher rate as 'inpatient admissions'" according to the Department of Justice[xvii].

In this example, the Top 100 Hospitals awards methodology unwittingly compares visits that other hospitals would have done on an outpatient basis, to inpatient care at "honest" hospitals. This meant <u>easier-to-care-for patients were being compared to ones who represented more difficult cases</u>, resulting in the appearance of superior care at the hospital that was upcoding.

Similarly, **EMH Regional Medical Center** in Elyria, Ohio vaunts its standing as a Thompson Reuters "Top 100" Cardiovascular Hospital. Like the Redding case, the procedure rate at EMH is highly atypical, and has been the subject of public scrutiny[xviii], including a 2006 New York Times investigative article. As with Redding Medical Center, the hospital may have won the award because when healthier patients get procedures, whether or not the procedures are medically appropriate, they have a higher chance of experiencing good outcomes.

One quality award Prime recently received stands out. Montclair Hospital, which has the highest rate of septicemia in the United States, won a 2009 "Top 100" award from Thompson Reuters.

The situation with Prime (and the three hospitals described above) is analogous to comparing teachers by their students' 9th grade proficiency scores, when Mr. P had seniors come in and take the test for his freshmen. Mr. P's ensuing "teaching excellence" award would be phony, and may indeed mask real problems in the quality of his teaching.

## Real infections? Drilling down

This analysis has focused on the probability that Prime may be overbilling Medicare, or that relatively healthy people may be getting infections at Prime hospitals.

Either of the likely possibilities is serious. Trying to distinguish between the two is difficult, because if Prime is overbilling Medicare, the data we are working with misrepresents actual patient diagnoses. A thorough investigation of billing and patient care at Prime will be needed to draw clear conclusions.

That said, we looked at two secondary diagnoses that may be more accurately reported, as they have less impact on reimbursement. One of these diagnoses is septic shock—a condition that can be caused by septicemia, but for which there is little motivation to inaccurately record. The other secondary diagnoses that we examined are skin ulcers. Skin ulcers, like septicemia, are often associated with inadequate care. Unlike septicemia, skin ulcers are not associated with a known upcoding modality.

In all these cases, we used the OSHPD data in order to most reliably limit our results to patients originating at the home, rather than at a nursing home or other provider.

Septic shock is a serious condition that can be caused by septicemia, and it often results in death. Septicemia rates at Prime hospitals may not provide a meaningful measure of quality—given the upcoding concerns noted in this analysis—but septic shock is not generally known to be a target of upcoding. However, it may be underreported or inconsistently reported, highlighting the need for detailed review.

| Provider | Shock rate | St. Dev. above the mean | Percentile | In-hospital mortality rate among septic shock patients |
|---|---|---|---|---|
| San Dimas Community Hospital | 5.1% | | | 40% |
| Montclair Hospital Medical Center | 4.9% | | | 26% |
| Sherman Oaks Hospital & Health Center | 3.8% | | | 58% |
| Huntington Beach Hospital | 3.7% | | | 38% |
| Garden Grove Hospital and Medical Center | 2.4% | | | 41% |
| Encino Hospital Medical Center | 2.3% | | | 38% |
| Centinela Freeman Regional Medical Center - Centinela Campus | 1.9% | 0.1 | 63% | 55% |
| Chino Valley Medical Center | 1.9% | 0.1 | 61% | 24% |
| West Anaheim Medical Center | 1.8% | 0.0 | 57% | 48% |
| Paradise Valley Hospital | 1.0% | (0.8) | 20% | 57% |
| La Palma Intercommunity Hospital | 0.7% | (1.2) | 9% | 40% |
| Desert Valley Hospital | 0.5% | (1.3) | 5% | 29% |

Of concern: four Prime hospitals are at least 2 standard deviations above the mean - and in the top 5% of the hospitals statewide.
Sherman Oaks may give particular cause for closer scrutiny. It is the largest of the top four hospitals, and the septic shock mortality rate appears elevated, as does the overall incidence of septic shock.

Methodology: Using Calendar Year 2008 OSHPD data, we started with the denominator most comparable to our work with the MedPAR data: Medicare fee-for-service patients 65 and older; excluding surgical stays and specialty MDCs. Then, we further limited the denominator as follows: we only included patients coming from *home* (rather than from a nursing home or other institutional source). All hospitals with at least 400 claims remaining in the denominator were included.

High levels of skin ulcers are not associated with known upcoding modality, but, like septicemia, they are often acquired in a healthcare setting. An initial look at skin ulcer rates in California hospitals points to a possible cause for concern at a number of Prime hospitals. Five Prime hospitals are at least 1.5 standard deviations above the California average, and four Prime hospitals appear in the top 5% of hospitals in California (all things being equal, one would expect only 1 in 20 hospitals to be in the top 5%). Note that we cannot be sure what is causing high rates of skin ulcers at Prime hospitals; closer scrutiny is needed to understand the root causes.

| Provider | Skin Ulcer rate | Standard Deviations above the mean | Percentile |
|---|---|---|---|
| La Palma Intercommunity Hospital | 21% | | |
| Huntington Beach Hospital | 18% | | |
| Centinela Freeman Regional Medical Center - Centinela Campus | 18% | | |
| Desert Valley Hospital | 17% | | |
| Montclair Hospital Medical Center | 16% | | |
| Encino Hospital Medical Center | 13% | | |
| West Anaheim Medical Center | 13% | | |
| Garden Grove Hospital and Medical Center | 11% | 0.2 | 63% |
| San Dimas Community Hospital | 10% | (0.1) | 51% |
| Chino Valley Medical Center | 8% | (0.5) | 32% |
| Sherman Oaks Hospital & Health Center | 7% | (0.9) | 19% |
| Paradise Valley Hospital | 6% | (0.9) | 16% |

Methodology: Using Calendar Year 2008 OSHPD data, we started with the denominator most comparable to our work with the MedPAR data: Medicare fee-for-service patients 65 and older; excluding surgical stays and specialty MDCs. Then we further limited the denominator as follows: (1) we only included patients coming from *home* (rather than from a nursing home or other institutional source), and (2) we excluded patients with a Length of Stay of less than 5 days, because it is likely they did not get their skin ulcer in the hospital (following the AHRQ National Quality Measures Clearinghouse recommendations[xix]). All hospitals with at least 100 claims remaining in the denominator were included.

## Conclusion

The numbers presented in this analysis are startling:

- Five of the six hospitals with the highest rates of septicemia in the United States are operated by Prime Healthcare

- As a whole, the rate of septicemia among seniors treated at Prime was 70% higher than the second-highest comparable health system

- In 2008 alone, Prime was reimbursed some $18 million more than expected from Medicare

- Upcoding alone cannot explain highly-elevated rates of skin ulcers and septic shock recorded at multiple Prime-operated hospitals

Whatever the root causes — improper bills, elevated infections, or some combination of the two — caregiver safety, patient safety, and tens of millions of public healthcare dollars are at stake. A thorough investigation of Prime Healthcare Services' hospitals is urgently needed.

[i] Methodology includes all fee-for-service Medicare patients 65 and over treated as an inpatient for a medical condition (Medical DRG) in a non-specialty Major Diagnostic Category (MDC). Data source: MedPAR.

[ii] See, e.g., Brown, June Gibbs. "Medicare Payments for Septicemia." Department of Health and Human Services, Office of Inspector General. March 1999

[iii] Source: Medicare MedPAR data, federal fiscal year (FFY) 2008. Septicemia claims were identified by MS-DRGs 870-872. The universe of inpatient stays (the denominator) is defined to include all non-surgical hospital stays in non-specialty Major Diagnostic Categories (MDCs) for patients 65 and older. All 2,912 general acute care hospitals having at least 500 qualifying hospital stays were included in the analysis. Note that surgical and specialty stays were excluded to improve comparability. Including these two categories would increase the number of qualifying hospital and hospital stays, but would not materially change the results of the analysis: of the 3,133 U.S. hospitals with at least 500 Medicare fee-for-service hospital stays for patients 65 and older in FFY 2008, five Prime hospitals would remain among the 10 hospitals with the highest septicemia rates in the country.

[iv] One Prime hospital (San Dimas) had too few Medicare claims to be included in the set of 2,912 hospitals that were ranked; however, if included it falls in the 98th percentile.

[v] Same methodology as above, except that San Dimas (which has less than 500 claims) was added to give a complete picture of the health system.

[vi] Again, we exclude surgical and specialty stays to improve comparability between hospitals. Including these categories – for all patients 65 and over – Montclair's numbers are 147 septicemia claims out of 655 total claims, a rate of 22.4%. The corresponding national rate (without exclusions) was 3.3%. Either way, Montclair had the highest septicemia rate of any hospital in the U.S. in 2008.

[vii] Includes all health systems having at least 10,000 claims in the denominator, in 2008. Prime had 16,874 claims in the denominator.

[viii] The federal government has used the term "upcoding" interchangeably to refer to services billed for but never provided, as well as services that were provided but not medically necessary and therefore not reimbursable. In one court filing, the federal government defined "upcoding" as the practice of "bill[ing] the federal health care programs for more highly reimbursed services than the time and services actually provided to patients", and later added, "'Upcoding' is the improper assignment of diagnosis codes in order to increase the amount of reimbursement. More specifically, Defendant…assigned diagnosis codes that were not supported by medical record documentation." U.S. Nichols vs. OMNI H.C. Inc., Case 4:02-cv-66 (HL), document 96, filed 5/25/07, pgs. 3, 24.

[ix] Brown, June Gibbs. "Medicare Payments for Septicemia." Department of Health and Human Services, Office of Inspector General, March 1999.

[x] Centers for Disease Control and Prevention. "Current Trends Increase in National Hospital Discharge Survey Rates for Septicemia -- United States, 1979-1987." Source: http://www.cdc.gov/mmwr/preview/mmwrhtml/00001539.htm. Accessed April 20, 2010.

[xi] All 260 California hospitals with at least 200 qualifying discharges were included.

[xii] Comparable health systems defined to mean the 111 health systems having at least 10,000 qualifying Medicare discharges in FFY 2008. The exact same denominator is employed here as is used for the septicemia analysis.

[xiii] 100 Top Hospitals: National Benchmarks 2009 Study. Thomson Reuters Top Hospitals, National. 2010 March 29. Pg 59-60.

[xiv] Same denominator as above: all non-surgical hospital stays in non-specialty MDCs for patients 65+.

[xv] Source: http://www.californiahealthline.org/articles/1999/4/2/cardiology--hcia-ranks-top-100-hospitals-ca-facilities-shine.aspx. Accessed April 16, 2010.

[xvi] From it's website on 16 April 2010: "Saint Joseph's is one of only 14 hospitals in the country to make both the 2005 National and Cardiovascular listings, and the only large community hospital (250+ acute care beds) in Georgia to earn the distinction."

[xvii] http://www.justice.gov/opa/pr/2007/December/07_civ_1029.html. Accessed 2010 April 16.

[xviii] See, e.g., Abelson, Reed. "Heart Procedure Is Off the Charts in an Ohio City". New York Times: 2006 August 18.; and Dicken, Brad. "Former cardiologist sues heart center." Chronicle-Telegram (Elyria, Ohio). 2009 May 19.

[xix] See, e.g., http://www.qualitymeasures.ahrq.gov/summary/summary.aspx?ss=1&doc_id=12716. Accessed April 19, 2010.

# A-4

## Congress of the United States
### Washington, DC 20515

July 1, 2010

The Honorable Daniel R Levinson
Inspector General
Department of Health & Human Services
330 Independence Ave, SW
Washington, D.C. 20201

Dear Mr. Levinson:

We recently received a disturbing report by SEIU Healthcare about Prime Healthcare Services, Inc. (Prime), a privately-held company that operates 13 acute care hospitals, all in California. The report potentially demonstrates a pattern of fraudulent billing of the Medicare program and/or extremely high rates of blood infections among Medicare patients treated at Prime-operated hospitals.

According to the report, far more Medicare patients are diagnosed with septicemia, or blood infections, at Prime-operated hospitals than at any other hospital chain in the country. Ranked by primary septicemia rates among Medicare inpatients in 2008, five of the top six hospitals in the United States were operated by Prime. All Prime-operated hospitals ranked in the top 10 percent, with all but one ranking in the top 5 percent.

Hospital bills for septicemia made up an unusually large portion of Prime's overall Medicare case load. At one Prime-operated hospital, Montclair Hospital Medical Center, 25 percent of Medicare inpatients were diagnosed with a blood infection. Prime-operated West Anaheim Medical Center and Sherman Oaks Hospital were close behind, with septicemia rates of 23 percent and 22.5 percent, respectively. Across the entire Prime health system, nearly 16 percent of Medicare inpatients aged 65 and older were diagnosed with the condition. The comparable national average rate was less than 5 percent, according to the SEIU report.

The SEIU report offers two possible explanations: (1) a system-wide pattern of up-coding that may have led to $18 million in excess Medicare payments in 2008 alone, or (2) a real infections crisis at the hospitals (resulting from either a high rate of infection in the community or poor quality care in the hospitals). Either possibility is deeply concerning to us. We ask that you examine this report and, if you confirm the information presented, commence an investigation.

We appreciate your prompt attention to this request.

Sincerely,

Pete Stark
Chairman
Subcommittee on Health
House Committee on Ways & Means

Henry A. Waxman
Chairman
House Committee on Energy & Commerce

# **A-5**

TONY STRICKLAND
VICE CHAIR

SAM AANESTAD
GILBERT CEDILLO
DAVE COX
MARK DeSAULNIER
MARK LENO
ABEL MALDONADO
GLORIA NEGRETE MCLEOD
FRAN PAVLEY
LOIS WOLK

### California Legislature

## SENATE COMMITTEE ON HEALTH

ELAINE KONTOMINAS ALQUIST
CHAIR



STATE CAPITOL  ROOM 2191
SACRAMENTO  CA  95814
(916) 651-4111
(916) 324-0384 FAX

STAFF DIRECTOR
PETER HANSEL

CONSULTANTS
ROGER DUNSTAN
MELANIE MORENO
LARK PARK
KELLY PATTERSON
CONCEPCION TADEO

COMMITTEE ASSISTANTS
CAROL THOMAS
STEPHANIE HINELINE

August 17, 2010

Kathleen Billingsley
Licensing and Certification
California Department of Public Health
PO Box 97399, MS 0512
Sacramento, CA 95899-7377

**Re: Septicemia Rates at Prime Healthcare Services Hospitals**

Dear Ms. Billingsley:

I am writing to request that you investigate septicemia rates in hospitals operated by Victorville-based Prime Healthcare Services, Inc. (Prime).

My office's review of data from 2008 provided by SEIU-UHW's healthcare analysis team indicates that there are abnormally high rates of septicemia reported among Medicare patients treated at hospitals operated by Prime.

As the author of the 2008 law that requires hospitals to reduce hospital acquired infections (HAIs) (SB 1064) and the 2006 law that requires reporting of adverse events (defined as including patient death or disability due to a contaminated drug, device, or biologic provided by a health facility - SB 1301), I am troubled to learn that five of the top six septicemia hospitals in the United States in 2008 were operated by Prime. Furthermore, the four California hospitals with the highest rates of septicemia among Medi-Cal patients in 2008 were all operated by Prime.

As you know, septicemia is usually bacterial and can originate with localized infections such as pneumonia, urinary tract infections, surgical site infections, or venous catheters. Frequently, such infections occur in a healthcare setting.

Upon comparing the septicemia rate for Medicare patients at more than 2,900 hospitals throughout the country, the SEIU report found that Prime's rate was 15.7%. That figure is 70% higher than the second-highest hospital system in the nation (9.2%). The national median was 4.1%.

The SEIU report offers two possible explanations for the high rates:

1) **Up-Coding**
   First, the extreme infection rates may reflect a pattern of up-coding by Prime. This theory is bolstered by the exceptionally low mortality rate among Prime's reported septicemia patients, indicating that diagnoses of septicemia may not have been warranted in many of the cases. If this explanation is true, **Prime may have been overpaid around $18 million by Medicare in 2008 alone,** according to the SEIU analysis.

2) **Real Infections Due to a High Community Infection Rate or Poor Quality of Care at Prime Hospitals**
   A second possible explanation is that the infections are real, resulting either from high infection rates in the communities around Prime hospitals or poor quality of care at the hospitals. In either case, at least some of the infections should be reportable adverse events under my SB 1301. This raises the question of whether Prime is failing to report adverse events as required by law.

Whether caused by system wide up-coding or by a real infections crisis, SEIU's findings are deeply concerning. Prime is a fast-growing system and continues to pursue new hospitals, including one that was licensed within a week's time in November 2008 - Shasta Regional Medical Center.

**I request that you take all appropriate steps to ensure that whatever is happening at Prime or the communities in which it operates is not permitted to grow into an even larger problem.**

**Most urgently, I request that your Department investigate Prime and support other state and federal investigations of Prime's practices.** As you can see from the attached, both the Office of the California Attorney General and the Inspector General of the United States Department of Health and Human Services also have been informed of SEIU's findings.

**Until all these investigations are complete, I request that you withhold approval of any additional facility licenses for Prime or Prime-related entities.**

Sincerely,

Senator Elaine Alquist
Chair, Senate Health Committee

Enclosures

EKA:sr

# A-6

# Los Angeles Times | ARTICLE COLLECTIONS

.— Back to Original Article

## U.S., California probe Prime Healthcare

*Investigators are trying to determine whether hospital chain's reportedly high rate of blood poisoning cases is a health problem or involves fraudulent billing.*

October 12, 2010 | By Lance Williams and Christina Jewett

A Southern California hospital chain known for aggressive billing practices and cost-cutting is being investigated by state and federal authorities for an unusually high rate of life-threatening infections among its older patients.

The U.S. Department of Health and Human Services and the state Department of Justice are looking into whether a reported surge in septicemia infections at hospitals operated by Prime Healthcare Services reflects a serious health problem or multimillion-dollar Medicare fraud, officials at both agencies said.

Septicemia, or blood poisoning, arises most often in hospitals with poor procedures for infection control. Severe cases can be difficult and costly to treat, and are often deadly. Medicare pays hospitals several thousand dollars more to treat septicemia than less severe hospital-acquired infections — prompting some hospitals to file what officials say are false claims.

Health and Human Services Department spokesman Don White said the federal probe of Prime Healthcare was requested in July by Democratic U.S. Reps. Henry A. Waxman (D-Beverly Hills) and Pete Stark (D-Fremont).

In a letter to the inspector general, the lawmakers said they acted after reviewing a computer analysis of Medicare billings by the Service Employees International Union, which has repeatedly clashed with Prime over pay and staffing issues.

Prime may have overbilled Medicare by $18 million for septicemia claims in 2008, the lawmakers wrote, citing the union's analysis.

Tipped off by a different source, the state attorney general's office began a criminal investigation into similar allegations about a year ago, said Mark Geiger, director of the Bureau of Medi-Cal Fraud & Elder Abuse. He declined to identify the source, and investigators haven't determined whether violations occurred, he said.

In e-mails and interviews, Prime Healthcare officials denied wrongdoing. Ajith Kumar, Prime's reimbursement management director, said the septicemia allegations are "part of an effort by the SEIU to extort concessions from Prime Healthcare in contract negotiations" now underway at Centinela Hospital Medical Center in Inglewood.

Kumar said the relatively high rates of septicemia reflect the company's emphasis on "early detection and treatment" of the illness. Also, "sicker patients are being admitted" at Prime as a result of the company's emphasis on emergency room admissions, Kumar wrote in an e-mail.

Prime has turned around money-losing hospitals by raising fees and slashing payroll and services, according to a 2007 Times investigation. The San Bernardino County company, led by founder and chairman Dr. Prem Reddy, operates 12 hospitals in Southern California and one in Shasta County.

Reddy has repeatedly canceled insurance contracts with managed care companies. Freed from pre-negotiated discounts, Reddy's hospitals can then collect higher reimbursements for treating insured patients.

Suspicions of fraudulent billing for septicemia at Prime hospitals have been fueled by SEIU, which represents about 150,000 hospital and healthcare workers in California. It distributed its computer analysis of national Medicare billing data to state and federal officials earlier this year. Medicare serves elderly and disabled people.

According to the analysis, Prime's septicemia rate among Medicare patients during fiscal 2008 was extremely high. Six Prime hospitals ranked in the 99th percentile of U.S. hospitals and five others in the 95th percentile.

Overall, according to the analysis, the septicemia rate in Prime hospitals was nearly 16% — triple the national average among Medicare patients. Four Prime hospitals — Montclair Hospital Medical Center, West Anaheim Medical Center, Sherman Oaks Hospital and Desert Valley Hospital in Victorville — reported septicemia rates of more than 20%.

But the union analysts noted that the death rate for septicemia patients at Prime hospitals was 38% below the national average. That, the analysts contended, suggested "upcoding," or inflation of the diagnosis to draw higher reimbursement.

In his e-mail, Kumar said the lower mortality rate reflects "early and aggressive treatment and better patient outcomes."

Separately, Medi-Cal auditors are conducting an inquiry into Prime Healthcare in which auditors have flagged $2.8 million in questionable expenses, including lease payments on a Beverly Hills home, depreciation on a Bentley sedan and use of a private helicopter. The charges represent potential "fraud, waste or abuse," according to officials from Medi-Cal, the state health program for the poor.

Prime disputes many of the findings and says it may appeal. Chief Executive Officer Lex Reddy, Prem Reddy's brother, said the helicopter was needed so executives could avoid being stuck in traffic. Another company official said the Beverly Hills home was to accommodate company executives who live in San Bernardino County but work in Los Angeles.

*lwilliams@californiawatch.org*

*Cjewett@californiawatch.org*

*Williams and Jewett are reporters for California Watch, a project of the nonprofit, independent Center for Investigative Reporting.*

---

**Los Angeles Times**  Copyright 2011 Los Angeles Times                    Index by Keyword | Index by Date | Privacy Policy | Terms of Service

# A-7

About SEIU-UHW      Join Us      Political Action      Media Center      Contact SEIU-UHW

# No New Licenses to Prime Healthcare While Under State, Federal Investigations for Shocking Hospital Infection Rate, SEIU-UHW Asserts

October 12, 2010 12:36 PM

In wake of today's LA Times and California Watch exposes ...

OAKLAND, CA -- In the wake of exposes by the Los Angeles Times and California Watch website today revealing off-the-charts infection rates at Prime Healthcare Services hospitals in California, the state's largest healthcare workers' union, Service Employees International Union-United Healthcare Workers West (SEIU-UHW), is calling on state officials to stop issuing licenses to the hospital operator until state and federal investigations are complete.

"It would be unconscionable to put more patients at risk, especially the frail elderly susceptible to life-threatening infections like septicemia, by allowing Prime Healthcare to operate more hospitals without a thorough investigation of both its patient care and billing practices," said Dave Regan, SEIU-UHW trustee. "Prime must be held accountable to the patients, communities and caregivers where it operates hospitals and should not be permitted to expand without full public confidence in the care it provides and is compensated for by taxpayers."

Prime Healthcare Services, a privately-held, for-profit hospital chain that operates 13 hospitals in California, has the highest rate of septicemia in the country, according to a study of medical claims conducted by SEIU-UHW and reported on by the Los Angeles Times and the website California Watch. SEIU-UHW analyzed medical records for septicemia, a life-threatening blood infection, for Medicare patients for 2008 in over 2,900 hospitals nationwide.

Alarmed by SEIU-UHW's findings, two U.S. Congressmembers and the Chair of the California Senate Health Committee have requested investigations into Prime's practices.

The recent investigation requests, one by California Congressmen Pete Stark and Henry Waxman, and the other by California State Senator Elaine Alquist, cite the report's high septicemia rates for every Prime hospital, all of which operate in California.

Stark and Waxman have asked the Inspector General of the federal Health and Human Services Department to investigate. Alquist has asked the California Department of Public Health to conduct an investigation and withhold approval of any new licenses for Prime until all investigations are complete. Prime is currently seeking a license to operate Victor Valley Community Hospital in Victorville, California.

According to the SEIU-UHW report, available here:

- Prime's overall septicemia rate was 15.7%. This figure is more than three times higher than the national average (4.8%), and 70% higher than the second-highest hospital chain (9.2%).

- Prime operates 5 of the 6 hospitals with the highest septicemia rates in the country. All but one Prime facility fall into the top 5% nationally, and the other falls in the top 10%.

- Within Prime, Montclair Hospital had the highest septicemia rate, affecting 25% of all Medicare patients. West Anaheim Medical Center (23.0%) and Sherman Oaks (22.5%) also showed extremely high rates.

- Prime's practices may have led it to receive $18 million in excess Medicare payments in 2008.

According to the Stark-Waxman letter to Inspector General Daniel Levinson, dated July 1, 2010, the SEIU-UHW report, "potentially demonstrates a pattern of fraudulent billing of the Medicare program and/or extremely high rates of blood infections among Medicare patients treated at Prime operated hospitals." The Congressmen requested that the Inspector General "examine this report" and upon confirming the data, "commence an investigation."

Similarly, Alquist, who has authored recent infection-related legislation in California, calls SEIU-UHW's findings, "deeply concerning" in an August 17, 2010 letter to the California Department of Public Health. She states that a timely investigation by the department is crucial as "Prime is a fast-growing system and continues to pursue new hospitals."

"Most urgently, I request that your Department investigate Prime and support other state and

### Connect with SEIU-UHW

Follow us on Twitter

Join us on Facebook

Slideshows and member photos on Flickr

Tune in to YouTube videos

Get Mobile Alerts: Text UHW to 787753
(Message and data rates may apply)

### Take Action. Get Updates. Sign Up.

Email Address     [ Sign Up ]

- Kaiser
- Sutter
- Tenet
- Daughters of Charity
- Catholic Healthcare West
- HCA
- Nursing Home/Convalescent
- Home Care
- Other Facilities in California

- Benefits
- Education
- H1N1 Flu Resources

### Search

[            ]   [ Search ]

federal investigations of Prime's practices," and, "take all appropriate steps to ensure that whatever is happening at Prime ... is not permitted to grow into an even larger problem."

Finally, Alquist requested that, "Until these investigations are complete ... you withhold approval of any additional facility licenses for Prime or Prime-related facilities."

Prime has made a practice of acquiring financially distressed hospitals and then cutting unprofitable services, such as chemotherapy, mental health and birthing centers. The corporation also has a history of canceling insurance contracts after acquiring hospitals, leading to significantly higher emergency department admissions. This practice often results in higher reimbursement rates from insurance companies, which by law are obligated to cover emergency care.

It is the alarming company-wide pattern of abnormally high septicemia rates among Medicare patients that has motivated the investigation requests.

Two possible explanations for the high septicemia rates are offered by the SEIU-UHW report. One is a system-wide pattern of up-coding, where Prime billed Medicare for more serious conditions than warranted, and received higher reimbursements as a result. The other is that the Prime hospitals suffer from an actual infections crisis. "Either possibility is deeply concerning to us," Congressmen Stark and Waxman wrote.

SEIU-UHW represents caregivers at four of Prime's 13 hospitals: Garden Grove, Centinela, Encino and Shasta.

### 

SEIU United Healthcare Workers-West (SEIU-UHW) is the largest healthcare union in the western U.S. with more than 150,000 members. SEIU-UHW is part of the 2.2 million-member Service Employees International Union (SEIU).

**Tags:**
prime healthcare

© SEIU UNITED HEALTHCARE WORKERS - WEST
560 THOMAS L. BERKLEY WAY, OAKLAND, CA 94612 | PHONE 510-251-1250 | FAX 510-763-2680
SERVICE EMPLOYEES INTERNATIONAL UNION, CTW, CLC
PRIVACY POLICY

# A-8



| 1007 7th Street | 3055 Wilshire Blvd. | 7677 Oakport Street |
| 4th Floor | Suite 1050 | Suite 725 |
| Sacramento, CA 95814 | Los Angeles, CA 90010 | Oakland, CA 94621 |
| 916.442.3838 | 213.368.7400 | 510.568.2500 |
| Fax: 916.442.0976 | Fax: 213.381.7348 | Fax: 510.568.3652 |

www.seiuca.org

Kathleen Billingsley, R.N.
Deputy Director, Licensing and Certification
California Department of Public Health
1615 Capitol Avenue, MS0512
Sacramento, CA 95814

Dear Ms. Billingsley,

The California State Council of the Service Employees International Union, representing more than 700,000 working Californians and their families, calls on the California Department of Public Health to refuse approval of any change of hospital ownership sought by Prime Healthcare until such time as all pending investigations, both state and federal, regarding Prime Healthcare are completed.

**Extraordinarily High Rates of Septicemia**

Prime Healthcare Services, a privately-held, for-profit hospital chain that operates 13 hospitals in California, has the highest rate of septicemia in the country, according to a study of medical claims conducted by SEIU and reported on by the Los Angeles Times and the website California Watch. SEIU analyzed medical records for septicemia, a life-threatening blood infection, for Medicare patients for 2008 in over 2,900 hospitals nationwide.

The recent investigation requests, one by California Congressmen Pete Stark and Henry Waxman, and the other by California State Senator Elaine Alquist, chair of the Senate Health Committee and Assemblymember Bill Monning, chair of the Assembly Health Committee, cite the report's high septicemia rates for every Prime hospital, all of which operate in California.

Stark and Waxman have asked the Inspector General of the federal Health and Human Services Department to investigate. Alquist and Monning requested that your unit conduct an investigation: we appreciate that you have commenced such an investigation and that you have reached out to involve both the California Department of Health Care Services Medi-Cal Audits and Investigations as well as the Office of Inspector General of the federal Centers for Medicare and Medicaid Services. We also note that the Medi-Cal fraud unit of the California Department of Justice has received a similar request.

According to the SEIU-UHW report, available at http://www.seiu-uhw.org/2010/10/eye-on-prime-healthcare.html:

- Prime's overall septicemia rate was 15.7%. This figure is more than three times higher than the national average (4.8%), and 70% higher than the second-highest hospital chain (9.2%).
- Prime operates 5 of the 6 hospitals with the highest septicemia rates in the country. All but one Prime facility fall into the top 5% nationally, and the other falls in the top 10%.

- Within Prime, Montclair Hospital had the highest septicemia rate, affecting 25% of all Medicare patients. West Anaheim Medical Center (23.0%) and Sherman Oaks (22.5%) also showed extremely high rates.
- Prime's practices may have led it to receive $18 million in excess Medicare payments in 2008.

According to the Stark-Waxman letter to Inspector General Daniel Levinson, dated July 1, 2010, the SEIU-UHW report, "potentially demonstrates a pattern of fraudulent billing of the Medicare program and/or extremely high rates of blood infections among Medicare patients treated at Prime operated hospitals." The Congressmen requested that the Inspector General "examine this report" and upon confirming the data, "commence an investigation."

Similarly, Alquist, who has authored recent infection-related legislation in California, calls SEIU-UHW's findings, "deeply concerning" in an August 17, 2010 letter to the California Department of Public Health. She states that a timely investigation by the department is crucial as "Prime is a fast-growing system and continues to pursue new hospitals."

Two possible explanations for the high septicemia rates are offered by the SEIU-UHW report. One is a system-wide pattern of up-coding, where Prime billed Medicare for more serious conditions than warranted, and received higher reimbursements as a result. The other is that the Prime hospitals suffer from an actual infections crisis. "Either possibility is deeply concerning to us," Congressmen Stark and Waxman wrote.

### Balance Billing of Patients

Prime Healthcare recently settled a longstanding complaint by the Department of Managed Health Care with respect to balance billing of patients, the practice of charging patients the balance between what the health care service plan paid and what the hospital wanted to be paid. The California Supreme Court in the Prospect case found 7-0 that balance billing violated California law.

In addition, we are aware that some hospitals that rely heavily on emergency room admissions and that have terminated most contracts with health care service plans and health insurers may have held patients for post-stabilization care. The Legislature and the Governor acted in AB1203 to prevent this.

We ask that your unit review complaints received by CDPH regarding both balance billing as well as post-stabilization care to determine whether Prime continues to engage in such practices. We also ask that your unit reach out to DMHC to determine whether that department has continued to receive complaints about Prime Healthcare.

Further, we ask that in determining whether Prime should receive a new license to operate Victor Valley, you take into account the prior lack of compliance with the law by Prime Healthcare with respect to its financial practices.

**Oppose Granting New Licenses Until Investigations Complete**

In our view, it would be unconscionable to put more patients at risk, especially the frail elderly susceptible to life-threatening infections like septicemia, by allowing Prime Healthcare to operate more hospitals without a thorough investigation of both its patient care and billing practices. Prime must be held accountable to the patients, communities and caregivers where it operates hospitals and should not be permitted to expand without full public confidence in the care it provides and is compensated for by taxpayers.

We formally ask that the California Department of Public Health withhold approval of any new licenses for Prime until all investigations are complete. Prime is currently seeking a license to operate Victor Valley Community Hospital in Victorville, California. If you need more information, you may contact our health advocate, Beth Capell at bcapell@jps.net or (916) 804-1870 or JJ Johnston, executive director for SEIU California State Council at jjohnston@seiucal.org or (916) 442-3838.

Sincerely,

Bill Lloyd

Bill A Lloyd
President

CC:    Richard Figueroa, Deputy Cabinet Secretary, Office of the Governor
       Senator Elaine Alquist, Chair, Senate Health Committee
       Assemblymember Bill Monning, Chair, Assembly Health Committee

# A-9



1 of 1 DOCUMENT

Copyright 1994 Factiva, a Dow Jones and Reuters Company
All Rights Reserved
Dow Jones Factiva

(Copyright (c) 1994, Dow Jones & Co., Inc.)
**THE WALL STREET JOURNAL**
The Wall Street Journal

March 21, 1994 Monday

**SECTION:** Pg. A1

**LENGTH:** 2384 words

**HEADLINE:** Waxing Dramatic: Janitors' Union Uses Pressure and Theatrics To Expand Its Ranks --- Targets Are Big Companies Using Nonunion Firms To Clean Their Buildings --- A Better Shine for Apple?

**BYLINE:** By Michael J. Ybarra, Staff Reporter of The Wall Street Journal

**BODY:**

WASHINGTON -- They obviously weren't part of the Old Ebbitt Grill's usual suit-and-tie, power-dining crowd. They trailed into the famed eatery across from the White House in a nervous line. They wore bright red T-shirts decorated with clenched fists holding upraised brooms, and their pockets bulged mysteriously. They ordered coffee and sodas.

Later, walking out of the restaurant, their leader gave a signal and they suddenly drew Coke cans filled with ball bearings, which they shook violently, setting off a deafening clatter. "Justice!" they yelled. "Justice for janitors!"

Stunned diners stared. A furious hostess sprinted toward the group. "We have a business to run," she sputtered. A security guard threatened arrests. The group tumbled out onto the sidewalk and belted out another chorus: "Justice for janitors!"

The Old Ebbitt Grill had just got a taste of a new thrust in American labor tactics. Although the restaurant doesn't employ any janitors, it is a tenant in a building cleaned by U.S. Service Industries Inc., a nonunion janitorial company. And with this odd dinner-time performance last fall and other, similar stunts, the Service Employees International Union is trying to harass USSI into going union.

At a time when traditional U.S. labor unions' influence continues to fade, the decidedly unconventional SEIU is flourishing, thanks largely to a combination of zany, obnoxious and occasionally illegal techniques that seem born more of the burlesque hall than the union hall. Instead of directly targeting employers with strikes or boycotts, the SEIU goes after the employers' employers -- mainly commercial landlords -- and their tenants. The basic idea: to shame, pester and push tenants and landlords into forcing their janitorial contractors to unionize.

So far, the SEIU has been cleaning up. While most unions have lost members steadily, SEIU has added 30,000 janitors since 1986 when it began a campaign to revitalize its moribund janitors division. The division now has 200,000 members -- a fifth of U.S. custodians.

Waxing Dramatic: Janitors' Union Uses Pressure and Theatrics To Expand Its Ranks --- Targets Are Big Companies Using Nonunion Firms To Clean Their Buildings --- A Better Shine for Apple? The Wall

The union says its tactics have proved so effective in Silicon Valley that it is launching an effort with the Teamsters and the Hotel and Restaurant Employees Union to humiliate other contractors into organizing the workers who serve food and trim flowers at high-tech concerns.

"It's some of the most innovative and successful organizing that's been done by any union," says Andy Stern, assistant to the president for organizing at SEIU. Allison Porter, a recruiting director at the AFL-CIO, calls it "an incredible success," adding that "it's certainly worth trying" in other industries.

Even the U.S. Department of Labor has taken a page from the Justice for Janitors' playbook by going straight to high-tech companies in Silicon Valley and threatening, under the "hot goods" provision of the Fair Labor Standards Act, to seize their products if their custodial contractors don't pay legal wages.

Targets of SEIU's Justice for Janitors campaign have filed dozens of complaints with the National Labor Relations Board and various courts, accusing the union of labor-law violations. In some cases, courts or the NLRB have ruled that the union has indeed broken the law. To date, the union, through appeals or settlements, has sidestepped any significant fines or penalties, but it has piled up many enemies. "I don't cotton to blackmail," growled George Vallen, owner of Advance Building Maintenance in Los Angeles, a prime target of SEIU, in an interview last summer. "I'll fight as long as I can."

The SEIU and its Justice for Janitors campaigners seem happy to oblige. Consider last summer's drive against San Jose-based Service by Medallion Inc., a janitorial contractor to several Silicon Valley stars, such as huge database maker Oracle Corp. Typically, the union concentrated its fire not on Service by Medallion but on Oracle and its landlord, developer William Wilson & Associates.

The opening salvo was an amphibious assault. During a picnic Mr. Wilson threw for the company at Oracle headquarters in Redwood City, Calif., three union organizers in sailor suits clambered aboard a rickety skiff, hoisted a flag bearing the insignia "SS Justice" and set sail across a lake in front of Oracle's offices. The sailors made it to shore, where a scuffle broke out with security guards as surprised Oracle employees looked on.

Justice for Janitors also infiltrated Oracle's internal electronic-mail system, imploring workers to send messages of protest to top management. Some did. One told the company that rather than spend money on employee picnics, it should pay janitors better. The debate even spread to outside computer bulletin boards: One professor from Buffalo wrote Oracle, "Are very low-paid janitors so very threatening to your corporation's survival?"

While Oracle took the brunt of the union's assault, organizers also were quietly collecting grievances from janitors and sending them to the Labor Department. Last June, the department found that Medallion had stiffed 199 employees for $78,273.89 over 18 months. Medallion had been investigated in 1990 and was discovered to have owed 109 employees $34,909.46 in unpaid overtime. The department fined Medallion almost $50,000 in the most recent case for being a repeat offender, and ordered it to pay back wages.

Roland Phillips, the company's president, concedes that some of his janitors didn't get full pay but blames record-keeping snafus. He says union shops routinely break the same laws his company was found to have violated, but escape punishment because labor tipsters don't blow the whistle on unionized outfits.

In the Oracle case, after two months of union heat on the database maker and on Mr. Wilson, Medallion gave in, settling with the union. Wages went from as little as $5 an hour with no benefits to $6 an hour with benefits, although the increase is phased in over two years. "It wasn't worth the effort to fight them anymore," Mr. Phillips says. He says he feared losing the Oracle contract -- half his company's business. And though Oracle and Mr. Wilson deny that Justice for Janitors' antics led them to pressure Medallion to settle, Mr. Phillips views it otherwise.

"The companies didn't want to be involved," he says. "They will quite conservatively and honestly tell you to clean up the mess because they don't want the limelight."

John Sculley was the reluctant star of one of the SEIU's most successful productions. The erstwhile computer visionary and Apple Computer Inc. chieftain found himself trailed virtually everywhere by organizers in the late 1980s. The union's real quarry was Shine Building Maintenance Inc., which cleans Apple's offices, but organizers serenaded Mr. Sculley at his home, berated him when he showed up at the symphony and confronted him at the company's MacWorld exhibitions.

One organizer crashed Apple's shareholder meeting in 1991, shouting out questions about the company's treatment of janitors. Flummoxed, Mr. Sculley could only stammer: "This is a dispute that has nothing to do with Apple." The

Case 1:11-cv-00276-CMH -IDD   Document 1-15   Filed 03/17/11   Page 53 of 82

Page 3
Waxing Dramatic: Janitors' Union Uses Pressure and Theatrics To Expand Its Ranks --- Targets Are Big Companies
Using Nonunion Firms To Clean Their Buildings --- A Better Shine for Apple? The Wall

union picketed computer stores in two dozen U.S. cities, called for an international boycott and tried to persuade schools -- a market Apple cherishes -- to ban its machines. Five janitors fasted for six days on the steps of Apple headquarters in Cupertino, Calif.

"The organizers did everything to make it appear that the problem was with Apple, not the janitorial service company," Mr. Sculley recalls.

He says Apple never leaned on Shine, but in 1992 Shine went union. John Krause, Shine's general manager, concedes that Justice for Janitors' tactics cost him clients and wore him down. "We weren't the vampires they portrayed us as," he says. "But we didn't believe they were ever going to go away."

For some years, in fact, the SEIU janitors division did look as if it might fade away. It has been organizing janitors since the turn of the century, and by World War II claimed a hold on most major cities. But by the late 1970s, it was on the skids: Its ranks thinned as companies switched to cleaning contractors and full-time jobs mutated into part-time ones. Wages fell and benefits disappeared. When building owners in Pittsburgh demanded that janitors take a pay cut in 1985, the union dug in its heels and won, the first victory in what became the Justice campaign.

Around that time, Stephen Lerner was named director of organizing for the building services division, charged with reviving it. He brainstormed with other organizers for the most theatrical tactics. It isn't cheap. Organizing eats up 25% of the SEIU's budget vs. 5% at most unions.

Tenacity has been a hallmark of Justice for Janitors. Six years ago, the union embarked on a campaign to organize the 5,000 private office cleaners in Washington, D.C.; at the time, fewer than 1% of them were in unions. Organizers periodically clogged K Street traffic with pot-banging marchers and chained themselves to doors at office towers cleaned by nonunion janitors. They donned Santa Claus suits every Christmas season, assembled in front of nonunion buildings and belted out renditions of customized carols such as "The Twelve Days of Injustice."

Last fall, the union signed a deal with several large Washington-area cleaning contractors, adding 1,000 janitors to SEIU rolls and lifting its representation in the district to 30%. Among the holdouts is United Services, whose 1,500 nonunion janitors clean the building housing the Old Ebbitt Grill and about 100 others. "If you sign a union contract with a gun to your head, how do you negotiate?" asks James Matthews, president of United Services.

Janitors hold the opposite view: Without the union, they are the ones with no recourse. Guillermo Barroso, a 37-year-old janitor who cleans buildings at Hewlett-Packard Co., says that in the 15 months he has worked for a union contractor, his hourly wage has jumped to $6.50 from $5.50; he also now gets medical and dental benefits. He sends most of the extra cash to his family in Mexico, about $500 to $600 every couple of months -- $200 more than before he joined the union. Just as important, he says, is the sense that he can speak up in the workplace without fear of losing his job. Before joining the union, he says, "If we had even opened our mouths, we would have been out in the street."

As it is, janitors spend considerable time in the street anyway -- protesting. In Los Angeles, one of their chief targets for three years has been Mr. Vallen.

Among Mr. Vallen's biggest clients is Toyota Motor Corp., which hired his Advanced Building Maintenance to clean Toyota Motor's U.S. headquarters in nearby Torrance. One evening last year, Yukiyasu Togo, then head of Toyota's U.S. operations, discovered a dozen union janitors and their children camped outside the electric gate at Mr. Togo's Pacific Palisades home. They chanted "Janitors don't love what Toyota does for them," a takeoff on the car maker's slogan.

The union turned up the heat by making Toyota and another of Mr. Vallen's big customers, Mattel Inc., a focus of last year's annual Justice for Janitors day -- a nationwide guerrilla-theater assault in 30 U.S. cities every June 15. In New York, organizers handed out fliers in front of FAO Schwarz to badger the toy store for doing business with Mattel. At Mattel headquarters in El Segundo, Calif., janitors performed a skit in which their caped superhero, Mop Man, wooed Barbie away from Ken by telling her of the shabby treatment custodians have to endure.

Such tactics sometimes backfire. The janitors' campaign flamed out in Atlanta when it took on mega-developer John Portman. During the 1988 Democratic convention, SEIU called for an international boycott of Portman properties and picketed dozens of his Atlanta holdings; "Good Morning America" canceled a feed from one of Mr. Portman's hotels rather than cross picket lines. The union passed out bars of soaps to guests at Portman hotels: "Wash up America: Clean your hands of John Portman," read the labels.

Waxing Dramatic: Janitors' Union Uses Pressure and Theatrics To Expand Its Ranks --- Targets Are Big Companies Using Nonunion Firms To Clean Their Buildings --- A Better Shine for Apple? The Wall

But Mr. Portman sued for $435,000 in damages in federal court, alleging violations of the National Labor Relations Act, which prohibits "secondary boycotts" -- picketing of companies not directly involved in a labor dispute. (Nevertheless, the union often gets around the restriction by fine-tuning its actions. For example, it sometimes distributes fliers instead of picketing or has protesters stand in a public park near the targeted building rather than on the company's sidewalk.)

In 1990, the SEIU settled with Mr. Portman and called off the boycott. Eventually, the union abandoned its effort in Atlanta. Union lawyer Larry Engelstein says the union hasn't paid any damages as a result of the suit; Mr. Portman won't comment.

That defeat seems to have been only a temporary setback, however. In Los Angeles, the union claims its three-year campaign has lifted union representation to nearly 90% of the janitors in the downtown area from 30%; in the nearby high-rise mecca of Century City, union representation is close to 100%. Wages in the Los Angeles area have increased to about $6.25 an hour, plus insurance and pensions, from $4.25 an hour with no benefits. In Silicon Valley, the union claims its membership is up to 65%, double where it was when its campaign began three years ago. In Denver, Pittsburgh and a dozen other battlegrounds, the union claims to have doubled or tripled janitor representation.

And a big victory came recently when Mattel awarded its contract to a union outfit. "We were tired of the nuisance . . . the false impression they created about Mattel not being a company that cares about its workers," says Donna Gibbs, a Mattel spokeswoman. "We wanted to put it behind us."

So who is Mattel's new unionized cleaning company? None other than Mr. Vallen's Advanced. In October, facing union lawsuits over his alleged firing of striking workers and his wage practices as well as a continuing onslaught of stunt protests, Mr. Vallen threw in the towel. Advanced is now an SEIU shop.

"People were afraid to hire us because as soon as they'd sign the contract, they'd have the union at their door," grumbles Mr. Vallen. He was losing customers, and fighting SEIU's Justice for Janitors organizers left him nearly broke, he says. "There was no way of making them go away."

**NOTES:**
PUBLISHER: Dow Jones & Company

**LOAD-DATE:** December 5, 2004

# A-10



**NATIONAL RIGHT TO WORK COMMITTEE**®
*No one should be forced to pay tribute to a union in order to get or keep a job.*

Search    [ Search ]

- Home
- ABOUT US
- BLOG
- LEGISLATION
- multimedia
- facts & issues
- newsroom
- Contact Us
- Donate Today!

"#Indiana Gov Daniels not Presidential says Mark Levin, because he did not stand against Force-dues tyranny http://goo.gl/zbpwv #potus" — Right2Work

## A True "Card Check" Story of SEIU and U.S. Labor Department Coordinated Abuse

*On July 24, 2009, By Post*

This is an important story in these times of Big Labor's takeover of the Federal government. This documented true story that contains Card Check abuse, SEIU physical violence against workers, SEIU abuse of the NLRB system, orchestrated false allegations, and a corrupt Clinton appointee; and you can see and hear about what happens when Big Labor Bosses control a president's administration like they do today.

Mr. Randy Schaber's story begins with the discovery of an ongoing SEIU Card Check Forced Unionism scheme that included harassing employees at their homes. Mr. Schaber offered to hold an NLRB sanctioned secret ballot election.

The SEIU organizers replied, "We will never let your employees have a secret ballot election." Then, Mr. Schaber began to feel the pain that SEIU's corporate campaign is designed to inflict.

Randy's employees were physically assaulted during this SEIU organizing campaign.

To hear Mr. Schaber tell the story in his own words, we recommend that you listen and watch his full interview (click links to video clip 1, video clip 2, and video clip 3); for a brief description view his shortened interview. You will be amazed at the abuse of federal power coordinated by SEIU in the 1990's when they had less control of the White House than they do today.

For more information, you can download the edited version of the U.S. House of Representatives Report and the U.S. Department of Labor Inspector General's Report that discuss SEIU's corporate campaign and the U.S. Department of Labor's abuses that Mr. Schaber suffered, and it eventually resulted in the dismissal of a Clinton appointee.

The following are quotes from that U.S. House of Representatives report:

> Abuse of power at the Department of Labor
>
> CONCLUSION
>
> Based on the Office of the Inspector General's investigation and the testimony of other witnesses at the hearing, it is obvious that Mr. Richard F. Sawyer abused his position as the Secretary's Representative by intervening on behalf of the SEIU in its campaign to organize the janitorial workers of Somers.
>
> This information establishes several irrefutable facts:
>
> (1) Mr. Sawyer contacted officials of Somers' largest client, and specifically discussed the Department of Labor's active and on-going investigation of Somers.
>
> (2) Mr. Sawyer contacted the Department of Labor's Wage and Hour investigators to request information on the status of the Somers' investigation and to complain about the progress of said investigation.
>
> (3) Mr. Sawyer improperly provided the SEIU with specific information regarding the Department of Labor's active and on-going investigation of Somers—information that was used by the SEIU both privately and publicly to pressure Somers to capitulate to the union's organizational demands.

(4) Mr. Sawyer contacted high-ranking officials within the Wage and Hour Division's national office to complain about the progress of the Somers' investigation.

(5) In response to Mr. Sawyer's repeated contacts, high-ranking officials within the Wage and Hour Division's national office assigned five additional investigators to the Somers' investigation and directed investigators to give Somers special attention.

(6) The Somers' investigation was kept open well beyond the point the lead Wage and Hour investigator deemed warranted by the facts.

(7) Despite the involvement of no less than six investigators and 500 hours of investigative work, the Wage and Hour Division discovered only $317.44 in FLSA violations.

These facts clearly illustrate that Mr. Sawyer was engaged in a conscious effort to use his position as the regional representative of Labor Secretary Robert Reich to assist his former employer, the SEIU, in its efforts to organize the janitorial workers of Somers. As such, the Subcommittee believes it wholly appropriate that Mr. Sawyer's employment with the Department of Labor was terminated.

The Subcommittee also remains concerned about the extent to which other Department of Labor employees had knowledge of, supported or assisted Mr. Sawyer in his efforts to coerce Somers into signing a union contract with the SEIU. As noted previously, Mr. Sawyer's position as a Secretary's Representative falls under the purview of the Office of Congressional and Intergovernmental Affairs and his official Department of Labor job description clearly states that the "Incumbent reports directly to the Director of the Office of Intergovernmental Affairs * * * [and] consults with the Director on decisions or matters which appropriately require personal attention." Based on this description of Mr. Sawyer's supervisory controls, it is reasonable to expect that high-level Departmental officers, like the Director of the Office of Intergovernmental Affairs, would have been aware of Mr. Sawyer's actions concerning Somers.

It is also reasonable to assume that Ms. Geri Palast, Assistant Secretary of Congressional and Intergovernmental Affairs, would also have knowledge of Mr. Sawyer's actions. If not, the Subcommittee cannot help but question the efficacy of the Department of Labor's supervisory controls with respect to the Secretary's Representatives.

*Corporate campaigns*

John Sweeney, President of the AFL-CIO, declared a new direction for the international labor unions that the Federation represents. Mr. Sweeney declared that labor would become far more militant in the pursuit of organizing and collective bargaining objectives. The term used to organize formally non-union corporations became known as "corporate campaigns."

A "corporate campaign" has several distinct elements. Two of the most prominent elements are: having the target company perceived negatively by the company's investors, customers, employees and the public, and initiating enforcement and oversight actions by federal, state, and local governmental agencies. In other words, organized labor in a "corporate campaign" does not necessarily target the employees of the corporation as it had done historically, but rather focuses on corporate management.

Perhaps Stephen Lerner, Organizing Director of the Service Employees International Union, said it best --

Instead of asking, 'How do we win a majority of (employee) votes?', we should be asking, 'How do we develop power to force employers to recognize the union and sign a contract.'

During the course of the 104th Congress many concerns were raised by targeted corporations regarding the tactics used by organized labor and their attendant relationship with the NLRB. Employers argued that the NLRB was favoring organized labor and was indeed a willing pawn in the "corporate campaign" strategy. As a result of these repeated and serious allegations, the Subcommittee conducted two hearings and one round-table discussion.

The first hearing held by the Subcommittee invited NLRB Chairman Gould, General Counsel Feinstein, and a variety of small and large employers to recount their personal experiences. The second hearing held by the Subcommittee focused on the "corporate campaign" technique of salting – the placing of professional union organizers or members in a nonunion facility to harass or disrupt contractor operations, to increase costs, or to organize.

These two hearings raised a number of concerns for the Subcommittee including the following:

- Organizing nonunion employees into a unified union membership is not necessarily the objective of union organizers;
- Resources are not an obstacle for the unions when it comes to public relations;
- The cost of frivolous complaints and other federal agency charges fall on the businesses and the federal taxpayer while the unions have no direct accountability or cost; and
- Jeopardizing jobs and employer viability is ultimately more important than ensuring that workers have good wages, safe worksites and fulfilling jobs.

In conclusion, the pursuit of injunctive relief, the NLRB's handling of "salting" cases and the public comments of the NLRB Chairman have served as ample evidence that the NLRB may be biased against the regulated employer community.

*(REPORT ON THE ACTIVITIES OF THE COMMITTEE ON ECONOMIC AND EDUCATIONAL OPPORTUNITIES DURING THE 104TH CONGRESS, 1/2/1997)*

Tagged with: AFL-CIO • Card Check • SEIU
Posted in: California, Card Check, DOL, Economics, Forced-Dues for Politics, Obama Administration, SEIU, Union Corruption and Violence, Union Violence

# A-11

   



SEARCH

This Site   Industry Sites

Floor Care   Carpet Care   Restroom Care   Green Cleaning   Hand Tools   Chemicals/Cleaners   Exterior Care   Technology   Business Improvement   Legal/Regulatory   More

**MAGAZINES**
Sanitary Maintenance
Contracting Profits
Housekeeping Solutions

**DEPARTMENTS**
News of Interest
People & Company Updates
Calendar
Jobs and Classifieds

**INFORMATION RESOURCES**
CleanLink Minute
Management Minute
CleanTips
Buyer's Guide
Case Studies/ White Papers
Industry Statistics
Industry Links
Weathering The Storm
Webcasts

**PRODUCT RESOURCES**
Product Watch
Top Products
Storefronts

**myCleanLink**
Home
Blogs
Groups
Multimedia
Forums

**BLOGS**
Corinne Zudonyi
Dan Weltin
Lisa Ridgely
Nick Bragg

**ABOUT**
About Us
Contact Us
Advertise
Subscribe
RSS
Site Map
Polices

# ContractingProfits



April 2010 |  Subscribe  |  Contact  |  Advertise  |  Reports  |  Archives  |  Current Issue

**cover story**

## Unionize, Or Else

*Examining EFCA and SEIU's Ties To Washington*

By Lisa Ridgely, Deputy Editor of Contracting Profits
Email the CP editors

The elections of 2008, in which Democrats took over in Congress and Barack Obama was elected president, helped situate the Service Employees International Union (SEIU) as one of the most powerful labor unions in the country.

SEIU has organized campaigns to unionize the janitorial workforce in mid-market cities such as Cincinnati, Miami and Indianapolis in recent years; large metropolitan areas such as Chicago and New York have a longer history with the union. The organization is the fastest-growing union in the United States, representing 2.2 million workers, according to its Web site.

The union spent upwards of $85 million during the 2008 campaign season, and its president, Andy Stern, hasn't been shy about seeking a return on investment, according to news reports.

Mark Mix, president of Washington, D.C.-based National Right To Work (NRTW) Committee, a nonprofit organization opposed to compulsory unionism, says SEIU's political power is immense, with one goal in mind: increased membership.

"The most powerful people in Washington are union officials," Mix says. "Andy Stern was the top visitor to the White House during the first six months of the Obama administration. He was there 22 times — that's more than the joint chiefs of staff, more than the secretary of state, more than the secretary of defense."

The number of union members in government is now greater than the number of union members in the private sector, which Mix says is concrete evidence of unions' drive to use the government to build their marketshare.

What concerns Mix, business groups such as the U.S. Chamber of Commerce, industry associations and individual business owners, is the possibility of the Employee Free Choice Act (EFCA) being passed through Congress or implemented through interpretations of the National Labor Relations Board (NLRB).

**READ MORE:**

**CleanLink Articles:** seiu, efca, unions

**Related Topics:** HR, Management, Legal/Regulatory

**Industry Articles:** seiu, efca, unions

Currently, employees who want to form a union go through a secret ballot election if their employer doesn't authorize unionization. EFCA, also known as "card check" legislation, would allow employees to form unions if a bare majority of employees sign cards authorizing union

representation. It would also provide government-assisted mediation and arbitration for first-contract disputes, and establish stronger penalties on employers for violations.

Obama has pledged to sign EFCA into law, but it faces difficulty in Congress.

"It's really a one-sided bill. It dramatically benefits organized labor, it does not benefit workers, it does not benefit employers," says Mix, who also heads the NRTW Legal Defense Foundation. "It is a dramatic increase in the power of organized labor officials."

Glenn Spencer, executive director of the Workforce Freedom Initiative of the U.S. Chamber of Commerce, agrees. He believes the legislation is facing an uphill battle, but says employers should be paying close attention to what's going on in Washington.

"It's such a grave threat to the employer community that we need to just remain in constant vigilance against this," Spencer says. "At a time when America's job creators are struggling to get us out of this economic downturn, it's just adding more layers of restrictions. Putting hindrances in the way of creating jobs is probably not the smartest thing to do."

Obama's recent recess appointment of labor attorney Craig Becker to the National Labor Relations Board is also stirring controversy in legal and business circles. Becker's nomination to the NLRB had been blocked by the Senate in February, but he was still appointed at the end of March.

NRTW's legal work is on behalf of employees who are fighting back against unions, Mix says, and it has about 160 cases pending with the NLRB. Currently, the organization has 12 cases pending with the board against Becker, which may present a conflict of interest now that he's a board member, Mix says.

"We're asking that he recuse himself from all cases related to his most recent employer, which was, as of last Friday [March 26], the Service Employee International Union," Mix says.

With Becker's appointment, the board now has a Democratic majority, suggesting the potential for dramatic change from here on out, Spencer says.

"I think they are likely to engage in active rule-making, which is something that hasn't been done in 30 years," Spencer says. "So, they won't just sit there and let cases come to them. They will go out and proactively put in place new rules."

The regulatory body that is the NLRB has become so political that it will now be used to do the unions' bidding, Mix says.

"It's become a mechanism for imposing things that organized labor officials can't get done through the legislative process," Mix adds.

### Questioning 'free choice'

While pro-labor organizations and unions say EFCA gives workers more freedom to join and form unions, many building service contractors and other professionals in the cleaning industry don't agree. ISSA called upon members in March 2009 to oppose EFCA, stating in a release that "trading federally supervised private ballot elections for a card check process tramples the privacy rights of individual workers. Secret ballots are the only way to protect an individual's freedom to choose without subtle or overt coercion."

BSCs argue that card check, which requires signatures from 50 percent of employees, plus one, benefits big unions more than it benefits employees.

"I could have sworn 'free choice' meant a private election where you could vote your mind and your conscience without other people knowing," says Paul Greenland, president of Aetna Building Maintenance in Columbus, Ohio. Columbus was targeted in 2006 and 2007, along with Indianapolis and Cincinnati, by SEIU's "Justice For Janitors" campaign. Aetna's employees, along with other area BSCs, are now SEIU members.

BSCs say that companies don't really have much of a choice once they are targeted by SEIU for unionization.

"For the most part, it's a no-win situation for the contractor," Greenland says. "While they were targeting us to become unionized, the methods affected our customers. And as a partner with my

customers, I couldn't let that happen."

Corporate campaigns are a mass organizing effort to recruit new union members, sometimes through questionable means. Few building service contractors have deemed it worthwhile to fight unionization — but those who have say they owe it to themselves, their employees and business owners as a whole to stand up to the unions.

Dave Bego, president of Indianapolis-based Executive Management Services (EMS), wrote a book about his refusal to sign a neutrality agreement and SEIU's subsequent campaign against his company (see sidebar). From the handing out of accusatory fliers and protests outside of customer facilities to employee harassment and a barrage of unsubstantiated labor and safety violation allegations, SEIU was on the attack for three years, he says.

"In corporate campaigns, the unions aren't coming after your employees -- they're coming after you," Bego says. "It's psychological warfare. Their goal is to get you, as the owner, to capitulate. It isn't about the employee at all. You need to wake up; they're coming after you, and the collateral damage is your employees and your customers."

SEIU did not comment after multiple requests for an interview.

Contractors in the cleaning industry have not been the only ones targeted in corporate campaigns by SEIU, which includes not only service workers but those in healthcare and security services as well. Other SEIU targets have included Sutter Health and Wackenhut, and entities like hospitals and nurses associations.

Most corporate campaigns are run exactly the same way, no matter what cities or companies or industries are targeted, says Randy Schaber, spokesman for Somers Building Maintenance in Sacramento, Calif. Somers was thrust into the limelight in the late 1990s when the company resisted an SEIU campaign.

Neutrality agreements are a contract between the union and the company that, among other things, ban a secret ballot election during an employee-organizing effort. The neutrality agreement is a technique used in so-called "top-down" organizing, in which union officials actively seek out and pursue members. The agreements contain the same basic provisions as EFCA, Bego says, so if the legislation passes, business owners' compliance would no longer be necessary. EFCA makes it easier for unions to organize, by bypassing the employer completely in order to increase membership, he adds.

"It's all about money and it's all about power," Bego says. "Unions are hurting financially, they're desperate for membership, desperate for revenue, and they don't really care about the employees. That's evident in their campaigns."

Campaigns are designed around filing numerous NLRB charges as well as lawsuits, Schaber says. The strategy is to increase a company's expenses while decreasing revenues by making them lose customers.

When SEIU comes to town with a campaign, companies sit back and watch, in fear, he says.

"It's kind of like a safari, where you have a whole group of zebras, and the lion goes after one zebra, and the others run away, thinking they're safe," Schaber says. "What they want to do, once they break the biggest company, then they'll go to the second-biggest and the third-biggest and so on, and presto! They've organized the city without an election."

When a company does decide to stand up to the union, they incur major expenses doing so. Bego says EMS has spent more than $1 million, much of that in legal bills, fighting SEIU. But, he says, it's a matter of principal — he believes it's wrong to sign the neutrality agreement, and to be bullied into cooperating.

### Don't lose sight of employee role

Companies that are unionized may not agree with the union or its tactics, but they live the best they can with the decision to sign a neutrality agreement. Because of the economy, and the cutting back of customer cleaning budgets, some BSCs have had to cut jobs and at the same time increase efficiencies, Greenland says. And the entrepreneurial side of the business is still allowed to flourish -- as long as they are competing with other union companies.

"We're competing on productivity, we're competing on overhead, we're competing on profit, we're competing on who we are as a company vs. who they are as a company, and that's OK. That's not so bad," Greenland says.

The real issue is if the union doesn't control the market, he says. Bidding against non-union contractors who pay lower wages and don't have to provide paid vacations and paid holidays and healthcare can put other companies at a price advantage.

Sometimes, the voice and perspective that gets lost in labor issues are those of the laborers themselves.

"Everyone thinks this is a battle between big employees and big unions, but there's a third part of the equation and that is the employees," Mix says.

Business owners like Bego resist SEIU because they want to preserve that employee choice.

"I'm pro-employee. I used to run union plants," Bego says. "The problem is not with the average union member but instead lies with the union's upper management and campaign organizers. Their objectives are often based on their own self-preservation and are not in the best interests of the employees."

In the past — and for the most part, up to the present day — the BSC perspective on campaigns such as "Justice For Janitors" in the media has been muted. A big reason for that, says Bego, is fear. BSCs, who have already been labeled the bad guys as employers, are afraid to speak out against unionization campaigns.

Bego says he understands why very few other BSCs have resisted unions conducting campaigns, such as the SEIU.

"You have to be mentally tough and you have to have a lot of willpower, and you also have to have a lot of heart, because you have to understand why you're doing what you're doing. And you have to be able to withstand it," he says.

Rather than looking at the fight as a business decision, analyzing how much money could be lost, Bego says he saw it as the right thing to do and he doesn't regret it. When only 10 of approximately 400 EMS employees actually went on strike during the corporate campaign, he felt that he had his employees' support in choosing not to sign the neutrality agreement.

Business owners should be mindful of any new regulations coming out of the Department of Labor, and need to think about becoming more politically engaged, Spencer says.

"I think a lot of companies assume that what happens in Washington doesn't really impact them, and in past years, that may have been at least somewhat true," he says. "But what's happening here, now, this is just the beginning." 🔲🔳

---

### Bego's Book

"Devil At My Doorstep: Protecting Employee Rights"



In 2006, Dave Bego, president of Indianapolis-based EMS, was paying his employees above-average wages and providing sick days and health benefits — because he believed that was the right way to treat employees. With 5,000 employees in 33 states, EMS was a thriving contract cleaning company Bego had built from the ground up. But business as usual changed abruptly when SEIU came to town with a corporate campaign. It all started with the union's request for Bego to sign a neutrality agreement.

"I've been a tremendously strong believer in, and consider myself a patriot when it comes to, personal freedoms in our country. And when I looked at this agreement, and if I signed it, I would unilaterally take away my employees' right to a secret election. I would give that up," Bego says. "And what I told the union brass when they were here in Indianapolis talking to me, is: 'I don't feel it is my right to give up the personal freedoms of my employees and I am not going to sign that agreement. I will never sign it.'"

Bego says he wrote the book not to be an author, but because he was appalled at what SEIU did

to his employees, customers, and to him. He describes in detail the many tactics used to coerce and intimidate customers, employees and even colleagues and neighbors. Now, he has become somewhat of a poster child for the card check resistance movement.

"I feel it's my obligation to tell the human side of the story, to tell the tragedy that's happening, so that people wake up to what's going on — because if we don't wake up and they get these things through it's going to destroy the business community," Bego says.

© copyright 2011, Trade Press Media Group, Inc.

# A-12



**FOR IMMEDIATE RELEASE:**
Thursday, June 15, 2006

**FOR MORE INFORMATION:**
Lynda Tran, 202-907-1172 cell

# New Lawsuit: Immigrant Janitors Instructed to Work "Off-the-Clock" by Houston's Largest Local Cleaning Firm

### Professional Janitorial Service charged with violating federal law, engaging in unlawful business practices

Houston - Mostly immigrant janitors were instructed to work "off-the clock" and had pay withheld by the city's largest locally-based cleaning company, Professional Janitorial Service (PJS), according to a new lawsuit filed today. The suit charges that PJS engaged in practices that violate the Fair Labor Standards Act. PJS counts several high-profile corporations among its clients, including KBS Realty Advisors and PM Realty. PJS also cleans the offices of Blue Cross Blue Shield of Texas. The overwhelming majority of PJS employees are Latino immigrants.

"We work hard, but PJS thinks they can treat us however they want," said Eleonora Parada, one of the plaintiffs. Parada has worked as a janitor for 2 years. "That's why PJS janitors are taking a stand today--so we can have some basic protections."

The class action lawsuit states that PJS violated the federal Fair Labor Standards Act by systematically failing to pay its employees for all hours worked and unlawfully delaying to pay, and in some cases failing to pay at all, wages owed to its workers.

If found liable, PJS could owe civil penalties and back pay to the plaintiffs and other current and former employees who have not received proper compensation. Overall, as many as 400 janitors could be eligible to receive back compensation amounting to hundreds of thousands of dollars.

The lawsuit was filed in United States Federal District Court for the Southern District of Texas today on behalf of the workers by the attorneys at the Houston law firm of Kennedy Hodges LLP. The plaintiffs are current and former PJS janitors: Eleonora Parada, who cleans the Sterling Bank building in West Chase and Enrique Almeida, who previously cleaned the Sterling Bank building in West Chase.

The class action lawsuit was filed the same day as hundreds of immigrant workers, religious and community leaders, elected leaders, and other supporters marched through downtown Houston in support of PJS janitors' efforts to form a union with SEIU for a better life. PJS has responded to janitors' efforts to join together by intimidating and threatening workers who support improvements on the job. Earlier today, SEIU filed charges against PJS with the National Labor Relations Board for unlawful behavior including:

- PJS fired janitors participating in efforts to form a union.
- PJS threatened the loss of janitors' jobs if they choose to form a union.
- PJS refused to hire janitors because they were supportive of a union.

"The abusive behavior faced by PJS janitors unfortunately is typical of the kind of treatment faced by immigrant workers on the job every day," said City Councilman Adrian Garcia, who has come out in support of the janitors along with fellow Council members Sue Lovell and Peter Brown. "Employers like PJS have a responsibility to obey the law."

Today's march marks the 16th anniversary of International Justice Day, a day when janitors and other workers who secure, clean, and maintain office buildings demonstrate for justice. For more info, visit justiceforjanitors.org

*With more than 1.8 million members, SEIU is the nation's largest union and the largest union of property services employees–including more than 225,000 janitors. In Texas, SEIU represents more than 14,000 workers, including janitors and public employees. In the last decade, SEIU has helped hundreds of thousands of workers win better pay and access to affordable health insurance on the job.*

Copyright © 2006, Service Employees International Union. All rights reserved.

# A-13

From: Dan Schlademan [mailto:schlademand@seiu1.org]
Sent: Tue 6/20/2006 12:35 PM
To: cbouvier@abm.com; DPANOZZO@One-Source.com; Sypolt, Dwight; Kane, Daniel
T.; Peter Sperduti; mmorris@abm.com; Vergara, Johnny
Cc: Thomas Balanoff; Susan Polouski; Christopher Schwartz
Subject: PJS

To: Houston Area Contractors

From: Daniel R. Schlademan

Re: PJS

Attached is a report on the PJS and their violations of the NLRA and FSLA.

We expect that more charges will be filed on PJS in the coming period. Due
to the press that we have received thus far, we have been getting more calls
from both current and former employees of PJS who are alleging more
violations.  Please feel free to distribute this report to any and all
interested parties as we have already begun.

Please let me know if you have any questions or comments.

Sincerely,

Daniel R Schlademan

Vice President

Commercial Buildings Director

SEIU Local 1

111 E Wacker - Suite 2500

Chicago, IL  60601

(312) 233-8761 - Office

(312) 233-8836 - Fax

This e-mail, including attachments, may include confidential and/or
proprietary information, and may be used only by the person or entity
to
which it is addressed. If the reader of this e-mail is not the intended
recipient or his or her authorized agent, the reader is hereby notified
that
any dissemination, distribution, or copying of this e-mail is
prohibited. If
you have received this e-mail in error, please notify the sender by
replying
to this message and delete this e-mail immediately.

# A-14



**LOCAL 5**
**SEIU**
**TEXAS**

September 12, 2006

Ms. Sarah Ellison
Property Manager
USAA Real Estate Company
1001 McKinney St.
Houston, TX 77002

Dear Ms. Ellison:

We recently learned that you had selected Professional Janitorial Service (PJS) as the cleaning contractor for 1001 McKinney. It is our understanding that the reason for the switch was the quality of service provided by the previous contractor. While we have no information by which to evaluate the previous contractor's performance, we can assure you that switching to PJS will do nothing to improve the quality of service you receive.

Turnover among janitors in Houston averages 300 percent, and is higher in many buildings. Workers simply can't afford to stay in part-time jobs that pay little more than minimum wage and don't include any benefits such as affordable health care. Janitors must cobble together several jobs just to make ends meet, meaning many have already worked a full day before they arrive to clean your building. Under such circumstances, it is little wonder that turnover soars and quality suffers.

The five largest cleaning companies in Houston are currently bargaining a contract for janitors that could raise standards, reduce turnover, stabilize the Houston cleaning market, and improve quality. PJS is not among those contractors. It is therefore very unlikely that USAA or your international investment partner will benefit from that more stable, productive, professional workforce.

SERVICE EMPLOYEES
INTERNATIONAL
UNION, CLC

In fact, PJS has resisted any market-wide approach to raise standards in Houston. A class action lawsuit filed against the company by PJS janitors alleges that the company violated the federal Fair Labor Standards Act by failing to pay its employees for all hours worked and unlawfully delaying to pay, and in some cases failing to pay at all, wages owed to its workers. If found liable, PJS could owe liquated damages and back pay to the plaintiffs and other current and former employees who have not received proper compensation. Overall, as many as 400 janitors could be eligible to receive back compensation amounting to hundreds of thousands of dollars.

4299 San Felipe Street
Suite 200
Houston, TX 77027

713 514 0005
FAX 713-514-0008

www.HoustonJanitors.org



In addition, an investigation into PJS conducted by the U.S. Department of Labor, concluded this past August, found a "child labor violation" resulting from PJS's employment of a 15-year-old minor who worked more than three hours a day, 18 hours a week while school was in session.

With other reputable choices among the bidders for the cleaning contract at 1001 McKinney, it is hard to understand why a company such as USAA—with whom SEIU has enjoyed productive working relations in the past—would choose to associate itself with a company such as PJS.

I can be reached at 312-233-8761.

Sincerely,

Daniel Schlademan
Vice President



**LOCAL 5**

**SEIU TEXAS**

June 11, 2007

Rick V. Kirk
President and CEO
PM Realty Group
1000 Main St, Suite 2400
Houston, Texas 77002

Mr. Kirk:

We have contacted your firm several times regarding Professional Janitorial Services (PJS), a cleaning contractor employed by your company at properties in Houston. We have raised concerns that PJS is not keeping pace with rising standards in the contract cleaning industry in Houston, has issues with its quality of service, and lacks respect for its workers and the law.

Enclosed is new information about PJS for your review.

In the process of learning about and raising concerns about PJS, we have also accrued information about the firms that use PJS to clean properties they own or manage. Enclosed is information that has come to our attention that we believe your tenants will be interested in and that we plan to share with them.

We urge you to switch immediately from PJS to a responsible contractor that we believe would benefit your business, the workers who clean your buildings, and Houston as a whole.

Sincerely,

Susan Strubbe
Campaign Coordinator

Enclosures: "Is doing business with PJS Worth the Risk?"
"Tenant Update" Vol. 2 Issue 2

CC: James C. Gunn
President, Property Services, PM Realty
via e-mail

SERVICE EMPLOYEES
INTERNATIONAL
UNION, CLC

4299 San Felipe Street
Suite 200
Houston, TX 77027

713-514-0005
FAX 713-514-0008

www.HoustonJanitors.org



# A-15



**SEIU.**

**Stronger Together**

OCTOBER 24, 2006

Richard Solomon, Chair
Randall Edwards, Oregon State Treasurer
Council Members
Oregon Investment Council
PERS Headquarters
11410 S.W. 68th Parkway
Tigard, OR 97223

Dear Council Members:

This letter is intended to clarify and respond to statements made to The Lionstone Group, and shared with the Oregon Investment Council, from Transwestern Commercial Services' Managing Senior Vice President Stephen C. Ash in a letter dated October 17, 2006. The letter references an earlier letter to Mr. Ash from Brent Southwell, the CEO of Professional Janitorial Services (PJS).

In general, we believe that PJS—and by extension, Transwestern—have deliberately presented and omitted information that misrepresents and distorts the central issues we brought before the OIC and Treasury staff last month. Namely that:

1. PJS has been engaged in stealing from its employees
2. PJS subjects its employees to hazardous chemicals without proper training and projective gear
3. PJS threatens and retaliates against its employees engaged in union activities.

***Class Action Lawsuit against Professional Janitorial Services (PJS)***

Eleanora Parada presented direct testimony to the Council last month that she and other employees of PJS were told to work time that they were not paid for. The Class action, wage and hour lawsuit is in litigation. Ultimately, a court of law will decide the case. We are confident the discovery process will substantiate the testimony of Ms. Parada and others through careful and thorough examination of timesheets, payroll records and other evidence.

PJS's letter to Transwestern dated October 16, 2006, suggests that a U.S. Department of Labor investigation into PJS's violations of the Fair Labor Standards Act, removes all doubt about whether PJS cheated its employees.

OAKLAND AREA

ANDREW L. STERN
*International President*

ANNA BURGER
*International Secretary-Treasurer*

MARY KAY HENRY
*Executive Vice President*

GERRY HUDSON
*Executive Vice President*

ELISEO MEDINA
*Executive Vice President*

TOM WOODRUFF
*Executive Vice President*

SERVICE EMPLOYEES
INTERNATIONAL UNION
CTW, CLC

7677 Oakport Street
Suite 725
Oakland, CA 94621

510.568.2500
Fax 510.568.3652
www.SEIU.org

As we explain below, the DoL investigation was very narrow and did not address the allegations made in the lawsuit. It should not be used— as PJS did in its letter—to give the contractor a clean bill of health.

After a media report that there had been an investigation by the U.S. Dept. of Labor (DoL) of PJS, SEIU filed a Freedom of Information Act (FOIA) request for all materials collected during that investigation, including the investigation report and redacted payroll records and timesheets. Based on the response to our request, we believe that the DoL did not conduct a complete and thorough investigation of PJS violations of child labor and wage and hour laws, and that many other wage and hour violations would have been uncovered if federal officials had conducted a complete investigation.

SEIU was told by the DoL FOIA officer that we were provided all payroll records and timesheets in the case file, which consist only of timesheets and sign in sheets for one PJS account (10260 Westheimer, where the two PJS worker lawsuit plaintiffs worked) for one 2-week pay period. PJS cleans at least 56 office buildings in Houston, and has other retail accounts.

The plaintiffs in the lawsuit had worked at PJS for much longer than the two-week pay period covered by the investigation. The fact that, we believe, the DoL investigator may have reviewed a very small portion of PJS payroll records makes the investigation of limited value in understanding PJS's practices.

It remains unclear if the DoL investigator ever actually talked with any PJS janitors. If he had, we believe that the investigator would have discovered that PJS janitors work more hours than they are paid for. We are confident that this information will be verified through the legal proceedings that are already underway. Interestingly, neither PJS nor Transwestern mentioned the practice of withholding the first two weeks of employees' wages until they resign.

Importantly, material provided SEIU by DoL indicates the DoL investigation was based on a narrow review of employee timesheets and payroll records (two weeks at one building) and that DoL never talked with janitors during the investigation. It is SEIU's continued position that PJS had a practice of illegally withholding wages earned by its employees.

OST.OIC.00090

**Page 3**

### Worker Injuries and Hazardous Chemicals

SEIU has in our possession doctor's records that indicate that chemical
exposures were the cause of Ms. Parada's health problems. Those
records, which follow from an examination by a physician in January
2006, focuses on a chemical called Double Play Crème Cleanser, as well
as other similar chemicals. Among the symptoms that she reported to
doctors were itching on her hands and forearms, headaches, dizziness,
frequent coughing, and nasal bleeding. According to the Material Safety
Data Sheet on the product, the cleanser is classified as "hazardous"
under OSHA regulations. The MSDS continued, "High concentrations
of vapor or mist may cause nose, throat, and respiratory tract irritation.
Symptoms may include coughing and a burning sensation in the nose
and throat." Despite this fact, Ms. Parada says she was not provided with
goggles or rubber gloves when using this product.

SEIU is currently assessing our options, including retaining an expert in
hazardous commercial chemicals and/or pursuing additional legal action
on Ms. Parada's behalf.

### Unfair Labor Practices

All unfair labor practice charges filed by SEIU against PJS are currently
on appeal to the National Labor Relations Board. SEIU stands by the
allegations that workers have been threatened or harassed by PJS, and
continues to aggressively pursue these charges on appeal. For example,
in a sworn affidavit, Jesus Del Toro, one of the PJS employees who filed
charges against his employer, describes an afternoon during which he
asked his co-workers to sign union authorization cards. Mr. Del Toro
recounts, "Several workers told me that before I arrived there, they
already had a meeting with the supervisor and warned them not to sign
any document from the Union. If they would sign, they could lose their
job." Mr. Del Toro—who had been observed by his supervisor talking to
his co-workers about the union, and whose image has appeared on a
leaflet about janitors' lack of health insurance—was later fired.

In the letter, PJS also alleges that SEIU has sought to intimidate
employees into joining SEIU. These allegations were the subject of eight
charges filed by PJS against SEIU, all of which were dismissed by the
NLRB. PJS has not chosen to pursue an appeal, leading us with only one
possible conclusion: that the company itself believes that they are
without merit.

OST.OIC.00091

In fact, the sworn testimony of Mr. Del Toro above describes a much more accurate picture of how workers come to form a union: by speaking with their own co-workers and forming leadership teams made up of the janitors who work in the buildings.

As for the question of a "secret ballot election," the National Labor Relations Board accepts that majority sign-up process, as utilized by SEIU and many other unions, as a legal and democratic method for allowing employees to freely select whether they wish to form a union. SEIU has used this method in city after city for more than a decade.

In conclusion, while PJS provided a carefully crafted reply to the issues we raised last month, they remain under pending legal action for wage and hour violations and unfair labor practice charges on appeal to the National Relations Labor Board. The testimony and medical records of at least one of its employees suggests a company that cares little for its employees' health and safety.

Thank you for your attention to this serious matter.

Sincerely,

Dennis L. Murphy
Director, Real Estate
SEIU Capital Stewardship Program



**SEIU TEXAS**

June 18, 2007

Mr. Mike Thompson
Portfolio Manager, Real Estate
California State Teachers Retirement System
7667 Folsom Blvd, MS-4
Sacramento, CA 95826-2614

Dear Mr. Thompson:

This is an update to my letter of May 24 alerting you to concerns we have with the contractor in the new CalSTRS/Thomas Properties Group office portfolio in Austin, TX. We have uncovered additional concerns about the company—Professional Janitorial Services (PJS)—that we believe are important to bring to your attention as you carry out your fiduciary due diligence while investing the retirement assets of California educators.

There are currently five Unfair Labor Practice (ULP) charges filed against PJS in various properties that the company cleans in Houston, Texas. Four of these charges have been filed since last we contacted you about this matter, which we believe indicates that PJS is intensifying a campaign to intimidate workers who are exercising their legally protected right to choose to join a union free from coercion or harassment. Four of the ULPs allege that workers were either harassed, interrogated, or threatened with retaliation by their employers because they supported the creation of a union at their workplace. The fifth ULP alleges that PJS has unlawfully refused to collectively negotiate a contract at a select group of locations where it has the legal obligation to bargain. Copies of all five charges, which are currently pending before the National Labor Relations Board, are attached to this letter.

As I noted in my last letter, more people are coming forward to participate in the lawsuit that has already been filed against PJS alleging the company violated the federal Fair Labor Standards Act by systematically failing to pay employees for all hours worked (*Almeida and Parada and on Behalf of All Others Similarly Situated v. Professional Janitorial Services of Houston*, Civil Action No. H-06-2044). Specifically, in the past several days an additional 20 plaintiffs have signed onto the lawsuit. This represents a major step forward in the progress of the lawsuit, and demonstrates that the potential scope of these legal proceedings continues to expand. If the plaintiffs prevail in this case, they will be entitled to both compensatory and liquidated damages. Therefore, PJS currently faces a significant financial risk resulting from its allegedly unlawful business practices.

With these ongoing developments in relation to PJS and with Thomas Properties' closing on the acquisition of the Austin portfolio, we believe this is an appropriate time for Thomas to conduct a thorough

SERVICE EMPLOYEES
INTERNATIONAL
UNION, CLC

4299 San Felipe Street
Suite 200
Houston, TX 77027

713-514-0005
FAX 713-514-0008

www.HoustonJanitors.org

review of PJS's business practices. While janitors in Austin are not currently seeking to organize with SEIU, we believe that PJS's business practices in Houston raise significant questions that should be taken into account as Thomas makes a decision on the cleaning company for the Austin buildings.

In summary, we believe that PJS's track record in Houston raises financial risks that all Austin commercial real estate market investors, including Calstrs and Thomas Properties, should factor into their considerations. As noted in our previous correspondence, SEIU's experience in many real estate markets indicates that fair wages and treatment for workers leads to reduced risk and improved performance for investors.

As you know, we have reached out to Thomas Properties Group to discuss these issues with them directly. In the meantime, if there is anything we can do to assist you in documenting our concerns with PJS, please do not hesitate to contact me at 312-233-8761. Thank you for your attention to this important matter.

Sincerely,

Daniel R. Schlademan
Commercial Buildings Director

Cc:     Jerry Hackney, Vice President, Thomas Properties Group

SEIU/Houston 0016

# A-16

# The Wedge Group: Out of Step with Houston's Values?

When it comes to driving the economy and raking in energy and real estate profits, the Houston-based Wedge Group leads the pack. But when it comes to the hard-working janitors who clean their offices, the Wedge Group may be out of step with the rest of the city.

Unlike many area business leaders who are supporting good jobs with health care for hard-working janitors and their families, the Wedge Group continues to use irresponsible contractor Professional Janitorial Service (PJS) to clean their office space.



PJS is resisting janitors' efforts to negotiate over better pay and access to health care on the job and is undermining the union contract that Mayor Bill White called "a milestone in the history of the city of Houston and more importantly something uplifting the lives of Houston residents who are just trying to get by every single day."

PJS has also responded to janitors' efforts to unite with their colleagues to win health care and better jobs by allegedly violating federal pay laws and allegedly threatening and intimidating workers.

## Call the Wedge Group at 713-739-6500.

**Tell them to support good jobs with health care in Houston by using a responsible cleaning contractor that provides good-paying jobs with health care for janitors.**

For more information, call 713-514-0005 or visit houstonjanitors.org.

**SEIU**