# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

_____

|  |  |  |
|---|---|---|
| SODEXO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:11-CV-276 (CMH/IDD) |
| | ) | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................................1

ARGUMENT ........................................................................................................................4

I.      THE LEGAL STANDARDS IN EVALUATING A RULE 12(b)(6) MOTION ...............4

II.     THE FOUR FATAL LEGAL DEFECTS IN SODEXO's RICO CLAIMS ......................5

        A.      The First Fatal Legal Defect In Sodexo's RICO Claims .........................................5

        B.      The Second Fatal Legal Defect In Sodexo's RICO Claims...................................13

        C.      The Third Fatal Legal Defect In Sodexo's RICO Claims......................................23

        D.      The Fourth Fatal Legal Defect In Sodexo's RICO Claims....................................29

III.    THE ADDITIONAL, COUNT-SPECIFIC LEGAL DEFECTS IN
        SODEXO's RICO CLAIMS ...............................................................................33

        A.      The Additional Legal Defects In Sodexo's First Two RICO Claims ...................33

        B.      The Additional Legal Defects In Sodexo's Remaining Two RICO Claims..........37

IV.     SODEXO's STATE LAW CLAIMS (COUNTS FIVE AND SIX) ARE DUE
        TO BE DISMISSED AS WELL.......................................................................39

CONCLUSION...................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*A. Terzi v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998) .................................18

*Adcock v. Freightliner*, 550 F.3d 369 (4th Cir. 2008),
    *cert. denied*, 130 S. Ct. 62 (2009) ....................................................2, 17, 19, 20, 22

*Al-Abood v. El-Shamari*, 217 F.3d 225 (4th Cir. 2000) ...............................................29

*American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th Cir. 2004) ..............25

*In re American Honda Motor Co. Inc. Dealerships*, 965 F. Supp. 716 (D. Md. 1997) ...........36, 37

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .......................................................5

*Bell Atlantic Corp.v. Twombly*, 550 U.S. 544 (2007) .................................................5

*Beverly Hills Foodland v. United Food & Commercial Workers Local 655*,
    39 F.3d 191 (8th Cir. 1994) ......................................................................18

*Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494 (3d Cir. 1998) ..................................15, 16

*Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990) ...........................................35

*Cintas Corp. v. UNITE HERE*, 601 F. Supp. 2d 571 (S.D. N.Y.), *aff'd mem.*,
    355 Fed. App'x 508 (2d Cir. 2009) ...................................................... 2, 13-16, 18

*Davis v. Hudgins*, 896 F. Supp. 561 (E.D. Va. 1995), *aff'd mem.*,
    87 F.3d 561 (4th Cir. 1996) ......................................................................38

*Davis v. Pak*, 856 F.2d 648 (4th Cir. 1988) .......................................................39

*Dtex, LLC v. BBVA Bancomer, Inc.*, 405 F. Supp. 2d 639 (D.S.C. 2005),
    *aff'd mem.*, 214 Fed. App'x 286 (4th Cir. 2007) ...................................... 3, 24-27, 29

*Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000) ...................................34

*G.E. Inv. Private Placement Partners II v. Parker*, 247 F.3d 543 (4th Cir. 2001) .................29, 34

*George Lussier Enters. v. Subaru of New England*, 393 F.3d 36 (1st Cir. 2004) ...................15, 16

*HERE, Local 17 v. J.P. Morgan Hotel*, 996 F.2d 561 (2d Cir. 1993) .....................................16, 17

*HERE, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206 (3d Cir. 2004) .......................16, 17

*H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989) .................................................23, 30

*Hinson v. Norwest Financial South Carolina*, 239 F.3d 611 (4th Cir. 2001)................................40

*Holland v. Cole Nat'l Corp.*, No. 7:04-CV-246, 2005 WL 1242349
    (W.D. Va. May 24, 2005) .................................................................................................26

*Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ. 9612(GEL), 2004 WL 2071689
    (S.D.N.Y. Sept. 16, 2004).............................................................................................26, 27

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)..................................................................26

*Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir. 1989) ........................................................29

*Metro. Opera Ass'n v. Local 100, HERE*, 239 F.3d 172 (2d Cir. 2001) .......................................18

*Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016 (7th Cir. 1992)............................................30

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ........................................................ 4, 5, 20-23, 32, 38

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)..............................................................................35

*Salinas v. United States*, 522 U.S. 52 (1997)....................................................................34, 35, 37

*Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003)....................... 7-11, 19

*Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91 (2d Cir. 1997) .....................................26

*Smithfield v. UFCW*, 585 F. Supp. 2d 789 (E.D. Va. 2008) .........................................................23

*Smithfield v. UFCW*, 633 F. Supp. 2d 214 (E.D. Va. 2008) .........................................3, 12, 28, 33

*Teague v. Bakker*, 35 F.3d 978 (4th Cir. 1994).............................................................................36

*United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966) .................................................39

*United States v. Clemente*, 640 F.2d 1069 (2d Cir. 1981) ............................................................15

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) ..............................................................12, 13

*US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312 (4th Cir. 2010) .................. 2, 3, 4, 29-32

*Viacom Int'l v. Icahn*, 747 F. Supp. 205 (S.D.N.Y. 1990), *aff'd on other grounds*,
    946 F.2d 998 (2d Cir. 1991)................................................................................................15, 16

*Wackenhut Corp. v. SEIU*, 593 F. Supp. 2d 1289 (S.D. Fla. 2009)............................. 1, 2, 5-9, 12

*Yellow Bus Lines Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*,
    913 F.2d 948 (D.C. Cir. 1990) ...........................................................................................35, 36

## STATUTES AND RULES

18 U.S.C. § 1951 ...........................................................................................................................6

18 U.S.C. § 1951(b)(2) ................................................................................................................15

18 U.S.C. § 1961 .....................................................................................................................10, 18

18 U.S.C. § 1961(1) .......................................................................................................................1

18 U.S.C. § 1962(a) ......................................................................................................................34

18 U.S.C. § 1962(b) ......................................................................................................................35

18 U.S.C. § 1962(d) ......................................................................................................................33

28 U.S.C. 1367 .............................................................................................................................40

28 U.S.C. 1367(c) .........................................................................................................................39

Fed. R. Civ. P. 12(b)(6)................................................................................................................40

## MISCELLANEOUS

Robert M. Hatch, et al., *RICO Theories, Cases and Strategies in  Consumer
    Litigation: Strategies for Defending Section 1962 Claims*,
    53 CONSUMER FIN. L.Q. REP. 140 (1999).......................................................................30

## INTRODUCTION AND SUMMARY OF ARGUMENT

"The Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. § 1961, *et seq.*, establishes civil and criminal liability for those who engage in 'a pattern of racketeering activity'"—*i.e.*, who engage in committing a "pattern" of two or more RICO "predicate acts." *See Wackenhut Corp. v. SEIU*, 593 F.Supp.2d 1289, 1294 (S.D. Fla. 2009); 18 U.S.C. § 1961(1) (enumerating the various felony crimes that constitute RICO "predicate acts").  The only type of RICO predicate act that Plaintiff Sodexo, Inc. ("Sodexo") alleges in its voluminous Complaint is the RICO predicate act of "attempted extortion."  And, Sodexo's claim that the twelve named Defendants are guilty of committing the RICO predicate act of "attempted extortion"—indeed, are guilty of committing *a "pattern" of two or more* such RICO predicate acts of "attempted extortion" in violation of the RICO statute —rests entirely on the following factual allegations:

(a)  Defendants are conducting a "corporate campaign" against Sodexo, consisting almost exclusively of "an unending stream of sensational and disparaging public allegations" about Sodexo (including "press releases," "blog articles," "social media posts" and a "litany" of "studies" and "reports" critical of Sodexo) and numerous "protests," "demonstrations" and other free speech appeals aimed at persuading Sodexo's "current and prospective business partners" to "terminate existing, or decline to enter into new, business relationships with Sodexo," *see* Complaint ("Cplt.") ¶¶ 8, 14-15, 113, 123, 161-62, 175-76; and

(b)  The objective of this "corporate campaign" is to put economic "pressure" on Sodexo, *id.* ¶¶ 113, 123, 170, 176, to enter into a "card check procedure" agreement with Defendant Service Employees International Union ("SEIU") that sets the terms on which Sodexo would recognize SEIU as the collective bargaining representative of designated groups of Sodexo employees—an agreement that has the same essential attributes as the "valid labor agreement

governing recognition of a labor union" upheld by the Fourth Circuit against a legal challenge in *Adcock v. Freightliner*, 550 F.3d 369, 376 (4th Cir. 2008), *cert. denied*, 130 S. Ct. 62 (2009) (internal quotations omitted), *see infra* pp. 19-20.

Sodexo's legal theory that such a campaign directed to such an end amounts to "criminal activity"—much less to a kind of "organized, long-term, habitual criminal activity" that "pose[s] a special threat to social well-being" and that the "unique [RICO] cause of action . . . is concerned with eradicating," *US Airline Pilots Ass'n v. AWAPPA, LLC*, 615 F.3d 312, 317, 318 (4th Cir. 2010)—strains credulity to say the very least.  Unsurprisingly, Sodexo's RICO "attempted extortion" claims resting on that legal theory suffer from four separate legal defects, each of which standing alone dictates the Rule 12(b)(6) dismissal of Sodexo's RICO claims in their entirety.  In brief summary, those four fatal legal defects are as follows:

1.    For the reasons stated in *Wackenhut v. SEIU*, *supra*, 593 F.Supp.2d 1289—in which the district court dismissed, under Rule 12(b)(6), a set of RICO "attempted extortion" claims made by an employer against Defendant SEIU that are indistinguishable in substance from the set of RICO "attempted extortion" claims made by Sodexo here—Sodexo has failed to allege facts that satisfy the essential "obtaining of property" element of RICO "attempted extortion." *See infra* pp. 5-12.

2.    For the reasons stated in *Cintas Corp. v. UNITE HERE*, 601 F.Supp.2d 571 (S.D. N.Y.), *aff'd mem.*, 355 Fed. App'x 508 (2d Cir. 2009)—in which the district court dismissed, under Rule 12(b)(6), a set of RICO "attempted extortion" claims made by an employer against another labor union that likewise are indistinguishable in substance from the set of RICO "attempted extortion" claims made by Sodexo here—Sodexo has failed to allege facts that satisfy the essential "wrongful use" element of RICO "attempted extortion."  *See infra* pp. 13-23.

3.    Even assuming *arguendo* that Sodexo had alleged facts that satisfy both of the above-described essential elements of RICO "attempted extortion," "[a]t best" from Sodexo's perspective, Sodexo has adequately pled only "one predicate act . . . in furtherance of [one] alleged ['attempted extortion'] scheme" relating "to [consummating] one [Sodexo/SEIU 'card check procedure' agreement]." *Dtex, LLC v. BBVA Bancomer, Inc.*, 405 F.Supp.2d 639, 649-50 (D.S.C. 2005), *aff'd mem.*, 214 Fed. App'x 286 (4th Cir. 2007). Sodexo thus has failed to allege facts that satisfy the essential "two or more [RICO] predicate acts" element of the RICO "pattern of racketeering activity" requirement. *Id. See infra* pp. 23-28.

4.    The "attempted extortion" scheme alleged by Sodexo has a "built-in ending point," *US Airline Pilots*, *supra*, 615 F.3d at 318—consummation of a Sodexo/SEIU "card check procedure" agreement. Thus, under a consistent line of Fourth Circuit decisions, including the Fourth Circuit's recent directly-on-point decision in *US Airline Pilots*, *supra*, 615 F.3d 312, Sodexo has failed to allege facts that satisfy the essential "continuity" element of the RICO "pattern" requirement. *See infra* pp. 29-33.

In the face of all this, we anticipate that Sodexo will seek to respond to this Motion by bringing heavily into play the pre-*Wackenhut* and pre-*Cintas* decision in *Smithfield v. UFCW*, 633 F.Supp.2d 214 (E.D. Va. 2008), denying the defendant unions' Rule 12(b)(6) motion to dismiss the RICO "attempted extortion" claims made by Smithfield in that earlier case.[1] But as we demonstrate below, that *Smithfield* Rule 12(b)(6) decision does not provide Sodexo any legal comfort here. In that decision, the *Smithfield* court barely noticed—and most certainly did

---

[1] Although the *Smithfield* Rule 12(b)(6) decision bears an "F.Supp.2d" volume number higher than the *Wackenhut* and *Cintas* Rule 12(b)(6) decisions, the *Smithfield* decision was issued on May 30, 2008, prior to both the January 6, 2009 decision in *Wackenhut* and the March 9, 2009 decision in *Cintas*—the latter of which was appealed to the United States Court of Appeals for the Second Circuit and affirmed by that court on December 8, 2009.

nothing to refute—the argument pertaining to the "obtaining of property" element of RICO "attempted extortion" that later prevailed in *Wackenhut*, *see infra* pp. 11-12 & n.3; and the *Smithfield* court did not address at all the argument pertaining to the "wrongful use" element of RICO "attempted extortion" that later prevailed in *Cintas*, *see infra* p. 23 n.8.  Moreover, the *Smithfield* court's rulings rejecting the legal arguments pertaining to the RICO "pattern of racketeering activity" requirement outlined in subparagraphs 3 and 4 above are squarely at odds with the well-settled and consistent RICO law within the Fourth Circuit—including, most pertinently, the Fourth Circuit decision in *US Airline Pilots*, *supra*, 615 F.3d 312, that post-dates *Smithfield*—and are thus singularly unpersuasive as authority.  *See infra* pp. 23-33.

Although each of the four legal defects in Sodexo's RICO claims outlined above and detailed below is independently sufficient to dictate the Rule 12(b)(6) dismissal of those claims in their entirety, there are additional legal defects in each of the four separate RICO Counts pled by Sodexo that dictate the dismissal of those Counts, either as to all Defendants or a subset of Defendants.  We point out those additional, Count-specific legal defects *infra* pp. 33-39.

## ARGUMENT

## I.   THE LEGAL STANDARDS IN EVALUATING A RULE 12(b)(6) MOTION

"[I]n evaluating a Rule 12(b)(6) motion to dismiss, a court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).  "But . . . legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes," and a court should "also decline to consider unwarranted inferences, unreasonable conclusions, or arguments."  *Id.* (internal quotations omitted).

"Ultimately, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and "[f]acial plausibility is established" only if "[the] complaint allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 255-26 (internal quotations omitted).  In short, "[t]he complaint must . . . plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct," for "[w]ithout such heft, . . ., the plaintiff's claims cannot establish a valid entitlement to relief." *Id.* at 256 (internal citation and quotations omitted).

## II.   THE FOUR FATAL LEGAL DEFECTS IN SODEXO's RICO CLAIMS

Applying these by-now-familiar pleading standards drawn from the Supreme Court's decisions in *Bell Atlantic Corp.v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), and the by-now-well-established legal principles pertaining to the essential elements of RICO "attempted extortion" and the essential elements of the RICO "pattern" requirement set out *infra* pp. 5-33, the conclusion is inescapable that Sodexo has *not* stated a "plausible" RICO claim of any kind against any of the twelve Defendants named in Sodexo's Complaint.  Indeed, as previously noted, and as now set out in detail below, Sodexo's RICO claims suffer from four independent legal defects, each of which standing alone dictates the Rule 12(b)(6) dismissal of those RICO claims in their entirety.

### A.   The First Fatal Legal Defect In Sodexo's RICO Claims

In *Wackenhut v. SEIU*, *supra*, 593 F.Supp.2d 1289, the district court dismissed, under Rule 12(b)(6), a set of RICO claims arising out of an allegedly "extortionate" "corporate campaign" by SEIU against Wackenhut that is not in any way legally distinguishable from the set of RICO claims in this case alleging an "extortionate" "corporate campaign" by SEIU against

5

Sodexo.  *See* Complaint ("Cplt.") ¶¶ 8, 81.  The *Wackenhut* court did so on the ground that

Wackenhut had failed to allege facts that satisfy the essential "obtaining of property" element of

RICO "attempted extortion."  The *Wackenhut* court's ruling in that regard is entirely correct and

points directly to a dismissal of Sodexo's RICO claims here on the same ground.

       1.      The RICO claims dismissed by the *Wackenhut* court rested on the following

factual allegations in Wackenhut's complaint against SEIU:

> SEIU allegedly launched a corporate campaign to "strong arm Wackenhut into
> signing labor agreements to which SEIU has no legal right." . . . .  Wackenhut
> alleges that SEIU aggressively pursued this campaign through "economic,
> political and psychological warfare," including "a continual barrage of anti-
> Wackenhut flyers, newsletters, website publications, public demonstrations and
> political maneuvering," all in effort to coerce Wackenhut into negotiating a labor
> agreement with SEIU [governing 'the union recognition process.'] . . .
>
> . . . Confronted with Wackenhut's refusal to recognize it, SEIU allegedly waged a
> "campaign of extortion designed to coerce [Wackenhut's] consent [to such an
> agreement], prompted by a desire to "maximize [SEIU's] membership and thus its
> income from dues and fees."  [593 F.Supp.2d at 1290, 1296 (internal citations
> omitted).]

The legal theory pressed by Wackenhut based on these factual allegations was that

SEIU's "corporate campaign" consisted of "multiple acts of attempted extortion" in violation of

the Hobbs Act, 18 U.S.C. § 1951, and thus constituted "a pattern of racketeering activity" in

violation of RICO.  *See id.* at 1293-94.  Specifically, Wackenhut's legal theory was that

> SEIU is attempting [in violation of the Hobbs Act and RICO] to "bend
> [Wackenhut's] will" and obtain from it various intangible property rights,
> including Wackenhut's right to control the form and nature of the union
> recognition process that applies to its employees; . . . Wackenhut's right to
> preserve its employees' statutory right to "free choice," and Wackenhut's right
> to conduct business with its customers free from interference, harassment and
> threats of economic doom from SEIU or its agents.  [*Id.* at 1296.]

On an SEIU Rule 12(b)(6) motion to dismiss asserting a number of legal defects in

Wackenhut's complaint, the *Wackenhut* court held "that the Complaint does not allege facts

constituting [RICO predicate] acts of 'extortion' as that crime is defined under the Hobbs Act," and "dismissed [the Complaint] for failure to state a [RICO] claim on this basis," without reaching SEIU's "remaining challenges to the Complaint." 593 F.Supp.2d at 1294.

In so holding, the *Wackenhut* court began by noting: (a) that the Hobbs Act defines "extortion" as "*the obtaining of* property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear . . ."; and (b) that "the United States Supreme Court significantly restricted the scope of the phrase '*the obtaining of* property from another' in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003)." *See* 593 F.Supp.2d at 1294-95 (emphasis added).

"In *Scheidler*," the *Wackenhut* court explained, "anti-abortion protestors . . . were attempting to shut down abortion clinics," and the question presented for the Supreme Court was "whether the actions of the anti-abortion protestors preventing access to the clinics, causing property damage and committing criminal trespass could constitute extortion and thus a predicate act under RICO." *See id.* at 1295. The *Wackenhut* court further explained that the Supreme Court, in answering that question, "said no," and did so on the ground that:

> "[E]ven when their acts of interference and disruption achieved their ultimate goal of 'shutting down' a clinic that performed abortions, such acts did not constitute extortion because petitioners did not 'obtain' respondents' property. Petitioners may have deprived or sought to deprive respondents of their alleged property right to exclusive control of their business assets, but they did not acquire any such property. Petitioners neither pursued nor received 'something of value from' respondents that they could exercise, transfer or sell." [*Id.* (quoting *Scheidler*, 537 U.S. at 404-05).]

In this regard, the *Wackenhut* court added, *Scheidler* draws a basic and critical distinction between "extortion," which *is* a RICO predicate act, and "coercion," which is *not* a RICO predicate act. *See* 593 F.Supp.2d at 1296. As the *Scheidler* Court had explained:

> [C]oercion . . .  involves the use of force or threat of force *to restrict another's freedom of action*.  Coercion's origin is statutory, and it was clearly defined in the New York Penal Code as a separate, and lesser, offense than extortion when Congress turned to New York law in drafting the Hobbs Act.  New York case law applying the coercion statute before the passage of the Hobbs Act involved the prosecution of individuals who . . .  employed threats and acts of force and violence *to dictate and restrict the actions and decisions of businesses*."  [*Scheidler*, 537 U.S. at 405-06 (emphasis added).]

Against this background, the *Wackenhut* court ruled that Wackenhut's factual allegations that "SEIU is attempting to 'bend [Wackenhut's] will' and obtain from [Wackenhut] various intangible property rights" such as "Wackenhut's right to control the form and nature of the union recognition process that applies to its employees" and Wackenhut's "right to preserve its employees' statutory right to 'free choice'" were sufficient to "satisfy *the 'property' prong* of the Hobbs Act."  593 F.Supp.2d at 1296 (emphasis added).

"However," applying *Scheidler*'s teachings, the *Wackenhut* court ruled that these factual allegations "fall short of satisfying *the 'obtaining' prong* of the extortion statute."  *Id.* (emphasis added).  That ruling is compelled by *Scheidler*, the *Wackenhut* court explained, because "Wackenhut does not allege that SEIU obtained any of Wackenhut's rights or property; at most, [Wackenhut] claims that SEIU *improperly coerced or attempted to coerce* [*Wackenhut*] *to do something to which it was not otherwise inclined or required to do*."  *Id.* (emphasis added).

To put this point another way, the essence of Wackenhut's factual allegations was that SEIU was attempting "to dictate and restrict the actions and decisions of [Wackenhut]," *Scheidler*, 537 U.S. at 406, with regard to according SEIU recognition as a collective bargaining representative; Wackenhut did not—and could not—allege that SEIU was attempting to "acquire" and to "exercise" in SEIU's own name, *id.* at 405, Wackenhut's intangible property right to take actions and make decisions with regard to according SEIU recognition as a bargaining representative.

In sum, said the *Wackenhut* court, Wackenhut's factual allegations "fall short of satisfying *the 'obtaining' prong* of the extortion statute" under *Scheidler* because

> even assuming the truth of Wackenhut's allegations—that the [SEIU] sought to exert economic pressure on Wackenhut to force it to accede to [SEIU's] demand for recognition and in doing so interfered with [Wackenhut's] right to conduct its business, even to the point of causing it to lose customers—such allegations merely establish that the [SEIU] sought to deprive Wackenhut of these property rights, not that it sought to acquire them for itself.  Without an allegation that [SEIU] sought to acquire these rights, the complaint fails to allege facts from which the court might conclude that SEIU "pursued or received something of value from [Wackenhut] that [SEIU] could exercise, transfer, or sell."  [593 F.Supp.2d at 1296 (quoting *Scheidler*, 537 U.S. at 405).]

2.     Sodexo's factual allegations and legal theory of RICO "attempted extortion" in this case are indistinguishable in substance from those of the plaintiff employer in *Wackenhut*. Accordingly, Sodexo's RICO claims in this case fail as a matter of law under the Supreme Court's decision in *Scheidler* as correctly read and applied by the *Wackenhut* court.

Like the employer in *Wackenhut*, Sodexo alleges that it is the target of an "elaborate" and "devastating" SEIU "[economic] pressure technique called the 'corporate campaign,'" Cplt. ¶¶ 2, 8, 81, consisting almost exclusively of "an unending stream of sensational and disparaging public allegations about Sodexo's business and human relations practices," *id.* ¶ 14, and efforts to "interfer[e] with Sodexo's business relationships" by seeking to persuade Sodexo's customers not to do business with Sodexo, *id.* ¶¶ 175-245.

And, like the employer's legal theory of RICO "attempted extortion" in *Wackenhut*, Sodexo's legal theory of RICO "attempted extortion" is that SEIU is attempting through the use of an economic pressure "corporate campaign" to induce Sodexo—"at the point of an economic bayonet," Cplt. ¶ 17—to enter into an agreement with SEIU to govern the union recognition process under which Sodexo would "waive" certain of its intangible property rights in

connection with that recognition process, including its "right to insist on secret-ballot elections conducted by the NLRB at each Company facility Defendant SEIU selects for unionization"; its "right guaranteed under Section 8(c) of the National Labor Relations Act to voice its opinion about, and/or opposition to, attempts to unionize its employees"; and "its right to refuse to recognize Defendant SEIU as bargaining agent of the Company's employees on the basis of signed union authorization cards," *id.* ¶ 129.

Moreover, like the employer in *Wackenhut*, Sodexo alleges here that SEIU's ultimate objective in pursuing this course of conduct is to maximize its membership and thus its income from dues and fees. *See* Cplt. ¶¶ 8, 25, 81, 90.

Indeed, the *only* distinction between the employer's complaint in *Wackenhut* and Sodexo's Complaint here is that while Wackenhut alleged that SEIU's economic pressure corporate campaign there was an "extortionate" campaign in violation of the Hobbs Act, 18 U.S.C. § 1951, Sodexo alleges that SEIU's economic pressure corporate campaign here is an "extortionate" campaign "under a variety of [enumerated] state criminal laws," *see* Cplt. ¶¶ 19, 285, 293, 300, 307.  But under the Supreme Court's decision in *Scheidler*, this is a distinction without a legal difference.  As *Scheidler* squarely holds:  (a) "for a state offense to be an 'act or threat involving . . . extortion, . . . which is chargeable under State law'"—and thus a RICO predicate crime under 18 U.S.C. § 1961—"the conduct must be capable of being *generically* classified as extortionate," and (b) "'generic' extortion is defined as '*obtaining* something of value from another with his consent induced by the wrongful use of force, fear, or threats.'"  537 U.S. at 409 (emphasis added).

Accordingly, under *Scheidler*, an allegation that a defendant is engaged in the RICO predicate act of "extortion" or "attempted extortion" fails as a matter of law if the plaintiff's

complaint does not allege facts satisfying the "obtaining of property" requirement, whether the complaint invokes the Hobbs Act, state extortions laws, or both. *See id.* at 409, 410 (because petitioners "did not obtain or attempt to obtain property from respondents," the respondents' Hobbs Act claims, "state extortion claims" and "the claim of attempting or conspiring to commit state extortion" were *all* "fatally flawed").

The short of the matter is this:  In *Wackenhut*, the employer's RICO "attempted extortion" allegations were correctly found to be legally deficient under the Supreme Court's decision in *Scheidler* because the essence of those allegations was that SEIU was attempting "to dictate and restrict the actions and decisions of [the employer]" with regard to according recognition to SEIU as a collective bargaining representative, rather than attempting to "acquire" and "exercise" in SEIU's own name the employer's intangible property right to take actions and make decisions with regard to according recognition to SEIU as a bargaining representative.  In other words, Wackenhut's allegations, as in *Scheidler*, sounded in "coercion," and did *not* sound in "extortion."[2]

Sodexo's RICO "attempted extortion" allegations precisely parallel the employer's failed RICO "attempted extortion" allegations in *Wackenhut* in all legally-pertinent respects; thus, Sodexo's allegations are equally deficient under the Supreme Court's decision in *Scheidler*.

3.      We anticipate a Sodexo argument that the *Wackenhut* court's ruling on the "obtaining of property" issue conflicts with the *Smithfield* court's decision denying the defendant unions' Rule 12(b)(6) motion in that earlier case, and is on that basis unsound.  But there is

---

[2] Of course, because SEIU's alleged actions in *Wackenhut*, like SEIU's alleged actions here, involved the use of fear of economic loss, rather than the use of force or threat of force, SEIU's alleged actions did not in *Wackenhut*, and do not here, constitute *the crime* of—as distinct from a lawful act of—"coercion."  *See Scheidler*, 537 U.S. at 405 ("*The crime* of coercion . . . involves *the use of force or threat of force* to restrict another's freedom of action.") (emphasis added).

nothing in the *Smithfield* decision that so much as calls the *Wackenhut* court's "no obtaining of property" ruling into any question, much less anything in the *Smithfield* decision that can be said to be in conflict with the *Wackenhut* court's ruling.

To be sure, in *Smithfield*, the unions did invoke, unsuccessfully, the Supreme Court's decision in *Scheidler* in support of their Rule 12(b)(6) motion.  But the *Smithfield* court understood the unions' reliance on *Scheidler* to center on the "contention" that the intangible right of a corporation to make a business decision—including a business decision whether "to recognize" or "not to recognize" a labor union—*is not a "property" right at all*, and thus not a right that is "susceptible of extortion."  633 F.Supp.2d at 224-25.  The *Smithfield* court's decision on this point is addressed almost exclusively to this "contention," which the court "rejected."  *Id.* In this regard, the *Smithfield* court's decision and the *Wackenhut* court's later decision are in full accord.  *See Wackenhut*, 593 F.Supp.2d at 1296 ("The court agrees that [Wackenhut's] allegations satisfy *the 'property' prong* of the extortion statute") (emphasis added).

 The entirety of what the *Smithfield* decision says with regard to the separate and distinct "*obtaining of* property" issue that later proved decisive in *Wackenhut* is the *Smithfield* court's wholly unelaborated conclusory statement that the unions' "efforts" to pressure the employer to "forego its property right not to recognize the [u]nions" was "no less an effort *to obtain* a property right than were the efforts of the defendants in [*United States v.*] *Gotti*, [459 F.3d 296 (2d Cir. 2006).]"  *See* 633 F.Supp.2d at 225 (emphasis added).  But as we show in the footnote below, that wholly unelaborated conclusory statement reflects a patent misreading of *Gotti*.[3]

---

[3] In the relevant portion of its decision addressed to the "*obtaining of* property" issue, the *Gotti* court held that the Government had proven that the defendant organized crime figures had *acquired* and thus *obtained* the intangible property rights of union members to control their union's internal affairs and of businesses to control the use and disposition of their assets—*not* by the defendants' application of coercive pressure on the union members and the businesses to

12

### B.      The Second Fatal Legal Defect In Sodexo's RICO Claims

In *Cintas Corp. v. UNITE HERE*, *supra*, 601 F.Supp.2d 571, the district court dismissed,

under Rule 12(b)(6), a set of RICO claims arising out of an allegedly "extortionate" union

"corporate campaign" against Cintas that is not in any way legally distinguishable from the set of

RICO claims in this case alleging an SEIU "extortionate" "corporate campaign" against Sodexo.

The *Cintas* court did so on the ground that Cintas had failed to allege facts that satisfy the

essential "wrongful use" element of RICO "attempted extortion."[4]   The *Cintas* court's ruling in

---

exercise their own right of control over their own union or business affairs in a certain manner advantageous to the defendants—but by the defendants *seizing and "exercis[ing]" that right of control "for themselves."  See* 459 F.3d at 325, 326, 327 (emphasis added) (upholding each of five separate extortion counts on this ground).

Thus, on "[t]he ILA Counts" in the *Gotti* case, the Government's proof established that the defendants had seized and "exercised" control over the internal affairs of the International Longshoreman's Association ("ILA"), "first by using force to determine 'who filled various International Executive Officer and other ILA positions' in order to 'ensure that organized crime associates would be placed in these positions,' and then by directing the activities of those office-holders." *Id.* at 302.  On "[t]he Alayev Counts," the Government's proof established that the defendants had seized and exercised physical control over part of a restaurant's operations, by "install[ing]" gambling machines in the restaurant against the owner's will, "collect[ing] money from th[ose] machines" which the defendants kept for themselves, and eventually forcing a sale of the restaurant from which one of the defendants "ended up taking a portion of" the proceeds. *Id.* at 313-14.  And, on "[t]he Seagal Counts," the Government's proof established that the defendants had sought, through threats of force, to have an actor pay them money and provide them his acting services.  *Id.* at 314-15.

A union's "efforts" to apply corporate campaign economic pressure on an employer so that the employer will exercise the employer's own right of control over the employer's own actions and decisions regarding union recognition in a certain manner advantageous to the union are—suffice it to say—a world removed from the "efforts" of the organized crime figures in *Gotti* to infiltrate legitimate unions and businesses so that the organized crime figures could themselves exercise operational control over those unions and businesses as they saw fit.

---

[4] Because the *Cintas* court dismissed Cintas' RICO claims on this "no wrongful use" ground, the court did not reach several other grounds for dismissal urged by the defendants in that case, including the "no obtaining of property" ground relied on by the *Wackenhut* court.

that regard is entirely correct and points directly to a dismissal of Sodexo's RICO claims here on the same ground.

1.      The *Cintas* case, like the *Wackenhut* case, arose out of a union economic pressure "corporate campaign" against the plaintiff employer that consisted almost exclusively of an endless stream of disparaging public commentary about the employer and "do not buy" appeals directed to the employer's customers. *See* 601 F.Supp.2d at 575.  That economic pressure corporate campaign, Cintas averred, was in support of a "demand" by the defendant unions (UNITE HERE and the Teamsters) that Cintas enter into a "card-check/neutrality agreement" with those unions establishing a process under which Cintas would agree "to recognize [the unions] as [its] employees' bargaining agents, *if* the unions can obtain cards signed by a majority of eligible workers stating a desire to join a union." *Id.* (emphasis added).  And, Cintas asserted that this union "demand" that Cintas enter into a "card-check/neutrality agreement" with the unions—backed up by an economic pressure corporate campaign that caused Cintas to "fear . . . economic loss" if it did not yield to the unions' "demand"—constituted "attempted extortion" in violation of both the Hobbs Act and the Ohio extortion statute. *Id.* at 577.

The *Cintas* court squarely rejected Cintas' RICO "attempted extortion" legal theory, and dismissed Cintas' RICO claims under Rule 12(b)(6) for failure to state a claim on which relief could be granted. *Id.* at 576-78.  On appeal, the Second Circuit affirmed the dismissal of Cintas' RICO claims in an unpublished Summary Order, "for substantially the reasons stated in the District Court's opinion." *See* 355 Fed. App'x at 511.

Hobbs Act "extortion," as we have noted, has two essential elements:  (i) "obtaining the property of another, with his consent"; (ii) that was "induced by *wrongful use* of actual or

threatened force, violence, or fear." *See* 18 U.S.C. § 1951(b)(2) (emphasis added).  The *Cintas* decision turns on the second element—the "wrongful use" element.

The *Cintas* court recognized that the critical legal point regarding this element of Hobbs Act "extortion" is that the use of "fear of economic loss"—as distinct from the use of "actual or threatened force [or] violence"—"is *not* inherently wrongful, except when employed to achieve *a wrongful purpose*."  601 F.Supp.2d at 577 (emphasis added) (internal quotations omitted).  Thus, a defendant who "exploits a plaintiff's fear of economic loss" in the course of negotiating a business or labor transaction between the parties in order to put economic pressure on the plaintiff to consummate that transaction on terms favorable to the defendant is guilty of "[a] Hobbs Act violation" *only* when the defendant "has no lawful claim" to the property that the defendant allegedly is seeking to "obtain" in that transaction.  *Id.*  As the Third Circuit has explained in the leading case in this area:

> [T]he use of economic fear in business [or labor] negotiations between private parties is not inherently wrongful.  Indeed, the fear of economic loss is a driving force of our economy that plays an important role in many legitimate business [or labor] transactions. . . . [Thus] . . . the reach of the Hobbs Act is limited in cases . . . which involve the use of economic fear in a transaction between two private parties [by the rule] . . . that a defendant is not guilty of extortion if he has a lawful claim to the property [that he allegedly is seeking to] obtain[ ] [in that transaction].  [*Brokerage Concepts v. U.S. Healthcare*, 140 F.3d 494, 523 (3d Cir. 1998) (internal quotations and citations omitted).][5]

As the Third Circuit went on to add, a Hobbs Act defendant *does* have "a lawful claim" to the property the defendant allegedly is seeking to "obtain" in a "legitimate business [or labor] transaction"—*i.e.*, a transaction in which the defendant through "hard bargaining," backed by the

---

[5] The other courts to consider this issue are all in accord.  *See United States v. Clemente*, 640 F.2d 1069, 1076-77 (2d Cir. 1981); *George Lussier Enters. v. Subaru of New England*, 393 F.3d 36, 50-51 (1st Cir. 2004); *Viacom Int'l v. Icahn*, 747 F. Supp. 205, 210-14 (S.D.N.Y. 1990), *aff'd on other grounds*, 946 F.2d 998 (2d Cir. 1991).

defendant's economic pressure on the plaintiff that causes the plaintiff to fear economic loss, induces the plaintiff to enter into a lawful and proper, "mutually beneficial" business or labor agreement with the defendant that is enforceable and binding under the law of contracts—*unless* the plaintiff has a legal right of some kind to conduct its business free from such economic pressure.  *See* 140 F.3d at 524-26; *accord George Lussier*, 393 F.3d at 50 ("[the use] of economic fear is wrongful under the Hobbs Act [only] if the plaintiff had a pre-existing statutory right to be free from the defendant's demand"); *Viacom Int'l*, 747 F. Supp. at 213 (ultimately, the distinction between "hard bargaining" and "extortion" lies in whether the plaintiff has "a pre-existing entitlement to pursue his business interests free of the [economic] fear he is quelling").

The *Cintas* court concluded that under this well-settled legal "framework," Cintas' factual allegations did not satisfy the essential "wrongful use" element of the RICO predicate crime of Hobbs Act "attempted extortion," 601 F. Supp.2d at 577, reasoning as follows:

*First*, it is plain under the case law that what the unions sought from Cintas through "hard bargaining" backed up by their economic pressure corporate campaign against Cintas—a card-check/neutrality agreement—is a lawful and proper, "mutually beneficial" labor agreement that is enforceable and binding under the federal law of labor contracts; *i.e.*, the very kind of "legitimate" labor agreement that is well outside the "limited" reach of the Hobbs Act.  *See id.*

 In this regard, the *Cintas* court relied on both the Second Circuit's decision in *HERE, Local 17 v. J.P. Morgan Hotel*, 996 F.2d 561 (2d Cir. 1993) and the Third Circuit's decision in *HERE, Local 57 v. Sage Hospitality Res., LLC*, 390 F.3d 206, 291 (3d Cir. 2004).  In *J.P. Morgan Hotel*, the Second Circuit held that the card-check/neutrality agreement challenged in that case was a legitimate, lawful and proper agreement that was enforceable and binding under the federal law of labor contracts because, *inter alia*, it was

16

> an example of a valid contract governing [union] representation.  Each [party to the contract] gave up rights under the [National Labor Relations] Act—the union agreed to forego picketing and the hotel agreed to accept the results of a card check—in an effort to make the union recognition process less burdensome for both.  [996 F.2d at 566.]

As the Third Circuit added in *Sage Hospitality*, a card-check/neutrality agreement is "a valid labor agreement governing recognition of a labor union" that "benefits both parties with efficiency and cost saving."  And, as the Fourth Circuit—in express "agree[ment] with the Third Circuit"—put the same point in its recent, post-*Cintas* decision in *Adcock v. Freightliner*, *supra,* a card-check/neutrality agreement is "'a valid labor agreement governing recognition of a labor union'" that "eliminate[s] the potential for hostile organizing campaigns in the workplace" and thus "serve[s] the interests of both [the employer] and the [u]nion."  550 F.3d at 375-76 (quoting *Sage Hospitality*, 390 F.3d at 219).

*Second*, it is equally plain under the case law that an employer does *not* have a legal right of *any* kind to conduct its business free from a union economic pressure corporate campaign that (a) consists almost exclusively of disparaging public commentary about the employer and "do not buy" appeals directed to the employer's customers; and (b) is aimed at enabling the union, through "hard bargaining," to induce the employer to enter into a legitimate, lawful and proper card-check/neutrality agreement with the union.  Indeed, as the *Cintas* court recognized, the case law firmly establishes that unions have *a constitutionally protected First Amendment right* to engage in such an economic pressure corporate campaign against an employer in support of such a legitimate union objective; and, that being so, Cintas could not possibly lay claim to "a right to operate [its business] free from" the unions' economic pressure corporate campaign to induce Cintas to enter into the proposed card-check/neutrality agreement with the unions:

> *See Metro. Opera Ass'n v. Local 100, HERE*, 239 F.3d 172, 177-78 (2d Cir. 2001) ("Within the labor context, in seeking to exert social pressure on [plaintiff], the Union's methods may be harassing, upsetting or coercive, but unless we are to depart from settled First Amendment principles, they are constitutionally protected"); *see also Beverly Hills Foodland v. United Food & Commercial Workers Local 655*, 39 F.3d 191, 197 (8th Cir. 1994) ("[T]he prime directive in the Union [organizing] campaign, a boycott of [the target employer] is . . . constitutionally safeguarded," as is the accompanying "activity of peaceful pamphleteering."). [601 F.Supp.2d at 578 (bracketed language by court).][6]

Having thus concluded that the union conduct complained of by Cintas was not "wrongful" and thus not "attempted extortion" in violation of the Hobbs Act, the *Cintas* court held that Cintas' allegation that this very same *non*-"wrongful" union conduct amounted to "attempted extortion" in violation of the Ohio extortion statute could not salvage Cintas' RICO claims, "regardless of what extortion is under Ohio state law." 601 F.Supp.2d at 578. On this point, the *Cintas* court relied on the Supreme Court's holding in *Scheidler*, discussed *supra* pp. 10-11, that: (a) a RICO defendant's conduct is "extortion . . . which is chargeable under state law"—and thus a RICO predicate crime under 18 U.S.C. § 1961—only if the defendant's conduct is "'capable of being *generically* classified as extortionate'"; and (b) "[e]xtortion is generically defined as 'obtaining something of value from another with his consent induced by

---

[6]   Like Sodexo here, *see* Cplt. ¶¶ 202(c)-(d) & 263, Cintas alleged the commission of a smattering of tortious acts during the course of the unions' economic pressure corporate campaign "by unidentified individuals believed to be agents of" the unions. The *Cintas* court ruled that these allegations of isolated tortious activities during the course of the unions' campaign did nothing to buttress Cintas' legally-deficient Hobbs Act "attempted extortion" claims, and that "[t]o the extent" the unions were complicit in such alleged tortious activities, Cintas "can pursue [its] claims under state tort laws." *See* 601 F.Supp.2d at 578.

   In a similar vein, the *Cintas* court added that "Cintas's reliance on *A. Terzi v. Theatrical Protective Union*, 2 F.Supp.2d 485 (S.D.N.Y. 1998)" in support of its Hobbs Act "attempted extortion" claims "is misplaced," because in that case "[d]efendants sought a wrongful purpose—a collective bargaining agreement without any process to recognize them as the collective bargaining agent—and wrongful means—the use of violence and threats of violence—to achieve their goal." *See* 601 F.Supp.2d at 578 n.1.

the *wrongful use* of force, fear, or threats.'"  *See id.* (quoting *Scheidler*, 537 U.S. at 409-10) (emphasis added).

    2.    Sodexo's factual allegations here—which track Cintas' factual allegations in all legally-pertinent respects—are legally deficient for the same reason that Cintas' RICO claims were legally deficient:  those alleged facts fail to satisfy the essential "wrongful use" element of RICO "attempted extortion," as that element has been authoritatively defined in the case law in the context of a defendant's alleged use of "fear of economic loss."

    Like Cintas, Sodexo alleges that the defendant unions are engaged in an economic pressure "corporate campaign" to induce Sodexo, "at the point of an economic bayonet," to yield to the unions' "demands."  *Supra* p. 9.

    And, like Cintas, Sodexo alleges that what the unions are "demanding" from Sodexo is a card-check/neutrality agreement having the same essential attributes as the card-check/neutrality agreement described as "a valid labor agreement governing recognition of a labor union" by the Fourth Circuit in *Freightliner*.  *See* 550 F.3d at 376 (internal quotations omitted).

    In the latter regard, the pertinent allegations in Sodexo's Complaint are the allegations in ¶¶ 138-58 concerning a series of telephone calls and meetings between Sodexo representatives and SEIU representatives in which the unions' "demands" were communicated to Sodexo.  The allegations in these paragraphs of the Complaint are highly repetitive and laden with pejorative descriptions of the unions' "demands," but the crux of those allegations is that what the unions were "demanding" from Sodexo was a comprehensive, nationwide agreement establishing "a card check procedure" that would be implemented at Sodexo facilities across the country on a "geo-sector" basis, and that would have the following essential attributes:

> "Sodexo would . . . 1) stand neutral at each and every facility Defendant SEIU unionized under its 'geo-sector' approach; 2) give up its right to NLRB-sponsored

19

secret-ballot elections at each facility; and 3) grant Defendant SEIU physical access to Sodexo premises to accost its employees to sign union ['authorization'] cards."  [*See* Cplt. ¶¶ 144-45; *see also id.* ¶ 140 (same).]

As previously noted, and as shown in the accompanying footnote, that "card check procedure" agreement allegedly being "demanded" by SEIU here has the same essential attributes as the "valid" card check "labor agreement" in *Freightliner*.[7]

The sum of the matter is this:  In a case like this one, where the "pressure" on the plaintiff comes not from force or violence but from "fear of economic loss," the plaintiff can satisfy the essential "wrongful use" element of RICO "attempted extortion" *only* by pleading facts showing, directly or by "reasonable inference," *Nemet Chevrolet*, 591 F.3d at 256, that the defendant is engaged in the economic pressure activities in question for the *wrongful* purpose of inducing the plaintiff—who has a legal right to conduct its affairs free from such economic pressure activities—to enter into an "[il]legitimate business [or labor] transaction."

But here, as in *Cintas*, all that Sodexo's Complaint can be said to plead as a factual matter is that SEIU is engaged in an economic pressure corporate campaign against Sodexo for the *non*-wrongful purpose of inducing Sodexo—which has no legal right to conduct its affairs free from such a union economic pressure corporate campaign—to enter into an entirely "legitimate [labor] transaction"; *i.e.*, a lawful and proper Sodexo/SEIU "card check procedure" agreement.  Sodexo's Complaint thus fails to allege facts that satisfy the essential "wrongful use"

---

[7] *Freightliner*, 550 F.3d at 371 ("In the Card Check Agreement, Freightliner agreed with respect to each bargaining unit [covered by the Agreement] to forego a [NLRB] election if a majority of the bargaining unit employees chose the Union as their exclusive bargaining representative by signing authorization cards.  As part of the Card Check Agreement, Freightliner also agreed to: (1) require some of its employees to attend, on paid company time, Union presentations explaining the Card Check Agreement; (2) provide the Union reasonable access to nonwork areas in company plants to allow Union representatives to meet with employees; and (3) refrain from making negative comments about the Union during the organizing campaigns.").

element of RICO "attempted extortion," and Sodexo's RICO "attempted extortion" claims are due to be dismissed under Rule 12(b)(6) on this independent ground.

      3.     Having said this much, we recognize that Sodexo makes one obvious—and obviously contrived—effort to plead around the *Cintas* decision.  Sodexo does so through the "bare assertion," *Nemet Chevrolet*, 591 F.3d at 255, in the introductory portion of its Complaint that the "true intent" behind SEIU's campaign against Sodexo is to cause Sodexo to enter into an *unlawful* and *improper* labor agreement providing for recognition of SEIU as the bargaining representative of "as many of the Company's currently non-union employees as Defendant SEIU is willing to accept," "regardless of the level of employee support for such representation."  Cplt. ¶ 17.  That contrivance fails utterly.

      Sodexo's bare assertion rests entirely on the following allegation, buried in ¶ 154 of its Complaint, regarding a single colloquy between Michael Fishman of SEIU and Thomas Mackall of Sodexo at one of several meetings between the parties over the "card check procedure" issue:

> Mackall then asked Fishman whether Defendants' Clean Up Sodexo Campaign "was just about a process," or whether it was "really about new members and growth."  Fishman answered unambiguously that the Campaign against Sodexo was indeed about increasing both union membership and Defendants' bottom line, and not just about a card-check process.  Mackall responded that the only logical conclusion he could draw from Fishman's answer was that Defendants would not stop attacking Sodexo until Defendant SEIU had gotten all of the new union members it wanted from among Sodexo's non-union workforce.  Fishman confirmed Mackall's fear, stating that "it's about how many employees you are willing to unionize and how many we are willing to accept."  In other words, losing was not part of the equation for Defendants.

      Suffice it to say that there is nothing in "Fishman's answer" to Mackall's question, as pled by Sodexo in ¶ 154 of its Complaint, which could support a "reasonable inference," *Nemet Chevrolet*, 591 F.3d at 255, that—while the SEIU's "demand" throughout the series of telephone calls and meetings alleged in meticulous detail in ¶¶ 138-153 & 155-58 of the Complaint was for

a lawful and proper *Freightliner*-type "card check procedure" agreement—SEIU's "true intent" is to have Sodexo sign its very antithesis—*i.e.*, an unlawful and improper agreement providing for recognition of SEIU as the bargaining representative of Sodexo employees "regardless of the level of employee support for such representation."

Quite to the contrary, the only "reasonable inference" that can be drawn from "Fishman's answer" to Mackall's question—read in the context of the full range of discussions between the parties over SEIU's "demand" for "a card check procedure" agreement as alleged in ¶¶ 138-58 of the Complaint—is this:  SEIU's campaign objective is *not* to negotiate a "card check procedure" agreement with Sodexo that is all form and no substance.  Rather, SEIU's objective is to negotiate a comprehensive, nationwide "card check procedure" agreement that covers a substantial number of Sodexo facilities across the country on a "geo-sector" basis and that, like the card-check/neutrality agreement in *Freightliner*, "eliminate[s] the potential for hostile organizing campaigns" in the covered facilities.  550 F.3d at 375.  In other words, SEIU's objective is to negotiate a "card check procedure" agreement with Sodexo that SEIU has reason to believe, based on its experience in organizing workers, "*really* [would be an agreement] about new members and growth."  Such a union objective may be ambitious, or even overly ambitious, but as the Fourth Circuit's decision in *Freightliner* holds, it most certainly is *not* "wrongful."

Sodexo's bare ¶ 17 allegation regarding SEIU's "true intent" is at most Sodexo's own subjective conclusion as to what was in SEIU's mind, not an allegation of fact regarding SEIU's conduct.  And, even taken on its own terms, that bare allegation is wholly unsupported by "reasonable inference[s]" to be drawn from "further factual enhancement[s]" in Sodexo's Complaint, *Nemet Chevrolet*, 591 F.3d at 255-56—indeed, it is directly contrary to the factual allegations in ¶¶ 138-158 of the Complaint.  Accordingly, that bare allegation "fail[s] to

constitute [a] well-pled fact[ ] for Rule 12(b)(6) purposes," *Nemet Chevrolet*, 591 F.3d at 255,

that Sodexo properly can rely on to distinguish this case from the *Cintas* case.[8]

### C.   The Third Fatal Legal Defect In Sodexo's RICO Claims

1.   To state an actionable RICO claim, the plaintiff must allege facts showing that the

defendant has engaged in a "pattern of racketeering activity" by, at a bare minimum, committing

two or more RICO predicate acts; in this regard, a RICO claim that rests on factual allegations

showing that the defendant committed *one* RICO predicate act is fatally defective and subject to

dismissal under Rule 12(b)(6) for failure to meet the RICO "pattern of racketeering activity"

requirement.  *See H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-38 (1989).

---

[8] We note that the *Smithfield* court's Rule 12(b)(6) decision in favor of Smithfield is not even arguably on point here.  There, unlike here, Smithfield adequately pled in its complaint that the objective of the defendant unions' "corporate campaign" was unlawful and thus "wrongful"—specifically, that the unions' objective was to secure "a fraudulent 'shoebox election.'"  *See Smithfield v. UFCW*, 585 F.Supp.2d 789, 807 (E.D. Va. 2008).  Thus, the unions did not at the Rule 12(b)(6) stage make the "no wrongful use of fear" argument that later prevailed in *Cintas*, and the *Smithfield* court had no occasion to address, and did not address, that argument in its Rule 12(b)(6) decision.

To be sure, in *Smithfield*, the unions did make the "no wrongful use of fear" argument at the summary judgment stage, and the *Smithfield* court rejected that argument.  But the *Smithfield* court did so on a case-specific, factual ground that has no analogue here:  that given Smithfield's evidence supporting its allegation that the unions had demanded "a fraudulent 'shoebox election,'" there was a genuine dispute of material fact "as to the intent of the Defendants in undertaking and pursuing the corporate campaign against Smithfield."  *See id.*

The *Smithfield* court did opine in *dictum* that the unions' "no wrongful use of fear" argument failed because the Virginia and North Carolina extortion statutes invoked by Smithfield in support of its RICO claims do not contain a "wrongful use" requirement.  *Id.* at 798-802.  But that *dictum* ignores a central lesson of the Supreme Court's decision in *Scheidler* which was correctly understood and applied by the *Cintas* court in rejecting Cintas' invocation of the Ohio extortion statute in support of its RICO claims in that case:  It is irrelevant whether or not a state extortion statute invoked by a RICO plaintiff contains a "wrongful use" requirement, because (a) to constitute a RICO predicate crime of extortion, a RICO defendant's conduct must be "capable of being *generically* classified as extortionate"; and (b) extortion is generically defined as "obtaining something of value from another with his consent induced by the *wrongful use* of force, fear, or threats."  *See supra* pp. 18-19 (emphasis added).

In *Dtex, LLC v. BBVA Bancomer*, *supra*, 405 F.Supp.2d 639, the district court dismissed, under Rule 12(b)(6), a RICO claim resting on the very same "two or more RICO predicate acts" of "attempted extortion" theory advanced by Sodexo here, and did so on the ground that the *Dtex* plaintiff's theory was an artificial construct that had no "proper" basis in the law of extortion. *See* 405 F.Supp.2d at 649-50.  And, the *Dtex* court's Rule 12(b)(6) dismissal was affirmed by the Fourth Circuit "on the reasoning" set out in what the Court of Appeals characterized as "the district court's excellent opinion."  *See* 214 Fed. App'x at 287.[9]  The *Dtex* court's ruling on this "two or more RICO predicate acts" of "attempted extortion" issue was entirely correct and points directly to a dismissal of Sodexo's RICO claims here on this same ground.

As we have described, Sodexo alleges that Defendants are conducting a corporate campaign, consisting of "countless" acts, Cplt. ¶ 8, to put economic pressure on Sodexo to enter into a "card check procedure" agreement with SEIU.  Sodexo attempts to satisfy the "two or more RICO predicate acts" element of the RICO "pattern" requirement by pleading as follows: Each and every one of Defendants' countless corporate campaign acts—*i.e.*, each and every one of Defendants' press releases, blog articles, social media posts, etc. "disparaging" Sodexo to the general public, and each and every one of Defendants' appeals to customers to "boycott[ ]" Sodexo—is not merely an act that constitutes one of countless "wrongful use[s] of [economic] fear" (as that term is used in the Hobbs Act and the RICO "generic" definition of extortion), but is instead an act that constitutes one of countless "*separately chargeable*" *crimes* of RICO "attempted extortion."  *See* Cplt. ¶ 128 (emphasis added); *see also id.* ¶¶ 285, 293, 300, 307.

_____

[9] The *Dtex* court gave two additional, alternative grounds for its dismissal of the plaintiff's RICO claim, *see* 405 F.Supp.2d at 650-52—including the additional ground discussed *infra* pp. 29-33 that applies with equal force to Sodexo's RICO claims here.  But it is fair to infer based on the Fourth Circuit's affirmance of the *Dtex* court's dismissal order "on the reasoning" set out in that court's "excellent opinion" that the Fourth Circuit found merit in each of the grounds given by the district court for its dismissal.

Thus, on Sodexo's theory, each of the twelve Defendants in this case is not simply guilty of *one* "chargeable" crime of "attempted extortion," but of literally *hundreds* of "chargeable" crimes of "attempted extortion," and has not merely committed one RICO predicate act of "attempted extortion," but literally *hundreds* of RICO predicate acts of "attempted extortion."

By the same token, "[t]he gravamen" of the plaintiff's failed RICO claim in *Dtex* was that the defendant had engaged in numerous acts constituting the "wrongful use of force, violence and [economic] fear" as part of a "wide-ranging" course of tortious conduct—including the making of "numerous false and fraudulent misrepresentations"—in furtherance of the defendant's objective of "extort[ing] money from Plaintiff in exchange for allowing Plaintiff to conduct its business in Mexico." 405 F.Supp.2d at 642-43. And, like Sodexo here, the *Dtex* plaintiff—in an attempt to satisfy the "two or more [RICO] predicate acts" element of the RICO "pattern" requirement—sought in its complaint to characterize each of the defendant's acts in that "wide-ranging" course of tortious conduct as *a separately chargeable* RICO predicate act of extortion or attempted extortion. *Id.* at 649.

The *Dtex* court held that the plaintiff's complaint was legally deficient in this respect and thus due to be dismissed under Rule 12(b)(6), because *in substance* the complaint "alleges at best one attempted predicate act [of extortion]," and "[p]laintiff's claims that Defendant engaged in multiple acts of extortion and attempted extortion are improper attempts to separate multiple acts in furtherance of the same alleged [extortion] scheme into multiple predicate acts." *Id.*

As the *Dtex* court correctly noted, its ruling on this issue is supported by the Fourth Circuit's decision in *American Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212 (4th

Cir. 2004),[10] as well as by other, on-point decisions from within and outside the Fourth Circuit.[11]

The critical point, as stated by the court in the *Linens of Europe* decision relied on by the

*Dtex* court, is this:

> [A] complaint adequately alleges a Hobbs Act violation insofar as it avers that
> [the defendants] attempted to . . . induc[e] [the plaintiff] through the wrongful use
> of actual or threatened force [consisting of 'repeatedly threaten[ing]' [the
> plaintiff] 'with harm' and committing an 'assault'] to part with its property.  But
> the multiple acts [of wrongful actual or threatened force] in furtherance of a *single*
> extortion episode constitute only a single predicate act of attempted extortion, not

---

[10] In this regard, the *Dtex* court explained:

> In *American Chiropractic Ass'n*, . . ., the plaintiff alleged that the defendant
> committed mail fraud, wire fraud, and extortion by limiting insurance
> reimbursements to several chiropractors.  The Fourth Circuit held that the
> complaint failed to state a claim for mail fraud or wire fraud.  With respect to the
> extortion allegations, the Court concluded that "[b]ecause we have held that
> [plaintiff] failed to state a claim for mail or wire fraud, it has failed to allege at
> least two predicate acts of racketeering, and we need not address whether it
> properly alleged a claim of extortion."  *Id.* at 235.  Thus, even though the
> defendant was alleged to have committed acts of extortion against several
> individual chiropractors, the Court viewed those allegations as amounting to, at
> best, one predicate act of extortion.  [405 F.Supp.2d at 649-50 (citation omitted).]

[11]  In this regard, the *Dtex* court cited:

> *Holland v. Cole Nat'l Corp.*, No. 7:04-CV-246, 2005 WL 1242349, at *9 (W.D.
> Va. May 24, 2005) (construing *American Chiropractic* and noting that "in
> rejecting extortion as the lone predicate act, the Fourth Circuit obviously did not
> consider each instance of reduced reimbursement to be a separate predicate act");
> *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)
> (holding that "artificially fragmenting a singular act into multiple acts simply to
> invoke RICO" is impermissible); *McLaughlin v. Anderson*, 962 F.2d 187, 194 (2d
> Cir. 1992) (complaint properly alleged only one predicate act of attempted
> extortion where subsequent acts were "examples of [defendant's] 'making good'
> on his threat" to plaintiff); *Linens of Europe, Inc. v. Best Mfg., Inc.*, No. 03 Civ.
> 9612(GEL), 2004 WL 2071689, at *16 (S.D.N.Y. Sept. 16, 2004) ("[M]ultiple
> acts in furtherance of a single extortion episode constitute only a single predicate
> act of attempted extortion, not a pattern of two or more predicate acts.").  [405
> F.Supp.2d at 650.]

a pattern of two or more predicate acts.  [*See* 2004 WL 2071689, at *16 (emphasis in original) (internal quotations omitted).]

The *Dtex* court's ruling on this issue—grounded in the well-reasoned prior precedent relied on by the *Dtex* court, and approved by the Fourth Circuit on appeal in *Dtex*—applies with full force to Sodexo's "two or more RICO predicate acts" of "attempted extortion" theory here.

According to the factual allegations in Sodexo's Complaint, each of Defendants' countless corporate campaign acts disparaging Sodexo to the general public and appealing to customers to "boycott" Sodexo is in furtherance of SEIU's *single*, allegedly "extort[ionate]" objective of inducing Sodexo to enter into "a card check procedure" agreement with SEIU.  *See supra* pp. 19-20.  Thus, as in *Dtex*, Sodexo's attempted characterization of each of those countless corporate campaign acts as a "separately chargeable" RICO predicate crime of "attempted extortion" is a manifestly "improper attempt[ ] to separate multiple acts [each involving the allegedly wrongful use of economic fear] in furtherance of the same alleged [extortion] scheme into multiple predicate acts [of extortion]."  405 F.Supp.2d at 649.

On proper analysis, what Sodexo's Complaint —like the *Dtex* plaintiff's complaint— does is "allege[ ] at best *one* attempted predicate act [of extortion]."  *Id.* (emphasis added).  Accordingly, Sodexo has failed to allege in legally sufficient terms the "pattern of racketeering activity" that is required to state any type of RICO claim, and its RICO claims are due to be dismissed on this independent ground.[12]

---

[12] It is telling we believe that Sodexo's legal theory makes a cruel travesty of the law of extortion.  On Sodexo's theory, each individual Defendant who participated in publishing corporate campaign press releases, blog articles, social media posts, etc. critical of Sodexo, or in making corporate campaign appeals to customers to "boycott" Sodexo—which were "wrongful" acts, if at all, only on the theory, correctly rejected in *Cintas*, that SEIU's ultimate objective of consummating a "card check procedure" agreement with Sodexo was "wrongful" (and only on the further theory, correctly rejected in *Wackenhut*, that SEIU's effort to consummate such an agreement with Sodexo was an attempt to "obtain" Sodexo's property)—is guilty of having

2.    We recognize that the *Smithfield* court, in its Rule 12(b)(6) decision in favor of Smithfield, rejected a "no pattern" argument along these very same lines, and in so doing brushed aside the *Dtex* court's decision on the stated ground that the *Dtex* court's "no pattern" ruling rested on the "conclu[sion] that the [*Dtex* plaintiff's] complaint had not alleged but one predicate act [of extortion]," whereas "[Smithfield's] Complaint in this case alleges many, related [predicate] acts of extortion."  633 F.Supp.2d at 227.  That refusal by the *Smithfield* court to follow the *Dtex* court's lead was doubly flawed.

*First*, contrary to what the *Smithfield* court stated, the *Dtex* plaintiff's complaint most assuredly did allege that the defendant had committed "many" predicate acts of extortion, and not "but one" such predicate act.  But the *Dtex* court, applying the well-settled rule that allegations which are merely self-serving "legal conclusions" or "arguments" are to be given no weight in assessing the legal sufficiency of a complaint, *see supra* p. 4, looked behind the plaintiff's allegation of "many" predicate acts of extortion and concluded that that allegation was entirely devoid of legal substance; indeed, was an "improper attempt[ ] to separate multiple acts in furtherance of the same alleged [extortion] scheme into multiple predicate acts."

*Second*, the *Smithfield* court did not even consider whether, under the law of extortion as set out by the *Dtex* court and the on-point precedents relied on by that court, *see supra* pp. 25-27 & nn. 10-11, Smithfield was engaged in the very same "improper attempt[ ]" as the *Dtex* plaintiff—much less give any reason for treating the Smithfield complaint as one that, under a proper analysis of the law of extortion, properly pled "two or more [RICO] predicate acts" of "attempted extortion."

---

committed literally *hundreds* of "attempted extortion" crimes, and is thus subject to both draconian monetary penalties and prolonged imprisonment.

**D.**     **The Fourth Fatal Legal Defect In Sodexo's RICO Claims**

1.     In terms that could not be more relevant here, the Fourth Circuit has twice upheld a

Rule 12(b)(6) dismissal of a RICO complaint resting on the allegation that the defendants were

engaged in an unlawful RICO "pattern of attempted extortion" on the ground that the plaintiff

had failed to plead facts satisfying the "continuity" element of the RICO "pattern" requirement.

The Fourth Circuit has done so first in its summary unpublished opinion in the *Dtex* case to

which we already have referred, *see* 214 Fed. App'x. 286; and, more recently, in its full

published opinion in *US Airline Pilots v. AWAPPA*, *supra*, 615 F.3d 312.

In *Dtex*, the district court—as an alternative ground for its Rule 12(b)(6) dismissal of the

plaintiff's "pattern of attempted extortion" RICO claim—ruled that, under the "consistent[ ]"

Fourth Circuit law, the "continuity" element of the RICO "pattern" requirement "is not satisfied

where . . . the alleged scheme is narrowly focused on one goal and will end when and if that goal

is accomplished."  *Dtex*, 405 F.Supp.2d at 650.[13]  In its subsequent, 2010 decision in *US Airline*

*Pilots*, the Fourth Circuit brought that consistent line of cases up to date by reaffirming that "[a]

_____

[13]  In this regard, the *Dtex* court cited:

> *G.E. Inv. Private Placement Partners II v. Parker*, 247 F.3d 543,
> 549 (4th Cir. 2001) ("Where the fraudulent conduct is part of the
> sale of a single enterprise, the fraud has a built-in ending point, and
> the case does not present the necessary threat of long-term,
> continued criminal activity."); *Al-Abood* [*v. El-Shamari*], 217 F.3d
> [225,] 238 [(4th Cir. 2000)] (Although there is no "per se rule
> against a RICO claim involving only one victim[,] . . . the narrow
> focus of the scheme . . . [and] commonplace predicate acts . . . do
> not satisfy the pattern requirement."); *Menasco, Inc. v.
> Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (allegations held
> not to satisfy continuity requirement where actions "were narrowly
> directed towards a single fraudulent goal," had only one set of
> victims, and took place over approximately one year).  [*See* 405
> F.Supp.2d at 650-51.]

[RICO] plaintiff *cannot* demonstrate [the requisite] . . . continuity if the [alleged] racketeering activity has *a built-in ending point*, and the case [therefore] does not present the necessary threat of long-term, continued criminal activity."  615 F.3d at 318 (emphasis added) (internal quotations omitted).[14]  The Fourth Circuit law thus dictates a Rule 12(b)(6) dismissal of Sodexo's RICO claims for failure to allege facts that satisfy the essential "continuity" element of the RICO "pattern" requirement.

In the terms relevant to that "continuity" element, the plaintiff's failed RICO claims in *US Airline Pilots* precisely parallel Sodexo's RICO claims here.  The plaintiff in that case "allege[d] that the defendants [were] engaged in [an ongoing campaign of] extortionate acts that constitute[d] a pattern of racketeering activity."  *See* 615 F.3d at 315.  And, the plaintiff further alleged that the defendants' ongoing "extortion campaign" was aimed at "achiev[ing] a single goal":  "to destroy [the plaintiff] and to obtain from [the plaintiff] [its] right to represent the pilots of U.S. Airways."  *See id.* at 319.

In *US Airline Pilots*, the Fourth Circuit, in affirming the district court's dismissal of the plaintiff's RICO claims for failure to satisfy the "continuity" element, squarely rejected the plaintiff's argument that its RICO complaint had "set forth facts adequately alleging open-ended continuity" under the Supreme Court's decision in *H.J., Inc., supra*, 492 U.S. at 241-42.[15]  "[The plaintiff's] claim [of open-ended continuity] fails," the Fourth Circuit held,

---

[14]  The "necess[ity]" of establishing such a "threat of long-term, continued criminal activity," the *US Airline Pilots* court explained, arises from the fact that Congress, in enacting RICO, clearly indicated its "desire to limit RICO's application to ongoing unlawful activities whose scope and persistence pose a special threat to social well-being."  615 F.3d at 318 (internal quotations omitted); *see also id.* at 317 (a civil RICO claim "is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.") (internal quotations omitted).

[15]  Unsurprisingly given that the alleged "extortion campaign" was ongoing at the time of suit, the plaintiff did not make a claim of "closed-ended continuity"; which, under *H.J., Inc.*, "'refers . . .

because [the plaintiff] alleges that the defendants have engaged in racketeering activity in order to achieve [the] single goal [of replacing the plaintiff as the representative of U.S. Airways pilots.]   This objective creates a foreseeable "built-in ending point" that is closely related to the extortion and thus precludes open-ended continuity; once the defendants replace [the plaintiff], the scheme will end.  [615 F.3d at 319.]

"The 'built-in ending point' in this case," the Fourth Circuit added,

distinguishes it from the only concrete example of open-ended continuity the Supreme Court has recognized:  the "hoodlum" who appears monthly to collect "insurance" payments that "cover" [business owners] against breakage of their windows."  *H.J. Inc.*, 492 U.S. at 242.  In that situation, even if the business owner submitted to the extortionists' demands and delivered payment, the extortion would continue, month after month.  Unlike the allegations with respect to the "hoodlum," [the plaintiff] simply has not alleged that the defendants' extortion campaign threatens *indefinite* repetition."  [*Id.* at 320 (emphasis in original).]

The Fourth Circuit's holding in *US Airline Pilots* applies to the instant case.  As we have shown, Sodexo's Complaint alleges that Defendants are "engaged in racketeering activity in order to achieve a single goal," *US Airline Pilots*, 615 F.3d at 319—inducing Sodexo to enter into a "card-check procedure" agreement with SEIU, *see supra* pp. 19-20.  On the face of Sodexo's Complaint, then, the Defendants' alleged "extortion scheme" has "a built-in ending point"—consummation of such a "card-check procedure" agreement—that "precludes" a finding of the requisite "continuity."  *Id.*

---

to a closed period of repeated [racketeering] conduct.'"  *See* 615 F.3d at 318; *see also Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1022 (7th Cir. 1992) ("As its label suggests, a 'closed-ended' period of racketeering activity involves a course of [alleged] criminal conduct which has come to a close."); Robert M. Hatch, et al., *RICO Theories, Cases and Strategies in Consumer Litigation:  Strategies for Defending Section 1962 Claims*, 53 CONSUMER FIN. L.Q. REP. 140, 145 (1999) (In determining whether the "continuity" element of the RICO "pattern of racketeering activity" requirement has been satisfied, "the threshold question which must be answered is whether the related RICO predicate acts have ceased or are continuing.  If the alleged predicate acts have ceased, closed-ended continuity must be satisfied.  If the alleged acts have not ceased, open-ended continuity must be satisfied.").

2.      Having said this much, we would be remiss if we failed to note that just as Sodexo makes one obviously contrived and unconvincing effort to plead around the *Cintas* decision, *see supra* pp. 21-23, Sodexo makes one equally contrived and unconvincing effort to plead around the Fourth Circuit's well-settled and consistent "continuity" case law.

In this instance, Sodexo makes the argumentative assertion in its Complaint that SEIU's allegedly "extortionate" economic pressure corporate campaign has "no foreseeable end" —*i.e.,* no "built-in ending point," *US Airline Pilots*, 615 F.3d at 319—because "Sodexo's non-union employees work in hundreds of different facilities throughout the United States," and under federal labor law SEIU "can unionize Sodexo's employees only one new bargaining unit at a time." *See* Cplt. ¶¶ 18, 133. But this argumentative assertion is entirely "unreasonable" and thus due no weight under the applicable *Twombly/Iqbal* pleading standards. *Nemet Chevrolet*, 591 F.3d at 255. That is so because Sodexo's assertion is belied by Sodexo's own allegations set out in meticulous detail in ¶¶ 138-58 of the Complaint that the objective of SEIU's allegedly "extortionate" campaign is the consummation of a *single*, *comprehensive* "card check procedure" agreement that would subdivide Sodexo's "different facilities throughout the United States" into "'geo-sector' groupings" (*i.e.*, "sectors of Sodexo's business in a particular defined geography"), Cplt. ¶ 140, and—through use of that "'geo-sector' approach," *id.* ¶ 145—fully and definitively settle the parties' ongoing dispute over the number and identity of Sodexo facilities that would be subject to SEIU organizing efforts during the term of the parties' agreement.

In short, on Sodexo's own allegations as set forth in ¶¶ 138-58 of its Complaint—and setting aside the argumentative assertions in the Complaint that plainly are "unreasonable," *Nemet Chevrolet*, 591 F.3d at 255, in light of those allegations—SEIU's alleged "extortion campaign" in this case has every bit as much of "a built-in ending point" as the "extortion

campaign" to "destroy [the plaintiff] and to obtain from [the plaintiff] [its] right to represent the pilots of U.S. Airways" alleged by the RICO plaintiff in *US Airline Pilots*.

That being so, the Fourth Circuit's decision in *US Airline Pilots* compels the conclusion that Sodexo has failed to allege facts that satisfy the essential "continuity" element of the RICO "pattern" requirement, and that Sodexo's RICO claims are due to be dismissed on this independent ground.[16]

## III.   THE ADDITIONAL, COUNT-SPECIFIC LEGAL DEFECTS IN SODEXO's RICO CLAIMS

As we have demonstrated, each of Sodexo's four RICO claims in this case fails as a matter of law based on the Complaint's failure to allege facts showing that Defendants have engaged in activity that might properly be regarded as constituting the RICO predicate crime of "attempted extortion"—much less alleged facts showing that Defendants have engaged in a RICO-proscribed *pattern* of "attempted extortion."  However, we would be derelict if we failed also to demonstrate that the Complaint suffers from additional, Count-specific legal defects that require the dismissal of Sodexo's first two RICO claims as to all Defendants, and the dismissal of Sodexo's third and fourth RICO claims as to a subset of Defendants.

### A.   The Additional Legal Defects In Sodexo's First Two RICO Claims

Sodexo brings its first two RICO claims under 18 U.S.C. § 1962(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection

---

[16] Given that the *Smithfield* court did not have the benefit of the Fourth Circuit's recent, directly-on-point decision in *US Airline Pilots* when it rejected the defendants' "lack of 'continuity'" argument in that case, *see Smithfield*, 633 F.Supp.2d at 227, any reliance by Sodexo on that pre-*US Airline Pilots* ruling by the *Smithfield* court would be entirely misplaced.

(a), (b), or (c) of this section."[17]  According to the "First" and "Second" Claims of Sodexo's

Complaint, "Each of the Defendants" has violated § 1962(d) "by Conspiring to Violate"

§§ 1962(a) and 1962(b), respectively.  *See* Cplt. ¶¶ 281-95.

Under the controlling Supreme Court and Fourth Circuit case law, to properly plead a

§ 1962(d) "conspiracy" to violate a RICO substantive provision, a plaintiff must allege facts

sufficient to show that if the defendants had succeeded in accomplishing what they purportedly

"conspired" to do, the defendants would have committed a violation of that RICO substantive

provision.  As the Supreme Court explained in *Salinas v. United States*, 522 U.S. 52 (1997), a

RICO "conspirator" is someone who enters into an agreement with others "to further an

endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal

offense."  *Id.* at 65.  And, as the Fourth Circuit added in *G.E. Investment Private Placement

Partners II v. Parker*, 247 F.3d 543 (4th Cir. 2001), in dismissing a RICO § 1962(d) conspiracy

claim, "[b]ecause the pleadings do not state a substantive RICO claim under § 1962(c),

Plaintiffs' RICO conspiracy claim fails as well."  *Id.* at 551 n.2.[18]

1.    As noted, Sodexo's first RICO claim alleges a conspiracy among all twelve of the

Defendants to violate § 1962(a), which makes it

> unlawful for any person *who has received any income derived,
> directly or indirectly, from a pattern of racketeering activity* … to
> use or invest, directly or indirectly, any part of such income, or the
> proceeds of such income, in acquisition of any interest in, or the
> establishment or operation of, any enterprise . . . .  [18 U.S.C. §
> 1962(a) (emphasis added).]

---

[17] Subsections (a), (b) and (c) commonly are referred to as RICO's "substantive" provisions—to distinguish them from subsection (d), the "conspiracy" provision.

[18]  In support, the *G.E. Investment* court cited *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000).  *Efron*, relying on *Salinas*, concludes that "if the pleadings do not state a substantive RICO claim upon which relief may be granted, then the conspiracy claim [under § 1962(d)] also fails."  *Id.* at 21.

On its face, § 1962(a) is addressed to, and proscribes, certain "use[s] or invest[ments]" of income (or its "proceeds") that a person "*has received* . . . from a pattern of racketeering activity." *See also Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837 (4th Cir. 1990) (requiring a plaintiff alleging a § 1962(a) violation to "show (a) receipt of income from a pattern of racketeering activity, and (b) the use or investment of this income in an enterprise").

In the Complaint's first RICO claim, Sodexo does *not* allege either that the twelve Defendants "*ha[ve] received*" income (or its "proceeds") from a pattern of racketeering activity, or that the Defendants have conspired to "use or invest" any such income (or its "proceeds") in a manner proscribed by § 1962(a).  Thus, at the most basic level, Sodexo's Complaint does *not* allege facts showing that the Defendants have conspired "to further an endeavor which, if completed, would satisfy all of the elements of a substantive [§ 1962(a)] offense." *Salinas*, 522 U.S. at 65.  For this independent reason, Sodexo's first RICO claim, alleging a conspiracy to violate § 1962(a), fails.

2.      Sodexo's second RICO claim alleges a conspiracy among all twelve Defendants to violate § 1962(b), which makes it "unlawful for any person through a pattern of racketeering activity … to *acquire or maintain*, directly or indirectly, any *interest in or control of* any enterprise . . . ."  18 U.S.C. § 1962(b) (emphasis added).

As the Supreme Court observed in *Reves v. Ernst & Young,* 507 U.S. 170 (1993), Congress' aim in § 1962(b) was "prohibiting *the acquisition of* an enterprise" through a pattern of racketeering activity.  *Id.* at 182 (emphasis added).  Indeed, one of the principal purposes of the RICO statute as a whole was "to attack" such "acquisition[s]" of "legitimate businesses, entire industries, and unions," typically "by organized crime" figures.  *Yellow Bus Lines Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 913 F.2d 948, 954 (D.C. Cir. 1990) (en banc).

35

In *Yellow Bus*' arresting "example," Congress did not "ha[ve] in mind" those persons "who hijack an airliner," but rather those persons who "hijack . . . the airline . . . by either directly or indirectly taking control of its executive management positions." *Id.* at 955.

Consistent with Congress' aim, the Fourth Circuit has held that a § 1962(b) violation can be established only by proof that the defendant, through a pattern of racketeering activity, (i) has acquired "stock or ownership equity" in the named business enterprise, or (ii) has acquired a role in the named business enterprise that enables the defendant to "control," on a "day-to-day" basis, the "management and operation" of the enterprise. *Teague v. Bakker,* 35 F.3d 978, 994 n.23 (4th Cir. 1994). *See also In re American Honda Motor Co. Inc. Dealerships*, 965 F. Supp. 716, 722 (D. Md. 1997) ("As courts [including the Fourth Circuit in *Teague*] have interpreted § 1962(b), the type of control required is that which would give the racketeering enterprise the power to affect the composition of the board of directors of the affected business, . . . or the day-to-day operation of the business.") (internal citation omitted).

For purposes of its second claim, Sodexo alleges that Sodexo itself is an "enterprise," and that the twelve Defendants have "conspired among themselves" to violate § 1962(b) by acquiring or maintaining "an interest in or control of [the] Sodexo [enterprise]" through a pattern of racketeering activity. *See* Cplt. ¶¶ 292-93.  That allegation is legally inadequate under the *Twombly/Iqbal* pleading standards to state a claim of an unlawful conspiracy to violate § 1962(b), because it is wholly unsupported by the well-pled facts set out in Sodexo's Complaint.

As we have shown, the essence of Sodexo's factual (as distinct from conclusory legal) allegations in this case is that Defendants have undertaken a coordinated effort to *coerce* Sodexo into exercising *its own right of control over its own business affairs* in a certain manner advantageous to the Defendants (*i.e.,* to coerce Sodexo to enter into a "card check procedure"

agreement with SEIU).  *See supra* pp. 5-11.  But under the manifestly-correct District Court of Maryland decision in *In re American Honda,* a factual allegation that the defendant is seeking to "coerce[ ]" a business enterprise into exercising its own right of control over its own business affairs in a certain manner advantageous to the defendant is *not*—under the Fourth Circuit's decision in *Teague*—a legally sufficient allegation that the defendant is seeking to acquire "control" over "the day-to-day operation of [that] business [enterprise]" in violation of § 1962(b).  *See* 965 F. Supp. at 722-23.

In this instance as well, then, Sodexo's Complaint does *not* allege facts showing that the Defendants have conspired "to further an endeavor which, if completed, would satisfy all the elements of a substantive [RICO] criminal offense," *Salinas*, 522 U.S. at 65, and Sodexo's second RICO claim, alleging a conspiracy to violate § 1962(b), fails on this independent ground.

**B.      The Additional Legal Defects In Sodexo's Remaining Two RICO Claims**

Sodexo's third and fourth RICO claims are complementary claims alleging (i) a violation by eleven of the twelve Defendants (*i.e.*, all of the Defendants other than SEIU) of § 1962(c)— which makes it "unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . ."—and (ii) a § 1962(d) "conspir[acy]" among those eleven Defendants "to violate" § 1962(c).  *See* Cplt. ¶¶ 296-309.

To be more specific, Sodexo's third RICO claim is that SEIU is an "enterprise," and that each of the remaining eleven Defendants has violated § 1962(c) by conducting or participating in the conduct of the SEIU enterprise's affairs "in relation to Sodexo" through a pattern of racketeering activity.  *See* Cplt. ¶¶ 299-300.  But the Complaint plainly fails to allege in legally sufficient terms that six of the eleven named Defendants on this third RICO claim have

"*conduct[ed] or participat[ed] . . . in the conduct of*" the SEIU enterprise's affairs as that italicized phrase is used in § 1962(c).  Sodexo's third RICO claim against those six Defendants is thus due to be dismissed under Rule 12(b)(6) on this independent ground.  Those six Defendants are:  SEIU Local 32BJ; SEIU Local 615; SEIU Local 1; Workers United; SEIU-United Service Workers West—collectively referred to by Sodexo in its Complaint as the "Local Union Defendants," *see* Cplt. ¶ 32—and Change to Win.

The legal test for determining when a RICO defendant "conduct[s] or participate[s] . . . in the conduct of" an enterprise's affairs was definitively established and clearly stated by the Supreme Court in *Reves*, *supra*.  The *Reves* Court held that a § 1962(c) claim brought by a defrauded investor against a cooperative's outside auditing firm (Arthur Young) failed because—although Arthur Young had exercised substantial influence over the cooperative's decision-making—it had not sufficiently "conduct[ed] or participat[ed] . . . in the conduct of" the cooperative's affairs under § 1962(c):  "to conduct or participate . . . in the conduct of" an enterprise's affairs under § 1962(c), "one must participate in the operation or management of the enterprise itself."  507 U.S. at 185.  In other words, said the Court, "some part in *directing* the enterprise's affairs *is required*."  *Id.* at 179 (emphasis added).  *See also Davis v. Hudgins* 896 F. Supp. 561, 567 (E.D. Va. 1995) (explaining this element of a § 1962(c) claim, and holding that the plaintiff's conspiracy to violate § 1962(c) claim failed because, *inter alia*, the complaint failed to allege any facts indicating that the defendants "directed the activities of" the alleged RICO enterprise), *aff'd mem.*, 87 F.3d 561 (4th Cir. 1996) (table).

Sodexo's voluminous Complaint in this case does not contain a single factual allegation that could be said to give rise to a "reasonable inference," *Nemet Chevrolet*, 591 F.3d at 255, that any of the named "Local Union Defendants"—each of which accurately is described by Sodexo

38

in its Complaint as a free-standing, local labor union "affiliated with, but distinct from,

Defendant SEIU," *see* Cplt. ¶¶ 27-31—plays any role whatsoever in "directing the [SEIU]

enterprise's affairs," as "is required" under *Reves* to state a claim for violating § 1962(c).  And,

the same is true with respect to Defendant Change to Win, which accurately is described by

Sodexo in its Complaint as a federation of "separate labor organizations" that includes, as

"chartered member[s]," "Defendant SEIU, International Brotherhood of Teamsters, United Food

and Commercial Workers, and United Farm Workers of America."  *See* Cplt. ¶¶ 25-26.

Absent such factual allegations, Sodexo's § 1962(c) claim against these six Defendants

fails under *Reves* as a matter of law.  And, for the reasons previously shown, *supra* p. 34,

Sodexo's complementary claim (*i.e.*, its fourth RICO claim) against these six Defendants for

"conspiring . . . to violate" § 1962(d) likewise fails as a matter of law.

## IV.   SODEXO's STATE LAW CLAIMS (COUNTS FIVE AND SIX) ARE DUE TO BE DISMISSED AS WELL

In the preceding sections of this Memorandum, we have shown that all of the federal

claims in this case are due to be dismissed.  Based on that showing, we submit that Sodexo's

putative RICO claims in this case are so insubstantial and so contrived as to warrant the

dismissal of Sodexo's pendent state law claims for lack of subject matter jurisdiction.  *See*, *e.g.*,

*Davis v. Pak*, 856 F.2d 648, 650-51 (4th Cir. 1988).

In the alternative, and at the very least, this Court should exercise its 28 U.S.C.

§ 1367(c) discretion to dismiss the pendent state law claims based on *United Mine Workers of

America v. Gibbs*, 383 U.S. 715 (1966).  *Gibbs* holds that:

> [n]eedless decisions of state law should be avoided both as a
> matter of comity and to promote justice between the parties, by
> procuring for them a surer-footed reading of applicable law.
> Certainly, if the federal claims are dismissed before trial, even
> though not insubstantial in a jurisdictional sense, the [pendent]

39

state law claims should be dismissed as well.  [*Id.* at 726 (footnote omitted).]

And, as *Hinson v. Norwest Financial South Carolina*, 239 F.3d 611, 616 (4th Cir. 2001) adds,

*Gibbs* and its progeny "continue[ ] to inform" a district court's discretion to dismiss pendent

state claims now that the doctrine of pendent jurisdiction has been codified in 28 U.S.C. § 1367.

## CONCLUSION

For the foregoing reasons, the Defendants' Joint Motion to Dismiss should be granted,

and Sodexo's Complaint should be dismissed in its entirety under Fed. R. Civ. P. 12(b)(6).

Dated:  June 3, 2011          Respectfully submitted,

SERVICE EMPLOYEES INTERNATIONAL UNION, et al.
*By Counsel*


/s/_____
Bernard J. DiMuro
VSB No. 18784
Counsel for All Defendants
DiMuroGinsberg, P.C.
908 King Street, Suite 200
Alexandria, VA 22314
Tel.: (703) 684-4333
Fax: (703) 548-3181
bdimuro@dimuro.com

| | |
|---|---|
| /s/_____<br>Robert M. Weinberg (DC 085530)*<br>rweinberg@bredhoff.com<br>W. Gary Kohlman (DC 177527)*<br>gkohlman@bredhoff.com<br>Andrew D. Roth (DC 414038)*<br>aroth@bredhoff.com<br>Leon Dayan (DC 444144)*<br>ldayan@bredhoff.com<br>Devki K. Virk (DC 459418)*<br>dvirk@bredhoff.com<br>Osvaldo Vazquez (DC 994527)*<br>ovazquez@bredhoff.com<br>Bredhoff & Kaiser, P.L.L.C.<br>805 15th Street, NW<br>Suite 1000<br>Washington, DC  20005<br>Tel.:  (202) 842-2600<br>Fax:  (202) 842-1888<br><br>/s/_____<br>Deirdre C. Fitzpatrick (DC 496415)<br>Deirdre.fitzpatrick@seiu.org<br>Associate General Counsel<br>Service Employees International Union<br>1800 Massachusetts Avenue NW<br>Washington, DC 20036<br>Tel.:  (202) 730-7000<br>Fax:  (202) 429-5565<br><br>*Counsel for Defendants Service Employees International Union, Michael Fishman, Mary Kay Henry, Autumn Weintraub, Thomas Woodruff* | /s/_____<br>Simon Y. Sandoval-Moshenberg (VA 77110)<br>sysm@lichtmanelliot.com<br>Lichtman & Elliot, P.C.<br>1666 Connecticut Ave NW, 5th Floor<br>Washington, DC 20009<br>Tel.: (202) 429-1725<br>Fax: (202) 452-0161<br><br>/s/_____<br>Edgar N. James (DC 333013)*<br>ejames@jamhoff.com<br>Kathy L. Krieger (DC 385877)*<br>klkrieger@jamhoff.com<br>Darin M. Dalmat (DC 978922)*<br>dmdalmat@jamhoff.com<br>Jeff Vockrodt (DC 985635)*<br>jvockrodt@jamhoff.com<br>James & Hoffman<br>1130 Connecticut Ave NW, Suite 950<br>Washington, DC 20036<br>Tel.: (202) 496-0500<br>Fax: (202) 496-0555<br><br>*Counsel for Defendants SEIU Local 32BJ, SEIU Local 615, SEIU Local 1, SEIU-United Service Workers West, Workers United* |

/s/
Patrick J. Szymanski (DC 269654)*
patrick.szymanski@changetowin.org
Change to Win
1900 L Street, N.W., Suite 900
Washington, D.C.  20036
Tel.: (202) 721-6035
Fax: (202) 721-0661

*Counsel for Defendant Change to Win*

/s/
Thomas M. Kennedy (NY 1394162)*
tkennedy@kjmlabor.com
Susan M. Jennik (NY 1809342)*
sjennik@kjmlabor.com
Kennedy, Jennik & Murray P.C.
113 University Place, 7th Floor
New York, NY 10003
Tel.: (212) 358-1500
Fax: (212) 353-0207

*Counsel for Defendant Workers United*

/s/
Gillian Costello
gcostello@spivaklipton.com
James M. Murphy
jmurphy@spivaklipton.com
Spivak Lipton LLP
1700 Broadway, 21st Floor
New York, NY 10019
Tel.: (212) 765-2100
Fax: (212) 541-5429

/s/
Irwin Rochman
rochmanesq@nyc.rr.com
Tesser, Ryan & Rochman
509 Madison Ave
New York, NY 10022-5501
Tel.: (212) 754-9000
Fax: (212) 754-5906

*Counsel for Defendant Bruce Raynor*

* Motion for *Pro Hac Vice* Pending

## CERTIFICATE OF SERVICE

I hereby certify on this 3rd day of June, 2011, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following counsel of record:

Thomas J. Cawley (VSB No. 04612)
Hunton & Williams LLP
1751 Pinnacle Drive, Suite 1700
McLean, VA 22102
Phone: (703) 714-7400
Fax: (703) 714-7410
Email: tcawley@hunton.com

Gregory B. Robertson (VSB No. 015681)
Kimberlee W. DeWitt (VSB No. 47235)
Kurt G. Larking (VSB No. 70730)
Hunton & Williams LLP
Riverfront Plaza, East Tower
951 E Byrd St
Richmond, VA 23219
Phone: (804) 788-8200
Fax: (804) 788-8219
Email: grobertson@hunton.com; kdewitt@hunton.com; klarkin@hunton.com

G. Robert Blakely (*pro hac motion to be filed*)
Notre Dame Law School
326 Eck Hall
P.O. Box 780
Notre Dame, IN 46556
Phone: (574) 631-5717
Fax: (574) 631-4197
Email: blakey.1@nd.edu
*Counsel for Plaintiff*

                                        /s/
                                        Bernard J. DiMuro
                                        VSB No. 18784
                                        Counsel for All Defendants
                                        DiMuroGinsberg, P.C.
                                        908 King Street, Suite 200
                                        Alexandria, VA 22314
                                        Tel.: (703) 684-4333
                                        Fax: (703) 548-3181
                                        bdimuro@dimuro.com